ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
EKATERINI M. POLYCHRONOPOULOS (284838)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
katerinap@rgrdlaw.com

MOTLEY RICE LLC
JAMES M. HUGHES
DAVID P. ABEL
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
dabel@motleyrice.com

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LEAPFROG ENTERPRISES, INC. SECURITIES LITIGATION | Master File No. 3:15-cv-00347-EMC |
| | <u>CLASS ACTION</u> |
| This Document Relates To: ALL ACTIONS. | LEAD PLAINTIFF KBC ASSET MANAGEMENT NV'S CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

## TABLE OF CONTENTS

Page

STATEMENT OF THE CASE ....... 1

JURISDICTION AND VENUE ....... 7

PARTIES ....... 8

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....... 9

- Defendants' May 5, 2014 False and Misleading Statements ....... 9
- Reasons Why Defendants' May 5, 2014 Statements Were Materially False ....... 12
- Defendants' June 11, 2014 False and Misleading Statements ....... 15
- Reasons Why Defendants' June 11, 2014 Statements Were Materially False ....... 16
- Defendants' August 4, 2014 False and Misleading Statements ....... 17
- Reasons Why Defendants' August 4, 2014 Statements Were Materially False ....... 22
- Defendants' November 3, 2014 False and Misleading Statements ....... 25
- Reasons Why Defendants' November 3, 2014 Statements Were Materially False ....... 28
- Defendants' January 22 and February 5, 2015 False Statements ....... 31
- Reasons Why Defendants' January 22 and February 5, 2015 Statements Were Materially False ....... 35
- Defendants' False Financial Statements and May 18, 2015 Press Release ....... 36
- Reasons Why Defendants' Financial Statements and May 18, 2015 Statements Were Materially False ....... 38
- Defendants' False Statements Regarding LeapFrog's Internal Controls ....... 48
- Reasons Why Defendants' Statements Regarding LeapFrog's Internal Controls Were Materially False ....... 48

THE END OF THE CLASS PERIOD ....... 49

ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS ....... 52

CLASS ACTION ALLEGATIONS ....... 59

APPLICABILITY OF THE PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET DOCTRINE ....... 60

NO SAFE HARBOR ....... 61

PRAYER FOR RELIEF ....... 63

**Page**

JURY DEMAND ....................................................................................................................64

## STATEMENT OF THE CASE

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of LeapFrog Enterprises, Inc. ("LeapFrog" or the "Company") between May 5, 2014 and June 11, 2015, inclusive (the "Class Period"). This action asserts claims under the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against LeapFrog, its Chief Executive Officer ("CEO") John Barbour ("Barbour") and its Chief Financial Officer ("CFO") Raymond L. Arthur ("Arthur"). Lead Plaintiff alleges the following based upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon investigation of counsel, which included, without limitation: (i) review and analysis of public filings made by LeapFrog with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by the Defendants; (iii) review of news articles and conference call transcripts; and (iv) review and analysis of other publicly available information concerning LeapFrog. The investigation of the facts pertaining to this case is continuing. Lead Plaintiff believes that additional evidence will support the allegations in this case after a reasonable opportunity for discovery.

2. LeapFrog creates electronic learning toys and content. Unsurprisingly, the bulk of its sales occur in the second half of the calendar year leading up to and during the holiday season. LeapFrog found prior success in 2011 with its first LeapPad product – a child-focused tablet. By the end of fiscal 2013, however, LeapFrog and its executives were facing aggressive pricing of the Company's tablets and increased competition resulting in a disappointing 2013 and 4Q13 fiscal results. As a result, LeapFrog's executives were under pressure to develop and execute a business strategy that would produce results, not another miss. Yet, the Company faced serious retail inventory hangover from 2013 that management knew would impact both margins and sales heading into 2014. Thus, in January 2014, management decided to move up the release of a new product, LeapTV, to a calendar 2014 release. The product had not been originally slated for such an early release and the decision placed a tight timeline for development and production of the new product.

3. Consistent with this strategy, on February 12, 2014, Defendants disclosed the launch of "a major new platform" in an effort to divert investors' attention from the disappointing 2013

results, which represented a 5% decrease in net sales from the prior year. Defendants also emphasized that "tablets are here to stay" and set investor expectations by telling the market that "we are going [to] face some challenges ***early in the year with the [excess retail] inventory***." Defendants also issued "weak" (according to analysts) FY 2014 guidance of $554-$580 million and earnings per share ("EPS")[1] of $0.18-$0.25.

4. Three months later, on the first day of the Class Period, May 5, 2014, Defendants reiterated guidance for FY 2014[2] of $554-$580 million and EPS of $0.18-$0.25, claiming that inventories "at retail have come down . . . by a fair amount," and announced LeapTV – the Company's new marquee product that would help it deliver growth. Investors bought Defendants' suggestion on the conference call held the same day that the low-end of guidance would be achieved and the role LeapTV would play in that growth. Unbeknownst to investors, however, the Company's excess carryover inventory of tablets and the promotional expenses associated with getting rid of that inventory would plague LeapFrog's sales throughout the Class Period. In addition to the carryover inventory, Defendants' guidance was undermined by an unknown launch date for LeapTV as a result of development delays. Following Defendants' statements on May 5, on June 11, 2014, Defendants continued to falsely reassure investors regarding the retail inventory and claimed, without basis, that LeapTV would hit stores in October.

5. Two months later, on August 4, 2014, Defendants slashed net sales guidance for what the Company now referred to as FY 2015 by about $75 million and announced a median 86% drop in expected EPS from $0.18-$0.25 to $(0.04)-$0.10. In doing so, Defendants claimed that elevated inventory and the timing of LeapTV's shipment were reasons for the lowered guidance. On this partial revelation, LeapFrog's stock plummeted 18.7% from a close of $7.39 on August 4, 2014 to $6.01 on August 5, 2014. Yet, Defendants knew that this revised guidance was utterly unobtainable as a result of: (i) the delays in LeapTV; (ii) the impact of the carryover inventory on new tablet sales;

---

[1] EPS is used interchangeably with net income per share.

[2] Defendants announced on May 16, 2014 a change in the reporting period of the Company, with a new fiscal year-end of March 31, rather than the calendar year. Thereafter, they referred to guidance for calendar 2014 and 1Q15 as FY 2015 guidance.

(iii) the declining demand for the LeapPad tablets; and (iv) the promotional expenses/discounts required to sell the carryover inventory. Defendants also continued to deceive investors regarding LeapTV's ability to deliver results for FY 2015, falsely telling investors that LeapTV would "get to stores when we had planned to get it to stores." That statement simply was not true as Defendants knew that LeapTV was not ready "as planned" and that the product continued to face developmental delays.

6. A short three months later, on November 3, 2014, Defendants again lowered guidance. This time Defendants lowered FY 2015 expectations for net sales by approximately $30 million from $480-$505 million to $450-$470 million and dramatically lowered EPS to $(0.13)-$(0.25) compared to guidance of $(0.04)-$0.10 given three months earlier. Thus, rather than forecasting a potential profit, Defendants informed investors that LeapFrog would report a loss. Once again, Defendants blamed the "continue[d] . . . impact[] [of] Holiday 2013 carry-forward retail inventory of LeapPads" as well as the delay in LeapTV's ship time. On these partial revelations, LeapFrog's stock dropped nearly 16% from a close of $5.43 on November 3, 2014 to $4.57 on November 6, 2014. Defendants, however, knew at the time that their revised guidance lacked any reasonable basis and continued to mislead investors by claiming that "[d]espite these challenges" the Company was "well-positioned for the all-important holiday season" and that growth would be driven by its new products with "LeapTV [] off to a very strong start." Indeed, Defendants told investors to ***expect an 18% to 28% increase in the following quarter's net sales*** results as compared to the same period in the prior year.

7. Defendant Barbour touted Defendants' close monitoring of retail inventory claiming that "***we get a kind of immediate idea what is happening***" and "***hav[e] eagle eyes to what is happening at retail***." That monitoring would have informed Defendants that two weeks after LeapTV's launch, LeapTV was not off to a strong start. Rather, the point of sales data ("POS") showed the opposite – LeapTV was performing below targets.[3] Further, LeapFrog had lost its shelf space for LeapTV at one of four retailers that were central to sales growth – Target – and the product

[3] Point of Sales ("POS") data is data from retailers that sold LeapTV, such as Wal-Mart Stores, Inc., Toys "R" Us, Inc. and Target Corporation ("Target"), among LeapFrog's largest customers.

was relegated by Target to end-cap space. Moreover, the carryover inventory from 2013 was continuing to cannibalize sales of LeapFrog's newer tablet offerings and margins for the Company's tablets.

8. Defendants also falsely reported 2Q15 financial results in the November 3, 2014 press release and during the conference call of the same day as well as in the Company's Form 10-Q filed with the SEC on November 10, 2014, as a result of failing to timely write-off $19.5 million of impaired goodwill. Defendants violated Generally Accepted Accounting Practices ("GAAP") by not writing down goodwill earlier. Defendants ignored the sustained decrease in share price of approximately 19% when the Company reported 1Q15 financial results on August 4, 2014. Defendants knew that even with their poor historical track record of meeting guidance and expectations that a substantial stock price decline was inevitable when 1Q15 results were to be announced because: (i) Defendants already knew that sales and EPS were going to be 7.8% and 9.5% below consensus estimates, respectively; (ii) sales were below the low-end of guidance; and (iii) that their fiscal year sales and EPS guidance were going to be dramatically cut. Defendants' fraud is evidenced by the fact that when they belatedly took the nearly $20 million goodwill impairment charge in 3Q15 they cited the decrease in stock price and corresponding market capitalization as the reason for the charge. Yet, at 2Q15 the differential between the fair value and book value of equity was less than half of what it was at 3Q15 ($0.21 vs. $0.43), and the fair value of equity was nearly $54 million below book value before LeapFrog's Form 10-Q for 2Q15 was issued. Thus, at 2Q15 there was a much stronger indicator of a goodwill impairment than at 3Q15.

9. By the Friday following Thanksgiving, Black Friday, it was clear that lightning would not magically strike twice, and that LeapTV would not hit the lottery of retail toys. The sales returns after that day were so alarming that LeapFrog cancelled the production of 200,000 units of LeapTV product in the days that followed. Defendant Barbour knew of the cancellation by around the first or second week of December 2014. Defendants, however, did not update investors, but continued to let the market believe that LeapFrog would report net sales for FY 2015 of $450-$470 million and EPS of $(0.13)-$(0.25).

10. The timing, nature and magnitude of LeapFrog's miss during holiday 2014 and goodwill charge is indicative of fraud. On January 22, 2015, Defendants were forced to disclose that the Company's net sales for 3Q15 fell at least $75 million (or 34%) short of the low-end of guidance and that the loss per share was $0.25,[4] excluding charges, compared to guidance of ***three months earlier*** of EPS for 3Q15 of $0.16-$0.28. The Company also disclosed that it would not achieve its FY 2015 guidance, and was taking a nearly $20 million goodwill impairment charge. The reason for the miss included the very challenges that Defendants had claimed earlier had been incorporated into their guidance – delayed shipment and promotion of LeapTV as well as inventory issues. On these partial revelations, LeapFrog's stock plummeted nearly 35% in a single day from a close of $3.90 on January 22, 2015 to $2.55 on January 23, 2015. Analysts at BMO Capital Markets wrote in a report issued January 26, 2015 that "[w]e had been of the belief that current guidance, as well as investor expectations had already incorporated a worst-case scenario. Clearly that was wrong."

11. Defendants, however, continued to conceal from investors on January 22, 2015 the impact of carryover inventory from 2014. Further, Defendants concealed the impact of the lackluster LeapTV sales and delays in shipment on the financial condition of LeapFrog going forward. Rather than telling investors that LeapFrog's tablet sales were in real trouble, Defendants stuck to their story, telling investors on January 22, 2015 that "[d]espite these sales declines, the children's tablet business remains a sizeable business around the world." During the conference call held on February 5, 2015, Defendants also continued to artificially inflate LeapFrog's stock price by telling investors that they believed LeapTV "will deliver" and downplayed the abysmal results that they knew would be reported for 4Q15, telling investors only that they would be "below that of the prior year." Defendants knew, however, ***with their "eagle eyes"*** and close monitoring of inventory that neither LeapTV nor LeapFrog's tablets were selling well. Thus, the expectations they set for

---

[4] Defendants disclosed, on January 22, 2015, that net loss per basic and diluted share was ($1.77) and included $0.23 per share of goodwill impairment and $1.29 per share of an additional deferred tax asset valuation allowance. The figure $0.25 is derived from subtracting the additional charges of $0.23 and $1.29 from $1.77. Later, LeapFrog's Form 10-K filed on June 15, 2015 reported that its fiscal 2015 results included a goodwill impairment charge, reporting that it accounted for a loss of $0.22 of the Company's basic and diluted net loss per share for the year.

investors were false. For example, analysts at Ascendiant Capital Markets, LLC wrote on May 14, 2015 that they expected a "slight miss" for 4Q15 results.

12. Further, Defendants falsely reported LeapFrog's 3Q15 financial results in the Company's January 22, 2015 press release, February 5, 2015 press release and conference call, and Form 10-Q filed with the SEC on February 9, 2015 by failing to timely account for the Company's impaired long-lived assets. Defendants had necessarily determined in their goodwill impairment analysis for 3Q15 that LeapFrog's long-lived assets were impaired. Moreover, the long-lived assets impairment triggering events that the Defendants specifically cited – namely, the dismal 2014 holiday sales and corresponding decline in market capitalization – had already occurred or were necessarily anticipated in connection with the Company's financial reporting for 3Q15. Yet, Defendants falsely told investors that the "the Company concluded that its long-lived assets were not impaired as of December 31, 2014." On May 18, 2015, Defendants announced that it was delaying the announcement of its 4Q15 and FY 2015 results because it may have to take an accounting charge for its long-lived assets. On this news, LeapFrog's stock price declined from a close of $2.19 on Friday, May 15, 2015 to a close of $2.08 on May 18, 2015, a drop of more than 5%. Investors, however, continued to be misled because, *inter alia*, LeapFrog should have taken a charge for its long-lived assets when it reported 3Q15 results.

13. Three weeks later, after the close of the market, on June 11, 2015, Defendants belatedly disclosed that net sales for fiscal year 2015 were $339.1 million, ***down 36% year-over-year***, and that 4Q15 net sales were ***down 40% from the prior year***. Similarly, gross profit for 4Q15 plummeted ***83% compared to the prior year, due to reduced sales, increased discounts and allowances to help clear inventory carried over from the holiday season*** and changes in product mix. Further, operating expenses had increased 98% to $78.8 million, largely as a result of a $36.5 million impairment charge for long-lived assets. Defendants conceded that the 4Q15 FY 2015 results were "***due mainly to carry-forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later-than-planned shipment and promotion of LeapTV***." These were all factors that Defendants were well aware of at the close of the holiday season, prior to their January 22 and February 5, 2015 statements.

14. Defendants were also forced to disclose on June 11, 2015, the end of the Class Period, that new product initiatives would not have an impact until the fiscal 2017 holiday season and that operating losses for FY 2016 would be similar to or greater than FY 2015 losses with sales to "contract considerably" in FY 2016. In other words, LeapTV had not driven growth in FY 2015 and would not be driving growth in FY 2016. Following this news, LeapFrog's stock plunged another 25.6% from a close of $2.07 on June 11, 2015 to close at $1.54 on June 12, 2015. Analysts at BMO Capital Markets wrote that "each time [LeapFrog misses we] think[] things have gotten so bad they could not possibly get any worse. Thus, ***neither we nor the market was prepared for the company's FY2016 guidance that financials would actually be worse than in FY2015***." Further, "[r]etail sales of LeapTV to date have significantly missed management expectations." As to the tablet market, BMO wrote that it was suspicious of management's claim that they were surprised by the decline: "***We find it a bit disconcerting the company was caught off guard (for the second year in a row)***" and stated that "many investors see the LeapPad as somewhat irrelevant." LeapFrog's stock price now languishes below $1.50 per share.

## JURISDICTION AND VENUE

15. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

17. LeapFrog's principal executive offices are located at 6401 Hollis Street, Suite 100, Emeryville, California 94608, a location within this Judicial District.

18. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because LeapFrog maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

19. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

20. Lead Plaintiff KBC Asset Management NV ("KBC") purchased or otherwise acquired LeapFrog's securities, as described in the attached certification, and suffered damages thereby. KBC was appointed by the Court as Lead Plaintiff of this action on May 5, 2015.

21. Defendant LeapFrog is a Delaware corporation with its principal executive offices in Emeryville, California. LeapFrog is a developer of educational entertainment for children. The Company's product portfolio consists of multimedia learning platforms, related content, and learning toys. The Company has developed a number of learning platforms, including the LeapPad learning tablets, the Leapster handheld learning game systems, the LeapReader reading and writing systems, and the LeapTV. The complaint focuses on key LeapFrog products during the Class Period – the LeapPad and LeapTV.

22. The Company's sales are dependent on a small group of large retailers. For fiscal 2015, the Company reported that the "[s]ales invoiced to Wal-Mart Stores, Inc. ("Wal-Mart"), Toys "R" Us, Inc. ("Toys "R" Us"), Target Corporation ("Target") and Amazon.com, Inc. ("Amazon"), in the aggregate, accounted for approximately 70%, 60%, 73% and 73% of the [U.S.] segment's gross sales for the year ended March 31, 2015, the three months ended March 31, 2014 and the years ended December 31, 2013 and 2012, respectively." In turn, the U.S. segment of LeapFrog represented approximately 70% of LeapFrog's net sales.

23. Defendant John Barbour was, at all relevant times, Chief Executive Officer and a director of LeapFrog. Barbour has extensive experience as an executive of a publicly held company including serving as President of Toys "R" Us and holding senior-level positions at Hasbro, Inc. Defendant Barbour participated in LeapFrog's conference calls on May 5, 2014, November 3, 2014, and February 5, 2015, and signed LeapFrog's Forms 10-Q for 2Q15 and 3Q15 filed with the SEC on November 10, 2014 and February 9, 2015.

24. Defendant Raymond L. Arthur was, at all relevant times, Chief Financial Officer of LeapFrog. Arthur has extensive experience as an executive of a publicly held company, including serving as CFO of Toys "R" Us at the same time Barbour was President. Arthur also has a degree in accounting, is a Certified Public Accountant and previously worked for KPMG Peat Marwick.

Defendant Arthur participated in LeapFrog's conference calls on May 5, 2014, November 3, 2014, and February 5, 2015, and signed LeapFrog's Forms 10-Q for 2Q15 and 3Q15 filed with the SEC on November 10, 2014 and February 9, 2015.

25. Defendants Barbour and Arthur are referred to as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LeapFrog's quarterly reports, press releases and presentations to securities analysts and institutional investors, *i.e.*, the market, and exercised such power and control. The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, their access to material non-public information available to them but not to the public, and their affirmative statements regarding the Company's operations, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pled herein.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### Defendants' May 5, 2014 False and Misleading Statements

26. On May 5, 2014, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur and attaching a LeapFrog press release announcing, *inter alia*, the Company's financial guidance for the remainder of calendar 2014. In the release, Defendants misled investors that sales would "be significantly more back-end focused in 2014 than last year. ***Our line-up of major new product introductions will begin shipping in late summer and fall***."[5] As explained below, Defendants knew LeapFrog's major new product, LeapTV, faced delays that would negatively impact sales but concealed that information from investors.

[5] The statements Lead Plaintiff alleges are materially false and misleading are in bold/italics in this section. Language is also included for context.

27. The press release also falsely set expectations regarding guidance including Defendants' statement that ***LeapFrog expected net sales for full year 2014 to be in the range of $554 million to $580 million and net income per diluted share to be in the range of $0.18 to $0.25***.

28. Also on May 5, 2014, LeapFrog hosted its 1Q14 earnings conference call. During the call, Defendants Barbour and Arthur discussed the launch of LeapTV and explained how it would enable the Company to grow. In doing so, Defendant Barbour falsely stated:

> We aim to become the leader in children's educational entertainment. . . . Both LeapBand and ***LeapTV*** not only fit that vision perfectly, they ***are significant investments in diversifying our product portfolio to provide us with a more solid foundation for growth***.

29. During the same call, Defendant Arthur also falsely represented that the Company's new products, including LeapTV, would be responsible for delivering growth for the third and fourth quarters of 2015:

> [W]e expect net sales in the second quarter to be in the range of $52 million to $48 million . . . . [W]e expect second-quarter GAAP and normalized net loss per basic and diluted share to be in the range of $0.21 to $0.24 . . . . We expect net sales and earnings declines in the first half of the year, largely due to a tough comp to Q1 2013 and beginning retail inventory levels, ***while we expect [to] make net sales and earnings growth in the second half a year, largely due to new product introductions***.
>
> Within the second half of this year, our results will be much more backend loaded ***with some new products shipping for the first time in September***. ***For the full year***, ***we are reiterating our guidance for sales between $554 million and $580 million and net income per diluted share to be in the range of $0.18 to $0.25 for both GAAP and normalized net income per diluted share*** . . . . However, ***if current retail trends continue, we do believe we will see ourselves coming in at the low end of this guidance range***.

30. Also during the May 5, 2014 call, in response to analyst questions, Defendant Barbour misled investors regarding the expected sales of LeapTV as well as by characterizing the elevated inventory at retailers as a "unique situation":

> ***[I]f you look at the inventory*** that we've been dealing with this year, . . . the bulk of it is really two products . . . the Power LeapPad and the LeapPad Bundles. . . . [T]he reason that we had carryover of those products was the significant discounting that happened on the LeapPad2, which . . . took away from the value of those products. So, as I said, ***it was quite a unique situation***, and we're working the way through the inventory right now.

*  *  *

> ***And then of course we've got LeapTV where*** – who is to say, but my guess is it is going to be in significant demand by the end of the year. It's not shipping until late, and ***I think there's a likelihood that the product will sell out, just like the original LeapPad did. It's a major innovation in the marketplace***. . . . So, it is not only a very big marketplace, it's a very big empty marketplace at the moment. So, I feel, at this stage, pretty good about the response we've had from the trade in terms of these products. I think they are going to be in super demand this year.

> [E]very retailer . . . is looking for new ways to drive traffic and drive incremental sales, so we are fortunate in both of these products we have had a very, very positive response from our retail partners.

31. On the same call, Defendants downplayed the effects of excess inventory on the Company by falsely claiming that the inventories had "come down . . . by a fair amount" and that the inventories were not "higher . . . across the board":

> [ANALYST:] [C]an you maybe talk about just inventory levels at retail at the end of the quarter?

> [ARTHUR:] Sure. ***Inventories at retail have come down from where they were at year end by a fair amount***. . . .

> [BARBOUR:] ***The important fact is that this isn't across the board***. . . . ***We don't have higher inventories across the board. We have some pockets of inventory***, and we are working with our retail partners to move that inventory.

32. Later on the May 5, 2014 call, when asked about whether investors should anticipate allowances for inventory to hit margin in the future quarter, Defendant Arthur falsely reported that: ***"I don't think it's going to be incredibly significant."***

33. On this news, LeapFrog's stock price increased more than 6% from a close of $6.83 per share on May 5, 2014 to a close of $7.29 on May 6, 2014, on unusually high volume.

34. Consistent with the impressions given by Defendants in the May 5, 2014 press release and conference call, analysts at KeyBanc Capital Markets issued a report on May 6, 2014, referring to Defendants' reaffirmation of guidance, writing that the lower-end of the full year guidance of EPS $0.18-$0.25 and net sales of $554-$580 million was "increasingly realistic given the heightened execution risk around new product introductions and an uncertain 2014 holiday retail environment." KeyBanc analysts also noted the importance of LeapTV to the Company: "[W]e are encouraged by the scope of the major platform launch, LeapTV, as it represents a meaningful market opportunity."

35. The same day, analysts at Roth Capital Partners, also repeated Defendants' false and misleading guidance, noting that Defendants' reiteration of 2014 guidance for EPS of $0.18-$0.25

and net sales of $554-$580 million "reflects later shipments of new products but a less condensed holiday season, though results could come in toward the lower end of that range if retail trends remain lackluster." Thus, the market believed from Defendants' statements that even with lackluster retail trends and the timing of new product introductions, LeapFrog would hit its guidance, at least at the lower end.

**Reasons Why Defendants' May 5, 2014 Statements Were Materially False**

36. Defendants knowingly issued false FY 2014 guidance of net sales of $554-$580 million and EPS of $0.18-$0.25 on May 5, 2014 for, *inter alia*, the following reasons:

(a) At the time guidance was issued Defendants knew they had to account for "sales returns, allowances for defective products, promotional markdowns, chargebacks and price changes, and cooperative promotional arrangements" according to LeapFrog's 2014 Form 10-K when recording net sales and, in turn, EPS. Defendants also knew that LeapFrog as of December 31, 2013 had a material weakness in internal controls "over [its] process for establishing reserves for customer-related discounts and promotional allowances." In FY 2013, LeapFrog's net sales decreased 5% compared to the prior fiscal year and Defendants acknowledged in LeapFrog's 2013 Form 10-K filed with the SEC two months before the start of the Class Period, that "trade allowances and discounts as a percentage of net sales increased" were a factor in that decrease. According to Leapfrog's 2013 Form 10-K, Defendants had taken steps to remediate the material weakness to capture "customer-related discounts and promotional allowances for [the] financial statement impact as of period-end." Thus, Defendants knew that any discounts or promotional allowances for the Company's carryover inventory had to be incorporated into LeapFrog's financial guidance but failed to do so;

(b) Defendants issued initial FY 2014 guidance (later incorporated into FY 2015 guidance) on February 12, 2014 of net sales of $554-$580 million and EPS of $0.18-$0.25. In doing so, Defendants claimed that they had taken into account the carryover inventory. When Defendants falsely reiterated their guidance on May 5, 2014, Defendants admitted there was "significant discounting" of carryover inventory at retailers. Yet, Defendants failed to account for the significant discounting that would be required of the millions in carryover inventory given the failure of this inventory to sell in the first four months of calendar 2014. Defendants conceded on August 4, 2014 that they "had to provide additional support to our retail partners to discount carryover tablets to help reduce inventory levels" with the support having a "negative impact on our net sales and gross margins";

(c) Defendants also knew not only the volume of the excess inventory but that it would need to be discounted because they closely monitored the inventory. Defendant Barbour not only admitted during the May 5, 2014 conference call that LeapFrog was working with its retail partners to move the inventory, he would later concede on November 3, 2014, that "we set" an immediate idea of what is happening at the stores, that the Company had "eagle eyes [as] to what is happening at retail" regarding inventory and that the Company closely "monitor[ed]" inventory levels at retail. Thus, Defendants knew that the Company's FY 2014 guidance (later incorporated into FY 2015 guidance) was unachievable because the carryover

inventory was not moving to clear the way for new product sales and would have to be significantly discounted and/or promotional support offered;

(d) Defendants' knowledge of the discounting/promotional support needed to clear out the excess inventory is further evidenced by Defendants' statements a short three months later. On August 4, 2014, after dramatically lowering guidance from net sales for FY 2014 of $554-$580 million to $480-$505 for the period ending March 31, 2015 (now referred to as FY 2015 guidance) as well as reducing net income per share guidance from $0.18-$0.25 to a range of loss per share of $0.04 to an income of $0.10. Defendants blamed, in part, inventory carryover. Defendant Arthur admitted to having taken the "pain" in the second quarter of the calendar year (April, May, June) with respect to discounting and promotional offers. Yet, Defendants failed to account for those promotional related expenses when they had issued financial guidance on May 5, 2014;

(e) Defendants also knew that the LeapPad carryover inventory from the holiday 2013 season impacted any new tablet sales. Yet, Defendants failed to take into account the impact of the carryover inventory in issuing the Company's guidance on May 5, 2014. This is evidenced by Defendants' dramatic reduction of guidance for net sales by approximately $75 million on August 4, 2014, citing, among other issues, the decision to postpone the launch of a new tablet. Further, Defendant Barbour admitted on February 5, 2015 that the "carryforward inventory that came into this year in retail that had to be cleared before we could get new tablets into the market place" and caused price degradation;

(f) In addition to the carryover inventory, Defendants knew that LeapTV would have a delayed launch, a delay that would necessarily negatively impact LeapFrog's financial results. For example, LeapFrog had set a very tight production and development timeline for LeapTV. Engineers assigned to the product indicated that they were not sure they could achieve the timeline, including VP of Engineering Paul Rymarz and Senior Director of Firmware Andy Cozine who put up warning signs about the timeline of LeapTV in weekly meetings that Chief Marketing Officer Greg Ahearn ("Ahearn") attended but these engineers were told to make it happen. And it was understood that Ahearn was conveying Defendant Barbour's position on LeapTV during the meetings;

(g) The launch date of LeapTV was pushed several times. The expectations of when LeapTV was going to be launched changed month to month and week to week, to the point that for much of 2014 the Company definitely did not know when the product was going to launch. By May/June 2014, it was known that the September 2014 launch date (or the projected launch date) was not going to be achieved. These facts are corroborated by the Company's admission on February 5, 2015 that LeapTV did not begin shipping until mid-October 2014;

(h) Defendants also knew that LeapFrog's tablet sales were declining based on the Company's actual results for calendar year 2013, a 5% decrease in net sales from calendar 2012, and a 31% decrease for 1Q14 (ending March 31, 2014) over the prior year. Further, Defendants were aware of increased competition as reflected in their comments on May 5, 2014; competition that stole market share. The declining trend in LeapFrog tablet sales coupled with the carryover inventory and delay in LeapTV undermined Defendants' May 5, 2014 financial guidance; and

(i) LeapFrog issued guidance as a range, giving itself a $16 million cushion between the top- and low-end of its guidance range for net sales and a $0.07 cushion for EPS; thus signaling to investors that it was incorporating the worst case

scenario regarding the carryover inventory and the sales of LeapTV. Yet, Defendants failed to take into account the "high" level of carryover inventory, declining sales and the delays in LeapTV.

37. Defendant Arthur's assurance to the market that the inventory hit to margin in the future quarter would not "be incredibly significant" was false. Defendants knew that substantial carryover inventory remained unsold and that to sell it substantial discounts would be required. On August 4, 2014, Defendants belatedly admitted that the gross margin for the three months ended June 30, 2014 had decreased by 18.4% compared to the same period the prior year "primarily driven by significantly higher trade discounts . . . to clear year-end inventory levels." Further, gross margins for the period ending March 31, 2014 had plummeted from 37.1% to 18.8% for the period ending June 30, 2014. Defendant Arthur also belatedly conceded on that the carryforward inventory had "significant impact on both our sales and margin" for 1Q15 (ending June 30, 2014).

38. Further, Defendants materially misled investors on May 5, 2014 regarding carryover inventory, by representing that the excess inventory was a "unique situation," that inventories "at retail have come down from where they were at year end by a fair amount," and that the Company did not "have higher inventories across the board" for, *inter alia*, the following reasons:

(a) A short three months later, Defendants admitted the need to clear out the excess inventory and the discounts required to do so had, in part, caused the Company to dramatically lower guidance on August 4, 2014 from $554-$580 million for the year ending December 31, 2014 to $480-$505 million for FY 2015 (ending March 31, 2015) its new reporting period;

(b) Defendants also admitted to having taken the "pain" in the second quarter of the calendar year (*i.e.*, April, May, and June) with respect to discounting and promotional offers and admitted that excess inventory had "significantly hindered" the Company's business. Thus, Defendants' statements downplaying the significance of carryforward inventory in May were misleading;

(c) Defendants reduced the Company's financial guidance on August 4, 2014 and November 3, 2014, citing excess inventory as a primary reason for their reduced guidance. These disclosures, made shortly following Defendants May 5, 2014 statements, evidence that at the time of their statements, Defendants, consistent with these admissions, knew or were deliberately reckless in not knowing the significant impact that the carryover inventory had on LeapFrog but concealed that information from investors;

(d) Defendants knew that the millions in carryover inventory levels did not present a "unique," short-lived situation because Defendants were "investing a lot of time and money" to monitor inventory and to properly plan for the upcoming holiday season by their own admission on May 5, 2014. On November 3, 2014, Defendant Barbour would claim that the Company had "eagle eyes [as] to what is

> happening at retail" regarding inventory, and that the Company closely "monitor[ed]" inventory levels at retail. Based on these admissions, Defendants were well aware of the excess carryover inventory and its negative impact on LeapFrog's financial condition, including new sales;
>
> (e) Defendants knew that in January 2014 the Company had about a year's worth of inventory. To that end, there were internal discussions, including at a Spring 2014 consensus meeting attended by Defendant Arthur and other LeapFrog management, wherein there were discussions regarding not building so much product; and
>
> (f) Defendants knew from 2013 that excess inventory of a product (*e.g.* the LeapPad2) negatively impacted the sales of other products.

39. Defendants also misled investors by representing that LeapTV would begin shipping in "late summer and fall" or "September" and by promising that it would be largely responsible for the Company's growth in the second half of the year on May 5, 2014. As set forth in ¶36, Defendants knew that LeapTV was facing delays in shipment that would impact negatively the Company's financial results. Later, Defendants would concede on February 5, 2015, that LeapTV had in fact not even begun to ship until mid-October 2014. LeapTV did not hit stores for weeks after shipment given the lag time for the retailers to receive and place the product on the shelves. Defendants knew the shorter selling window during the critical fourth quarter would negatively impact sales because Defendants had blamed a shorter holiday shopping period for the Company's miss for holiday 2013.

**<u>Defendants' June 11, 2014 False and Misleading Statements</u>**

40. On June 11, 2014, LeapFrog's CFO, Ray Arthur, participated in the Piper Jaffray Consumer Conference. During the call, Defendant Arthur falsely claimed that all the inventory on retailer's shelves would "clear up" by the third calendar quarter in response to an analyst question, as follows:

> [ANALYST:] But where are you now with respect to that fourth quarter inventory? Do you feel like you're in a position where you can move through a lot of that residual?
>
> [ARTHUR:] ***From inventory retail***, it's still being worked down. . . . ***That will probably take [until] second and third quarter to clear up*** because they're traditionally not high volume quarters at all.

41. Also on the call, Defendant Arthur knowingly misled investors by claiming that LeapTV would "hit stores" in October and that date had been incorporated into LeapFrog's guidance:

> [ARTHUR:] I think this year is going to be a challenge because the products are coming in so late. ***LeapTV is hitting stores in October***, so that is a couple of months later than what we would normally do in the product introduction.
>
> So we're not going to get the full benefit of that introduction this year. I mean, even if you assume it's a runaway success and we have inventory that we could supply retailers, there becomes a fiscal limit to what they're going to actually get through their distribution centers into their stores in time to hit the holiday shopping season. So that's ***our guidance as kind of flat sales at this point versus last year***, but I think we get back on the growth trajectory the following year.

42. Defendants' false and misleading statements caused LeapFrog's stock price to remain artificially inflated, as Defendants continued to conceal, *inter alia*, the financial impact of the carryover inventory (including the impact on new tablet sales), the delayed launch of LeapTV and that LeapFrog's guidance was unachievable.

43. Defendants' statements were absorbed by the market. On July 10, 2014, analysts at Piper Jaffray issued a report noting that the Company "ha[d] worked down excess channel inventory."

**Reasons Why Defendants' June 11, 2014 Statements Were Materially False**

44. Defendants' statement that their "guidance [was] kind of flat sales at this point versus last year" was a reiteration of the false guidance provided by Defendants on May 5, 2014 and was false and misleading for the reasons set forth in ¶36. Further, Defendants had even more undisclosed material adverse information on June 11, 2014 when they reiterated their false guidance because on this date, Defendants had all but 19 days left for the quarter ending June 30, 2014. The Company also later admitted that in that quarter, the Company had taken the "pain" of discounting and promotional offers related to excess inventory and that this had "significantly hindered" the Company's business. The Company also would report for the quarter ending June 30, 2014 net sales below guidance ($47 million vs guidance of $48-$52 million).

45. Defendants also knowingly made false statements on June 11, 2014 regarding the Company's excess retail inventory for the reasons set forth in ¶38 and for, *inter alia*, the following reasons:

(a) Defendants reduced the Company's financial guidance on August 4, 2014 and November 3, 2014, citing excess inventory as a primary reason for their reduced guidance. These disclosures, made shortly following Defendants' June 11, 2014 statements, evidence that consistent with these admissions, Defendants knew or were deliberately reckless in not knowing the significant impact that the carryover inventory had on LeapFrog but concealed that information from investors;

(b) Defendants knew that the millions in carryover inventory levels would not be cleared by the "second and third quarter" because Defendants closely monitored LeapFrog's inventory and the Company maintained weekly POS reports of precisely what had sold; and

(c) Defendants knew that in January 2014 the Company had about a year's worth of inventory and Defendants admitted less than 8 weeks after their statement, on August 4, 2014, that the "high inventory levels" and related discounts "had a significant impact on both our sales and margin."

46. Defendants also misled investors by representing that LeapTV would be "***hitting stores*** in October" on June 11, 2014. As set forth in ¶¶36, 39, Defendants knew that LeapTV was under a tight production timeline and was facing development delays that affected shipment. Later, Defendants would concede on February 5, 2015, that LeapTV had in fact not begun "shipping" until mid-October. Once LeapTV shipped it would typically take weeks for it to hit stores. Mere months prior, Defendants' holiday 2013 results were impaired by execution issues (*e.g.* inventory sitting on trucks) and shelf-stocking lag time. Therefore, they had reasons to know that their "hitting stores in October" statement was misleading.

**Defendants' August 4, 2014 False and Misleading Statements**

47. On August 4, 2014, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur and attaching a Leapfrog press release wherein Defendants falsely set expectations regarding guidance, including that ***LeapFrog expected net sales for the full year 2015 (ending March 31, 2015) to be $480-$505 million***, claiming that this reissued guidance incorporated information regarding "elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of new product shipments," and "the deferral of our consumer electronics tablet until next year to allow us to focus on the launch of our major new platform

introduction – LeapTV." Defendants also falsely stated they ***expected net income (loss) per basic and diluted share to be in the range of a loss per share of $0.04 to an income per share of $0.10***. For the ***second fiscal quarter*** ending September 30, 2014, Defendants falsely stated they ***expected net sales to be in the range of $125 million to $130 million***.

48. Defendants also falsely represented that "***these challenges***" would be "***offset[]***" by "a very back-end loaded year ***with LeapTV shipping at the end of September***," "***the introduction of new products that we expect to perform very well in the market place in fiscal 2015 and beyond***." "***We believe LeapTV will be a big hit when it launches, but it won't start shipping until the end of September, limiting the upside for this year*** but positioning us nicely for next year."

49. In the August 4, 2014 press release, Defendants falsely represented that LeapFrog would experience a "strong holiday season" and that the Company expected "solid net sales growth in both the December and March quarters" as a result of the release of LeapTV in October 2014, among other products:

> Our business so far this year has been significantly hindered by retail inventory carry-forward from Holiday 2013, tough conditions in most of our key markets and the planned later launch of our major new product introductions for the year. While these difficulties have caused our financial performance to decline substantially during our seasonally slow quarters, ***we are making good progress on our growth initiatives, which should position us well for a strong holiday season, expansion into new major entertainment categories and profitable long-term growth***.
>
> * * *
>
> We expect our financial results to decline year-over-year in the September quarter due to remaining elevated retail inventory levels, continued challenging POS trends and the comparative timing of new product launches. . . . ***However, we expect solid net sales growth in both the December and March quarters, led largely by sales of new releases including LeapTV, LeapBand, LeapPad3, LeapPad Ultra XDi and related content***.

50. Also on August 4, 2014, LeapFrog hosted its 1Q15 earnings conference call for the period ending June 30, 2014. During the call, Defendants emphasized that LeapTV would be responsible for LeapFrog's financial turn-around for the second half of fiscal 2015, falsely representing that the Company would experience "***double-digit sales growth in the December and March quarter***." During the call, Defendant Arthur reiterated the false guidance contained in the Company's August 4, 2014 press release.

51. Defendant Barbour also misled investors on the August 4, 2014 call by implying that the excess carryover inventory issue was behind them and that the Company expected "sales growth in both the December and March quarters." Defendant Barbour specifically issued the following false statements:

> ***The second half of fiscal 2015 should be much brighter and we expect solid double-digit sales growth in the December and March quarters. We expect this growth to be driven by shipments of our exciting new product introductions for the year, which include . . . new feature-filled tablets, and two new exciting product lines [LeapTV and LeapBand] in new high-growth categories not currently being addressed for younger children***.
>
> While our net sales for the quarter were slightly worse than forecasted, ***our progress in reducing carryforward retail and inventory levels and initial success in launching our major new product categories position us for a strong holiday season and long-term profitable growth***.
>
> * * *
>
> As we look ahead, we expect continued headwinds in the September quarter from the remaining carryforward inventory and the timing of new product shipments compared to the prior year. As a result, we expect net sales and profit to decline in the September quarter, ***but we then expect considerable sales growth in both the December and March quarters, led largely by new product shipments.***
>
> * * *
>
> ***We are well positioned for a robust holiday season with the strongest product line we have ever had.*** Good momentum with retailers and PR and new product launches, planned national multimedia marketing campaigns for our key drivers and our video gaming, tablet, health and fitness, reading, and toy lines and exciting off shelf placement of key products at major retailers.

52. Also during the August 4, 2014 call, Defendant Arthur echoed Barbour's statements, further misleading investors by claiming that LeapFrog expected "solid growth in [its] third and fourth fiscal quarters" and that it was "well positioned for a strong holiday season with a new lineup of tablets, fantastic new products in LeapTV and LeapBand set to enter the market" despite "carryforward . . . inventories" and a "later introduction of new products." Defendant Arthur issued the following false statements:

> In the second quarter of fiscal 2015, which is the September quarter, we expect our results to be impacted by the timing of new product launches as we expect to ship more of our new products in the December and March quarters this year, compared to the June and September quarters last year. Specifically, ***we expect net sales in the second quarter to be in the range of $125 million to $130 million***, down 38% to 35% as compared to a year ago. The decline is largely due to the timing of new

> product launches with our major new launch, ***LeapTV, which we will begin shipping at the end of September.***
>
> In addition, our sales projections have declined with the deferral until next year of our consumer electronics tablet as we focus more of our current-year efforts on LeapTV.
>
> * * *
>
> ***[W]e believe that we are very well positioned for a strong holiday season with a new lineup of tablets, fantastic new products in LeapTV and LeapBand set to enter the market***, and even more great content in our library, ***and we expect solid growth in our third and fourth fiscal quarters.***

53. In response to an analyst questioning how carryover inventory could be so high if the product was selling, on the August 4, 2014 call, Defendant Arthur misled investors by claiming that retail point-of-sale trends had "improved" and that the necessary discounts had been taken for the Company's excess inventory to be timely cleared:

> [ANALYST:] [W]e are talking about retail inventory carryover affecting sales all the way through September. How could the inventory be that high if the shipments are down that much and the stuff is selling? Can you help us with that? How is it not getting cleared out fast enough to allow for shipments?
>
> [ARTHUR:] Retail POS has been challenged in the first quarter of the calendar year. . . . And ***that trend has improved*** somewhat, but it still carried over into the second quarter. . . . So, we have made some good progress on bringing down the amount of carryover inventory, but we are probably just past halfway through it at this point in time. . . . That being said, ***I think we have given all the discounting and promotional offers we've needed to give during this quarter and taken the pain so that those units will now clear out more quickly.***

54. Similarly, when asked by an analyst when the excess inventory would be cleared, Defendant Barbour falsely stated that the inventory buildup would be essentially gone by Thanksgiving, called it a "one-off situation" and misled investors regarding the impact of the carryover inventory of LeapFrog's financial condition:

> [BARBOUR:] I think that if you think about it, we are probably right now just over halfway for clearing the product that was there. ***My sense is that the bulk of it will be cleared as we move into probably late fall, into the early part of the season. . . .*** So again, ***our sense is that the bulk of it will be gone as you get close – as we get close to Thanksgiving*** as people are looking for really incredible value gifts to put away for the holiday season.
>
> * * *
>
> ***It doesn't take away from the incredible opportunity this Company has ahead of it. We're dealing with a one-off situation here, which, as I say, we have***

> ***explained many times on the calls in the past where we are trying to deal with it as quickly as possible***.
>
> But I will be frank. We're totally energized about the response we have had to LeapBand and LeapTV . . . . If you look at the scale of the video marketplace and there is nothing like this product out there for young children, and the potential to deliver content to those video game systems, including for the first time video content to people's TV. . . . We are incredibly energized and we are investing still in the future of this business. And while at the same time, ***we deal with a one-off situation here, and as we get through this and our tablet business starts to get back onto a growth curve and then we launch these new diversification opportunities, we're still big believers in the opportunity ahead of us***.

55. Defendants' responses to additional analyst questions on the August 4, 2014 call also misled investors regarding the planned shipment of LeapTV and its impact on guidance:

> [ANALYST:] I'm trying to reconcile your prior guidance, which was on a December year-end, versus your current guidance. It implies a pretty substantial step up in the December quarter specifically, both in sales and margins, so Ray, if you could just walk us through the P&L for what we should be thinking about as we look into that holiday quarter, that would be helpful.
>
> * * *
>
> [ARTHUR:] Sure. Definitely the third quarter of our fiscal year is a big quarter for us, bigger than it has been for a long time. ***I think that's primarily the result of LeapTV starting to ship at the end of September, so most of the channel fill is going to occur in Q3.*** Even with LeapBand, which is going to come out a little earlier, a lot of the channel fill is going to come in Q3. ***And also, the new tablet lineup is hitting then***. So, the response we have gotten to LeapTV is just – it is incredibly exciting and we anticipate that this is going to be a really good quarter in terms of sales there and channel fill for our other products that are going into retail.

56. On the same August 4, 2014 call, Defendants continued to lie to investors regarding the shipment date of LeapTV and its impact on sales as follows:

> [ANALYST:] [T]hinking about LeapTV and it not starting to ship until September, is this where you guys were planning it to start shipping or is this a little bit later than expected?
>
> [BARBOUR:] I think if you look at the video game marketplace and you look at POS, there are not many people in the marketplace that buy $150 video game systems before Thanksgiving. So, the fact that it is being launched at that time and get[ting] into the marketplace, we see it hitting the bulk of the POS opportunity for this year. So, we're excited about it. Technologically, there is a lot of technology in it. This wasn't a simple product to develop. There's a lot of really cool technology in it and we are very excited about it.
>
> [ARTHUR:] ***It will get to stores when we had planned to get it to stores.***

57. On LeapFrog's partial revelations, the Company's share price fell from a close of $7.39 on August 4, 2014 to a close of $6.01 on August 5, 2014 – a decline of more than 18%.

LeapFrog's stock price, however, remained artificially inflated as a result of Defendants' false representations that, *inter alia*, LeapTV would launch when planned, that excess inventory was a "one-off" and would be clear by the Thanksgiving holiday season, as well as that Defendants would meet revised guidance.

58. Analyst commentary demonstrates that the market continued to be deceived by Defendants' bullish statements regarding LeapFrog's ability to produce financial growth from its new products, including LeapTV. For example, analyst BMO Capital Markets issued a report on August 5, 2014 noting that "we think the company has a strong new product line for the fall and believe the patient investor will be rewarded." BMO referred to LeapTV as LeapFrog's "marquee 2014 holiday product" with management's expectation that it would ship "in September for the October retail resets" and, in turn, "recording [the] sales in the third (December) quarter."

**<u>Reasons Why Defendants' August 4, 2014 Statements Were Materially False</u>**

59. Defendants knowingly issued false FY 2015 guidance of net sales of $480-$505 million and net income (loss) per basic share of a loss per share of $0.04 to an income per share of $0.10 and quarterly guidance of net sales of $125-$130 million on August 4, 2014 for the reasons set forth in ¶¶36, 44 and for, *inter alia*, the following reasons:

(a) Despite claiming that they had taken the remediation steps to address the Company's material weakness in accounting "for customer-related discounts and promotional allowances" in LeapFrog's 2013 Form 10-K, and quarterly SEC filings on May 7, June 23 and August 6, 2014, Defendants lowered the Company's August 4 FY 2015 guidance on November 3, nearly 7% from $480-$505 to $450-$470 million, and EPS of $(0.04)-$0.10 to $(0.13)-$(0.25), blaming, in part, the holiday 2013 carryforward inventory. In other words, Defendants knew they had to account for the promotional expenses and/or discounts associated with the pain of moving stale inventory from the prior holiday season but failed to take the fact into account when issuing guidance on August 4, 2014. This fact is evidenced by Defendants' dramatic reduction of guidance on November 3, 2014, citing the carryover inventory as one of the primary reasons for the reduction;

(b) Defendants' guidance for 2Q15 net sales of $125-$130 million lacked a reasonable basis. This guidance was undermined by adverse facts known to Defendants, including the delays with LeapTV and the impact of carryover inventory. This is reflected in LeapFrog's 9.12% miss of net sales for 2Q15 and Defendants' admissions on November 3, 2014 that these challenges caused, in part, the miss;

(c) At the time of their false guidance on August 4, 2014, Defendants admitted there was a "significant discounting" of carryover inventory at retailers. Yet, Defendants failed to account for the significant discounting that would be

required of the millions in carryover inventory given the failure of this inventory to sell in the first seven months of calendar 2014. This is evidenced by the fact that on November 3, 2014, when they slashed net sales guidance by $30 million and a reported $0.21 expected increase in loss per share for FY 2015 under the worst-case scenario, Defendants admitted that LeapFrog's 2Q15 financial performance was impacted by "elevated carryover retail inventory." Further, Defendant Arthur conceded in response to an analyst inquiry on that same day that discounted inventory had "been a major factor in depressing margin";

(d) Defendants also knew that the excess inventory would need to be discounted because they closely monitored the inventory. Defendant Barbour not only had earlier admitted, on May 5, 2014, that LeapFrog was working with its retail partners to move the inventory, he would later concede on November 3, 2014, that the Company had "eagle eyes [as] to what is happening at retail" regarding inventory and that the Company closely "monitor[ed]" inventory levels at retail. Thus, Defendants knew that the Company's FY 2015 guidance was unachievable because the carryover inventory was not moving to allow for new tablet sales and would have to be significantly discounted;

(e) In addition to the carryover inventory, Defendants knew that LeapTV would have a delayed launch and that the delay would negatively impact LeapFrog's financial results. By May/June 2014, it was known that the September 2014 (or projected) launch date was not going to be achieved. Further, the Company admitted on February 5, 2015, that LeapTV did not begin to ship until mid-October 2014;

(f) Defendants also knew that LeapFrog's tablet sales were declining based on the Company's actual results for calendar year 2013, a 5% decrease in net sales from calendar 2012, and a 31% decrease for the first quarter of 2014 (ended March 31, 2014) over the prior year. They also knew that net sales for 1Q15 (ended June 30, 2014) had come in below the low-end of guidance ($47 million vs. guidance of $48-$52 million). Moreover, Defendants were in the middle of 2Q15 at the time of their statements and 2Q15 net sales (ending September 30, 2014) were down 43% from the same quarter in the prior year. Further, Defendants were aware of increased competition as reflected in their comments on May 5, 2014; competition that stole market share. The declining trend in LeapFrog tablet sales coupled with the carryover inventory and development delays with LeapTV undermined Defendants' August 6, 2014 financial guidance;

(g) LeapFrog issued guidance as a range, giving itself a $25 million cushion between the top- and low-end of its guidance range for net sales and a $0.14 cushion for EPS, thus signaling to investors that it was incorporating the worst case scenario regarding the carryover inventory, decline in tablet sales and the sales of LeapTV. Yet, Defendants failed to take into account the impact of these issues when issuing guidance; and

(h) Defendants issued net sales and net income per share guidance for FY 2015 on August 4, 2014 but failed to update financial guidance until such time as Defendants announced their 2Q15 (quarter ended September 30, 2014) financial results on November 3, 2014, when they slashed FY 2015 guidance by $30 million for net sales and increased the expected loss per share by $0.21 per share under a worst-case scenario. Defendants failed to update LeapFrog's guidance despite the fact that prior to November 3, Defendants knew that, for example, LeapTV faced continued delays and had not shipped in September.

60. Defendants further materially misled investors on August 4, 2014 regarding the "one-off" inventory situation, LeapFrog's "progress in reducing carryforward retail and inventory levels" that LeapFrog claimed would "position" the Company "for a strong holiday season and long-term profitable growth," and that inventory would now "clear out more quickly" because LeapFrog had "given all the discounting and promotional offers" they "needed to give," for, *inter alia,* the following reasons:

(a) Defendants knew that the millions in carryover inventory levels did not present a "one-off" short-lived situation and knew that LeapFrog's inventory would continue to affect the Company's financial results because Defendants were closely monitoring inventory and as a result knew as of August 4, 2014 that the carryover inventory was hampering shipments of new tablets and was a "major factor in depressing margin" as Defendants admitted three months later on November 3, 2014. Further, Defendants significantly reduced their FY 2015 financial guidance a mere three months later, on November 3, 2014, citing excess inventory as a primary reason for their reduced guidance. These disclosures reflect that at the time of Defendants' August 4, 2014 statement, Defendants, consistent with this admission, knew the impact that the carryover inventory had on LeapFrog but concealed that information from investors;

(b) Even in November and December 2014, there was still a great deal of LeapPad inventory in the channel and director-level and below employees had been reporting the reality of the situation. Thus, Defendants' representations that in August 4, 2014 inventory was at a level that would position the Company for a strong holiday season and growth was false as there was even more inventory at that time;

(c) LeapFrog maintained weekly reports regarding LeapPad sales – weekly POS (point of sale) reports that showed the previous week's sales, as well as year-to-date sales and the inventory levels being held by retailers. Excess inventory was discussed in meetings of the Demand Planning group. The availability of this information evidences that Defendants knew of the excess carryover inventory and negative impact on LeapFrog's financial condition;

(d) Additional promotional discounts would be required given the 7+ months that had passed since holiday 2013 and LeapFrog's inability to adequately move the carryover inventory. Thus, they had not given all the promotional offers they "needed to give" as falsely claimed. Defendants' subsequent admissions that carryover inventory was hampering shipments of new tablets and lowering of FY 2015 guidance demonstrate the falsity of Defendants' statements at the time they were made; and

(e) Defendants were not positioned for long-term profitable growth but rather the carryover inventory was impacting current replenishment and new tablet sales. The magnitude of this impact is exemplified when on February 5, 2015 they admitted that "new tablets were hampered by tighter inventory management" as a reason for disappointing 3Q15 results and that the 38% decrease in gross profit for the quarter from the same period the prior year was in part due to "increased discounts and allowances to clear inventory carried over from the prior holiday season." Further, on June 2015, Defendants reported abysmal 4Q15 and FY 2015

> financial results including a 40% decline in net sales year-over-year for the quarter and a 36% decline for the fiscal year and net *loss* per share of $3.12 as compared to net income per share of $1.07 the prior year. Defendants blamed, in part, "[h]igh carry-forward retail inventories from the holidays" and disclosed that they "continue to work through the impact of . . . inventory overhang." Also on June 11, 2015, Defendants conceded that gross profit was significantly down year-over-year, "due to . . . higher discounts and allowances."

61. Further, Defendants materially misled investors on August 4, 2014 regarding LeapTV's expected ship date and its expected contribution to the Company's growth in 3Q15 and 4Q15. As set forth in ¶¶36, 39, 46, Defendants knew that LeapTV was facing delays in shipment that would negatively impact the Company's financial results. Later, Defendants would concede on February 5, 2015, that LeapTV had in fact not begun shipping until mid-October. Moreover, Defendants were well aware of the development delays and impact of those delays because it was LeapFrog's new marquee product. Further, weekly meetings beginning in July 2014 were held regarding LeapTV's progress and development status. Monthly consensus meetings (attended by Defendant Arthur and, at times, Defendant Barbour) were also held, whose objective it was to determine how many products needed to be produced, shipped, and delivered.

**<u>Defendants' November 3, 2014 False and Misleading Statements</u>**

62. On November 3, 2014, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur and attaching a LeapFrog press release for the 2Q15 (ending September 30, 2014). In it, Defendants downplayed the Company's 43% sales decline compared to the same period in the previous calendar year and continued to tout LeapTV:

> In addition, our fiscal second quarter net sales were hampered with the slippage of first shipments of LeapTV into the fiscal third quarter, which is the primary reason our fiscal second quarter net sales results were below our guidance range.
>
> ***Despite these challenges, we believe we are well-positioned for the all-important holiday season with*** our biggest ever line of fun educational content, filled with lots of new games, books and videos; the exciting launch of our innovative new active educational video game system, LeapTV; [and] two new feature-filled tablets in our LeapPad line . . . .
>
> * * *
>
> We expected a decline in our financial performance year-over-year given higher levels of retail carry-over inventory from Holiday 2013 and the comparative timing of new product launches . . . . However, the decline in net sales was more than anticipated primarily due to the slippage of first shipments of LeapTV into the fiscal third quarter. . . .

> ***We expect our financial results in our fiscal third quarter ending December 31, 2014 to improve year-over-year given the launch of LeapTV, two new LeapPad tablets***, a strong line-up of learning toys and interactive reading platforms and an exceptional educational content offering.

63. The November 3, 2014 press release issued by Defendants falsely set expectations regarding ***FY 2015 guidance of net sales to be $450-$470 million and net loss per basic and diluted share to be in the range of $0.13 to $0.25***. This guidance compared to the Company's August 4, 2014 FY 2015 guidance of $480-$505 million. Defendants also falsely set expectations ***regarding fiscal 3Q15 guidance of net sales to be in the range of $220-$240 million and net income per diluted share to be in the range of $0.16 to $0.28***. Defendants falsely maintained that for the fiscal quarter ended December 31, 2014, the Company would experience a massive, up to 28% growth, in net sales year-over-year as follows despite the carryover inventory and retail softness:

> [W]e also expect our business to continue to be impacted by residual Holiday 2013 carry-forward retail inventory of LeapPads. Additionally, many of our retail partners around the world are running far tighter inventories this year, and we are experiencing retail sales softness in some of our key product categories. As a result, we are lowering our outlook for the fiscal year . . . .
>
> For the full fiscal year ending March 31, 2015, we expect:
>
> - ***Net sales to be in the range of $450 million to $470 million*** compared to $528 million for the twelve-month period ended March 31, 2014.
>
> * * *
>
> For the third fiscal quarter ending December 31, 2014, we expect:
>
> - ***Net sales to be in the range of $220 million to $240 million, up 18% to 28%, compared to $187 million for the quarter ended December 31, 2013.***

64. Also on November 3, 2014, LeapFrog hosted its 2Q15 earnings conference call. During the call, ***Defendant Arthur repeated the false and misleading guidance provided by Defendants in the Company's November 3, 2014 press release***. Also during the call, Defendants continued to falsely tell investors that they should expect a "much brighter" second half of fiscal year 2015 and "double-digit sales growth in the December and March quarters" driven by LeapTV:

> [W]e are developing and launching innovative products . . . including the introduction of a major new platform that will diversify and grow our global business. . . . ***The second half of fiscal 2015 will be much brighter and we expect solid double-digit sales growth in the December and March quarters. We expect this growth to be driven by shipments of our exciting new product introductions for the year.***

> We started shipping units [of LeapTV] to retailers a few weeks ago and ***I am very pleased to report that LeapTV is off to a very strong start.*** While launch inventory is still flowing to many stores, early sales and reviews have been very encouraging. With limited distribution, LeapTV has already hit the top 25 selling list this week at one major retailer and it has been selected on many retailer, media, and industry top toy lists for this holiday.

65. On the same call, Defendant Arthur reiterated that although LeapFrog had experienced a sales decline in comparison with the same period last year, the launch of LeapTV was expected to cause sales to increase for the balance of FY 2015. Defendant Arthur stated:

> Four major factors affected our financial performance in the second fiscal quarter of 2015. . . . That said, we now have launched LeapTV and we are optimistic that this innovative new educational and video gaming platform and related content will be a top seller in our third fiscal quarter and beyond. ***We expect sales to increase for the balance of our fiscal year versus the same period of last year as we are well positioned for the holidays with our best product lineup ever and strong support from significant retail, trade, and advertising campaigns, as well as off-shelf promotions.***
>
> *　　*　　*
>
> Now I would like to finish my prepared remarks with insight into our full-year outlook. While our reported results through the second fiscal quarter of 2015 reflect sales and earnings reductions versus the same periods in the prior year, ***we expect to see improved results for the remaining two quarters of the year versus the same periods a year ago.***

66. On the same November 3, 2014 call, Defendant Barbour falsely represented that any shortfall of LeapTV sales in the second quarter would be made up in the third quarter:

> [ANALYST:] And just to follow up on that, JB. The delay and the shortfall in the second quarter, do you make up all of that in the fiscal third quarter?
>
> [BARBOUR:] ***We would hope that we would make up most of it, yes.***

67. During the November 3, 2014 call, Defendants falsely represented that retailers' inventory of LeapFrog products had already been worked through and because of this, the Company would see "***growth for the . . . third quarter and into the fourth quarter***":

> [ANALYST:] Could you provide some more color on inventory levels at retail? Specifically, how did the levels look by product type – tablet versus content versus toys? And when do you expect them to normalize?
>
> [ARTHUR:] Yes. The carryover inventory was primarily in tablets and ***we substantially sold through the excess inventory in tablets that's at the marketplace***. . . . I would say, if anything, I think people are just being – are really keeping their inventories tightly managed this year.

68. Despite Defendants' reduction of guidance and disclosure that sales of LeapTV were delayed until the third quarter, LeapFrog's stock price remained artificially inflated because of, *inter alia*, Defendants' false and misleading representations that LeapTV would drive the Company's growth, including a year-over-year increase in net sales, failure to disclose the impact of the inventory situation as well as the discounts required to move the carryover inventory. LeapFrog's stock price went from a close of $5.32 on October 31, 2014 to a close of $5.43 on November 3, 2014; and subsequently dropped to $4.70 on November 5, 2014 and $4.57 on November 6, 2014, trading in unusually high volume.

**Reasons Why Defendants' November 3, 2014 Statements Were Materially False**

69. Defendants knowingly issued false FY 2015 guidance of net sales of $450-$470 million and net income (loss) per basic share of a loss per share of $0.13-$0.25 and 3Q15 net sales of $220-$240 million and net income per diluted share of $0.16 to $0.28 per share on November 3, 2014 for the reasons set forth in ¶¶36, 44, 59 and for, *inter alia*, the following reasons:

(a) At the time guidance was issued Defendants knew and failed to account "for customer-related discounts and promotional allowances," when they issued guidance. This is reflected by Defendants' admission on February 5, 2015 that the 38% decrease in gross profit for 3Q15 compared to the prior year was, in part, due to "increased discounts and allowances to clear inventory carried over from the prior holiday season";

(b) When Defendants issued guidance they acknowledged the carryover inventory implying that it was incorporated into guidance. For example, when they gave their false guidance on November 3, 2014, Defendants admitted there was a "significant discounting" of carryover inventory at retailers. Yet, Defendants failed to account for the significant discounting that would be required of the millions in carryover inventory given the failure of this inventory to sell in the first ten months of calendar 2014 when issuing guidance. This is evidenced by the fact that when Defendants reported 3Q15 net sales 34% below guidance and EPS of $(0.25), excluding charges versus guidance of a profit of $0.16, Defendants blamed in part the discounting of carryover inventory;

(c) Defendants also knew that the excess inventory would need to be discounted and was impacting replenishment of tablets by retailers because they closely monitored the inventory and admitted the replenishment issue on November 3, 2014;

(d) Defendants also knew that LeapFrog's tablet sales were declining based on the Company's actual results for calendar year 2013, a 5% decrease in net sales from calendar 2012, and a 31% decrease for the first quarter of 2014 (ended March 31, 2014) over the prior year. They also knew that net sales for 1Q15 (ended June 30, 2014) had come in below the low-end of guidance ($47 million vs. guidance of $48-$52 million). Moreover, 2Q15 net sales (ending September 30, 2014) were

down 43% from the same quarter in the prior year. Further, Defendants were aware of increased competition as reflected in their comments on May 5, 2014; competition that stole market share. The declining trend in LeapFrog tablet sales coupled with the carryover inventory and delays with LeapTV undermined Defendants' November 3, 2014 financial guidance;

(e) LeapFrog's carryover inventory continued to negatively impact net sales and margins of the Company's tablets. Retailers did not want new product when the remaining product had not sold. Defendants conceded this fundamental problem despite not accounting for it in their guidance. For example, on November 3, 2014, Defendants admitted that "[n]ew LeapPad shipments to customers continue to be hampered by the remaining carryforward inventory";

(f) In addition to the carryover inventory, Defendants knew that LeapTV's delayed launch would negatively impact LeapFrog's financial results because, *inter alia*, Defendants would be unable to provide the necessary promotional support to ensure LeapTV would meet sales expectations for the holiday season, as Defendants admitted on January 22, 2015. Further, the late launch caused some retailers to drop LeapTV and for the product to be relegated to end-cap space at Target. Defendants' experience with execution issues from the prior year put them on notice to expect such issues for holiday 2014;

(g) Defendants also knew that LeapTV's sales within two weeks of launch were not strong but below targets;

(h) LeapFrog issued guidance as a range for FY 2015, giving itself a $20 million cushion between the top- and low-end of its guidance range for net sales and a $0.12 cushion for EPS, thus signaling to investors that it was incorporating the worst case scenario regarding the carryover inventory and the sales of LeapTV. Yet, Defendants failed to take into account the inventory issues, declining demand in tablets or the delays in LeapTV;

(i) Defendants' guidance for 3Q15 of net sales of $220-$240 million and EPS of $0.16-$0.28 were false. A little over two months from issuing this financial guidance, Defendants reported a massive miss to net sales and net income per share guidance, respectively. On January 22, 2015, reported a ***loss*** of $0.25 excluding charges, and a loss of $1.77 with charges. The magnitude of this miss given the adverse facts known to Defendants at the time of their guidance is indicative of fraud; and

(j) Defendants issued net sales and EPS guidance for FY 2015 and 3Q15 on November 3, 2014 but failed to update financial guidance until such time as Defendants announced they would withdraw FY 2015 guidance, on January 22, 2015. Defendants failed to update LeapFrog's financial guidance despite knowledge of adverse facts that informed them that the guidance was unobtainable. For example, leading up to Black Friday 2014 LeapTV sales were off-trend and LeapTV sales after Black Friday had dramatically missed sales expectations and, in fact, were off by orders of magnitude. By Cyber Monday, Defendants had begun their attempt to cut production of LeapTV units by approximately 200,000. Thus, Defendants' November 3, 2014 guidance continued to mislead investors.

70. Defendants also materially misled investors on November 3, 2014 by representing that retail inventory had already been worked through, that LeapFrog had "substantially sold through

the excess inventory in tablets that's at the marketplace," and because of this, the Company would see growth for 3Q15 and 4Q15 for, *inter alia,* the following reasons:

(a) Defendants knew that the carryover inventory would continue to affect the Company's financial results because Defendants closely "monitor[ed]" inventory levels at retail;

(b) Even in November and December 2014, there was still a great deal of LeapPad inventory in the channel and director-level and below employees had been reporting the reality of the situation. Thus, Defendants' representations on November 3, 2014 that the inventory was substantially sold was misleading;

(c) LeapFrog maintained weekly reports regarding LeapPad sales – weekly POS reports that showed the previous week's sales, as well as year-to-date sales and the inventory levels being held by retailers. Excess inventory was also discussed in meetings of the Demand Planning group. The availability of this information evidences that Defendants were well aware of the excess carryover inventory and its negative impact on LeapFrog's financial condition; and

(d) On January 22, 2015, a little over two months after the November 3, 2014 statement, Defendants disclosed they did not see, and would not be seeing growth for 3Q15 and 4Q15, blaming, again, in part, inventory issues: "retail in-stocks of our new tablets were hampered by tighter inventory management." On the February 5, 2015 conference call, Defendants admitted that, "[g]ross profit for the quarter was $45 million, a decrease of 38% compared to the prior year, due to . . . increased discounts and allowances to clear inventory carried over from the prior holiday season . . . and higher inventory allowances." Defendant Barbour also admitted that there was "price degradation" for LeapFrog's tablets "driven by especially in our case, the amount of carryforward inventory that came into this year in retail that had to be cleared before we could get new tablets into the market place." Defendants' admissions undermine Defendants' statements on November 3, 2014 that the Company would see growth because it had substantially sold through its excess inventory.

71. Further, Defendants materially misled investors on November 3, 2014 regarding LeapTV's expected contribution to the Company's growth in 3Q15 and 4Q15 and further misled investors by stating that the Company's disappointing 2Q15 financial results would be "ma[d]e up . . . in the fiscal third quarter," for, *inter alia*, the following reasons:

(a) The Company held weekly Friday meetings during which financial models were discussed that showed the expected unit sales of LeapTV. And by within two weeks of the launch of LeapTV, sales had been below targets. Further, because of LeapTV's late launch, LeapFrog was unable to provide marketing support for LeapTV in time and therefore some retailers dropped LeapTV. Another retailer, Target, relegated LeapTV to end-cap space. Thus, LeapFrog was not capable of delivering an 18% to 28% improvement of net sales over the same quarter in the prior year because, in contrast to Defendants' misrepresentations, LeapFrog could not provide "strong support" for "advertising campaigns" and "promotions." The delayed launch as well as the proximity between these actions and LeapFrog's representations that LeapTV would be responsible for the Company's significant

growth in 3Q15 and 4Q15 indicates Defendants had no reasonable basis for stating that LeapTV would do so;

(b) Market trends were heading toward mobile gaming applications and far from TV-based products. These trends in addition to the late launch of LeapTV further undermined Defendants' statements;

(c) By September 2014, it was obvious internally that the original launch date of LeapTV was not going to be achieved and the Company was having to fly hardware from the far east to the U.S. and was also flashing hardware in Fontana, California – *i.e.*, installing firmware and software – instead of in Asia. Both the air shipments and flashing the hardware in the U.S. represented additional costs for LeapTV. Thus, Defendants knew the Company was incurring additional unexpected costs in launching LeapTV and their representations that LeapTV would be responsible for the Company's growth in 3Q15 and 4Q15 were false and misleading; and

(d) Just two months later, on January 22, 2015, LeapFrog disclosed that weak LeapTV sales played an important role in the extremely disappointing 3Q15 financial results; a $75 million miss in net sales and a median miss of $0.28 per share from original guidance, excluding the Company's goodwill charge. Thus, Defendants were unable to "make up" the disappointing 2Q15 sales of LeapTV as they falsely represented they would be able to do on November 3, 2014.

**<u>Defendants' January 22 and February 5, 2015 False Statements</u>**

72. On January 23, 2015, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur and attaching a LeapFrog press release dated January 22, 2015, announcing that its net sales for the third quarter of fiscal 2015 fell at least $75 million (or 34%) short of guidance, that the Company would not achieve its fiscal 2015 guidance, and was taking a $20 million goodwill impairment charge. On that day, the Company issued a press release, disclosing that net sales for 3Q15 would be approximately $145 million, net loss would be approximately $124 million, including non-cash charges of approximately $20 million for goodwill impairment and approximately $87 million for deferred tax asset valuation allowance and net loss per basic and diluted share would be $0.25, excluding other charges. Defendants also withdrew guidance for 4Q15 and FY 2015.

73. On January 22, 2015, Defendants issued a press release in which they gave an explanation of the primary reasons for the massive shortfall as follows:

- In our major territories, holiday sales of children's tablets across the toy and electronics segments declined more than expected. This fall in consumer demand resulted in lower than planned LeapPad shipments in the quarter.

- Due to development issues, we shipped and promoted our new LeapTV educational video game system later than planned. This delay along with communication challenges and inconsistent execution at retail resulted in us significantly missing our sales expectations on this innovative new platform.

- The lower consumer sales of LeapPad and LeapTV hardware resulted in less demand for cartridges, accessories and digital content.

- Our LeapReader learn-to-read system sales were also lower than expected over the quarter, partly due to the significant drop in the retail prices of children's tablets.

- In addition to the primary drivers above, retail in-stocks of our new tablets were hampered by tighter inventory management and open-to-buy challenges across a number of our retailer partners . . . .

74. Defendants however, continued to mislead investors and artificially inflate the Company's stock price by failing to disclose that reduced demand for LeapFrog's tablets would have a negative impact on the Company going forward as follows:

> ***Despite these sales declines, the children's tablet business remains a sizeable business around the world***, and we believe based on market data that LeapPad tablets continued to be the #1 selling kids' tablets in the US based on units. In addition, our LeapPad tablets were also the overall #1 selling toy in the UK for the year according to NPD.

75. On these partial revelations, LeapFrog's stock price fell dramatically, declining $1.35 per share, or nearly 35%, to close on January 23, 2015 at $2.55 per share, on unusually heavy volume.

76. Analyst commentary demonstrates that the market continued to be deceived by Defendants. For example, analyst Ascendiant Capital Markets, LLC, issued a report on May 14, 2015 noting that the analyst expected only a "slight miss." "We expect Q4 results below our estimates for revenue of $48 million and EPS of $(0.27) and consensus for revenue of $48 million and EPS of $(0.20)."

77. On February 5, 2015, LeapFrog filed a Form 8-K with the SEC signed by Defendant Arthur and attaching a press release, reporting LeapFrog's 3Q15 financial results, including net sales of $144.6 million, net losses of $124.2 million, and net losses per basic and diluted share of $1.77 (including a $0.23 per share of goodwill impairment) and a $1.29 deferred tax allowance. The Company also announced that it was terminating approximately 16% of its workforce.

78. Also on February 5, 2015, LeapFrog held their 3Q15 earnings conference call for the quarter ended December 31, 2014. The Company began the call by admitting that 3Q15 results "were very disappointing." LeapFrog offered two principal reasons for the dramatic earnings miss: (1) "a significant drop in LeapPad and associated content sales," and (2) LeapTV's failure to meet "sales expectations":

> As we came into the year with significant carryover of LeapPad bundles from holiday 2013, that took more time and resources to sell through than expected. As we headed into the holiday season with cleaner inventory in our retail partner stores around the world, and two exciting new tablets, the LeapPad3 and LeapPad Ultra XDi, we felt that sales momentum across our tablet business was going to improve. Unfortunately, it did not.
>
> In addition, open to buy challenges plus tight inventory control at retail . . . during the holiday season compounded the decline in consumer demand. Overseas the situation was very similar, with a larger expected drop in shipments over November and December, as a result of category sales declines and retail inventory challenges.
>
> * * *
>
> The other disappointment in the quarter was the sales of our new educational video game system, LeapTV, which was our largest overall product investment in time and money over the last 12 months. This innovative system was extensively tested prior to launch, and children loved playing the games. . . . Due to technical development challenges, we began shipping the product in mid-October, which meant that our TV advertising around the world was back end loaded. We are researching whether prospective consumers may have already decided their large holiday purchases prior to our major advertising push. We are also evaluating whether our marketing measures could have been more clear, and based on our findings we will adjust this year's messages accordingly. Pricing could also have been a factor, with the glut of discount electronics on the market in the holiday season.
>
> Based on [positive LeapTV reviews], and our own experiences with consumers playing with ***LeapTV, we believe this platform will deliver***, but understand that financial performance did not live up to expectations for this past holiday season.
>
> We recognize the need to build a stronger, more stable product foundation, while still investing in innovative and technologically advanced products and solutions.

79. Also on the February 5, 2015 call, Defendant Arthur repeated LeapFrog's financial results disclosed in its February 5 press release, echoed Defendant Barbour's explanations for the dramatic miss in financial guidance, and explained the reasons for the goodwill impairment charge:

> We are very disappointed that our performance in the third fiscal quarter of 2015 was significantly below our expectations . . . . In our projections for the third quarter we planned for a decline in retail sales of LeapPad tablets. ***However, we are surprised by the magnitude of the actual decline across the tablet business*** and our key

> competitors during the holiday season, which was significantly in excess of our expectations. . . . [C]learly, the broader tablet market also suffered in the quarter.
>
> * * *
>
> The goodwill impairment charge in the quarter is attributable to the magnitude of the sales decline in holiday season, where we do a significant amount of our annual business, and the loss incurred in our fiscal third quarter coupled with our expectations for the future under GAAP accounting guidance.

80. Also on the February 5, 2015 call, Defendant Arthur reiterated the Company would not be providing fourth quarter and full year 2015 guidance and would implement a reduction in force:

> [W]e will not be providing guidance for fiscal fourth quarter or full year beyond indicating that ***we believe sales for our fiscal fourth quarter will be below that of the prior year*** period. In closing considering our third quarter sales decline and losses, we are reviewing our product strategies, operations and cost structure, in order to improve our financial performance. As John mentioned, we just announced internally a reduction in our organization of 95 positions. We will record a restructuring charge in our fiscal fourth quarter of about $1.4 million to complete this reduction.

81. Defendant Barbour, however, implied the challenges facing the Company this year would not leak into fiscal 2016:

> ***[O]ne of the big advantages we have this year is that there's less inventory at retail, and that retail is significantly cleaner***. . . . Unfortunately we come into 2014 with a significant quantity of older tablets on shelf, that took in my view too long and was too long actually clear through the marketplace, but in 2014 the calendar 2014, only 37% of our POS sales came from new tablets. I believe that mix of tablets through the beginning of the year hindered our business, potentially hindered our business and ***that's an opportunity as we go forward***.

82. On the February 5, 2015 call, Defendant Barbour also explained that there was price degradation of LeapFrog's tablets and "a lot of that was driven by especially in our case, the amount of carryforward inventory that came into this year in retail that had to be cleared before we could get new tablets into the marketplace."

83. On this news, LeapFrog's share price increased, going from a close of $2.44 on February 5, 2015 to a close of $2.56 on February 9, 2015, an increase of 5%.

84. Following Defendants' February 5, 2015 comments, analysts at BMO Capital Markets raised their price targets noting that management "seemed quite confident that retailers are still very much behind LeapTV" and that BMO was encouraged by "comments regarding strategy

and product." Further, analysts at SunTrust Robinson Humphrey issued a report on the same day noting that "retail inventory is in good shape" referring to it as the "bright side."

**<u>Reasons Why Defendants' January 22 and February 5, 2015 Statements Were Materially False</u>**

85. Defendants materially misled investors on January 22, 2015, regarding the demand for the Company's tablets as set forth in ¶¶74, 81 because Defendants knew, as they would disclose just a few months later, that the children's tablet business would not be a catalyst to the financial results LeapFrog had enjoyed when the LeapPad was at its peak. On the June 11, 2015, call Defendant Barbour stated: "[W]e don't have [the] expectations that [the long-term tablet marketplace is] going to be back where it was at its peak."

86. Defendants also materially misled investors on February 5, 2015, regarding LeapTV's potential to "deliver" positive financial results for LeapFrog as set forth in ¶78 because Defendants knew LeapTV would not deliver, given, *inter alia*, its poor sales performance during the 2014 holiday season, the historically slow sales in the first-half of the calendar year for LeapFrog products and the demand for the product, including some retailers dropping the product in the 2014 holiday season.

87. Defendants also materially misled investors on February 5, 2015, regarding their "surprise" at the "magnitude of the actual [sales] decline across the tablet business" as set forth in ¶79 because Defendants knew when they gave FY 2015 guidance, given the state of the tablet industry and carryover inventory from the prior year that they would not achieve that guidance and that the following quarter would be a similarly significant disappointment.

88. Defendants also materially misled investors on February 5, 2015, when they stated that "we believe sales for our fiscal fourth quarter will be below that of the prior year" because Defendants failed to disclose the true extent of the expected 4Q15 decline. Defendants failed to disclose that the source of LeapFrog's poor performance in 3Q15 would continue to plague the Company, including lagging LeapTV and LeapPad sales. Defendants admitted during their June 11, 2015 earnings conference call that nearly the same factors that caused the Company's financial results to suffer at December 31, 2014, would negatively impact the Company's financial results

through, at least, FY 2016. Defendants also knew LeapFrog's margins would be disappointing, as they admitted on June 11, 2015, because of the significant discounts they had to provide in order to once again clear excess inventory.

89. Defendants also materially misled investors on February 5, 2015, when they stated that "one of the big advantages we have this year is that there's less inventory at retail, and that retail is significantly cleaner. . . . [T]hat's an opportunity as we go forward" because Defendants knew, but did not disclose, that in contrast to their statements, excess inventory would continue to negatively impact LeapFrog's 4Q15 results as Defendants would disclose on June 11, 2015. In November and December 2014, there was still a great deal of LeapPad inventory in the channel. LeapFrog reported abysmal sales for 4Q15 and, as a result there was an inventory hangover from 2014. Retailers did not want new product until they had cleared out the old product and overall sales of tablets had declined. Defendant Barbour also had conceded on November 3, 2014 that the Company had "eagle eyes [as] to what is happening at retail" regarding inventory and the Company was closely monitoring inventory levels at retail by "working far closer with our retail partners." Thus, Defendants knew the Company's inventory hangover from holiday 2014 would continue to suppress LeapPad sales well into fiscal 2016 (beginning April 1, 2016).

**Defendants' False Financial Statements and May 18, 2015 Press Release**

90. Defendants caused the Company to falsely report its net income, total assets and stockholders' equity for 2Q15 and 3Q15 by failing to timely write-off $19.5 million impaired goodwill associated with its U.S. reporting unit in 2Q15 and by failing to timely write-off $36.5 million impaired long-lived assets in 3Q15. Specifically for 2Q15, Defendants falsely reported ***net income (loss) of $(2,026) and EPS of $(0.03)***. For 3Q15, Defendants falsely reported ***net income (loss) of $(124,212) and EPS of $(1.77)*** with $(0.22) accounting for goodwill.

91. LeapFrog's financial results were included in Forms 10-Q for the quarters ended September 30, 2014 and December 31, 2014, filed with the SEC on November 10, 2014 and February 9, 2015, respectively. The results were also included in press releases disseminated to the public and discussed on conference calls with analysts and investors on November 3, 2014 (2Q15), January 22, 2015 and February 5, 2015 (3Q15). Defendants claimed that the financial information

they reported was a fair statement of LeapFrog's financial results and that the results were prepared in accordance with GAAP.[6]

92. Defendants' representations were materially false and misleading as to the financial information reported, because such financial information was not prepared in conformity with GAAP, nor was the financial information a "fair representation" of LeapFrog's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

93. If LeapFrog had properly recorded goodwill impairment charges of $19.5 million in 2Q15 and long-lived assets impairment charges in 3Q15, the Company's reported net income and basic and diluted EPS would have dramatically decreased as shown in the following chart:

| (In Thousands of $ Except EPS) | 2Q15 | 3Q15 |
|---|---|---|
| Net Income (Loss) as Falsely Reported | ($2,026) | ($124,212) |
| Basic and Diluted EPS as Falsely Reported | ($0.03) | ($1.77) |
| Goodwill Write-Off Defendants Should Have Taken to Timely Reflect Impairment | ($19,549) | $19,549 |
| Long-lived Assets Write-Off Defendants Should Have Taken to Reflect Impairment | | ($36,461) |
| **Net Income (Loss) Reflecting Goodwill and Long-lived Assets Write-Offs[7]** | **($17,442)** | **($145,233)** |
| **Actual Basic and Diluted EPS Reflecting Goodwill and Long-Lived Assets Write-Offs[8]** | **($0.25)** | **($2.07)** |

94. Defendants, however, falsely told investors in the Company's 2Q15 Form 10-Q that: ***"[A]s of September 30, 2014, based on [the Company's] assessment of various qualitative factors and projection of future operating results, the Company does not believe that sufficient indicators***

[6] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

[7] Adjusted for taxes.

[8] Adjusted for taxes.

***of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment***." And in the Company's 3Q15 Form 10-Q that: "***[T]he Company concluded that its long-lived assets were not impaired as of December 31, 2014***."

95. Defendants also falsely told investors in a May 18, 2015 press release regarding the recoverability of its long-lived assets that: "The result of this [long-lived assets recoverability] analysis could lead to a non-cash accounting charge."

**<u>Reasons Why Defendants' Financial Statements and May 18, 2015 Statements Were Materially False</u>**

96. Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Accounting Standards Codification ("ASC") 805-10-05-4 requires that a business combination be accounted for by applying what is referred to as the acquisition method. Under the acquisition method, the assets acquired and liabilities assumed are recorded at their respective fair market values as of the date of the acquisition. ASC 805-20-30-1. "Fair value is the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 805-10-20. The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. ASC 350-20-35-16.

97. An asset is an item which provides economic value to an entity. Goodwill is considered to be an asset because future economic benefits are expected from it in combination with the future benefits of the other assets acquired in the acquisition. ASC 805-30-20 ("Goodwill" definition from glossary).

98. Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20. Goodwill is not amortized over a pre-determined number of years; instead, ASC 350-20-35-1 requires that a company test goodwill for impairment annually and between annual tests in certain circumstances at a level of reporting

referred to as a reporting unit.[9] ASC 350-20-35-28. "Impairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." ASC 350-20-35-2.

99. Impairment testing on a quarterly basis is required if events or circumstances change (*i.e.*, triggering events) that would more likely than not reduce the fair value of a reporting unit below its carrying amount. ASC 350-20-35-30. In evaluating whether it is more likely than not that the fair value of a reporting unit is less than its carrying amount, an entity shall assess relevant events and circumstances. Examples of such events and circumstances include, but are not limited to, the following:

a. Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;

b. Industry and market considerations such as a deterioration in the environment in which an entity operates, ***an increased competitive environment***, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), ***a change in the market for an entity's products or services***, or a regulatory or political development;

c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;

d. ***Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods***;

e. Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;

f. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and

g. ***If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).***

ASC 350-20-35-3C.

---

[9] A reporting unit is an operating segment of a company or one level below an operating segment (also known as a component). ASC 350-20-20 ("Reporting Unit" definition from glossary). LeapFrog had two operating segments during the Class Period: (i) U.S.; and (ii) International. For purposes of its goodwill impairment testing, LeapFrog considers its operating segments to be its reporting units.

100. If, after assessing the totality of the events and circumstances described above, an entity determines that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, then the entity shall perform the first step of the two-step goodwill impairment test. ASC 350-20-35-3E. Testing for goodwill impairment is a two-step process. The first step in the process is used to identify potential goodwill impairment while the second step is used to measure the amount of the impairment. In the first step, a company will compare the fair value of a reporting unit to its carrying value. If the fair value of the unit exceeds its carrying amount, then goodwill is not deemed to be impaired and thus the second step of the impairment test is unnecessary. ASC 350-20-35-6. However, if the carrying value of the unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any. ASC 350-20-35-8.

101. The second step of the goodwill impairment test compares the implied fair value of goodwill with the carrying amount of that goodwill. ASC 350-20-35-9. If the carrying amount of goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. ASC 350-20-35-11. Subsequent reversal of a previously recognized goodwill impairment loss is prohibited once the measurement of that loss is recognized. ASC 350-20-35-13.

102. Defendants' failure to timely write-down the impaired goodwill associated with LeapFrog's U.S. reporting unit in compliance with GAAP or ASC 350 is a common fraudulent scheme. In a recent academic study, Kevin K. Li and Richard G. Sloan concluded that the implementation of what was previously referred to as the Statement of Financial Accounting Standards or "SFAS" 142 (currently ASC 350) has resulted in "relatively inflated goodwill balances and untimely impairments." They also concluded that "managers exploit the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated."[10]

---

[10] Kevin K. Li and Richard G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (March 30, 2015), available at http://ssrn.com/abstract=1466271.

103. Defendants here engaged in the exact same conduct Li and Sloan found to be prevalent by failing to record a goodwill impairment charge in 2Q15 and materially overstating LeapFrog's assets, net income and EPS. Defendants chose to ignore the critical triggers that clearly indicated that "more likely than not that the fair value of [the] reporting unit [was] less than its carrying amount." ASC 350-20-35-3C. Defendants falsely stated that ***"[a]s of September 30, 2014, based on [the Company's] assessment of various qualitative factors and projection of future operating results, the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment."***

104. The most conspicuous indicator of goodwill impairment in 2Q15 that Defendants chose to ignore was LeapFrog's "sustained decrease in share price" in both absolute terms and relative to peers, a circumstance that is specifically cited in GAAP as a goodwill impairment trigger. ASC 350-20-35-3C(g). Defendants knew that LeapFrog's stock price suffered a shocking drop in 2Q15 when the Company reported 1Q15 financial results. The day before the Company's announcement on August 4, 2014, LeapFrog had been trading at an average price of $7.50 per share during July 2014 and closed at $7.39 per share on August 4, 2014. But after the Company's announcement, the stock price dove sharply – nearly 19% – to a closing price of $6.01 per share. LeapFrog's stock price continued to trade in the $6 range throughout the remainder of 2Q15, and closed at $5.99 on September 30, 2014. LeapFrog's dramatic and sustained decline in stock price stood out among its peers, as few of the 12 direct peer companies cited in LeapFrog's Proxy Statement dated April 21, 2014 suffered such a dramatic and sustained decline in their stock prices during their respective quarters as LeapFrog did after the Company reported its 1Q15 results, and none faced the steep decline that LeapFrog did after reporting its 1Q15 results.[11] LeapFrog's market cap plunged approximately $96 million from $515.5 million on August 4, 2014 (*i.e.*, $7.39 price per

---

[11] Market capitalization or "market cap" is the total dollar market value of a company's outstanding shares and is calculated by multiplying the company's shares outstanding by the current market price of one share. At September 30, 2014, LeapFrog's weighted-average outstanding Class A and Class B shares was 70.052 million, and LeapFrog's market cap was $419.6 million (*i.e.*, 70.072 million shares x $5.99 closing price per share).

share x 69.754 million shares outstanding) to $419.6 million on September 30, 2014 (*i.e.*, $5.99 price per share x 70.052 million shares outstanding).

105. Although LeapFrog's stock price (and market cap) continued to fall further in 3Q15, the key benchmark for an indicator of goodwill impairment is not a company's stock price alone; rather the benchmark is the relationship between the stock price per share and the book value per share of stockholders' equity because goodwill is more likely impaired than not when "the fair value of a reporting unit [*i.e.*, fair value of equity] is less than its carrying amount [*i.e.*, book value of equity]." ASC 350-20-35-3C. As of September 30, 2014, according to the Company's 2Q15 Form 10-Q, LeapFrog's book value per share was $5.78 (*i.e.*, $404.921 million stockholders' equity ÷ 70.052 million Class A and B shares = $5.78 book value per share). Consequently, as of September 30, 2014, Leapfrog's $5.99 market value of equity per share was only $0.21 greater than its $5.78 book value of equity per share, a classic indicator of potential goodwill impairment.

106. In 3Q15, when Defendants actually took their $19.5 million goodwill impairment charge, Defendants specifically cited in LeapFrog's Form 10-Q the "decrease in trading values of the Company's stock and corresponding . . . market capitalization" as indicators of goodwill impairment. Critically, however, LeapFrog's $4.72 market value of equity per share was $0.43 greater than its $4.29 book value of equity per share as of December 31, 2014, an amount more than double the much narrower $0.21 differential between the fair value and the book value of equity at September 30, 2014.[12] In fact, the $0.21 differential in 2Q15 between LeapFrog's fair value and book value of equity was the narrowest it had ever been at the close of any quarter since the Company's initial public offering in July 2002. Moreover, Defendants knew that even the $0.21 differential, based on LeapFrog's $5.99 stock price at September 30, 2014, was inflated because the market had not yet learned about the Company's poor 2Q15 financial results and lowered outlook for FY 2015. On November 3, 2014, before the Company announced 2Q15 results, LeapFrog's stock closed at $5.43.

---

[12] According to LeapFrog's Form 10-Q as of December 31, 2014, LeapFrog's book value of equity at December 31, 2014 = $281.767 million reported stockholders' equity + $19.549 million book value of goodwill not included in reported stockholders' equity = $301.316 million. $301.316 million book value of equity ÷ 70.169 million Class A and B shares = $4.29 book value per share of equity. $4.72 closing market stock price per share - $4.29 book value per share of equity at December 31, 2014 = $0.43.

After the Company announced those results, LeapFrog's stock closed at $5.01 on November 4, 2014. Had that $5.01 price been used as a fair value indicator, the $0.21 differential would have evaporated and the fair value of equity would have been underwater by nearly $54 million; that is, $54 million below book value.[13] Defendants claimed LeapFrog's declining stock price and market cap were indicators of goodwill impairment at December 31, 2014, when Defendants actually took their $19.5 million goodwill impairment charge. Those indicators, however, were even stronger in 2Q15, when Defendants deliberately avoided taking that charge against reported income.

107. Defendants also ignored other indicators of goodwill impairment, such as the U.S. segment's continued poor overall financial performance in actual revenue and gross margin results for the first half of FY 2015 and, in particular, continued declining cash flows and a decline in actual or planned revenue or earnings compared with projected results, factors specifically cited in ASC 350-20-35-3C(d). For five consecutive quarters running from 2Q14 through 2Q15, LeapFrog reported weak financial results or substantially lowered guidance, demonstrating Defendants' repeated failure to meet their own projections and the unreliability of their forecasts. Further, Defendants ignored adverse industry and market considerations and an increased competitive environment in the first half of FY 2015 as well, factors cited in ASC 350-20-35-3C(b). Defendants also knew, for example, that the Company was plagued by continued inventory overhang; delays in the launch of LeapTV; sales declines in key product categories; and a more cautious stance from retailers. The Company's sustained decrease in stock price and market cap relative to book value, poor overall financial performance, continuous failure to meet the Company's own guidance, and an increased competitive environment were triggering events under GAAP that required an impairment test to be performed in 2Q15. ASC 350-20-35-3C(b),(d), and (g). Nonetheless, Defendants deliberately ignored the plethora of triggering events and stated without basis in LeapFrog's 2Q15 Form 10-Q that "the Company does not believe that sufficient indicators of impairment of its

---

[13] According to LeapFrog's Form 10-Q as of September 30, 2014, $5.01 closing price at November 4, 2014 x 70.052 million shares = $350.96 million fair value of equity. $350.96 million fair value equity - $404.921 book value of stockholders' equity = ***negative*** $53.96 million. Yet, Defendants issued LeapFrog's Form 10-Q for 2Q15 six days later, on November 10, 2014, stating that there were no indications of goodwill impairment.

goodwill currently exist" to test for goodwill impairment at 2Q15, even though the narrow differential between the fair value and book value of equity and the subsequent $54 million plunge below book value alone indicated that goodwill was more likely than not impaired at 2Q15. If LeapFrog had complied with ASC 350, the Company would have taken the $19.5 million goodwill impairment charge in 2Q15, as shown in the chart in ¶93.

108. Defendants also intentionally delayed the write-down of the Company's long-lived assets from 3Q15 to 4Q15. LeapFrog's long-lived assets consisted of property and equipment, capitalized content costs, and other intangible assets that the Company expected to retain for at least a year to generate cash flows. GAAP required the Company to evaluate its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset group may not be recoverable. ASC 360-10-35-17.

109. For 3Q15, Defendants acknowledged that triggers existed that required testing long-lived assets to determine whether long-lived assets were impaired as of December 31, 2014, such that the carrying value of those assets did not exceed the cumulative undiscounted cash flows to be generated from those assets. These triggers according to LeapFrog's 3Q15 Form 10-Q "included, among others, the Company's performance during the 2014 holiday season being significantly lower than anticipated, which included the underperformance of products and product lines newly introduced to the market, and the continuing decrease in trading values of the Company's stock and corresponding decline in the Company's market capitalization." However, after purportedly testing long-lived assets as of December 31, 2014, "the Company concluded that its long-lived assets were not impaired as of December 31, 2014." The Company also noted that "the Company's undiscounted cash flow analyses consisted of projections of future net cash flows, which are considered as Level 3 inputs within the fair value hierarchy." Level 3 inputs are unobservable inputs for the asset, as opposed to observable inputs such as quoted market prices, quoted market prices of similar assets, and other inputs that are directly or indirectly observable. ASC 820-10-35-40 through ASC 820-10-35-54A.

110. Although GAAP permits Level 3 inputs to be used when directly or indirectly observable inputs are not available, GAAP still did not permit LeapFrog to use inputs that other

market participants would not have used. Even in fair value accounting, a company must use inputs and estimates that are "not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users." Statement of Financial Accounting Concepts No. 8, QC 14. In particular, GAAP states that "[i]n developing unobservable inputs, a reporting entity may begin with its own data, but it shall adjust those data if reasonably available information indicates that other market participants would use different data." ASC 820-10-35-54A.

111. LeapFrog ultimately took a $36.5 million impairment charge for long-lived assets in 4Q15, which had the primary impact of reducing the Company's property and equipment from $38.2 million as of December 31, 2014 to $1.7 million as of March 31, 2015. However, Defendants should have taken the long-lived assets charge in 3Q15, as of December 31, 2014, for the reasons described below.

112. First, Defendants specifically stated in LeapFrog's Form 10-K for the period ending March 31, 2015 that the reason that the carrying value of LeapFrog's long-lived assets in the U.S. reporting unit in 4Q15 "exceeded the cumulative undiscounted future cash flows that included an estimated residual market valuation . . . was primarily due to the significant decline of the trading value of our Class A common stock and the corresponding market capitalization." Defendants' stated primary reason was clearly fallacious, however, because the primary driver of LeapFrog's plunging stock price from $4.72 at December 31, 2014 (3Q15) to $2.55 as of January 23, 2015 (4Q15) was the announcement on January 22, 2015 of the Company's reported results for 3Q15 – which were obviously already known to Defendants when 3Q15 closed. Defendants already knew that 3Q15 results were far below expectations and did not need the market to reconfirm that fact for them. Had the market learned of those poor results when Defendants already knew about them, LeapFrog's stock price would have plunged during 3Q15 rather than in 4Q15, and Defendants knew that to be a fact in 3Q15.

113. Second, in quarter after quarter, the Company failed to meet its own unsupported guidance; and even as financial analysts continually lowered their own estimates, given LeapFrog's poor track record, the Company's reported results still fell below expectations. In fact, for 2Q14,

3Q14, 4Q14, 1Q15, 2Q15, and 3Q15, LeapFrog reported weak results or lowered guidance, with reported sales often missing Wall Street's estimates by double-digit percentages. Defendants provided inflated guidance in consecutive quarters even though they had access to internal information that strongly indicated their projections were unsupportable.

114. Third, the Company would have necessarily analyzed the fair value of long-lived assets as part of its goodwill impairment analysis for the step two test. As part of the step two test, the Company would have needed to determine the fair values of all assets and liabilities, excluding goodwill.[14] Consequently, because the Company reported $19.5 million goodwill impairment in 3Q15 (though even that should have been recorded in 2Q15, as discussed earlier), the Company already knew that the fair value of such long-lived assets as property and equipment were less than their carrying amount (book value). This was so because the Company would have necessarily determined, at a minimum, the fair value of long-lived assets relative to their carrying value in the Company's step two test of goodwill impairment.[15] Consequently, Defendants would have known that the fair value of long-lived assets was less than carrying value at least by 3Q15 when the Company actually performed its step two of the goodwill impairment test because determining the fair value of long-lived assets was an essential component of the step two calculation of goodwill impairment, in which the entire $19.5 million in goodwill was written off.

115. Fourth, Defendants already knew in 3Q15 that a substantial portion of the Company's property and equipment needed to be replaced; in particular, the Company's enterprise resource planning ("ERP") system, which was business management software used to collect, store, manage and interpret data from many business activities, including product planning, manufacturing and

---

[14] "The implied fair value of goodwill shall be determined in the same manner as the amount of goodwill recognized in a business combination . . . was determined. That is, an entity shall assign the fair value of a reporting unit to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination." ASC 350-20-35-14.

[15] The step two formula for computing the amount of goodwill impairment, if any, is as follows: Fair value of the reporting unit – Fair value of total assets (including long-lived assets, but excluding goodwill) + Fair value of total liabilities – Book value of goodwill = the amount of goodwill impairment (up to the book value of goodwill), if the resulting amount is less than zero, *i.e.*, a negative number. ASC 350-20-35-9 through 350-20-35-27.

service delivery, inventory management, and other critical business functions. During Defendants' August 4, 2014 investors' conference call, CFO Arthur stated that "the low $20 million [capital expenditures] is [for] maintenance, updating the content library, and probably near $15 million to $18 million is probably more like a lot of strategic initiatives, ERP. I think I told you before, ERP is about a $14 million investment, and then site development."

116. Fifth, the Company's normal holiday season ended as of December 31, 2014, which was the Company's "old 4Q14." Although the Company changed its financial reporting from a December 31 calendar year end to a March 31 fiscal year, this did not change the fact that the Company's most critical season runs from the period July 1 through December 31. Consequently, through the last quarter of the calendar year, or the "new 3Q15," Defendants already knew that the holiday season was a financial disaster. Inventory levels had increased 43% year-over-year, from $54.290 million to $77.796 million, while sales decreased 23% year-over-year, from $186.707 million to $144.598 million. Defendants knew in 3Q15 that with poor introductions of their new products – such as LeapTV – along with increased competition for LeapReader and the significant drop in retail prices of children's tablets, that the higher inventory levels combined with lower sales during the peak holiday season did not bode well for 4Q15 and, going forward, FY 2016, yet they failed to take the necessary charge to long-lived assets in 3Q15. Defendants deliberately ignored all of the above facts and circumstances that indicated that long-lived assets were more likely than not impaired at 3Q15. Rather, Defendants waited until June 11, 2015 to disclose the impairment and the abysmal financial condition of the Company. Defendants knew that the disclosure of this additional adverse information on June 11, 2015 would cause LeapFrog's stock price to further decline. If LeapFrog had complied with ASC 360, the Company would have taken the $36.5 million long-lived assets impairment charge in 3Q15, as shown in the chart in ¶93.

117. Defendants' May 18, 2015 statement that the testing of the recoverability of LeapFrog's long-lived assets "could lead to a non-cash accounting charge" was misleading for the same reasons set forth in ¶¶108-116 above. LeapFrog's long-lived assets were impaired no later than 3Q15 and a charge should have been recorded at that time.

**Defendants' False Statements Regarding LeapFrog's Internal Controls**

118. Defendants Barbour and Arthur signed Sarbanes-Oxley Act of 2002 ("SOX") certifications accompanying LeapFrog's 2Q15 Form 10-Q (for the period ending September 30, 2014), filed on November 10, 2014 and 3Q15 Form 10-Q (for the period ending December 31, 2014), filed on February 9, 2015. Each certification stated in pertinent part:

> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]

**Reasons Why Defendants' Statements Regarding LeapFrog's Internal Controls Were Materially False**

119. Defendants' statements in ¶118 above were materially false and misleading for, *inter alia*, the following reasons:

> (a) LeapFrog's lack of internal controls and procedures caused it to falsely report its financial results included in publicly issued financial statements for 2Q15 and 3Q15, press releases and conference calls, which improperly inflated the Company's earnings by failing to timely account for the impairment of the Company's goodwill and long-lived assets;
>
> (b) Management of any public company is responsible for establishing and maintaining adequate internal controls over financial reporting as defined in 15 U.S.C. §78m-o under the 1934 Act. AU 319.06, Internal Control in a Financial Statement Audit, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations";
>
> (c) Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which,

in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]." 15 U.S.C. §78m(b)(2). These provisions require an issuer to employ and supervise reliable personnel to maintain reasonable assurances that transactions are executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets;

(d) Here, Defendants claimed that they had evaluated "the effectiveness of [LeapFrog's] disclosure controls and procedures" and that they "have undertaken a number of procedures and instituted controls to help ensure the proper collection, evaluation and disclosure of the information in our financial statements." Included in LeapFrog's reports for 2Q15 and 3Q15 were LeapFrog's assets, net income and EPS for each quarter that were overstated as explained in ¶¶90-116. Had LeapFrog had the internal controls over the monitoring and reporting of the Company's financial condition that Defendants represented, those results would not have been overstated. Defendants, under GAAP, which they represented was adhered to, would have had to account for triggering factors that would have required LeapFrog to timely re-value goodwill in 2Q15 and record an impairment of long-lived assets no later than 3Q15 – as discussed in ¶¶96-116;

(e) While Defendants claimed they had taken steps in 4Q15 to remediate the period-end close process to capture customer-related discounts and promotional allowances for financial statement impact, they failed to capture these discounts/allowances when issuing guidance as described in ¶¶36, 59, 69. The failure to do so was a lack of internal controls pertaining to the Company's goodwill and long-lived asset analysis in its 2Q15 and 3Q15 quarterly financial reports because that analysis included accounting for "planned revenue or earnings" and "projected results." Further, the issuance of guidance without taking into account these discounts/allowances served to inflate the Company's stock price and, in turn, the overstatement of LeapFrog's financial results for 2Q15 and 3Q15. For example, had Defendants issued guidance that took these discounts/allowances into account, LeapFrog's stock price would have decreased, an important factor in the analysis of the Company's goodwill and long-lived assets; and

(f) LeapFrog's financial statements contained untrue statements and omitted material facts as alleged herein. Defendants' attestation to the sufficiency of disclosure controls and procedures misled investors to believe that the Company's financials fairly represented the financial condition of the Company when, in fact, they did not.

## THE END OF THE CLASS PERIOD

120. On June 11, 2015, LeapFrog issued a press release reporting the Company's 4Q15 and full year fiscal 2015 financial results for the period ending March 31, 2015. In the release, Defendants reported ***net sales for fiscal year*** 2015 to be $339.1 million, ***down 36% year-over-year***. Net loss per basic and diluted share for the year was $3.12, which included a net non-cash charge of $0.22 per share for goodwill impairment, $0.52 per share for impairment of long-lived assets and $1.30 per share for additional deferred tax asset valuation allowance. In the prior year, net income

per diluted share was $1.07. Net loss for the year was a staggering $218.8 million. The press release also reported ***that sales and net income "fell below expectations primarily due to high carry-forward retail inventories from the holidays, lower demand for our tablets and associated content and the later than planned shipment and promotion of LeapTV."*** Defendants also disclosed that ***operating expenses*** for the full year 2015 were $235.1 million, ***up 28% compared to the prior year*** because of the non-cash permanent impairment of goodwill and ***$36.5 million of long-lived assets***.

121. Also in the June 11, 2015 press release, Defendants reported fourth fiscal quarter ***net sales were*** $33.9 million, ***down 40% compared to last year*** and operating expenses were $78.8 million, up 98% compared to $39.8 million last year. Defendants attributed the increase in operating expenses primarily to a non-cash $36.5 million permanent impairment of long-lived assets following a Financial Accounting Standards Board ("FASB") ASC 360 review. Defendants also reported net loss for the fourth quarter was $76.2 million, or $1.08 per basic and diluted share.

122. Defendant Arthur also disclosed, for the first time, the breadth of LeapFrog's financial troubles:

> While we continue to make good progress on our ***new product initiatives***, most of these ***will not be impactful until the fiscal 2017 holiday season***. We continue to work through the impact of retail space losses, inventory overhang and significant competitive pressures . . . . This will be a year of rebuilding. We will continue to prudently manage expenses and cash as we stabilize the business and position LeapFrog for long-term growth. We expect fiscal year 2016 sales to contract considerably relative to the prior year, and operating losses for fiscal year 2016 to be similar to or greater than fiscal year 2015 losses, excluding goodwill and long-lived asset impairments.

123. Also on June 11, 2015, LeapFrog hosted its 4Q15 and FY 2015 earnings conference call. During the call Defendant Barbour explained the reasons for the dismal financial results:

> For the fourth quarter and full year, our net sales and net income declined year-over-year and fell well below expectations, ***due mainly to carry-forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later-than-planned shipment and promotion of LeapTV***. The downturn in consumer sales of tablets over [the] holiday season and into 2015 across our major markets was greater than expected. Since tablets along with their associated content represent a large share of our overall sales, this decline had a significant impact on our performance. In addition, retail sales of LeapTV to date significantly missed our expectations. Following the later-than-planned shipment of the platform in the holiday season, we progressed into spring, which is seasonally sluggish and when consumer demand for video game consoles is traditionally very low. . . . Given our disappointing financial performance in the fiscal 2015, we've undertaken a major strategic review of our go-forward business model, product and operating plans.

124. Defendant Arthur added that gross profit for the quarter was $4 million, a ***decrease of 83% compared to the prior year, due to reduced sales, increased discounts and allowances to help clear inventory carried over from the holiday season and changes in product mix***. According to Arthur, "gross margin rate was 10.3% compared to 37.1% a year ago, due to the reasons [] just mentioned and overall lower sales levels resulting in less effective leverage of fixed costs." ***Gross profit for the year was $94 million, a decline of 54% compared to the prior year***, again, "due to unfavorable changes in our product sales mix and higher discounts and allowances as a percentage of sales."

125. Operating expenses for the year were up 28% at $235 million as a result of "the non-cash permanent impairment of $20 million of goodwill . . . and the non-cash impairment of long-lived assets of $36 million." Inventory balance was $72 million, up $20 million or 38% from last year, "largely due to the decrease in sales." Arthur stated that LeapFrog "believe[d] inventories at retail are down by about 10% from last year due to SKU rationalization, loss of shelf space and lower POS." Defendant Arthur also reiterated the reasons for the disappointing fourth quarter performance: "The shortfalls in the quarter and full year were [primarily] due to . . . [h]igh carry forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later than planned shipment and promotion of LeapTV."

126. During the same call on June 11, 2015, Defendant Barbour disclosed, for the first time, that the reduced demand in the tablet space was likely a permanent development: "So as I said earlier, the decline in the fourth quarter in the overall tablet space and kid tablet space took many people, including us, by surprise, the scale of that decline. . . . [W]e still believe in a long-term tablet marketplace as being a profitable business for us, but in saying that, ***we don't have expectations that it's going to be back where it was in its peak***."

127. On this news, the Company's stock price declined dramatically, from a close of $2.07 on June 11, 2015 to a close of $1.54 per share on June 12, 2015, on unusually high volume. The share price continued to decline, closing at $1.47 on June 15, 2015 and $1.39 on June 16, 2015. This represented a nearly 33% decrease over the course of a few days.

## ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS

128. Defendants' wrongful conduct and fraudulent scheme, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. Throughout the Class Period, the market prices of LeapFrog's common shares were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. Defendants' false and misleading statements set forth in ¶¶26-32, 40-41, 47-56, 62-67, 74, 78-81, 90-95, 118 operated as a fraud or deceit on Plaintiffs during the Class Period by, *inter alia*, misrepresenting the Company's financial prospects and assuring investors that LeapTV would launch in time to drive LeapFrog's financial results. Instead, Defendants falsely reported LeapFrog's business prospects and financial guidance and caused the Company to falsely report its net income, total assets and stockholder's equity for 2Q15 and 3Q15 by failing to timely write-off $19.5 million impaired goodwill associated with its U.S. reporting unit in 2Q15 and by failing to timely write-off $36.5 million impaired long-lived assets in 3Q15. Defendants also failed to disclose that carryforward inventory would negatively impact LeapFrog's financial results and future growth, further serving to artificially inflate the prices of the Company's stock price throughout the Class Period.

129. Defendants' false and misleading statements had their intended effect and proximately caused LeapFrog's securities to trade at artificially inflated levels, with its stock reaching a high of $7.85 per share on July 8, 2014. The artificial inflation was eliminated when the true financial condition, expectations for future growth and other information concealed by Defendants' scheme were revealed to the market as reflected in the following chart:[16]

[16] The peer group index referenced in the chart is the group that is defined in LeapFrog's 2014 proxy as direct peers. Pricing for the companies was downloaded from Bloomberg. The chart reflects the stock price until June 15, 2015.




130. Beginning on August 4, 2014, Defendants began to partially disclose LeapFrog's true financial condition, including that LeapFrog would not meet previously-issued guidance, concealed from investors by Defendants' scheme to defraud. While the disclosure was incomplete, it partially revealed the adverse business and financial conditions concealed by Defendants' fraudulent scheme. As a result, LeapFrog's stock price was partially corrected, reducing the extent which it had been inflated by Defendants' fraudulent scheme, and false and misleading statements alleged in herein.

131. On August 4, 2014, LeapFrog announced, *inter alia*: (i) the Company was reducing financial guidance, stating that it expected net sales to be $480-$505 million for FY 2015 (period ending March 31, 2015) as opposed to $554-$580 million for the period ending December 31, 2014, and net income per share to be in the range of a loss per share of $0.04 to income per share of $0.10 as opposed to $0.18 to $0.25; (ii) Defendants claimed this reduction in guidance reflected "elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of" LeapTV's shipment, and "the deferral of [LeapFrog's] consumer electronics tablet until next year to allow [LeapFrog] to focus on the launch of . . . LeapTV"; and (iii) LeapTV would begin shipping at the end of September, as opposed to "late summer and fall." These partial disclosures were causally connected to LeapFrog's May 5, 2014 and June 11, 2014 inflated financial guidance,

to Defendants' false and misleading statements regarding the shipment of LeapTV and to Defendants' false and misleading statements regarding the impact excess inventory was and would continue to have on LeapFrog's financial performance, including new tablet sales. As a direct result of Defendants' partial disclosures, the following day, LeapFrog's stock fell more than 18% from $7.39 on August 4, 2014 to $6.01 on August 5, 2014, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts including, *inter alia*, the impact of excess carryover inventory at retailers and the delay of LeapTV, as well as issuing financial guidance that lacked a reasonable basis.

132. Following this partial disclosure, analysts lowered their expectations for LeapFrog. For example, an August 4, 2014 SunTrust Robinson Humphrey analyst report noted that LeapFrog had "elected to step up promotional investments in recent weeks to clear carry-over inventory" resulting in lower quarterly revenue for 1Q15 (ending June 30, 2014) and a "massive" decline in gross margin. In lowering estimates, SunTrust noted that LeapFrog had "cut FY15 guidance dramatically" as a result of "slower than expected post-2013 inventory reduction" and "delayed launch of a new tablet until 2015."

133. On November 3, 2014, LeapFrog issued a second partial disclosure in which it announced, *inter alia*: (i) the Company was reducing financial guidance, stating that it expected net sales for FY 2015 to be $450-$470 million as opposed to $480-$505 million, and net loss per share to be in the range of $0.13 to $0.25 as opposed to a net loss per share of $0.04 to net income per share of $0.10; (ii) Defendants claimed this reduction in guidance reflected the "continue[d] . . . impact[] [of] Holiday 2013 carry-forward retail inventory of LeapPads" and the fact that "many of [LeapFrog's] retail partners around the world are running far tighter inventories this year, and [LeapFrog] [is] experiencing retail sales softness in some of [their] key product categories"; and (iii) LeapTV's ship time had "slip[ped] . . . into the fiscal third quarter," which "hampered" the Company's second quarter net sales and was the "primary reason [LeapFrog's] fiscal second quarter net sales results were below [LeapFrog's] guidance range." These partial disclosures were causally

connected to LeapFrog's inflated financial guidance for FY 2015, to Defendants' false and misleading statements regarding the expected shipping date for LeapTV and to Defendants' false and misleading statements regarding the impact excess inventory would have on LeapFrog's financial performance, including new tablet sales. As a direct result of Defendants' partial disclosures, by November 6, 2014, LeapFrog's stock fell nearly 16% from $5.43 on November 3, 2014, to $4.57 on November 6, 2014, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because *inter alia*, Defendants continued to conceal adverse material facts regarding the true expected impact of excess carryover inventory at retailers, the delay of LeapTV, LeapTV's poor sales, the lack of internal controls, the impairment of goodwill, as well as issuing financial guidance that lacked a reasonable basis. Indeed, Defendants falsely stated that they expected "financial results in [the Company's] fiscal third quarter ending December 31, 2014 to improve year-over-year given the launch of LeapTV."

134. Following this partial disclosure, analysts again lowered their expectations for LeapFrog. For example, on November 3, 2014, KeyBanc Capital Markets issued an analyst report in which it noted that LeapFrog "attributed essentially all of fiscal 2Q15's revenue miss (roughly $14 million) to delayed shipments of the LeapTV." Further, "results again came in well below expectations as the 2013 holiday season inventory hangover continues to meaningfully weigh on near-term results."

135. On January 22, 2015, LeapFrog issued a third partial disclosure, preannouncing its 3Q15 financial results, and announcing, *inter alia*: (i) its net sales for the third quarter of fiscal 2015 fell at least $75 million (or 34%) short of guidance and that net sales for 3Q15 would be approximately $145 million, net loss would be approximately $124 million, and net loss per basic and diluted share would be approximately $1.77 per share; (ii) that the Company would not achieve its FY 2015 or 4Q15 financial guidance and was withdrawing its 4Q15 and FY 2015 financial guidance; (iii) that the Company was taking a $20 million goodwill impairment charge; and (iv) the primary reasons for LeapFrog's 3Q15 shortfall were that "holiday sales of children's tablets . . .

declined more than expected" that resulted in "lower than planned LeapPad shipments in the quarter," "[d]ue to development issues, [LeapFrog] shipped and promoted [its] new LeapTV educational video game system later than planned" that "resulted in [LeapFrog] significantly missing [their] sales expectations" of LeapTV and associated accessories, and "retail in-stocks of [LeapFrog's] new tablets were hampered by tighter inventory management." These partial disclosures were causally connected to LeapFrog's inflated financial guidance for FY 2015, to Defendants' false and misleading statements regarding LeapTV and to Defendants' false and misleading statements regarding the impact excess inventory would have on LeapFrog's financial performance, including new tablet sales. As a direct result of Defendants' partial disclosures, the next day, on January 23, 2015, LeapFrog's stock fell ***34.62%*** from $3.90 on January 22, 2015 to $2.55 on January 23, 2015, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts including, *inter alia*, the impact of excess carryover inventory at retailers, the impact of the delays of LeapTV, LeapTV's effect on the Company's financial results going forward, the Company's lack of internal controls and the impairment of LeapFrog's long-lived assets.

136. Analyst reports following the January 22, 2015 partial disclosures reflected the market's shock. For example, on January 23, 2015, Piper Jaffray issued a report describing the severity of the miss as "staggering." Likewise, analysts at BMO Capital Markets wrote in a report issued January 26, 2015 that "[w]e had been of the belief that current guidance, as well as investor expectations had already incorporated a worst-case scenario. Clearly that was wrong." BMO also noted that "[t]he company's inability to accurately guide the Street is a strong indication that it may not have the best systems in place to gauge demand or track its supply."

137. On May 18, 2015, LeapFrog issued a fourth partial disclosure, announcing in a press release that they would be delaying its fiscal fourth quarter and full year 2015 earnings conference call scheduled for May 18, 2015 because it was, "in the process of testing the recoverability of its long-lived assets under the requirements of FASB ASC 360." The Company also announced that

"[t]he result of this analysis could lead to a non-cash accounting charge." This partial disclosure was causally connected to Defendants' fraud, including LeapFrog's falsely reported financial results for 3Q15 (ending December 31, 2014). As a direct result of Defendants' partial disclosure, LeapFrog's stock price declined from close of $2.19 on Friday, May 15, 2015, to a close of $2.08 on May 18, 2015, a drop of more than 5%, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts, including, *inter alia*, the impact of carryover inventory at retailers, the impact of the delays of LeapTV, poor LeapTV sales and effect of the Company's financial results going forward, the Company's lack of internal controls and the impact or magnitude of the impairment of LeapFrog's long-lived assets. Following the May 18, 2015 partial disclosure, Piper Jaffray issued an analyst report noting that, "[a] delay in the FQ1 report further adds to concern and may signal forthcoming asset revaluation and the possibility of significant write-downs. . . . To-date, the stock price decline has largely been tied to poor fundamental execution. But with this delay, the argument around true asset value is surfacing and speculation about a material write-down of assets is a valuation risk."

138. Finally, on June 11, 2015, LeapFrog again surprised investors for the fifth time when they disclosed in a press release and during an earnings conference call, that LeapFrog's 4Q15 and full year results were far worse than analysts expected. The Company revealed that: (i) net sales for FY 2015 were $339.1 million, down 36% year-over-year, net sales for the 4Q15 were $33.9 million, down 40% compared to the same quarter last year, and net loss per basic and diluted share for FY 2015 was $3.12 compared to the prior year's income per share of $1.07, and net loss per share for 4Q15 was $1.08 per share compared to a loss of $0.18 per share in the same period the prior year, while operating expenses for the quarter were up 98%, at $78.8 million compared to last year's $39.8 million; (ii) LeapFrog was taking a $36 million non-cash payment accounting charge which reflected impairment of the Company's long-lived assets; (iii) that FY 2016 results were actually expected to be ***worse*** than FY 2015 and that financial improvements from new products would not be felt until 2017 (*i.e.*, LeapTV would not deliver growth in 2016); (iv) that the decline in demand for tablets was

likely a permanent thing because "we don't have expectations that it's going to be back where it was in its peak"; and (v) that retailers ***still*** had excess inventory. In reaction to these disclosures, LeapFrog's stock price fell nearly 29%, from $2.07 per share on June 11, 2015 to close at $1.47 per share on June 15, 2015, on heavy volume.

139. Analyst reports following the June 11, 2015 disclosure reflected the market's shock. On June 14, 2015, BMO Capital Markets issued an analyst report in which it noted that "***neither we nor the market was prepared for the company's FY2016 guidance that financials would actually be worse than in FY2015, a year when sales declined 36% (on top of an 11% decline in FY 2014)*** and earnings plummeted to a loss of ($1.08) per share. . . . [LeapFrog's] outlook continues to deteriorate." BMO also noted that "[r]etail sales of LeapTV to date have significantly missed management expectations, with management believing the weakness was caused by a later-than-planned release of the system last fall, resulting in lack of holiday momentum and spring season follow-through" and that the market did not "have confidence that the inventory really is 'good quality' or will stay 'good quality.'" BMO said it was "disconcerting that the company was caught off guard [regarding the decline in the tablet market] (for the second year in a row)." BMO commented that many investors regarded LeapPad as "somewhat irrelevant" and continued to "see the tablet market weakening."

140. In a June 14, 2015 article on *Seeking Alpha*, entitled "Even A Kiss From A Prince Can't Save LeapFrog," the author wrote:

> In my last LeapFrog . . . article I made a comment that I've never seen a company blow guidance this badly when it reported fiscal Q3 results. Unfortunately the disappointment continued really badly into Q4 results and now the company seems like a lost cause. . . . The results were absolutely nowhere close to estimates of $48.3 million in sales and an adjusted net loss of $(0.21) per share. . . . I believe competition from tablets and other devices are turning the Leapfrog line into a dinosaur. LF management has already proven that they stink at guidance and even they don't expect any hope before the fiscal 2017 holiday season. . . . ***[W]ith management's extreme confidence in a highly profitable last-holiday season, then absolutely blowing it, it's hard to imagine that they [have] their finger on the pulse*** on what will change the business around . . . .

141. The stock decline removed the artificial inflation from LeapFrog's stock price, causing economic loss to investors who had purchased the stock during the Class Period.

## CLASS ACTION ALLEGATIONS

142. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired shares of LeapFrog common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their family members, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

143. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. LeapFrog has over 66 million shares of stock outstanding, owned by hundreds if not thousands of persons.

144. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) whether Defendants violated the 1934 Act;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the finances, business, operations and management of LeapFrog;

(c) whether statements made by Defendants omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d) whether the price of LeapFrog stock was artificially inflated; and

(e) to what extent the members of the Class have sustained damages and the proper measure of damages.

145. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

146. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

147. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

148. A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results. Class members have not indicated an interest in prosecuting separate actions as none have been filed. The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable. No difficulties are likely to be encountered in the management of this action as a class action.

149. In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class members have suffered disparate damages, the fraudulent scheme alleged and the misrepresentations and omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET DOCTRINE

150. At all relevant times, the market for LeapFrog common stock was an efficient market for the following reasons, among others:

(a) LeapFrog common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, LeapFrog filed periodic reports with the SEC;

(c) LeapFrog regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) LeapFrog was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

151. As a result of the foregoing, the market for LeapFrog common stock promptly digested current information regarding LeapFrog from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of LeapFrog common stock during the Class Period suffered similar injury through their purchase of LeapFrog common stock at artificially inflated prices, and a presumption of reliance applies.

**NO SAFE HARBOR**

152. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. For example, the following statements identified as materially false and/or misleading in ¶¶26-32, 40-41, 47-56, 62-67, 74, 78-81, 90-95, 118 above are statements of past or present fact and are not forward-looking: LeapTV "***provide[s] us*** with a more solid foundation for growth" (¶28); "[I]f you look at the inventory . . . ***it was*** quite a unique situation, and ***we're working*** the way through the inventory right now" (¶30); "***I feel, at this stage***, pretty good about the response we've had from the trade in terms of these products. I think they are going to be in super demand this year" (¶30); "LeapTV ***is*** hitting stores in October" (¶41); "***we are making good progress*** on our growth initiatives" (¶49); "***our progress*** in reducing carryforward retail and inventory levels and initial success in launching our major new product categories" (¶51); "***we are very well positioned*** for a strong holiday season" (¶52); "that trend [retail POS] ***has*** improved somewhat" (¶53); "***we have given*** all the discounting and promotional offers ***we've needed*** to give during this quarter and taken the pain" (¶53); "***[w]e're dealing with*** a one-off situation here" (¶54); LeapTV "will get to stores ***when we had planned*** to get it to stores" (¶54); "we ***are well-positioned*** for the all-important holiday

season" (¶62); "LeapTV is off to a very strong start" (¶64); the "carryover inventory was primarily in tablets and ***we substantially sold*** through the excess inventory in tablets" (¶67); and "***there's less*** inventory at retail, and that retail ***is*** significantly cleaner" (¶81).

153. Even with regard to Defendants' forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For example, Defendants did not caution investors that LeapTV had not shipped as planned. Nor did Defendants sufficiently caution investors that LeapFrog's carryover inventory would negatively impact the Company's financial results. Moreover, as set forth in ¶¶4-12, 36-39, 44-46, 59-61, 69-71, 85-89, 96-117, 119, at the time the purportedly forward-looking statements were made, the speaker knew that the particular forward-looking statement was false.

**COUNT I**

**For Violation of Section 10(b) of the 1934 Act and Rule 10b-5**
**Against All Defendants**

154. Lead Plaintiff incorporates ¶¶1-153 by reference.

155. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

156. These Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of LeapFrog common stock during the Class Period.

157. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LeapFrog common stock. Lead Plaintiff and the Class would not have purchased LeapFrog common stock at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**

**For Violation of Section 20(a) of the 1934 Act**
**Against All Defendants**

158. Lead Plaintiff incorporates ¶¶1-157 by reference.

159. The Officer Defendants acted as controlling persons of LeapFrog within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, their ownership of LeapFrog stock, the nature of LeapFrog's business and the small size of the Company, and their review and control of the press releases, conference call statements and financial statements, the Officer Defendants had the power and authority to cause LeapFrog to engage in the wrongful conduct complained of herein. LeapFrog controlled the Officer Defendants and all of its employees. It also had the power to control the financial information disseminated in LeapFrog's SEC filings. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiff and the members of the Class damages, including interest;

C. Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

**JURY DEMAND**

Lead Plaintiff demands a trial by jury.

DATED: June 24, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
EKATERINI M. POLYCHRONOPOULOS

s/ Willow E. Radcliffe
WILLOW E. RADCLIFFE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

MOTLEY RICE LLC
JAMES M. HUGHES
DAVID P. ABEL
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

Co-Lead Counsel for Plaintiffs

**PLAINTIFF'S CERTIFICATION**
**PURSUANT TO FEDERAL SECURITIES LAWS**

The undersigned, Chris Sterckx and Dirk Mampaey, on behalf of KBC Asset Management NV ("KBC"), on account of its funds listed in Schedule A (the "Funds"), declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1. We have reviewed a complaint against LeapFrog Enterprises, Inc. ("LeapFrog") and designate Motley Rice LLC as proposed lead counsel for KBC in this action for all purposes.

2. We are duly authorized to institute legal action on behalf of KBC and the Funds' behalf, including litigation against LeapFrog and any other defendants.

3. KBC did not purchase or sell the security that is the subject of this litigation at the direction of plaintiff's counsel or in order to participate in any private action under the federal securities laws.

4. KBC is willing to serve as a lead plaintiff and understands that a lead plaintiff is a representative party who acts on behalf of other class members in directing the action, and whose duties may include testifying at deposition and trial. KBC also understands that, if appointed Lead Plaintiff in this action, it will be subject to the jurisdiction of the Court and will be bound by all rulings of the Court, including rulings regarding any judgments.

5. KBC will not accept any payment for serving as a representative party beyond its *pro rata* share of any recovery, except reasonable costs and expenses, such as lost wages and travel expenses, directly related to the class representation, as ordered or approved by the Court.

6. KBC has not sought to serve as a lead plaintiff or representative party on behalf of a class in any action under the federal securities laws filed during the three-year period preceding the date of this Certification, except as detailed below:

*Ross v. Career Education Corporation et al.*, No. 12-cv-00276 (N.D. Ill. 2012);

*City of Westland Police and Fire Retirement System v. SAIC, Inc. et al.*, No. 12-cv-01353 (S.D.N.Y. 2012);

*Brian Roffe Profit Sharing Plan, et al. v. Facebook, Inc., et al.*, No. 12-cv-04081 (S.D.N.Y. 2012);

*Florida Carpenters Regional Council Pension Plan v. Eaton Corporation, et al.*, No. 12-cv-02001 (N.D. Ohio 2012);

*Barnicle v. Mellanox Technologies, Ltd., et al.*, No. 13-cv-00925 (S.D.N.Y. 2013);

*Bondali v. Yum! Brands, Inc.*, No. 13-cv-00117 (C.D. Cal. 2013);

*Birmingham Retirement and Relief System v. S.A.C. Capital Advisors, LLC, et al.*, No. 13-cv-02459 (S.D.N.Y. 2013);

*Hatamian v. Advanced Micro Devices, Inc., et al.*, No. 14-cv-00226 (N.D. Cal. 2014);

*Bodner v. Aegerion Pharmaceuticals, Inc., et al.*, No. 14-cv-10105 (D. Mass. 2014);

*Pio v. General Motors Company, et al.*, No. 14-cv-11191 (E.D. Mich. 2014);

*Kalika v. Weight Watchers International, Inc., et al.*, No. 14-cv-01997 (S.D.N.Y. 2014);

*City of Hialeah Employees' Retirement System v. Genworth Financial, Inc., et al.*, No. 14-cv-02392 (S.D.N.Y. 2014);

*Henningsen v. The ADT Corporation, et al.*, No. 14-cv-80566 (S.D. Fla. 2014);

*Laborers Pension Trust Fund – Detroit & Vicinity v. Lions Gate Entertainment Corp., et al.*, No. 14-cv-05197 (S.D.N.Y. 2014);

*Aruliah v. Impax Laboratories, Inc., et al.*, No. 14-cv-03673 (N.D. Cal. 2014);

*Ciraulu v. American Realty Capital Properties, Inc., et al.*, No. 14-cv-08659 (S.D.N.Y. 2014; and

*St. Lucie County Fire District Firefighters' Pension Trust Fund, et al. v. Bryant, et al.*, No. 14-cv-03428 (S.D. Tex. 2015).

7. KBC understands that this is not a claim form, and that its ability to share in any recovery as a member of the class is unaffected by its decision to serve as a representative party.

8. Attached hereto as Schedule A is a complete listing of all transactions the Funds made during the Class Period in the security that is the subject of this litigation. KBC will provide records of those transactions upon request.

9. KBC is also represented and counseled in this matter by its attorney, Deborah M. Sturman of Sturman LLC.

**We declare under penalty of perjury, under the laws of the United States of America, that the foregoing is true and correct to the best of our knowledge, information and belief.**

Executed this 11th day of March, 2015.

For KBC Asset Management NV:

Chris Sterckx
Managing Director

Dirk Mampaey
Managing Director

**Schedule A**

**LeapFrog Enterprises, Inc. (NYSE: LF)**
**Class Period: 05/05/14 - 01/22/15**

| KBC Asset Management NV | | Date | Shares | Price |
|---|---|---|---|---|
| **KBC EQUITY FD - BUYBACK AMERICA** | | | | |
| | Purchases: | 05/15/14 | 4,859 | $6.8400 |
| | | 06/19/14 | 48,549 | $7.5946 |
| | | 11/12/14 | 14,546 | $4.8900 |
| | Sales: | 08/08/14 | 28,956 | $6.2800 |
| | | 12/01/14 | 11,470 | $5.3200 |
| **KBC EQUITY FD - US SMALL CAPS** | | | | |
| | Purchases: | 11/20/14 | 92,916 | $5.6563 |
| | | 12/18/14 | 7,065 | $4.9100 |

CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on June 24, 2015.

s/ Willow E. Radcliffe
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: willowr@rgrdlaw.com

# Mailing Information for a Case 3:15-cv-00347-EMC In Re: LeapFrog Enterprise, Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,dawn.hartman@ksfcounsel.com
- **Jordan Eth**
  jeth@mofo.com,jrahman@mofo.com
- **Mark R.S. Foster**
  mfoster@mofo.com,lroiz@mofo.com
- **James Michael Hughes**
  jhughes@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,ptiffith@rgrdlaw.com,katerinap@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)