ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MATTHEW S. MELAMED (260272)
EKATERINI M. POLYCHRONOPOULOS (284838)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
mmelamed@rgrdlaw.com
katerinap@rgrdlaw.com

MOTLEY RICE LLC
JAMES M. HUGHES (*pro hac vice*)
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LEAPFROG ENTERPRISES, INC. SECURITIES LITIGATION | Master File No. 3:15-cv-00347-EMC |
| | <u>CLASS ACTION</u> |
| This Document Relates To:<br><br>ALL ACTIONS. | LEAD PLAINTIFF KBC ASSET MANAGEMENT NV'S FIRST AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS |

## TABLE OF CONTENTS

Page

INTRODUCTION ....................1

BACKGROUND AND OVERVIEW OF THE CASE ....................2

JURISDICTION AND VENUE ....................9

PARTIES ....................9

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS ....................11

- Defendants' May 5, 2014 False and Misleading Statements ....................11
- Defendants Had No Reasonable Basis for Their May 5, 2014 Guidance, or Their Statements Regarding LeapTV's Ship Date and the Company's Carryover Inventory ....................14
- Defendants' June 11, 2014 False and Misleading Statements ....................21
- Defendants Had No Reasonable Basis to Reaffirm Guidance on June 11, 2014 and Continued to Conceal the Impact of the Carryover Inventory on LeapFrog ....................22
- Defendants' August 4, 2014 False and Misleading Statements ....................23
- Defendants Had No Reasonable Basis for the 2Q15 or FY 2015 Guidance Issued on August 4, 2014, Their Assurances to Investors that They Had Already Taken the Pain of Discounting the Carryover Inventory or that LeapTV Would Hit Stores as Planned ....................28
- Defendants' November 3, 2014 False and Misleading Statements ....................32
- Defendants Had No Reasonable Basis for Their November 3, 2014 Guidance, or Their Statements Regarding the Company's Carryover Inventory or LeapTV ....................34
- LeapFrog's 2Q15 False Financial Results ....................38
- LeapFrog's 2Q15 Financial Results Were False Because LeapFrog's Goodwill Was Impaired ....................40
- Defendants' January 22 and February 5, 2015 False Statements ....................46
- Defendants' January 22 and February 5, 2015 Statements Continued to Mislead Investors ....................50
- LeapFrog's 3Q15 False Financial Results ....................51
- LeapFrog's 3Q15 Financial Results Failed to Account for the Company's Impaired Long-Lived Assets ....................52
- Defendants' False Statements Regarding LeapFrog's Internal Controls ....................56

LeapFrog Lacked Internal Controls....57

THE END OF THE CLASS PERIOD....58

ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS....60

CLASS ACTION ALLEGATIONS....68

APPLICABILITY OF THE PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET DOCTRINE....69

NO SAFE HARBOR....70

PRAYER FOR RELIEF....72

JURY DEMAND....73

## INTRODUCTION

1. This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of LeapFrog Enterprises, Inc. ("LeapFrog" or the "Company") between May 5, 2014 and June 11, 2015, inclusive (the "Class Period"). This action asserts claims under the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against LeapFrog, its Chief Executive Officer ("CEO") John Barbour ("Barbour") and its Chief Financial Officer ("CFO") Raymond L. Arthur ("Arthur") (collectively, "Defendants").

2. Lead Plaintiff alleges the following based upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon investigation of counsel, including: (i) review and analysis of public filings made by LeapFrog with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by the Defendants; (iii) review of news articles and conference call transcripts; and (iv) review and analysis of other publicly available information concerning LeapFrog. The investigation of the facts pertaining to this case is ongoing. Lead Plaintiff believes that additional evidence will support the allegations in this case after a reasonable opportunity for discovery.

3. Defendants defrauded investors by knowingly or recklessly engaging in materially false accounting fraud and providing knowingly false guidance that lacked any reasonable basis. The accounting fraud arises from Defendants': (i) failure to test and record a $19.5 million goodwill impairment for 2Q15 when LeapFrog's book value was underwater; and (ii) failure to record a $36.5 million long-lived asset impairment for 3Q15 when Defendants knew LeapFrog's actual results for the quarter ending December 31, 2014 missed net sales expectations by 34%.

4. The guidance fraud is two-fold: Defendants issued guidance that: (i) lacked any reasonable basis; and (ii) was knowingly false when issued. The very fact of issuing guidance implied that Defendants had a reasonable basis at the time it was issued, when they did not. Further, while the guidance issued was accompanied by the acknowledgement of "headwinds" the Company faced when issuing guidance, Defendants either deliberately concealed the extent of those problems from investors or failed to adequately inform themselves of the extent of those problems before they spoke. This is confirmed by Defendants' subsequent revelations of the same problems as the basis

for dramatically lowered guidance and missed expectations quarter after quarter, all while LeapFrog's stock price repeatedly declined steeply following Defendants' revelations on August 4, 2014 (18.7% ), November 3, 2014 (16%), January 22, 2015 (35%), May 18, 2015 (5%) and June 11, 2015 (29%).

## BACKGROUND AND OVERVIEW OF THE CASE

5. LeapFrog creates electronic learning toys and content. The bulk of its sales occur in the second half of the calendar year, primarily leading up to and during the holiday season. LeapFrog found substantial success in 2011 with its first LeapPad product – a child-focused tablet. By the end of fiscal year 2013, however, LeapFrog and its executives were facing aggressive competition in the tablet market from other manufacturers, which resulted in disappointing 2013 and 4Q13 results.

6. As a result, LeapFrog's executives entered the Class Period under pressure to develop and execute a business strategy that would produce results, after a string of misses. At the same time, the Company faced a substantial retail inventory hangover of LeapPads from 2013 that management knew would impact both margins and sales heading into 2014. Thus, as a result of market pressure and the inventory backlog (called carryover or carryforward inventory by the Company) management decided in January 2014 to move up the release of a new product, LeapTV, to a calendar 2014 release. The product had not been slated for such an early release and the decision placed an extremely tight timeline for development and production of the new product. The timeline, which was unrealistic from the beginning due to the lack of documentation and the complicated nature of the product only became more so as development deadlines were missed.

7. On February 12, 2014, Defendants disclosed the launch of "a major new platform" in an effort to divert investors' attention from the disappointing 2013 results, which represented a 5% decrease in net sales from the prior year. Defendants also emphasized that "tablets are here to stay." Defendants acknowledged the challenges posed by carryover inventory but told investors that those challenges would be short-lived: "we are going [to] face some challenges ***early in the year with the [excess retail] inventory***." Against this backdrop, Defendants issued what analysts called "weak"

FY 2014 guidance of revenues between $554 and $580 million and earnings per share ("EPS")[1] between $0.18 and $0.25.

8. Three months later, on the first day of the Class Period, May 5, 2014, Defendants acknowledged that they were still facing "higher carry forward inventories across the overall tablet business and significant clearance activity and greater competition." In addition, they acknowledged that the Company's second-quarter results would "also be impacted by the timing of new product launches" with LeapTV "not shipping until late."

9. Nevertheless, Defendants reiterated revenue guidance for FY 2014[2] of between $554 and $580 million and EPS of between $0.18 and $0.25. In support of guidance, Defendants claimed that inventories "at retail have come down . . . by a fair amount." Defendant Arthur also downplayed the impact of the carryover inventory on the Company's margins, claiming that any allowances were not "going to be incredibly significant." In addition, Defendants also claimed that LeapTV – the Company's major new platform – would help it deliver growth.

10. During an earnings conference call later the same day, Defendants reiterated guidance and highlighted the role LeapTV would play in that growth. Unbeknownst to investors, however, the Company's significant excess carryover inventory of tablets and the promotional expenses associated with getting rid of that inventory rendered the guidance false because it would plague LeapFrog's earnings throughout the Class Period. In addition to the carryover inventory, Defendants' guidance was undermined by an unknown launch date for LeapTV as a result of an unrealistic development timeline made even less achievable by delays. Following Defendants' statements on May 5, on June 11, 2014, Defendants continued to falsely reassure investors regarding the retail inventory and claimed, without basis, that LeapTV would hit stores in October 2014.

11. Two months later, on August 4, 2014, Defendants slashed net sales guidance for what the Company now referred to as FY 2015 by about $75 million and announced a median 86% drop in expected EPS from $0.18-$0.25 to $(0.04)-$0.10. In doing so, Defendants claimed that "elevated

[1] EPS is used interchangeably with net income per share.

[2] Defendants announced on May 16, 2014 a change in the reporting period of the Company, with a new fiscal year-end of March 31, rather than the calendar year. Thereafter, they referred to guidance for calendar 2014 and 1Q15 as FY 2015 guidance.

beginning retail inventory levels, a challenging market environment and [Point of Sales][3] trends as well as the timing of new product shipments" led to the poor results and lowered guidance. Notably, these were precisely the issues Defendants had previously acknowledged, and indicated their guidance accounted for, on May 5, 2014, and June 11, 2014. On the partial revelation of the impact of these issues, LeapFrog's stock fell nearly 19%, from a close of $7.39 on August 4, 2014, to a close of $6.01 on August 5, 2014.

12. Yet, Defendants knew that even the Company's August 4, 2014 reduced guidance was unobtainable due to: (i) the continued delays in LeapTV's development, including missing the mid-July date whereby quality assurance testing was supposed to be done, but was not; (ii) the impact of the shocking amount of continued carryover inventory of LeapPads from the 2013 holiday season on new tablet sales; (iii) the declining demand for the LeapPad tablets; and (iv) the promotional expenses and discounts undertaken in the attempt to sell the carryover inventory.

13. Defendants also continued to deceive investors regarding LeapTV's ability to drive results for FY 2015, falsely telling investors when pressed by analysts that LeapTV would "get to stores when we had planned to get it to stores." That statement was false. Defendants knew that LeapTV was not shipping "as planned"; rather, it would ship late due to missing the initial mid-July 2014 quality assurance goal master date because the hardware was not ready.[4]

14. Three months later, on November 3, 2014, Defendants again lowered guidance. This time Defendants lowered FY 2015 expectations for net sales by approximately $30 million from its previous range, $480-$505 million, to $450-$470 million, and dramatically lowered EPS to $(0.13) to $(0.25), compared with the previous range of $(0.04)-$0.10 given only three months earlier. Thus, rather than forecasting a potential profit, Defendants informed investors that LeapFrog would report a loss. Again, Defendants blamed issues they had previously acknowledged, including the

---

[3] Point of Sales ("POS") data is sales data concerning LeapFrog products from retailers that sold LeapTV, such as Wal-Mart Stores, Inc. ("Wal-Mart"), Toys "R" Us, Inc. ("Toys "R" Us") and Target Corporation ("Target"), among LeapFrog's largest customers.

[4] A goal master date refers to the date which quality assurance work was supposed to be done. Once the goal master date had been achieved, LeapTV would then proceed to manufacturing, where the products would spend a couple of weeks before shipping.

"continue[d] . . . impact[] [of] Holiday 2013 carry-forward retail inventory of LeapPads" and the delay in LeapTV's ship time. On these partial revelations, LeapFrog's stock dropped nearly 16%, from a close of $5.43 on November 3, 2014, to $4.57 on November 6, 2014.

15. Defendants, however, knew at the time that they lacked any reasonable basis for issuing guidance. Moreover, they continued to mislead investors by claiming that "[d]espite these challenges" the Company was "well-positioned for the all-important holiday season" and that growth would be driven by its new products with "LeapTV [] off to a very strong start." Indeed, Defendants told investors to ***expect an 18% to 28% increase in the following quarter's net sales*** results as compared to the same period in the prior year. This guidance would require LeapFrog to surpass the net sales that it achieved for the holiday quarter with its successful launch of its LeapPad product in 2011.

16. During the November 3, 2014 conference call, Defendant Barbour told investors that Defendants closely monitored retail inventory, representing that he and Defendant Arthur visited stores and he "got a good sense as to what is happening." Referencing LeapFrog's on-site staff, Arthur reassured investors that, with more people in stores, "***we get a kind of immediate idea what is happening***" and that he believed it was important to "***hav[e] eagle eyes to what is happening at retail***." Eagle eyes would have, and did, inform Defendants that two weeks after LeapTV's launch, LeapTV was not off to a strong start. Rather, the POS data showed the opposite – LeapTV was performing below targets. Further, LeapFrog had LeapTV dropped by some retailers and lost its shelf space for LeapTV at Target, one of four retailers that were central to sales growth, where the product was relegated by Target to end-cap space. In addition to the challenges faced by LeapTV, the 2013 carryover inventory was continuing to cannibalize sales of LeapFrog's newer tablet offerings and negatively impact margins for the Company's tablets.

17. Defendants also falsely reported 2Q15 financial results in the November 3, 2014 press release and during the conference call of the same day as well as in the Company's Form 10-Q filed with the SEC on November 10, 2014, as a result of failing to timely write-off $19.5 million of impaired goodwill. Defendants violated Generally Accepted Accounting Practices ("GAAP") by not testing for goodwill at 2Q15 based on the numerous triggering events requiring such testing and

failing to write down goodwill at 2Q15. Those GAAP triggering events known to Defendants included: (i) the sustained decrease in share price of approximately 19% when the Company reported 1Q15 financial results on August 4, 2014; (ii) the increased competition that Defendants admittedly faced; and (iii) the declines in actual and planned net sales and earnings, including knowledge that 2Q15 sales and EPS were going to be 7.8% and 9.5% below consensus estimates and that LeapFrog knew that it would have to dramatically reduce guidance with an anticipated loss for the fiscal year.

18. When Defendants belatedly took the $19.5 million goodwill impairment charge in 3Q15, they cited the decrease in stock price and corresponding market capitalization as the reason for the charge. Yet, at 2Q15 the differential between the fair value and book value of equity was only $0.21, indicating that it was more likely than not goodwill was impaired. Indeed, LeapFrog's goodwill was impaired prior to the issuance of LeapFrog's Form 10-Q for 2Q15, its fair value of equity was nearly $54 million below book value (*i.e.*, underwater) before the Form 10-Q was filed.

19. By the Friday following Thanksgiving it was clear that the lightning that had driven the 2011 LeapPad sales would not magically strike twice, and that LeapTV would not hit the retail toy lottery. The sales returns after that day were so alarming that LeapFrog cancelled the production of 200,000 units of LeapTV product in the days that followed. The Company knew of the cancellation by around the first or second week of December 2014. Defendants, however, did not update investors, instead continuing to let the investors believe that LeapFrog would report net sales for FY 2015 of $450-$470 million and EPS of $(0.13)-$(0.25).

20. The timing, nature and magnitude of LeapFrog's miss during the 2014 holiday season and the goodwill charge are indicative of fraud. On January 22, 2015, Defendants were forced to disclose that the Company's net sales for 3Q15 fell at least $75 million, or 34%, short of the low-end of guidance and that the ***loss*** per share was $0.25,[5] excluding charges, compared to guidance from merely ***three months earlier*** of EPS for 3Q15 of $0.16-$0.28. The Company also disclosed that it

[5] Defendants disclosed, on January 22, 2015, that net loss per basic and diluted share was ($1.77) and included $0.23 per share of goodwill impairment and $1.29 per share of an additional deferred tax asset valuation allowance. The figure $0.25 is derived from subtracting the additional charges of $0.23 and $1.29 from $1.77. Later, LeapFrog's Form 10-K filed on June 15, 2015 reported that its FY 2015 results included a goodwill impairment charge, reporting that it accounted for a loss of $0.22 of the Company's basic and diluted net loss per share for the year.

would not achieve its already twice-reduced FY 2015 guidance, and was writing down goodwill by 100%, taking a nearly $20 million goodwill impairment charge.

21. The reasons Defendants gave for the disastrous results included, yet again, the very challenges that Defendants had repeatedly claimed earlier had been incorporated into their guidance – delayed shipment and promotion of LeapTV and the impact of the carryover inventory. On these partial revelations, LeapFrog's stock plummeted nearly 35% in a single day, from a close of $3.90 on January 22, 2015, to a close of $2.55 on January 23, 2015. Summing up investor reaction, on January 26, 2015, analysts at BMO Capital Markets wrote: "We had been of the belief that current guidance, as well as investor expectations had already incorporated a worst-case scenario. Clearly that was wrong."

22. Defendants, however, continued to conceal from investors on January 22, 2015 the impact of carryover inventory from 2014. Rather than telling investors that LeapFrog's tablet sales were in real trouble, Defendants stuck to their story, telling investors on January 22, 2015 that "[d]espite these sales declines, the children's tablet business remains a sizeable business around the world."

23. Further, Defendants concealed the impact of the lackluster LeapTV sales and delays in shipment on the financial condition of LeapFrog going forward. During the conference call held on February 5, 2015, Defendants also continued to artificially inflate LeapFrog's stock price by telling investors that they believed LeapTV "will deliver" and downplayed the abysmal results that they knew would be reported for 4Q15, telling investors only that they would be "below that of the prior year." However, as a result of their close monitoring of inventory, Defendants knew that neither LeapTV nor LeapFrog's tablets were meeting the expectations they set for investors who, as analysts at Ascendiant Capital Markets, LLC put it on May 14, 2015, expected only a "slight miss" for 4Q15 results.

24. Further, Defendants falsely reported LeapFrog's 3Q15 financial results in the Company's January 22, 2015 press release, February 5, 2015 press release and conference call, and Form 10-Q filed with the SEC on February 9, 2015 by failing to timely account for the Company's impaired long-lived assets. Defendants had necessarily determined in their goodwill impairment

analysis for 3Q15 that LeapFrog's long-lived assets were impaired. Moreover, the long-lived assets GAAP impairment triggering events that Defendants specifically cited – namely, the dismal 2014 holiday sales and corresponding decline in market capitalization – had ***already occurred or were necessarily anticipated*** in connection with the Company's financial reporting for 3Q15. For example, Defendants knew that net sales for 3Q15 were 34% short of guidance and that rather than a profit of $0.16-$0.28, LeapFrog would report a $0.25 loss for the holiday quarter.

25. When Defendants preannounced these results on January 22, 2015, more than two weeks prior to the filing of LeapFrog's 3Q15 Form 10-Q on February 9, 2015, LeapFrog's stock price plummeted 35% in a single day. Defendants falsely told investors that the "the Company concluded that its long-lived assets were not impaired as of December 31, 2014," yet cited the decline in stock price for taking the long-lived assets charge as of March 31, 2015.

26. On May 18, 2015, Defendants announced that LeapFrog was delaying the announcement of its 4Q15 and FY 2015 results because it may have to take an accounting charge for its long-lived assets. On this news, LeapFrog's stock price declined, from a close of $2.19 on Friday, May 15, 2015, to a close of $2.08 on May 18, 2015 – a drop of more than 5%. Investors, however, continued to be misled because, *inter alia*, LeapFrog had not taken the charge it should have for its long-lived assets when it reported 3Q15 results.

27. Three weeks later, after the close of the market, on June 11, 2015, Defendants belatedly disclosed that net sales for FY 2015 were $339.1 million, ***down 36% year-over-year***, and that 4Q15 net sales were ***down 40% from the prior year***. Similarly, gross profit for 4Q15 plummeted "***83% compared to the prior year, due to reduced sales, increased discounts and allowances to help clear inventory carried over from the holiday season*** and changes in product mix." Further, operating expenses had increased 98% to $78.8 million, largely as a result of a $36.5 million impairment charge for long-lived assets. Defendants conceded that the 4Q15 FY 2015 results were "***due mainly to carry-forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later-than-planned shipment and promotion of LeapTV***." These were all factors that Defendants were well aware of at the close of the holiday season, prior to their January 22, 2015 and February 5, 2015 statements.

28. Defendants were also forced to disclose that new product initiatives would not have an impact until the 2017 holiday season and that operating losses for FY 2016 would be similar to or greater than FY 2015 losses with sales to "contract considerably" in FY 2016. In other words, not only had LeapTV failed to drive growth in FY 2015, it would not drive growth in FY 2016, either. Following this news, LeapFrog's stock plunged another 25.6%, from a close of $2.07 on June 11, 2015, to a close at $1.54 on June 12, 2015.

29. Analysts at BMO Capital Markets wrote that "each time [LeapFrog misses we] think[] things have gotten so bad they could not possibly get any worse. Thus, ***neither we nor the market was prepared for the company's FY2016 guidance that financials would actually be worse than in FY2015***." LeapFrog's stock price now languishes below $0.75 per share.

## JURISDICTION AND VENUE

30. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

31. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

32. LeapFrog's principal executive offices are located at 6401 Hollis Street, Suite 100, Emeryville, California 94608, a location within this Judicial District.

33. Venue is proper in this District pursuant to 28 U.S.C. §1391(b), because LeapFrog maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

34. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

35. Lead Plaintiff KBC Asset Management NV ("KBC") purchased or otherwise acquired LeapFrog's securities, as described in the certification filed on July 10, 2015, and suffered damages thereby. KBC was appointed by the Court as Lead Plaintiff of this action on May 5, 2015.

36. Defendant LeapFrog is a Delaware corporation with its principal executive offices in Emeryville, California. LeapFrog is a developer of educational entertainment for children. The Company's product portfolio consists of multimedia learning platforms, related content, and learning toys. The Company has developed a number of learning platforms, including the LeapPad learning tablets, the Leapster handheld learning game systems, the LeapReader reading and writing systems, and the LeapTV. The complaint focuses on the key LeapFrog products during the Class Period – the LeapPad and LeapTV.

37. The Company's sales are dependent on a small group of large retailers. For fiscal 2015, the Company reported that the "[s]ales invoiced to Wal-Mart Stores, Inc. ("Wal-Mart"), Toys "R" Us, Inc. ("Toys "R" Us"), Target Corporation ("Target") and Amazon.com, Inc. ("Amazon"), in the aggregate, accounted for approximately 70%, 60%, 73% and 73% of the [U.S.] segment's gross sales for the year ended March 31, 2015, the three months ended March 31, 2014 and the years ended December 31, 2013 and 2012, respectively." In turn, the U.S. segment of LeapFrog represented approximately 70% of LeapFrog's net sales.

38. Defendant John Barbour was, at all relevant times, Chief Executive Officer and a director of LeapFrog. Barbour has extensive experience as an executive of publicly held companies including serving as President of Toys "R" Us and holding senior-level positions at Hasbro, Inc. Defendant Barbour participated in LeapFrog's conference calls on May 5, 2014, November 3, 2014, and February 5, 2015, and signed LeapFrog's Forms 10-Q for 2Q15 and 3Q15 filed with the SEC on November 10, 2014 and February 9, 2015.

39. Defendant Raymond L. Arthur was, at all relevant times, Chief Financial Officer of LeapFrog. Arthur has extensive experience as an executive of a publicly held company, including serving as CFO of Toys "R" Us at the same time Barbour was President. Arthur also has a degree in accounting, is a Certified Public Accountant and previously worked for KPMG Peat Marwick. Defendant Arthur participated in LeapFrog's conference calls on May 5, 2014, November 3, 2014, and February 5, 2015, and signed LeapFrog's Forms 10-Q for 2Q15 and 3Q15 filed with the SEC on November 10, 2014 and February 9, 2015.

40. Defendants Barbour and Arthur are referred to as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LeapFrog's quarterly reports, press releases and presentations to securities analysts and institutional investors, *i.e.*, the market, and exercised such power and control. The Officer Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, their access to material non-public information available to them but not to the public, and their affirmative statements regarding the Company's operations, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Officer Defendants are liable for the false statements pled herein.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### Defendants' May 5, 2014 False and Misleading Statements

41. On May 5, 2014, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur and attaching a LeapFrog press release announcing, *inter alia*, the Company's financial guidance for the remainder of calendar 2014. In the release, Defendants misled investors that sales would "be significantly more back-end focused in 2014 than last year. ***Our line-up of major new product introductions will begin shipping in late summer and fall***."[6] As explained below, Defendants knew LeapFrog's major new product, LeapTV faced delays that would negatively impact sales but concealed that information from investors.

42. The press release also falsely set expectations regarding guidance including Defendants' statement that ***LeapFrog expected net sales for full year 2014 to be in the range of $554 million to $580 million and net income per diluted share to be in the range of $0.18 to $0.25***.

[6] The statements Lead Plaintiff alleges are materially false and misleading are in bold/italics in this section. Language is also included for context.

43. Also on May 5, 2014, LeapFrog hosted its 1Q14 earnings conference call. During the call, Defendant Arthur falsely represented that the Company's new products, including LeapTV, would be responsible for delivering growth for the second half of the calendar year:

> [W]e expect net sales in the second quarter to be in the range of $52 million to $48 million . . . . [W]e expect second-quarter GAAP and normalized net loss per basic and diluted share to be in the range of $0.21 to $0.24 . . . . We expect net sales and earnings declines in the first half of the year, largely due to a tough comp to Q1 2013 and beginning retail inventory levels, ***while we expect [to] make net sales and earnings growth in the second half a year, largely due to new product introductions***.
>
> Within the second half of this year, our results will be much more backend loaded ***with some new products shipping for the first time in September***. ***For the full year***, ***we are reiterating our guidance for sales between $554 million and $580 million and net income per diluted share to be in the range of $0.18 to $0.25 for both GAAP and normalized net income per diluted share*** . . . . However, ***if current retail trends continue, we do believe we will see ourselves coming in at the low end of this guidance range***.

44. Also during the May 5, 2014 call, in response to analyst questions, Defendant Barbour misled investors regarding the expected sales of LeapTV as well as by characterizing the elevated inventory at retailers as a "unique situation":

> ***[I]f you look at the inventory*** that we've been dealing with this year, . . . the bulk of it is really two products . . . the Power LeapPad and the LeapPad Bundles. . . . [T]he reason that we had carryover of those products was the significant discounting that happened on the LeapPad2, which . . . took away from the value of those products. So, as I said, ***it was quite a unique situation***, and we're working the way through the inventory right now.
>
> * * *
>
> And then of course ***we've got LeapTV*** where – who is to say, but my guess is it is going to be in significant demand by the end of the year. It's not shipping until late, and I think there's a likelihood that the product will sell out, just like the original LeapPad did. It's a major innovation in the marketplace. . . . So, it is not only a very big marketplace, it's a very big empty marketplace at the moment. So, I feel, at this stage, pretty good about the response we've had from the trade in terms of these products. I think they are going to be in super demand this year.

45. On the same call, Defendants downplayed the effects of excess inventory on the Company by falsely claiming that the inventories had "come down . . . by a fair amount" and that the inventories were not "higher . . . across the board" while concealing the shocking amount of inventory at retailers:

> [ANALYST:] [C]an you maybe talk about just inventory levels at retail at the end of the quarter?

> [ARTHUR:] Sure. ***Inventories at retail have come down from where they were at year end by a fair amount***. . . .
>
> [BARBOUR:] ***The important fact is that this isn't across the board***. . . . ***We don't have higher inventories across the board. We have some pockets of inventory***, and we are working with our retail partners to move that inventory.

46. Later on the May 5, 2014 call, Defendants were specifically asked about whether investors should anticipate allowances for inventory to hit margin in the future quarter as follows:

> [ANALYST:] So those pockets of inventory you are referring to that you're working with the retailers to move, are you guys fully reserved for that or should we anticipate further allowances to hit margin in the future quarter?
>
> [ARTHUR:] There will probably be some cost associated with the clearance, but ***I don't think it's going to be incredibly significant***.

47. On this news, LeapFrog's stock price increased more than 6% from a close of $6.83 per share on May 5, 2014 to a close of $7.29 on May 6, 2014, on unusually high volume.

48. Consistent with the impressions given by Defendants in the May 5, 2014 press release and conference call, analysts at KeyBanc Capital Markets issued a report on May 6, 2014, referring to Defendants' reaffirmation of guidance, writing that the lower-end of the full year guidance of EPS $0.18-$0.25 and net sales of $554-$580 million was "increasingly realistic given the heightened execution risk around new product introductions and an uncertain 2014 holiday retail environment." KeyBanc analysts also noted the importance of LeapTV to the Company: "[W]e are encouraged by the scope of the major platform launch, LeapTV, as it represents a meaningful market opportunity."

49. The same day, analysts at Roth Capital Partners, also repeated Defendants' false and misleading guidance, noting that Defendants' reiteration of 2014 guidance for EPS of $0.18-$0.25 and net sales of $554-$580 million "reflects later shipments of new products but a less condensed holiday season, though results could come in toward the lower end of that range if retail trends remain lackluster." Thus, the market believed from Defendants' statements that even with lackluster retail trends and the timing of new product introductions, LeapFrog would hit its guidance, at least at the lower end.

**<u>Defendants Had No Reasonable Basis for Their May 5, 2014 Guidance, or Their Statements Regarding LeapTV's Ship Date and the Company's Carryover Inventory</u>**

50. Defendants' statements on May 5, 2014 gave the false impression that they had a reasonable basis for LeapFrog's FY 2014 guidance including net sales of $554-$580 million and EPS of $0.18-$0.25. The May 5, 2014 statements also gave the false and misleading impression that the guidance accounted for the carryover LeapPad inventory from holiday 2013 and took into consideration that LeapTV would not be shipping until later than customary (*i.e.*, "for the first time in September" and "[i]t's not shipping until late"). The May 5, 2014 statements further gave investors the false and misleading impression that allowances for the LeapPad inventory hangover would ***not*** be "incredibly significant," but rather that the "important fact" was that "[w]e don't have higher inventories across the board."

51. In fact, Defendants lacked any reasonable basis at the time for these representations. Defendants lacked any reasonable basis for the guidance; lacked any basis for representing that LeapTV would sell out like LeapPad or that LeapTV would ship to retailers in September; and lacked any reasonable basis for the impression they gave regarding the levels of Leapfrog's carryover inventory or its impact on margins.

52. Based on their experience, Defendants knew that the holiday 2013 carryover inventory would require further allowances, which would have an additional negative impact on LeapFrog's financial guidance. The Company's FY 2013 net sales and net income per share decreased respectively 5% and 4% year-over-year – despite Defendants' representation that FY 2013 was LeapFrog's second most profitable year in the last ten years. One of the reasons Defendants provided for the disappointing results was that "trade allowances and discounts as a percentage of net sales increased." These results were followed in 1Q14 by a decrease in tablet sales of 31% compared to the prior year despite 1Q14 results "slightly" exceeding guidance. Defendants explained that the decrease resulted in part from "retail inventory levels from the beginning of the year," *i.e.*, the holiday 2013 carryover inventory.

53. Despite this knowledge, Defendants concealed the amount of holiday 2013 carryover inventory and its impact on LeapFrog throughout the Class Period. As set forth above, Defendants

represented that they did ***not*** anticipate any "incredibly significant" impact due to the continued existence of carryover inventory. Indeed, Defendants downplayed the carryover inventory by telling investors that the important thing was that the inventories were not "higher" across the board, referring to them as pockets of inventory. They also misled investors by claiming the inventories "have come down . . . by a fair amount." These half-truths concealed the sheer volume of the carryover inventory and negative impact that the carryover inventory would have on the Company's 2014 earnings. To wit, the Company had been intending to introduce a new LeapPad product in 2014, sales of which were a part of at least the Wal-Mart sales forecast, but internal expectations for LeapPad for the 2014 holiday retail season were lowered in March/April 2014. Despite these internally lowered expectations, Defendants reaffirmed on May 5, 2014 guidance that they had issued on February 12, 2014.

54. The carryover inventory from 2013 continued throughout 2014. Despite downplaying the significance of the carryover inventory on May 5, 2014, just four months later Defendants would acknowledge that half of it still remained and that it contributed to the 86% median decrease in the fiscal year earnings forecast. The amount of 2013 LeapPad carryover inventory was a prominent concern within the Company and was a topic of internal discussion, including during weekly E-Commerce team meetings. Defendant Arthur and other LeapFrog management attended consensus meetings, including the spring 2014 meeting, wherein there were discussions regarding not building so much product. Defendants later acknowledged that they were only halfway through the carryover inventory in August demonstrates that the volume of carryover was a significant material fact that was concealed from investors on May 5, 2014 and that Defendants maintained access to the amount of carryover inventory. Given that Defendants were only halfway through the shocking amount of carryover inventory four months after May 5, 2014 and that the inventory was a "major factor in depressing margin" in the July/September quarter, it stands to reason that the holiday 2013 carryover inventory would have a significant impact on margins.

55. With respect to guidance, in the Company's 2013 Form 10-K Defendants had acknowledged a material weakness in internal controls regarding accounting for "sales returns, allowances for defective products, promotional markdowns, chargebacks and price changes, and

cooperative promotional arrangements" when recording net sales. Also in the 2013 Form 10-K, Defendants had acknowledged that, as of December 31, 2013, the Company had a material weakness in internal controls "over [its] process for establishing reserves for customer-related discounts and promotional allowances."

56. This material weakness in accounting for allowances was directly related to the guidance given by Defendants during the Class Period. Defendants knew that any financial guidance provided to investors had to account for promotional allowances and discounts for it to have a reasonable basis. But the Class Period guidance failed to do so. Several facts and circumstances highlight Defendants' failure to account for the promotional allowances and discounts when providing guidance or the impact of the carryover inventory on sales of new tablets on May 5, 2014, including:

(a) On January 2014, the Company had about a year's worth of carryover inventory;

(b) Defendants knew from 2013 that excess inventory of a product negatively impacted the sales of other products;

(c) Defendants knew that the excess inventory would need to be discounted because they closely monitored the inventory. Defendant Barbour admitted during the May 5, 2014 conference call that LeapFrog was working with its retail partners to move the excess inventory;

(d) Defendants also knew that the LeapPad carryover inventory from the holiday 2013 season would negatively impact new tablet sales, but failed to take into account the impact of the carryover inventory in issuing the Company's guidance on May 5, 2014, as evidenced by Defendants' dramatic reduction of guidance for net sales by approximately $75 million and 86% median reduction for EPS on August 4, 2014, citing, among other issues, the decision to postpone the launch of a new tablet. Further, Defendant Barbour later admitted on February 5, 2015 that the "carry forward inventory that came into this year in retail that had to be cleared before we could get new tablets into the market place" and caused price degradation;

(e) Even though on May 5, 2014, Defendants reaffirmed their prior FY 2014 guidance given on February 12, 2014, they also admitted that there already was "significant discounting" of carryover inventory at retailers. Yet at the time more than half the carryover inventory remained to be sold requiring further discounting;

(f) Defendants conceded on an August 4, 2014 earnings call that LeapFrog's 18.4% decrease in gross margins for the quarter ending June 30, 2014 compared to the prior year was driven by "high inventory levels at retail entering the fiscal year that were carried over from the 2013 holiday season,

which drove retailers to discount products, cut replenishment orders, and require higher trade discounts";

(g) Defendant Arthur conceded on August 4, 2014 that the carryforward inventory had a "significant impact on both our sales and margin" for 1Q15 (ending June 30, 2014);

(h) Defendants admitted on August 4, 2014 that the Company "had to provide additional support to our retail partners to discount carryover tablets to help reduce inventory levels" with the support having a "negative impact on our net sales and gross margins"; and

(i) Defendants admitted on August 4, 2014 that the Company had taken the "pain" in the second quarter of the calendar year (April through June) with respect to discounting and promotional offers.

57. These facts and admissions contradict Defendant Arthur's May 5, 2014 assurances that allowances or costs associated with the carryover inventory would not be "incredibly significant." They also undermine Defendants' responses to the question from an analyst on May 5, 2014 with respect to "inventory levels." The responses failed to adequately inform investors with the requisite specificity that there remained a massive volume of carryover inventory at retailers that required discounts to sell. Instead, Defendants deflected the question claiming that the inventory had come down by "a fair amount" and the Company only had "some pockets of inventory."

58. Also on August 4, 2014, Defendants dramatically reduced FY 2014 net sales guidance from $554-$580 million to $480-$505 for the period ending March 31, 2015 (now referred to as FY 2015 guidance) and reduced net income per share guidance for the same period from $0.18-$0.25 to $(0.04) to $0.10, an 86% reduction from the midpoint. Defendants represented that the reasons for the reductions included "headwinds in the September quarter from the remaining carry-forward inventory and the timing of new product shipments compared to the prior year." Both of these facts were already known to Defendants by May 5, 2014, as evidenced by their acknowledgements.[7]

59. The carryforward inventory reason for guidance reduction was not new on August 4, 2014. Defendants knew the shocking volume of holiday 2013 carryover inventory when they issued

[7] *See, e.g.*, May 5, 2014 Conference Call ("We expect net sales and earnings declines in the first half of the year, largely due to a tough comp to Q1 2013 and beginning retail inventory levels."); *id.* (LeapTV is "not shipping until late").

guidance on May 5, 2014. Moreover, Defendants also knew that fewer sales were made during the second quarter of the calendar year (April through June) than in the second half of the calendar year.[8] Thus, the purportedly new circumstances driving guidance down were not new at all.

60. Analysts noted this inconsistency. For example, as set forth in ¶87, during the August 4, 2014 conference call a Needham & Company analyst asked: "Now at this point, we are talking about retail inventory carryover affecting sales all the way through September. How could the inventory be that high if the shipments are down that much and the stuff is selling? Can you help us with that? How is it not getting cleared out fast enough to allow for shipments?"

61. The purported timing of "new product shipments" was also known on May 5, 2014. Defendants indicated on August 4, 2014 when they reduced guidance that LeapTV would "launch" in October, which necessarily meant a September ship date. Defendants said much the same on May 5, 2014, when they had represented LeapTV would ship in September, which would mean that the product would hit store shelves in October due to the lag time between shipping and the availability of the product in stores. Thus, circumstances around the LeapTV launch had not dramatically deteriorated between May 5 and August 4, 2014. Yet, suddenly on August 4, 2014, Defendants claimed that the September quarter would be negatively impacted by the timing of LeapTV's end of September ship date with expected net sales to be down 38% to 35% compared to the same quarter the prior year.

62. The circumstances known to Defendants undermined any reasonable basis for financial guidance that included LeapTV or make any predictions regarding LeapTV's ship date on May 5, 2014. At the time, Defendants knew that LeapTV faced enormous development hurdles that made any guidance based on its ship date (and resultant sales) false. Given the facts and circumstances known to Defendants at the time of their May 5, 2014 statements, Defendants should have remained silent or sufficiently informed investors of the material adverse facts known to them regarding LeapTV including, *inter alia*, that Defendants did not know when LeapTV would ship because they had accelerated its anticipated release and the product faced development delays.

---

8 *See, e.g.*, August 4, 2014 Conference Call ("slow first and second quarters of the calendar year").

63. For example, from the date LeapTV was announced, Defendants were aware of its tight production timeline. A timeline that was unrealistic. In the original planning for LeapTV, there were two LeapTV schedules discussed. One schedule allowed for a longer concept time and time to develop an appropriate interface; that schedule called for a 2015 release date. The other schedule called for a 2014 release date. The 2014 release date was chosen due to market pressure.

64. LeapTV quality assurance engineers first heard of the LeapTV product around January and February 2014, when they were assigned to LeapTV. At that time, the release date for LeapTV was a mystery because there was no documentation for the LeapTV project, which was highly unusual. Instead, the quality assurance engineers were required to track down information of what was supposed to be developed.

65. Ultimately, a game plan for LeapTV's development was established. The plan established a GM, or goal master, date when quality assurance work would be done. After the GM date, LeapTV would then be ready for manufacture, which could take a couple of weeks. In order for LeapTV to be ready for the 2014 holiday retail season, the GM date would have had to have been early August 2014, at the latest. Regardless, the original goal master date of approximately mid-July 2014 was unrealistic from the very beginning because there was no documentation for LeapTV and no one knew what to expect. LeapTV was an "incredibly complicated product" as Defendant Arthur would acknowledge on November 3, 2014. LeapTV's inherent complications, coupled with the lack of documentation and unrealistic development schedule, undermined Defendants' statements.

66. Additionally, engineers assigned to the product indicated that they were not sure they could achieve the timeline for LeapTV. VP of Engineering Paul Rymarz and Senior Director of Firmware Andy Cozine raised concerns about the LeapTV timeline in weekly meetings attended by Chief Marketing Officer Greg Ahearn ("Ahearn"), but they were told to make it stick to the timeline. It was further understood that Ahearn was conveying Defendant Barbour's position on LeapTV during the meetings. Others working on the project raised concerns in meetings with those working on LeapTV's development that quality assurance would not be able to sign off on LeapTV and meet the GM date because quality assurance had not yet seen the actual product. Meetings in which discussions regarding LeapTV development being behind schedule were attended by those involved

in its development, including engineers and product managers. Given that the engineers responsible for the product were giving warnings regarding LeapTV meeting the timeline and that delays were broadly discussed internally regarding LeapFrog's marquee new product, Defendants had no reasonable basis to tell investors that it would ship in September or issue financial guidance based on sales of LeapTVs shipped on that date.

67. Further, Defendants were aware that the unrealistic development schedule was already slipping by May 5, 2014. The expectations of when LeapTV would be launched changed monthly, then weekly, to the point that for much of 2014 no one at the Company knew when it would launch. By May or June 2014, it was known by those working on the project that the LeapTV would miss the projected September 2014 launch date. In fact, on May 5, 2014, there was no actual LeapTV hardware for quality assurance to even assess. That hardware would not be available until late August.

68. Yet, investors were not told on May 5, 2014 that the ship date for LeapTV was in question or that there were development delays. Rather, Defendants not only represented that it would ship in September 2014 but that the as-yet undeveloped and untested product would drive the Company's growth.

69. Even if LeapTV had, against all reasonable odds, shipped in September, Defendants knew that late ship date would adversely affect sales. As Defendant Arthur explained during a June 11, 2014 conference, "even if you assume [LeapTV is a] runaway success and we have inventory that we could supply retailers, there becomes a fiscal limit to what they're going to actually get through their distribution centers into their stores in time to hit the holiday shopping season." That is, for example, because retailers such as Wal-Mart typically put holiday items on their shelves in August. To do so, Wal-Mart needed to receive items at its distribution center by the end of July. Defendants' September ship date would still result in LeapTV hitting shelves at least two months later than most competing holiday items.

70. Defendants were also aware of increased competition, as reflected in their comments on May 5, 2014.[9] Competition that stole market share. When Defendants issued guidance on May 5, 2014, they provided a net sales range with a $16 million cushion between the top and bottom end and an EPS range with a cushion of $0.07. Investors understood the range to incorporate best- and, importantly, worst-case scenarios regarding carryover inventory and LeapTV sales – two primary drivers of the guidance. Yet, the range did not come close to accounting for the facts Defendants knew about these primary drivers: the "high" level of carryover inventory, declining sales and margins as well as costs associated with carryover inventory, and development delays in LeapTV. The guidance lacked any reasonable basis, and the mere fact of its issuance misled investors.

**<u>Defendants' June 11, 2014 False and Misleading Statements</u>**

71. On June 11, 2014, LeapFrog's CFO, Ray Arthur, participated in the Piper Jaffray Consumer Conference. During the call, Defendant Arthur falsely claimed that all the inventory on retailer's shelves would "clear up" by the third calendar quarter in response to an analyst question, as follows:

> [ANALYST:] But where are you now with respect to that fourth quarter inventory? Do you feel like you're in a position where you can move through a lot of that residual?
>
> [ARTHUR:] ***From inventory retail***, it's still being worked down. . . . ***That will probably take [until] second and third quarter to clear up*** because they're traditionally not high volume quarters at all.

72. Also on the call, Defendant Arthur knowingly misled investors by claiming that LeapTV would "hit stores" in October and that date had been incorporated into LeapFrog's guidance:

> [ARTHUR:] I think this year is going to be a challenge because the products are coming in so late. ***LeapTV is hitting stores in October***, so that is a couple of months later than what we would normally do in the product introduction.
>
> So we're not going to get the full benefit of that introduction this year. I mean, even if you assume it's a runaway success and we have inventory that we could supply retailers, there becomes a fiscal limit to what they're going to actually get through their distribution centers into their stores in time to hit the holiday

[9] May 5, 2014 Conference Call ("The overall children's retail environment was weaker than expected, being impacted by significant industrywide discounting, increased competition . . . .").

shopping season. So that's ***our guidance as kind of flat sales at this point versus last year***, but I think we get back on the growth trajectory the following year.

73. Defendants' false and misleading statements caused LeapFrog's stock price to remain artificially inflated, as Defendants continued to conceal, *inter alia*, the financial impact of the carryover inventory (including the impact on new tablet sales), the delayed launch of LeapTV and that LeapFrog's guidance was unachievable.

**Defendants Had No Reasonable Basis to Reaffirm Guidance on June 11, 2014 and Continued to Conceal the Impact of the Carryover Inventory on LeapFrog**

74. Arthur's representation that LeapFrog's "guidance [was] kind of flat sales at this point versus last year" was an affirmation of the false guidance provided by Defendants on May 5, 2014. Thus, it was false and misleading for the same reasons the guidance issued on that date was, as set forth in ¶¶51-70. Moreover, the quarter's guidance was reaffirmed only 19 days before the end of the quarter – a quarter Defendants would later reveal experienced a year-over-year decrease in gross margins of 18.4% driven by discounts and other efforts undertaken to assist retailers in reducing carryover inventory.

75. Indeed, LeapFrog's dramatic guidance reduction on August 4, 2014 was based on circumstances known to Defendants at the time of their June 11, 2014 statements. Just six weeks after Arthur reaffirmed guidance, Defendants would reduce guidance for net sales from $554-$580 million to $480-$505 for net sales for the period ending March 31, 2015 (now referred to as FY 2015 guidance), and reduce guidance for EPS for the same period from $0.18-$0.25 to $(0.04)-$0.10 for EPS – an 86% reduction from the midpoint. The reasons Defendants gave for the reduction – "headwinds in the September quarter from the remaining carryforward inventory and the timing of new product shipments compared to the prior year" – were ***already known*** to Defendants by May 5, 2014, and thus to Arthur by June 11, 2014. In fact, Arthur knew that a minimum of six months of carryover inventory remained from holiday 2013.[10]

---

[10] On August 4, 2014, Arthur represented to investors during LeapFrog's conference call that LeapFrog was "probably just past halfway through [the carryover inventory] at this point in time." At the beginning of the year, it was a year's worth of inventory.

76. Arthur's representations continued to falsely and misleadingly minimize the volume of carryover inventory and its financial impact as set forth in ¶¶52-60.

77. Defendants also misled investors by reaffirming guidance and representing that LeapTV would be "***hitting stores*** in October" on June 11, 2014. As set forth in ¶¶62-69, Defendants knew that LeapTV's development timeline was unrealistic from the beginning and by this time development delays that would push shipment even further out than the initial late shipment date were evident. For instance, the Company still did not have LeapTV hardware for quality assurance to begin assessment. In fact, LeapTV would not ship until mid-October, meaning that it would not be on store shelves until November as the result of the typical lag time between shipment and arrival of the product in stores of weeks. During the 2013 holiday season, LeapFrog's results were impaired by execution issues (*e.g.*, inventory sitting on trucks) and shelf-stocking lag time. Given these facts, Defendants knew that their representation that LeapTV would be "hitting stores in October," in time for the 2014 holiday season, coupled with the reaffirmation of guidance was false.

78. Likewise, the dramatic reduction in guidance six weeks later on August 4, 2014 from net sales of $554-$580 to $480-$505 million for the period ending March 31, 2015 (now referred to as FY 2015 guidance) and reduced net income per share guidance for the same period from $0.18-$0.25 to $(0.04) to $0.10, an 86% reduction from the midpoint, illustrates Defendants' fraud. Defendants' reduction in guidance was based on the same circumstances known to Defendants since no later than May 5, 2014 – "headwinds in the September quarter from the remaining carryforward inventory and the timing of new product shipments compared to the prior year."

79. On June 11, 2014, Defendants knew that a significant amount of carryover inventory remained from holiday 2013, approximately six months or more worth of inventory. They also claimed that LeapTV would be "hitting stores in October" which is precisely what Defendants told investors when they dramatically lowered guidance on August 4, 2014 (*i.e.*, [i]n October, we will launch LeapTV"). Therefore, Defendants had reasons to know their statements were false.

**Defendants' August 4, 2014 False and Misleading Statements**

80. On August 4, 2014, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur that attached a Leapfrog press release wherein Defendants set false and misleading

expectations regarding guidance, including that ***LeapFrog expected net sales for the full year 2015 (ending March 31, 2015) would be between $480-$505 million***. Defendants also falsely and misleadingly represented that this guidance revision incorporated information regarding "elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of new product shipments," and "the deferral of our consumer electronics tablet until next year to allow us to focus on the launch of our major new platform introduction – LeapTV." In addition, Defendants also falsely and misleadingly represented that they ***expected net income (loss) per basic and diluted share to between $(0.04) and $0.10***. For the ***second fiscal quarter*** ending September 30, 2014, Defendants falsely stated they ***expected net sales to be between $125 million and $130 million***.

81. While Defendants acknowledged "***these challenges***," they falsely and misleadingly minimized them by representing the challenges would be "***offset[]***" by "a very back-end loaded year ***with LeapTV shipping at the end of September***," "***the introduction of new products that we expect to perform very well in the market place in fiscal 2015 and beyond***." "We believe ***LeapTV*** will be a big hit when it launches, ***but it won't start shipping until the end of September, limiting the upside for this year*** but positioning us nicely for next year."

82. In the August 4, 2014 press release, Defendants falsely represented that LeapFrog would experience a "strong holiday season" and that the Company expected "solid net sales growth in both the December and March quarters" as a result of the release of LeapTV in October 2014, and the sales of LeapPad3 and LeapPad Ultra XDi, among other products:

> Our business so far this year has been significantly hindered by retail inventory carry-forward from Holiday 2013, tough conditions in most of our key markets and the planned later launch of our major new product introductions for the year. While these difficulties have caused our financial performance to decline substantially during our seasonally slow quarters, we are making good progress on our growth initiatives, which should position us well for a strong holiday season, expansion into new major entertainment categories and profitable long-term growth.
>
> * * *
>
> We expect our financial results to decline year-over-year in the September quarter due to remaining elevated retail inventory levels, continued challenging POS trends and the comparative timing of new product launches. . . . ***However, we expect solid net sales growth in both the December and March quarters, led largely by***

> ***sales of new releases including LeapTV, LeapBand, LeapPad3, LeapPad Ultra XDi and related content***.

83. Later on August 4, 2014, LeapFrog hosted its 1Q15 conference call concerning the Company's financial results for the period ending June 30, 2014. During the call, Defendants falsely and misleadingly emphasized that LeapTV would be responsible for LeapFrog's financial turn-around for the second half of fiscal 2015, falsely representing that the Company would experience "***double-digit sales growth in the December and March quarter***." During the call, Defendant Arthur reiterated the false guidance contained in the Company's August 4, 2014 press release.

84. Defendant Barbour also misled investors on the August 4, 2014 call by implying that the excess carryover inventory issue was behind them and that the Company expected "sales growth in both the December and March quarters":

> ***The second half of fiscal 2015 should be much brighter and we expect solid double-digit sales growth in the December and March quarters. We expect this growth to be driven by shipments of our exciting new product introductions for the year, which include . . . new feature-filled tablets, and two new exciting product lines [LeapTV and LeapBand] in new high-growth categories not currently being addressed for younger children***.
>
> While our net sales for the quarter were slightly worse than forecasted, ***our progress in reducing carryforward retail and inventory levels and initial success in launching our major new product categories position us for a strong holiday season and long-term profitable growth***.
>
> * * *
>
> As we look ahead, we expect continued headwinds in the September quarter from the remaining carryforward inventory and the timing of new product shipments compared to the prior year. As a result, we expect net sales and profit to decline in the September quarter, ***but we then expect considerable sales growth in both the December and March quarters, led largely by new product shipments.***

85. Defendant Arthur echoed Barbour's statements, further misleading investors by claiming that LeapFrog expected "***solid growth in [its] third and fourth fiscal quarters" and that it was "well positioned for a strong holiday season with a new lineup of tablets, fantastic new products in LeapTV and LeapBand set to enter the market" despite "carryforward . . . inventories" and a "later introduction of new products.***"

86. Defendant Arthur continued by making the following false and misleading statements:

> In the second quarter of fiscal 2015, which is the September quarter, we expect our results to be impacted by the timing of new product launches as we expect to ship more of our new products in the December and March quarters this year, compared to the June and September quarters last year. Specifically, ***we expect net sales in the second quarter to be in the range of $125 million to $130 million***, down 38% to 35% as compared to a year ago. The decline is largely due to the timing of new product launches with our major new launch, ***LeapTV, which we will begin shipping at the end of September.***
>
> In addition, our sales projections have declined with the deferral until next year of our consumer electronics tablet as we focus more of our current-year efforts on LeapTV.
>
> * * *
>
> ***[W]e believe that we are very well positioned for a strong holiday season with a new lineup of tablets, fantastic new products in LeapTV and LeapBand set to enter the market***, and even more great content in our library, ***and we expect solid growth in our third and fourth fiscal quarters.***

87. On the call, analyst expressed confusion that carryover inventory could be so high if the product was selling. Defendant Arthur's response falsely and misleadingly represented that retail POS trends had "improved," that the discounts necessary to clear the inventory had already been taken, and that the Company had taken the pain (*i.e.*, that no more pain would result from efforts to clear out carryover inventory):

> [ANALYST:] [W]e are talking about retail inventory carryover affecting sales all the way through September. How could the inventory be that high if the shipments are down that much and the stuff is selling? Can you help us with that? How is it not getting cleared out fast enough to allow for shipments?
>
> [ARTHUR:] Retail POS has been challenged in the first quarter of the calendar year. . . . And ***that trend has improved*** somewhat, but it still carried over into the second quarter. . . . So, we have made some good progress on bringing down the amount of carryover inventory, but we are probably just past halfway through it at this point in time. . . . That being said, ***I think we have given all the discounting and promotional offers we've needed to give during this quarter and taken the pain so that those units will now clear out more quickly.***

88. Similarly, when asked by an analyst when the excess inventory would be cleared, Defendant Barbour falsely and misleadingly represented that the inventory buildup would be essentially gone by Thanksgiving, calling a "one-off situation" that would not have any lingering effect on LeapFrog's tablet business:

> [BARBOUR:] I think that if you think about it, we are probably right now just over halfway for clearing the product that was there. ***My sense is that the bulk of it will be cleared as we move into probably late fall, into the early part of the season. . . .*** So again, ***our sense is that the bulk of it will be gone as you get close – as we get***

> ***close to Thanksgiving*** as people are looking for really incredible value gifts to put away for the holiday season.
>
> * * *
>
> It doesn't take away from the incredible opportunity this Company has ahead of it. ***We're dealing with a one-off situation here, which, as I say, we have explained many times on the calls in the past where we are trying to deal with it as quickly as possible***.
>
> But I will be frank. We're totally energized about the response we have had to LeapBand and LeapTV . . . . If you look at the scale of the video marketplace and there is nothing like this product out there for young children, and the potential to deliver content to those video game systems, including for the first time video content to people's TV. . . . We are incredibly energized and we are investing still in the future of this business. And while at the same time, ***we deal with a one-off situation here***, and as we get through this and our tablet business starts to get back onto a growth curve and then we launch these new diversification opportunities, we're still big believers in the opportunity ahead of us.

89. In response to questions from analysts regarding guidance reduction, Arthur again falsely and misleadingly represented that "we should be done with the discounting":

> [ANALYST:] Thinking about the point of sales trends that now they have been challenging over the last quarter or so, is this really the main driver for the reduction in guidance or is there anything else that we should be thinking about?
>
> [ARTHUR:] I think cancellation -- not cancellation, but deferring our CE tablet to next year, challenging POS trends, and the carryover inventory are the real drivers, as well as the discounts we have given, although ***we should be done with the discounting***.

90. Defendants' responses to analyst questions about the "substantial" step up in the December quarter guidance by falsely representing that sales of LeapTV and the new LeapPad would result in LeapFrog's biggest quarter in a long time:

> [ANALYST:] I'm trying to reconcile your prior guidance, which was on a December year-end, versus your current guidance. It implies a pretty substantial step up in the December quarter specifically, both in sales and margins, so Ray, if you could just walk us through the P&L for what we should be thinking about as we look into that holiday quarter, that would be helpful.
>
> * * *
>
> [ARTHUR:] Sure. Definitely the third quarter of our fiscal year is a big quarter for us, bigger than it has been for a long time. ***I think that's primarily the result of LeapTV starting to ship at the end of September, so most of the channel fill is going to occur in Q3.*** Even with LeapBand, which is going to come out a little earlier, a lot of the channel fill is going to come in Q3. ***And also, the new tablet lineup is hitting then***. So, the response we have gotten to LeapTV is just – it is incredibly exciting and we anticipate that this is going to be a really good quarter in terms of sales there and channel fill for our other products that are going into retail.

91. Moreover, Defendants continued to falsely and misleadingly represent to investors that LeapTV would launch according to the Company's previously announced plans:

> [ANALYST:] [T]hinking about LeapTV and it not starting to ship until September, is this where you guys were planning it to start shipping or is this a little bit later than expected?
>
> [BARBOUR:] I think if you look at the video game marketplace and you look at POS, there are not many people in the marketplace that buy $150 video game systems before Thanksgiving. So, the fact that it is being launched at that time and get[ting] into the marketplace, we see it hitting the bulk of the POS opportunity for this year. So, we're excited about it. Technologically, there is a lot of technology in it. This wasn't a simple product to develop. There's a lot of really cool technology in it and we are very excited about it.
>
> [ARTHUR:] ***It will get to stores when we had planned to get it to stores.***

92. On LeapFrog's partial revelations, the Company's share price fell from a close of $7.39 on August 4, 2014 to a close of $6.01 on August 5, 2014 – a decline of nearly 19%. LeapFrog's stock price, however, remained artificially inflated as a result of Defendants' false and misleading representations that, *inter alia*, LeapTV would launch when planned, that excess inventory was a "one-off" and would be clear by the Thanksgiving holiday season, as well as that Defendants would meet revised guidance.

93. Analyst commentary demonstrates that the market continued to be deceived by Defendants' bullish statements regarding LeapFrog's ability to produce financial growth from its new products, including LeapTV. For example, analyst BMO Capital Markets issued a report on August 5, 2014 noting that "we think the company has a strong new product line for the fall and believe the patient investor will be rewarded." BMO referred to LeapTV as LeapFrog's "marquee 2014 holiday product" with management's expectation that it would ship "in September for the October retail resets" and, in turn, "recording [the] sales in the third (December) quarter."

**<u>Defendants Had No Reasonable Basis for the 2Q15 or FY 2015 Guidance Issued on August 4, 2014, Their Assurances to Investors that They Had Already Taken the Pain of Discounting the Carryover Inventory or that LeapTV Would Hit Stores as Planned</u>**

94. Defendants revised FY 2015 guidance of net sales between $480 and $505 million and net income (loss) per basic share of a loss per share $(0.04) and $0.10, and quarterly guidance of net sales between $125 and $130 million was false when made for the same reasons set forth in ¶¶51-70, 74-79. Defendants claimed on August 4, 2014, that the revised guidance, which reduced

expectations for FY 2015, incorporated information regarding "elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of new product shipments." Each of these factors was known to Defendants prior to issuing guidance on August 4, 2014 as reflected by their own statements.[11] By giving guidance on August 4, 2014, Defendants represented to the market that they had a basis for the guidance. Specifically, they represented that these factors had been accounted for in LeapFrog's financial guidance when they had not.

95. Merely three months later, Defendants would inform investors that rather than an expected EPS of $(0.04) to $0.10 and net sales of $480 to $505 million for FY 2015, LeapFrog expected to report a loss of $(0.13) to $(0.25) and net sales of $450-$470 million. When informing investors of this drastic reduction in guidance, Defendants admitted that many of the same factors that led to lowered guidance in November had been cited as those that had led to reduced guidance in August: "Given concerns related to the remaining clearance inventory, weakness in the retail environment in some of our key product categories, and retailers bringing down their inventory levels, we are reducing our full fiscal-year 2015 guidance." The "primary reason" for the 43% decline in net sales for 2Q15 reported on November 3, 2014 was the delay of LeapTV.

96. In addition, when Defendants issued FY 2015 guidance on August 4, 2014, Defendants acknowledged that LeapFrog's discounted carryover inventory "is still at prices that are significantly higher than the average consumer prices for children's products" and that the inventory had been selling at retailers "that are filled with competitor clients' product which are a lot of times at far deeper discount prices." Regardless, Defendants tried to blame these very factors for its lowered guidance on November 3, 2014 citing concerns related to clearance inventory.[12]

[11] May 5, 2014 Conference Call ("if current retail trends continue, we do believe we will see ourselves coming in at the low end of this guidance range"); *id.* ("POS is not very robust in the first quarter."); *id.* ("We expect net sales and earnings declines in the first half of the year, largely due to a tough comp to Q1 2013 and beginning retail inventory levels . . . ."); *id.* (LeapTV is "not shipping until late"); June 11, 2014 Conference Call ("I think that the marketplace today, the tablets overall are swelling down."); *id.* ("we think that retailers will probably be cautious"); *id.* ("this year is going to be a challenge because the products are coming in so late"); *id.* ("LeapTV is hitting stores in October, so that is a couple of months later than what we would normally do in the product introduction.").

[12] November 3, 2014 Conference Call (the inventory "is still at prices that are significantly higher than the average consumer prices for other children's products sold during this time of year"); *id.*

Defendants' repetition of the same problems as a basis for lowering guidance and disappointing results demonstrates the lack of a reasonable basis for their initial guidance.

97. Defendants' evasive responses to analyst questions regarding carryover inventory and margins highlight their deliberate concealment of the nature and impact of the carryover inventory. For example, Defendants did not disclose the shocking amount of inventory that remained or the financial impact of the inventory, including the necessity for further discounts or resultant cannibalizing of new tablet sales. Instead, their representations were half-truths at best, dismissing the inventory as a "one-off situation" and telling investors that the inventory build-up would be gone by Thanksgiving and they "should be done" with discounts.

98. Defendants also emphasized that they had taken the "pain" with respect to discounting and promotional offers. This was highly misleading, as there remained a shocking amount of inventory a month later in September 2014 that would require additional discounting and negatively impact new tablet sales and margins.

99. Defendants' knowledge of the breadth of LeapFrog's inventory problem is demonstrated by their repeated discussion of the carryover inventory on conference calls throughout the Class Period. For example: (i) "we're working the way through the inventory right now" (May 5, 2014); (ii) "we are working with our retail partners to move that inventory" (May 5, 2014); and (iii) "we are focused on right sizing retail inventory levels" (August 4, 2014). Given this knowledge, their deceit is exemplified by their subsequent revelations that stand in direct contrast to their August 4, 2014 guidance:

(a) On November 3, 2014, Defendants slashed the low end of net sales guidance by $30 million and a reported $0.21 expected increase in loss per share for on the low-end of guidance. In so doing, Defendants admitted that LeapFrog's 2Q15 financial performance was impacted by "elevated carryover retail inventory" and "continued clearance of carryover product from last holiday season";

(b) On November 3, 2014, Defendants also dramatically reduced guidance, including a median 86% drop in expected EPS for FY 2015, citing "concerns related to the remaining clearance inventory";

---

("it's been selling in retail environments that still contain competitive clearance product, which are a lot times at far deeper discount prices.").

(c) On February 5, 2015, Defendants admitted that the 38% decrease in gross profit for the quarter from the same period the prior year was in part due to "increased discounts and allowances to clear inventory carried over from the prior holiday season";

(d) On June 11, 2015, when reporting abysmal 4Q15 and FY 2015 financial results, including a 40% decline in quarterly net sales year-over-year and a 36% net sales decline for the fiscal year, as well as a net *loss* per share of $3.12 as compared to net income per share of $1.07 the prior year, Defendants blamed the "[h]igh carry-forward retail inventories from the holidays"; and

(e) On June 11, 2015, Defendants admitted that gross profit was significantly down year-over-year "due to . . . higher discounts and allowances."

100. Similarly, Defendants' guidance for 2Q15 (ending September 30, 2014) of net sales of $125-$130 million lacked a reasonable basis. Defendants claimed that the guidance, 38% below the prior year, reflected the "timing of new product launches" due to LeapTV "shipping at the end of September." Given what Defendants knew about the development of LeapTV, they lacked any basis for telling investors that it would ship at the end of September or including sales of LeapTV in any forecast, as explained in ¶62-69, 77.

101. Further, Defendants knew that LeapTV would not "get to stores when [LeapFrog] had planned to get it to stores." By August 4, 2014, Defendants knew that the original goal master date had already passed and that LeapTV's hardware still had not yet been made available for quality assurance. Weekly meetings were held regarding LeapTV's progress and development status beginning in July 2014 and monthly consensus meetings attended by Defendant Arthur and, at times, Defendant Barbour were also held. The objective of those meetings was to determine how many products needed to be produced, shipped, and delivered at the end of August/early September. Based on what they learned first-hand during the monthly meetings and what was discussed during the weekly meetings, Defendants knew that LeapTV was not shipping "as planned." They also knew that they did not have a reasonable basis for issuing FY 2015 financial forecasts with a September ship date for LeapTV.

102. LeapFrog issued guidance as a range, giving itself a $25 million cushion for its guidance range for net sales and a $0.14 cushion for EPS, thus signaling to investors that it was incorporating the worst case scenario regarding the carryover inventory, decline in tablet sales and

the sales of LeapTV. Yet, as described in ¶¶51-70, 74-79, 94-101, Defendants failed to take into account the impact of these issues when issuing guidance.

**<u>Defendants' November 3, 2014 False and Misleading Statements</u>**

103. On November 3, 2014, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur attaching a LeapFrog press release regarding the Company's financial results 2Q15 (ending September 30, 2014). In the press release, Defendants downplayed the Company's 43% sales decline compared to the same period in the previous calendar year while continuing to assure investors that LeapTV and LeapPads would drive 3Q15 results:

> In addition, our fiscal second quarter net sales were hampered with the slippage of first shipments of LeapTV into the fiscal third quarter, which is the primary reason our fiscal second quarter net sales results were below our guidance range.
>
> ***Despite these challenges, we believe we are well-positioned for the all-important holiday season with*** our biggest ever line of fun educational content, filled with lots of new games, books and videos; the exciting launch of our innovative new active educational video game system, LeapTV; [and] two new feature-filled tablets in our LeapPad line. . . .
>
> * * *
>
> We expected a decline in our financial performance year-over-year given higher levels of retail carry-over inventory from Holiday 2013 and the comparative timing of new product launches. . . . However, the decline in net sales was more than anticipated primarily due to the slippage of first shipments of LeapTV into the fiscal third quarter. . . .
>
> ***We expect our financial results in our fiscal third quarter ending December 31, 2014 to improve year-over-year given the launch of LeapTV, two new LeapPad tablets***, a strong line-up of learning toys and interactive reading platforms and an exceptional educational content offering.

104. The November 3, 2014 press release set false expectations regarding ***FY 2015 guidance of net sales between $450 and $470 million and net loss per basic and diluted share to be between $0.13 and $0.25***. Defendants also set false expectations ***regarding fiscal 3Q15 guidance of net sales between $220 and $240 million and net income per diluted share between $0.16 and $0.28***. Defendants falsely maintained that for the fiscal quarter ended December 31, 2014, the Company would experience a massive net sales growth of up to 28% despite the carryover inventory and retail softness:

> [W]e also expect our business to continue to be impacted by residual Holiday 2013 carry-forward retail inventory of LeapPads. Additionally, many of our retail partners

> around the world are running far tighter inventories this year, and we are experiencing retail sales softness in some of our key product categories. As a result, we are lowering our outlook for the fiscal year . . . .
>
> For the full fiscal year ending March 31, 2015, we expect:
>
> - ***Net sales to be in the range of $450 million to $470 million*** compared to $528 million for the twelve-month period ended March 31, 2014.
>
> * * *
>
> For the third fiscal quarter ending December 31, 2014, we expect:
>
> - ***Net sales to be in the range of $220 million to $240 million, up 18% to 28%, compared to $187 million for the quarter ended December 31, 2013.***

105. Also on November 3, 2014, LeapFrog hosted its 2Q15 conference call. During the call, ***Defendant Arthur repeated the false and misleading guidance provided by Defendants in the Company's November 3, 2014 press release***. Defendants also continued to falsely and misleadingly tell investors that they should expect a "much brighter" second half of fiscal year 2015 and "double-digit sales growth in the December and March quarters" driven by LeapTV:

> [W]e are developing and launching innovative products . . . including the introduction of a major new platform that will diversify and grow our global business. . . . ***The second half of fiscal 2015 will be much brighter and we expect solid double-digit sales growth in the December and March quarters. We expect this growth to be driven by shipments of our exciting new product introductions for the year.***
>
> We started shipping units [of LeapTV] to retailers a few weeks ago and ***I am very pleased to report that LeapTV is off to a very strong start.*** While launch inventory is still flowing to many stores, early sales and reviews have been very encouraging. With limited distribution, LeapTV has already hit the top 25 selling list this week at one major retailer and it has been selected on many retailer, media, and industry top toy lists for this holiday.

106. During the call, Defendant Arthur falsely reiterated that although LeapFrog had experienced a sales decline in comparison with the same period last year, the launch of LeapTV was expected to cause sales to increase for the balance of FY 2015:

> Four major factors affected our financial performance in the second fiscal quarter of 2015. . . . That said, we now have launched LeapTV and we are optimistic that this innovative new educational and video gaming platform and related content will be a top seller in our third fiscal quarter and beyond. ***We expect sales to increase for the balance of our fiscal year versus the same period of last year as we are well positioned for the holidays with our best product lineup ever and strong support from significant retail, trade, and advertising campaigns, as well as off-shelf promotions***.

* * *

> Now I would like to finish my prepared remarks with insight into our full-year outlook. While our reported results through the second fiscal quarter of 2015 reflect sales and earnings reductions versus the same periods in the prior year, ***we expect to see improved results for the remaining two quarters of the year versus the same periods a year ago.***

107. Defendant Barbour followed by falsely and misleadingly representing that any shortfall of LeapTV sales in the second quarter would be made up in the third quarter:

> [ANALYST:] And just to follow up on that, JB. The delay and the shortfall in the second quarter, do you make up all of that in the fiscal third quarter?
>
> [BARBOUR:] ***We would hope that we would make up most of it, yes.***

108. In addition, Defendants continued to falsely and misleadingly represent that retailers' inventory of LeapFrog products had already been worked through and because of this, the Company would see "***growth for the . . . third quarter and into the fourth quarter***":

> [ANALYST:] Could you provide some more color on inventory levels at retail? Specifically, how did the levels look by product type – tablet versus content versus toys? And when do you expect them to normalize?
>
> [ARTHUR:] Yes. The carryover inventory was primarily in tablets and ***we substantially sold through the excess inventory in tablets that's at the marketplace***. . . . I would say, if anything, I think people are just being – are really keeping their inventories tightly managed this year.

109. Despite Defendants' reduction of guidance and disclosure that sales of LeapTV were delayed until the third quarter, LeapFrog's stock price remained artificially inflated because of, *inter alia*, Defendants' false and misleading representations that LeapTV would drive the Company's growth, including a year-over-year increase in net sales, failure to disclose the impact of the inventory situation as well as the discounts required to move the carryover inventory. Prior to the press release and call, LeapFrog's stock price rose, from a close $5.32 on October 31, 2014 to a close of $5.43 on November 3, 2014. Subsequently, Leapfrog's stock price closed at $4.70 on November 5, 2014, and $4.57 on November 6, 2014, on unusually high volume each day.

**<u>Defendants Had No Reasonable Basis for Their November 3, 2014 Guidance, or Their Statements Regarding the Company's Carryover Inventory or LeapTV</u>**

110. Defendants knowingly issued false FY 2015 guidance of net sales of $450-$470 million and net income (loss) per basic share of $(0.13)-$(0.25) and 3Q15 net sales of $220-$240

million and net income per diluted share of $0.16 to $0.28 per share for the reasons set forth in ¶¶51-70, 74-79, 94-102. Defendants knew that to achieve this guidance, the Company had to have holiday 2014 sales that surpassed those of its successful launch of LeapPad in 2011, and knew that this would be impossible due to their awareness of adverse facts and circumstances at the time.[13]

111. But on July 11, 2014, Defendants had admitted the limitations facing sales of LeapTV for holiday 2014: "even if you assume it's a runaway success and we have inventory that we could supply retailers, there becomes a fiscal limit to what they're going to actually get through their distribution centers into their stores in time to hit the holiday shopping season." Moreover, at the time of Defendants' November 3, 2014 statements, they knew that LeapTV had shipped to retailers late, in mid-October. Given the late shipment and previously acknowledged limitations, Defendants knew that LeapTV could not drive the 3Q15 and FY 2015 guidance they issued.

112. Indeed, each of the following facts, known to defendants before November 3, 2014, undermined any reasonable belief that LeapTV would sell like LeapPad had in 2011 or deliver an 18%-28% improvement of net sales over the same quarter the prior year:

(a) Leap TV had development delays, including an unrealistic timeline and missed its initial goal master date, as set forth in ¶¶62-67, 77;

(b) By September 2014, it was obvious internally that the original launch date of LeapTV was not going to be achieved. The Company was having to fly hardware from the far east to the U.S. and was also flashing hardware in Fontana, California – *i.e.*, installing firmware and software – instead of in Asia. Both the air shipments and flashing the hardware in the U.S. represented additional costs for LeapTV;

(c) The late launch caused retailers important to LeapFrog's sales to drop LeapTV from sales. It also caused LeapFrog to lose shelf space with Target relegating LeapTV to end-cap space. The loss of shelf space was important because as Defendants would concede in LeapFrog's 2015 Form 10-K, reduced shelf space at Wal-Mart and Target can negatively impact sales at these retailers. Defendants' experience with execution issues from the prior year put them on notice of the inevitable import of these factors on holiday 2014 sales;

(d) LeapTV's sales within two weeks of launch were not "off to a very strong start," but rather below target, information that was available to Defendants via internal POS data; and

[13] For the quarter ending December 31, 2011, LeapFrog reported net sales of $210 million and EPS of $0.16.

(e) Market trends were heading toward mobile gaming applications and away from TV-based products.

113. On January 22, 2015, Defendants would concede that the very development issues they knew of prior to November 3, 2014 contributed to the massive 34% net sales miss for 3Q15: "Due to development issues, we shipped and promoted our new LeapTV educational video game system later than planned. This delay along with communication challenges and inconsistent execution at retail resulted in us significantly missing our sales expectations on this innovative new platform." Having known of the development delays at the time of their November 3, 2014 statements as well as the likely possibility of execution issues given the Company's FY 2013 experience, Defendants' guidance, which failed to incorporate the known delays and corresponding effects, lacked any reasonable basis.

114. In addition, Defendants' November 3, 2014 statements continued to mislead investors regarding the carryover inventory. While Defendants acknowledged that "we also expect our business to continue to be impacted by residual Holiday 2013 carry-forward retail inventory of LeapPads," they also assured investors that the impact had been incorporated into the November 3, 2014 guidance and that they had "substantially sold through the excess inventory." These half-truths cannot be reconciled with Defendants' admission on February 5, 2015 that the 38% year-over-year decrease in 3Q15 gross profit was due in part to "increased discounts and allowances to clear inventory carried over from the prior holiday season." Defendants knew the extent of the remaining carryover inventory and that discounts that would be required to sell it, and also knew they needed to account for such discounts in forecasting and reporting actual results due to the material weakness they reported in FY 2013 for precisely this issue.

115. Nor can Defendants' November 3, 2014 acknowledgement that "[n]ew LeapPad shipments to customers continue to be hampered by the remaining carryforward inventory" be reconciled with their February 5, 2015 claim with respect to the Company's massive miss that "a lot of [the price degradation] was driven by especially in our case, the amount of carryforward inventory that came into this year in retail that had to be cleared before we could get new tablets into the

marketplace." Unlike investors, Defendants knew on November 3, 2014 exactly what was being ordered by LeapFrog's retailers, what was being sold and the status of the carryover inventory.

116. Similarly, Defendants' November 3, 2014 guidance and statements regarding carryover inventory cannot be reconciled with the magnitude of the earnings miss for 3Q15. Defendants acknowledged they were aware of carryover inventory on November 3, 2014. Yet rather than meeting, or even approaching, the 3Q15 guidance of $0.16 to $0.28 per share they provided on that date, Defendants reported losses of $0.25 per share for the quarter. Similarly, rather than net sales between the $220-$240 net income million 3Q15 guidance range they provided on November 3, 2015, Defendants would report net income of merely $145 million. LeapFrog's massive guidance misses were due to circumstances Defendants claimed to have taken into account when issuing guidance on November 3, 2014.

117. Defendants knew that the excess inventory would need to be discounted and was impacting retailers decisions to purchase new LeapPads because Defendants closely monitored the inventory. LeapFrog maintained weekly POS reports regarding LeapPad sales that showed the previous week's sales, as well as year-to-date sales and the inventory levels being held by retailers. Excess inventory was also discussed in meetings of the Demand Planning group. The availability of this information evidences that Defendants were well aware of the excess carryover inventory and its negative impact on LeapFrog's financial condition despite their failure to incorporate that impact into guidance. If Defendants did not know the extent of the impact of the carryover inventory, they had no basis to claim it was accounted for in the guidance they gave to investors.

118. Defendants also knew that LeapFrog's tablet sales were declining based on the Company's actual results for calendar year 2013, which represented a 5% decrease in net sales from calendar 2012, and a year-over-year 31% decrease for the first quarter of 2014 (ended March 31, 2014). They knew that net sales for 1Q15 (ended June 30, 2014) had come in below the low-end of guidance ($47 million vs. guidance of $48-$52 million). They knew that 2Q15 net sales (ending September 30, 2014) were down 43% from the same quarter in the prior year. These declines informed Defendants that the Company's LeapPad business was deteriorating. To wit, Defendants acknowledged on February 5, 2015 that "[i]n our projections for the third quarter we planned for a

decline in retail sales of LeapPad tablets." Yet, Defendants concealed this projected decline from investors on November 3, 2014, instead telling them that "[w]e expect our financial results in our fiscal third quarter ending December 31, 2014 to improve year-over-year given the launch of LeapTV [and] two new LeapPad tablets."

119. Defendants repeatedly acknowledged challenges while failing to sufficiently inform investors of the impact of those challenges on LeapFrog's financial outlook when giving guidance. Compare, for example, Defendants' statements on the Company's November 3, 2014 conference call that "many of our retail partners . . . are running far tighter inventories this year, and we are experiencing retail sales softness in some of our key product categories," with the January 22, 2015 announcement that "retail in-stocks of our new tablets were hampered by tighter inventory management" being one of the reasons for the 34% miss in 3Q15 guidance.

120. Having acknowledged that LeapFrog faced these issues, Defendants were required to incorporate the impact of these issues into their guidance and/or fully disclose material facts necessary to inform investors of the magnitude of the issues or remain silent. Here, Defendants chose to issue guidance without a reasonable basis. Hopes that lightening would strike with LeapTV or that it would be a runaway success when it faced numerous development delays, or that retail partners might suddenly loosen inventories or that retail trends for LeapPads will suddenly reverse, were not reasonable.

121. When LeapFrog provided a $20 million range between the top- and low-end of its FY 2015 guidance for net sales and a $0.12 cushion for EPS, it signaled to investors that it was incorporating the worst case scenario regarding the issues it identified. Yet, Defendants failed to take into account the inventory issues, declining demand in tablets or the delays in LeapTV as evidenced by the dramatic miss for 3Q15 and the identification of these same issues as the basis for the miss.

**<u>LeapFrog's 2Q15 False Financial Results</u>**

122. For 2Q15, Defendants falsely reported ***net income (loss) of $(2,026) and EPS of $(0.03)***. LeapFrog's financial results were included in a press release disseminated to the public and discussed on a conference call with analysts and investors on November 3, 2014 (2Q15). The results

were also included in the Company's 2Q15 Form 10-Q filed with the SEC on November 10, 2014 for the quarter ended September 30, 2014.

123. In LeapFrog's 2Q15 Form 10-Q, Defendants also falsely claimed that: ***"[A]s of September 30, 2014, based on [the Company's] assessment of various qualitative factors and projection of future operating results, the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment***."

124. The Form 2Q15 further falsely stated ***the financial information they reported was a fair statement of LeapFrog's financial results and that the results were prepared in accordance with GAAP***.[14]

125. If LeapFrog had properly recorded goodwill impairment charges of $19.5 million in 2Q15, the Company's reported net income and basic and diluted EPS would have dramatically decreased as shown in the following chart:

| (In Thousands of $ Except EPS) | **2Q15** |
|---|---|
| Net Income (Loss) as Falsely Reported | ($2,026) |
| Basic and Diluted EPS as Falsely Reported | ($0.03) |
| Goodwill Write-Off Defendants Should Have Taken to Timely Reflect Impairment | ($19,549) |
| **Net Income (Loss) Reflecting Goodwill** | **($17,442)** |
| **Actual Basic and Diluted EPS Reflecting Goodwill Write-Off**[15] | **($0.25)** |

[14] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

[15] Adjusted for taxes.

**<u>LeapFrog's 2Q15 Financial Results Were False Because LeapFrog's Goodwill Was Impaired</u>**

126. Defendants caused the Company to falsely report its net income, total assets and stockholders' equity for 2Q15 by failing to timely write-off $19.5 million impaired goodwill associated with its U.S. reporting unit. LeapFrog's goodwill was impaired.

127. Pursuant to Accounting Standards Codification ("ASC") 350-20-35-2 "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." At the time Defendants reported LeapFrog's 2Q15 financial results the Company was underwater, its fair value was less than its book value. The impairment was material – $54 million compared to a reported loss of $2 million for the quarter.[16]

128. Defendants, however, told investors that they did "not believe" there were "sufficient indicators of [goodwill] impairment" to even test for goodwill impairment. Under the circumstances and conditions specific to LeapFrog that Defendants knew, such a statement was false.

129. Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. ASC 805-10-05-4 requires that a business combination be accounted for by applying the acquisition method. ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "the price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." The excess of the purchase price over the fair value of the net assets acquired is recognized as an asset called goodwill. ASC 350-20-35-16.

130. Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in accordance with ASC 350-20. Goodwill is not amortized over a pre-determined number of years. Instead, ASC 350-20-35-1 requires that a company test goodwill

[16] According to LeapFrog's Form 10-Q as of September 30, 2014, $5.01 closing price at November 4, 2014 x 70.052 million shares = $350.96 million fair value of equity. $350.96 million fair value equity - $404.921 book value of stockholders' equity = ***negative*** $53.96 million. Yet, Defendants issued LeapFrog's Form 10-Q for 2Q15 six days later, on November 10, 2014, stating that there were no indications of goodwill impairment.

for impairment annually. ASC 350-20-35-28. Moreover, GAAP requires quarterly impairment testing if certain "triggering events" are present that would more likely than not reduce the fair value of a reporting unit[17] below its carrying amount. ASC 350-20-35-30. Pursuant to ASC 350-20-35-3C, examples of such "triggering events" include, but are not limited to, the following:

> a. Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;
>
> b. Industry and market considerations such as a deterioration in the environment in which an entity operates, ***an increased competitive environment***, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), ***a change in the market for an entity's products or services***, or a regulatory or political development;
>
> c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;
>
> d. ***Overall*** financial ***performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods***;
>
> e. Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation;
>
> f. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit; and
>
> g. If applicable, ***a sustained decrease in share price (consider in both absolute terms and relative to peers)***.

131. ASC 350-20-35-3E required Defendants to test for goodwill impairment if ***any*** of the triggering events made it more likely than not the fair value of reporting unit is less than the book value or carrying amount. The same ASC provision provides that the triggering events must be considered holistically. In other words, even if none of the triggering events is sufficient, on its own, to make it more likely than not the fair value of the reporting unit is less than the book value, if the

---

[17] A reporting unit is an operating segment of a company or one level below an operating segment (also known as a component). ASC 350-20-20 ("Reporting Unit" definition from glossary). LeapFrog had two operating segments during the Class Period: (i) U.S.; and (ii) International. For purposes of its goodwill impairment testing, LeapFrog considers its operating segments to be its reporting units.

totality of the events and circumstances described above as applied to LeapFrog made it more likely than not that the fair value of a reporting unit at 2Q15 was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test.[18]

132. For 2Q15, multiple triggering events and circumstances specific to LeapFrog required LeapFrog to test for goodwill impairment as explained below.

133. ***A sustained decrease in share price***. Following Defendants' August 4, 2014 announcement of LeapFrog's 1Q15 results, LeapFrog stock price plummeted nearly 19% from a close of $7.39 per share on August 4, 2014 to a close of $6.01 per share on August 5, 2014. Throughout July, LeapFrog had been trading at an average price of $7.50 per share. But after the Company's August 4, 2014 announcement, the stock price continued to trade in the $6 range throughout the remainder of 2Q15. The share price closed at $5.99 on September 30, 2014 (the close of 2Q15).

134. LeapFrog's dramatic and sustained decline in stock price of nearly 19% during the period August 4, 2014 (the day before reporting 1Q15 results) through September 30, 2014 (the last day of 2Q15), contrasted starkly with its peers. During this period, the 12 direct peer companies cited in LeapFrog's April 21, 2014 Proxy Statement only declined by a mean (or average) of about 4% and a median of less than 1%.[19] And LeapFrog's market cap plunged approximately $96 million, from $515.5 million on August 4, 2014 ( $7.39 price per share x 69.754 million shares outstanding) to $419.6 million on September 30, 2014 ($5.99 price per share x 70.052 million shares outstanding).[20]

---

[18] Testing for goodwill impairment is a two-step process. In the first step, a company will compare the fair value of a reporting unit to its carrying value. If the fair value of the unit exceeds its carrying amount, then goodwill is not deemed to be impaired and thus the second step of the impairment test is unnecessary. ASC 350-20-35-6. However, if the carrying value of the unit exceeds its fair value, the second step of the goodwill impairment test is performed to measure the amount of impairment loss, if any. ASC 350-20-35-8. If the carrying amount of goodwill exceeds the implied fair value of that goodwill, an impairment loss is recognized in an amount equal to that excess. ASC 350-20-35-11.

[19] According to LeapFrog's Proxy Statement dated April 21, 2014, LeapFrog's peer companies were Arctic Cat, Demand Media, JAKKS Pacific, K12, Rosetta Stone, Rovi, Shutterfly, Skullcandy, Take-Two Interactive Software, TiVo, United Online, and Universal Electronics.

[20] Market capitalization or "market cap" is the total dollar market value of a company's outstanding shares and is calculated by multiplying the company's shares outstanding by the current market price

135. LeapFrog's dramatic and sustained market cap plunge was a key GAAP indicator that its goodwill was impaired. As of September 30, 2014, from figures derived from the Company's 2Q15 Form 10-Q, LeapFrog's book value per share was $5.78 (*i.e.*, $404.921 million stockholders' equity ÷ 70.052 million Class A and B shares = $5.78 book value per share). LeapFrog's stock closed at $5.99 per share on the same day. Consequently, as of September 30, 2014, Leapfrog's $5.99 market value of equity per share was only $0.21 greater than its $5.78 book value of equity per share, a razor thin margin and a clear indication that goodwill was more likely than not impaired.

136. In fact, when Defendants belatedly reported that LeapFrog's goodwill was impaired in its 3Q15 Form 10-Q they themselves ascribed the "decrease in trading values of the Company's stock and corresponding . . . market capitalization" as indicators of goodwill impairment. Yet, the $0.21 differential in 2Q15 between LeapFrog's fair value and book value of equity was the narrowest it had ever been at the close of any quarter since the Company's initial public offering in July 2002 and even narrower than when the Company finally reported the impairment at 3Q15.[21]

137. Defendants also knew that even the $0.21 differential, based on LeapFrog's $5.99 stock price at September 30, 2014, was inflated. As of that date, Defendants knew – but the market had not yet learned – that the Company's 2Q15 financial results were poor. Net sales were 10.6% below guidance for the quarter and, rather than the previously forecasted profit, Defendants would reduce guidance and forecast a loss of $0.13 to $0.25 per share for FY 2015.

138. Prior to the announcement of the Company's 2Q15 results and the filing of the Form 10-Q with the SEC on November 10, 2014, things only got worse, further informing Defendants that Leapfrog's goodwill was, in fact, impaired. LeapFrog's goodwill was underwater beginning on October 24, 2014, when the Company's share price closed at $5.72. The share price continued to

---

of one share. At September 30, 2014, LeapFrog's weighted-average outstanding Class A and Class B shares was 70.052 million, and LeapFrog's market cap was $419.6 million (*i.e.*, 70.072 million shares x $5.99 closing price per share).

[21] According to LeapFrog's Form 10-Q as of December 31, 2014, LeapFrog's book value of equity at December 31, 2014 = $281.767 million reported stockholders' equity + $19.549 million book value of goodwill not included in reported stockholders' equity = $301.316 million. $301.316 million book value of equity ÷ 70.169 million Class A and B shares = $4.29 book value per share of equity. $4.72 closing market stock price per share – $4.29 book value per share of equity at December 31, 2014 = $0.43.

decline up to the time of the announcement of LeapFrog's 2Q15 results. When Defendants announced the results of 2Q15 on November 3, 2014, the share price declined almost 8% further, closing at $5.43 per share on November 4, 2014. It continued to decline the next day, falling another 6% the following day to $5.01 per share and almost 3% further to $4.70 the day after. But a week later, Defendants would file LeapFrog's Form 10-Q claiming they had followed GAAP and there were no sufficient indicators of goodwill impairment.

139. ***Poor overall financial performance***. In addition to the dramatic and sustained decrease in share price, LeapFrog's U.S. segment's continued poor overall financial performance in actual revenue and gross margin results for the first half of FY 2015 and, in particular, continued declining cash flows and a decline in actual or planned revenue or earnings compared with projected results were other GAAP indicators that LeapFrog's goodwill was more likely than not impaired.

140. These factors are specifically cited in ASC 350-20-35-3C(d) as indicators of goodwill impairment. For five consecutive quarters running from 2Q14 through 2Q15, LeapFrog reported weak financial results or substantially lowered guidance, demonstrating Defendants' repeated failure to meet their own projections and the unreliability of their forecasts.

141. Moreover, Defendants knew of the decline in actual net sales, announcing on November 3, 2014, that LeapFrog's disappointing 2Q15 results (more than 10% below guidance). They also knew of a decline in planned earnings, announcing on the same day that for FY 2015 a profit was no longer possible as previously guided on August 4, 2014 but that the Company expected a loss of $0.13 to $0.25. Under these circumstances, testing for a goodwill impairment was required under GAAP.

142. Further, given that Defendants themselves admitted that LeapFrog would report a substantial loss, they knew the Company's goodwill was more likely than not impaired at 2Q15 (that is, with a "likelihood of more than 50 percent"). Defendants also knew that there were no offsetting "positive and mitigating . . . circumstances" that could conceivably obviate an impairment charge. ASC 350-20-35-3A, 3F. Rather, as explained in ¶¶62-69, 77, 101, Defendants knew that LeapTV had not hit stores as planned but had not even shipped until mid-October 2014 as a result of development delays. Given the late shipment, Defendants knew sales of LeapTV would be

impaired. LeapFrog's FY 2015 and 3Q15 guidance required net sales that surpassed those of the launch of LeapPad in 2011. This was an impossibility given the delayed shipment of LeapTV as well as the other problems that LeapFrog faced, such as declining tablet sales (¶¶56(d), 118) and the adverse impact of carryover inventory (¶¶52-60, 96-99).

143. ***Increased Competition and Change in Industry Conditions.*** Defendants repeatedly represented that LeapFrog faced increased competition and changed industry conditions. Pursuant to ASC 350-20-35-3C(b), the existence of increased competition and changed industry conditions added to the requirement that the Company test for goodwill impairment.

144. For example, during the May 5, 2014 conference call, Defendant Barbour acknowledged the "greater competition." Further, Defendant Arthur claimed that the "overall children's retail environment was weaker than expected, being impacted by significant industrywide discounting, increased competition, and harsh weather conditions in January and February." And on September 18, 2014, LeapFrog acknowledged the very industry and market circumstances that under ASC 350-20-35-3C(b) required that goodwill be tested: "it's been a tough overall retail environment with soft consumer sales in most of our key markets. There is increased competition in the kids tablet market."[22]

145. Defendants also acknowledged the changed industry conditions that required goodwill to be tested for impairment. For example, on the June 11, 2014 conference call, Defendant Arthur stated that retailers "will probably be cautious" with inventory due to changed conditions. This added to the totality of events and circumstances making it more likely than not LeapFrog's goodwill was impaired.

146. The Company's sustained decrease in stock price and market cap relative to book value, poor overall financial performance, and continuous failure to meet guidance, as well as the increased competitive environment, were triggering events under GAAP that required an impairment test to be performed in 2Q15. ASC 350-20-35-3C(b),(d), and (g). These circumstances coupled with

---

22 Analysts also commented on the increased competition. *See, e.g.*, "increased competition in the children's table market" (Imperial Capital on 2/19/14); "[k]ids tablet competition likely to get tougher" (Ascendiant Capital Markets, LLC on 3/18/14, 5/6/14, 7/29/14 and 8/5/14); and "increased competition/lack of pricing power" (PiperJaffray on 5/5/14).

the GAAP directive that bias, slanting, and manipulation of the presentation of financial information "to increase the probability that financial information will be received favorably" be strictly avoided (Statement of Financial Accounting Concepts ("SFAC") No. 8, QC14), rendered Defendants' representation in LeapFrog's 2Q15 Form 10-Q that "the Company does not believe that sufficient indicators of impairment of its goodwill currently exist" to test for goodwill impairment at 2Q15 knowingly or recklessly false. The narrow differential between the fair value and book value of equity and the subsequent $54 million plunge below book value alone indicated that goodwill was more likely than not impaired at 2Q15. If LeapFrog had complied with GAAP, the Company would have taken the $19.5 million goodwill impairment charge in 2Q15, as shown in the chart in ¶125.

147. Defendants' failure to test for goodwill impairment and, in turn, timely write-down the impaired goodwill associated with LeapFrog's U.S. reporting unit in compliance with GAAP or ASC 350 is a common fraudulent scheme. In a recent academic study, Kevin K. Li and Richard G. Sloan concluded that the implementation of what was previously referred to as the Statement of Financial Accounting Standards or "SFAS" 142 (currently ASC 350) has resulted in "relatively inflated goodwill balances and untimely impairments." They also concluded that, precisely as Defendants did here, "managers exploit the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated."[23]

**Defendants' January 22 and February 5, 2015 False Statements**

148. On January 23, 2015, LeapFrog filed with the SEC a Form 8-K signed by Defendant Arthur and attaching a LeapFrog press release dated January 22, 2015, announcing that its net sales for the third quarter of fiscal 2015 fell at least $75 million (or 34%) short of guidance, that the Company would not achieve its fiscal 2015 guidance, and was taking a $19.5 million goodwill impairment charge. The Company's press release disclosed that net sales for 3Q15 would be approximately $145 million, net loss would be approximately $124 million, including non-cash charges of approximately $20 million for goodwill impairment and approximately $87 million for

[23] Kevin K. Li and Richard G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (March 30, 2015), available at http://ssrn.com/abstract=1466271.

deferred tax asset valuation allowance and net loss per basic and diluted share would be $0.25, excluding other charges. Defendants also withdrew guidance for 4Q15 and FY 2015.

149. LeapFrog's January 22, 2015 press release purported to give an explanation of the primary reasons for the massive shortfall:

- In our major territories, holiday sales of children's tablets across the toy and electronics segments declined more than expected. This fall in consumer demand resulted in lower than planned LeapPad shipments in the quarter.
- Due to development issues, we shipped and promoted our new LeapTV educational video game system later than planned. This delay along with communication challenges and inconsistent execution at retail resulted in us significantly missing our sales expectations on this innovative new platform.
- The lower consumer sales of LeapPad and LeapTV hardware resulted in less demand for cartridges, accessories and digital content.
- Our LeapReader learn-to-read system sales were also lower than expected over the quarter, partly due to the significant drop in the retail prices of children's tablets.
- In addition to the primary drivers above, retail in-stocks of our new tablets were hampered by tighter inventory management and open-to-buy challenges across a number of our retailer partners . . . .

150. Defendants, however, continued to mislead investors and artificially inflate the Company's stock price by failing to disclose that reduced demand for LeapFrog's tablets would have a negative impact on the Company going forward as follows:

> ***Despite these sales declines, the children's tablet business remains a sizeable business around the world***, and we believe based on market data that LeapPad tablets continued to be the #1 selling kids' tablets in the US based on units. In addition, our LeapPad tablets were also the overall #1 selling toy in the UK for the year according to NPD.

151. On these partial revelations, LeapFrog's stock price fell dramatically, declining $1.35 per share, or nearly 35%, to close on January 23, 2015 at $2.55 per share, on unusually heavy volume.

152. But analyst commentary demonstrates that the market continued to be deceived by Defendants. For example, analyst Ascendiant Capital Markets, LLC, issued a report on May 14, 2015 noting that the analyst expected only a "slight miss." "We expect Q4 results below our estimates for revenue of $48 million and EPS of $(0.27) and consensus for revenue of $48 million and EPS of $(0.20)."

153. On February 5, 2015, LeapFrog filed a Form 8-K with the SEC signed by Defendant Arthur and attaching a press release, reporting LeapFrog's 3Q15 financial results, including net sales of $144.6 million, net losses of $124.2 million, and net losses per basic and diluted share of $1.77 (including a $0.23 per share of goodwill impairment) and a $1.29 deferred tax allowance. The Company also announced that it was terminating approximately 16% of its workforce.

154. Also on February 5, 2015, LeapFrog held their 3Q15 conference call for the quarter ended December 31, 2014. The Company began the call by conceding that 3Q15 results "were very disappointing." LeapFrog offered two principal reasons for the dramatic earnings miss: (1) "a significant drop in LeapPad and associated content sales," and (2) LeapTV's failure to meet "sales expectations":

> As we came into the year with significant carryover of LeapPad bundles from holiday 2013, that took more time and resources to sell through than expected. As we headed into the holiday season with cleaner inventory in our retail partner stores around the world, and two exciting new tablets, the LeapPad3 and LeapPad Ultra XDi, we felt that sales momentum across our tablet business was going to improve. Unfortunately, it did not.
>
> In addition, open to buy challenges plus tight inventory control at retail . . . during the holiday season compounded the decline in consumer demand. Overseas the situation was very similar, with a larger expected drop in shipments over November and December, as a result of category sales declines and retail inventory challenges.
>
> * * *
>
> The other disappointment in the quarter was the sales of our new educational video game system, LeapTV, which was our largest overall product investment in time and money over the last 12 months. This innovative system was extensively tested prior to launch, and children loved playing the games. . . . Due to technical development challenges, we began shipping the product in mid-October, which meant that our TV advertising around the world was back end loaded. We are researching whether prospective consumers may have already decided their large holiday purchases prior to our major advertising push. We are also evaluating whether our marketing measures could have been more clear, and based on our findings we will adjust this year's messages accordingly. Pricing could also have been a factor, with the glut of discount electronics on the market in the holiday season.
>
> Based on [positive LeapTV reviews], and our own experiences with consumers playing with ***LeapTV, we believe this platform will deliver***, but understand that financial performance did not live up to expectations for this past holiday season.
>
> We recognize the need to build a stronger, more stable product foundation, while still investing in innovative and technologically advanced products and solutions.

155. Also on the February 5, 2015 call, Defendant Arthur repeated LeapFrog's financial results disclosed in its February 5 press release, echoed Defendant Barbour's explanations for the dramatic miss in financial guidance, and explained the reasons for the goodwill impairment charge:

> We are very disappointed that our performance in the third fiscal quarter of 2015 was significantly below our expectations . . . . In our projections for the third quarter we planned for a decline in retail sales of LeapPad tablets. ***However, we are surprised by the magnitude of the actual decline across the tablet business*** and our key competitors during the holiday season, which was significantly in excess of our expectations. . . . [C]learly, the broader tablet market also suffered in the quarter.

156. Defendant Arthur continued by reiterating that the Company would not be providing fourth quarter and full year 2015 guidance and would implement a reduction in force:

> [W]e will not be providing guidance for fiscal fourth quarter or full year beyond indicating that ***we believe sales for our fiscal fourth quarter will be below that of the prior year*** period. In closing considering our third quarter sales decline and losses, we are reviewing our product strategies, operations and cost structure, in order to improve our financial performance. As John mentioned, we just announced internally a reduction in our organization of 95 positions. We will record a restructuring charge in our fiscal fourth quarter of about $1.4 million to complete this reduction.

157. Defendant Barbour, however, implied the challenges facing the Company this year would not leak into fiscal 2016:

> ***[O]ne of the big advantages we have this year is that there's less inventory at retail, and that retail is significantly cleaner***. . . . Unfortunately we come into 2014 with a significant quantity of older tablets on shelf, that took in my view too long and was too long actually clear through the marketplace, but in 2014 the calendar 2014, only 37% of our POS sales came from new tablets. I believe that mix of tablets through the beginning of the year hindered our business, potentially hindered our business and that's an opportunity as we go forward.

158. On the February 5, 2015 call, Defendant Barbour also explained that there was price degradation of LeapFrog's tablets and "a lot of that was driven by especially in our case, the amount of carryforward inventory that came into this year in retail that had to be cleared before we could get new tablets into the marketplace."

159. On this news, LeapFrog's share price increased, going from a close of $2.44 on February 5, 2015 to a close of $2.56 on February 9, 2015, an increase of 5%.

160. Following Defendants' February 5, 2015 comments, analysts at BMO Capital Markets raised their price targets noting that management "seemed quite confident that retailers are still very much behind LeapTV" and that BMO was encouraged by "comments regarding strategy

and product." Further, analysts at SunTrust Robinson Humphrey issued a report on the same day noting that "retail inventory is in good shape" referring to it as the "bright side."

**Defendants' January 22 and February 5, 2015 Statements Continued to Mislead Investors**

161. Defendants materially misled investors on January 22, 2015, regarding the demand for the Company's tablets for the reasons set forth in ¶¶52-60, 96-99, 114-119, 144-145 and because Defendants knew, as they would disclose just a few months later, that the children's tablet business would not be a catalyst to the financial results LeapFrog had enjoyed when the LeapPad was at its peak. On the June 11, 2015 conference call, Defendant Barbour stated: "[W]e don't have [the] expectations that [the long-term tablet marketplace is] going to be back where it was at its peak."

162. Defendants also materially misled investors on February 5, 2015, regarding LeapTV's potential to "deliver" positive financial results for LeapFrog because Defendants knew LeapTV would not deliver, given, *inter alia*:

(a) its poor sales performance during the 2014 holiday season;

(b) the historically slow sales in the first-half of the calendar year for LeapFrog products;

(c) the fact that some retailers dropped the product in the 2014 holiday season;

(d) that leading up to Black Friday 2014 LeapTV sales were off-trend;

(e) that LeapTV sales after Black Friday had dramatically missed sales expectations and, in fact, were off by orders of magnitude; and

(f) LeapTV sales returns were so bad that by Cyber Monday, Defendants had begun their attempt to cut production of LeapTV units by approximately 200,000.

163. In addition, Defendants materially misled investors on February 5, 2015, regarding their "surprise" at the "magnitude of the actual [sales] decline across the tablet business" because in addition to their knowledge that LeapTV's sales were dramatically below expectations by Black Friday as described in ¶162 above, Defendants knew when they gave FY 2015 guidance on November 3, 2014, given the state of the tablet industry and carryover inventory from the prior year that they would not achieve that guidance and that the following quarter would be a similarly significant disappointment due to the declining tablet market and LeapPad carryover inventory.

164. Defendants also materially misled investors on February 5, 2015, when they stated that "we believe sales for our fiscal fourth quarter will be below that of the prior year" because Defendants failed to disclose the true extent of the expected 4Q15 decline. Defendants failed to disclose that the source of LeapFrog's poor performance in 3Q15 would continue to plague the Company.

165. Defendants admitted during their June 11, 2015 conference call that nearly the same factors that caused the Company's financial results to suffer at December 31, 2014, would negatively impact the Company's financial results through, at least, FY 2016. Defendants also knew at the time of their statements based on their experience with holiday 2013 inventory that LeapFrog's margins would be disappointing, as they admitted on June 11, 2015, because of the significant discounts they had to provide to once again clear excess inventory.

166. Defendants also materially misled investors on February 5, 2015, when they stated that "one of the big advantages we have this year is that there's less inventory at retail, and that retail is significantly cleaner" because Defendants knew, but did not disclose, that in contrast to their statements, excess inventory would continue to negatively impact LeapFrog's 4Q15 results, as Defendants would reveal on June 11, 2015. For example, Defendants knew in November and December 2014, there was still a great deal of LeapPad inventory in the channel. They also knew that LeapFrog reported abysmal sales for 4Q15 and, as a result there was an inventory hangover from 2014. Defendants acknowledged on February 5, 2015 that retailers did not want new product until they had cleared out the old product and overall sales of tablets had declined. Defendants closely monitored inventory as described in ¶16, 56(c), 117. Thus, Defendants knew the Company's inventory hangover from holiday 2014 would continue to suppress LeapPad sales well into fiscal 2016 (beginning April 1, 2016).

**LeapFrog's 3Q15 False Financial Results**

167. Defendants falsely reported 3Q15 ***net income (loss) of $(124,212) and EPS of $(1.77)*** with $(0.22) accounting for goodwill in a January 22, 2015 press release and on a conference call with analysts and investors on February 5, 2015, as well as in LeapFrog's 3Q15 Form 10-Q filed with the SEC on February 9, 2015.

168. Defendants also falsely claimed in LeapFrog's 3Q15 Form 10-Q that the financial information they reported was a fair statement of LeapFrog's financial results and that the results were prepared in accordance with GAAP. Further, that "***the Company concluded that its long-lived assets were not impaired as of December 31, 2014***."

169. Later, Defendants materially misled investors by claiming on May 18, 2015 that the testing of the ***recoverability of LeapFrog's long-lived assets "could lead to a non-cash accounting charge***." That charge should have been taken at 3Q15.

170. If LeapFrog had properly recorded long-lived assets impairment charges for 3Q15, the Company's reported net income and basic and diluted EPS would have dramatically decreased as shown in the following chart:

| (In Thousands of $ Except EPS) | **3Q15** |
|---|---|
| Net Income (Loss) as Falsely Reported | ($124,212) |
| Basic and Diluted EPS as Falsely Reported | ($1.77) |
| Goodwill Write-Off Defendants Should Have Taken to Timely Reflect Impairment | $19,549 |
| Long-lived Assets Write-Off Defendants Should Have Taken to Reflect Impairment | ($36,461) |
| **Net Income (Loss) Reflecting Goodwill and Long-lived Assets Write-Offs**[24] | **($145,233)** |
| **Actual Basic and Diluted EPS Reflecting Long-Lived Assets Write-Offs**[25] | **($2.07)** |

**LeapFrog's 3Q15 Financial Results Failed to Account for the Company's Impaired Long-Lived Assets**

171. Defendants failed to timely write-off $36.5 million in impaired long-lived assets in 3Q15 knowing, at the time, that the carrying value of the Company's long-lived assets was not recoverable as a result of the dismal sales results for 3Q15 (ended December 31, 2014). Further, Defendants knew LeapFrog's stock price had plummeted at least 35% when LeapFrog's 3Q15 results were preannounced on January 22, 2015, weeks prior to the filing of the Company's 3Q15 Form 10-Q on February 9, 2015.

[24] Adjusted for taxes.

[25] Adjusted for taxes.

172. LeapFrog belatedly took the $36.5 million impairment charge for long-lived assets in 4Q15, which had the primary impact of reducing the Company's property and equipment from $38.2 million as of December 31, 2014 to $1.7 million as of March 31, 2015 (~95% reduction). However, the events and circumstances known to Defendants at 3Q15 required that the impairment be taken in 3Q15. Defendants ***already knew*** the results of LeapFrog's critical holiday quarter and that: (i) revenues were off by $75 million – $145 million compared to guidance of $220 million; and (ii) earnings per share were off $0.41 – $(0.25) vs. guidance of $0.16-$0.28 per share for 3Q15. The critical holiday season was over and Defendants already knew that 3Q15 results were financially disastrous; results which, when reported, would more likely than not cause the stock price to plunge substantially to a level that Defendants later cited as the very reason for taking the long-lived assets charge at 4Q15.

173. LeapFrog's long-lived assets consisted of property and equipment, capitalized content costs, and other intangible assets that the Company expected to retain for at least a year to generate cash flows. GAAP required the Company to evaluate its long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset group may not be recoverable. ASC 360-10-35-17.

174. For 3Q15, Defendants acknowledged the existence of triggers requiring testing long-lived assets to determine whether they were impaired as of December 31, 2014, such that the carrying value of those assets did not exceed the cumulative undiscounted cash flows to be generated from those assets. These triggers, according to LeapFrog's 3Q15 Form 10-Q, "included, among others, the Company's performance during the 2014 holiday season being significantly lower than anticipated, which included the underperformance of products and product lines newly introduced to the market, and the continuing decrease in trading values of the Company's stock and corresponding decline in the Company's market capitalization."

175. The Company also noted that "the Company's undiscounted cash flow analyses consisted of projections of future net cash flows, which are considered as Level 3 inputs within the fair value hierarchy." Level 3 inputs are unobservable inputs for the asset, as opposed to observable inputs such as quoted market prices, quoted market prices of similar assets, and other inputs that are

directly or indirectly observable. ASC 820-10-35-40 through ASC 820-10-35-54A. Although GAAP permits Level 3 inputs to be used when directly or indirectly observable inputs are not available, GAAP still did not permit LeapFrog to use inputs that other market participants would not have used. LeapFrog was required to use inputs and estimates that were "not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users." SFAC No. 8, QC 14. In particular, GAAP states that "[i]n developing unobservable inputs, a reporting entity may begin with its own data, but it shall adjust those data if reasonably available information indicates that other market participants would use different data." ASC 820-10-35-54A.

176. When Defendants belatedly took the $36.5 million impairment charge , they admitted in the Company's 2015 Form 10-K that they did so "primarily due to the significant decline of the trading value of our Class A common stock and the corresponding market capitalization." That circumstance, however, was triggered by the abysmal 3Q15 results, which were known to Defendants in 3Q15 (ending December 31, 2014). As described herein, Defendants knew that LeapTV sales were so far below target that Defendants had cut back on production. During 3Q15, inventory levels had increased 43% year-over-year, from $54.290 million to $77.796 million, while sales decreased 23% year-over-year, from $186.707 million to $144.598 million. The higher inventory levels combined with lower sales during the peak holiday season did not bode well for 4Q15 or FY 2016.

177. Defendants also knew that the magnitude of the disappointing results in the key holiday quarter would impact LeapFrog's stock price, and, in turn, its market capitalization. Prior to the filing of the 3Q15 Form 10-Q on February 9, 2015, Defendants watched LeapFrog's stock price plunge from $4.72 at December 31, 2014 (3Q15) to $2.55 as of January 23, 2015 following the announcement on January 22, 2015 of the Company's reported 3Q15 results. Defendant Barbour acknowledged in the January 22, 2015 press release that: "[w]e are very disappointed that our performance in the third quarter [of 2015] was significantly below our expectations and that we will not achieve our fiscal year guidance." And the Company withdrew prior guidance with Defendant Arthur acknowledging "[w]e expect our net sales to decline the fourth quarter."

178. When defendants belatedly took the long-lived asset charge at 4Q15 they claimed a reason for the impairment charge was the "significant decline in trading values of our Class A common stock and the corresponding decline in our market capitalization." Yet, LeapFrog's stock price had already fallen to the $2.00 range when defendants announced the actual results for 3Q15.

179. Further, in quarter after quarter, the Company failed to meet its own unsupported guidance. Remarkably, even as financial analysts continually lowered their own estimates, given LeapFrog's poor track record, the Company's reported results still fell below expectations. In fact, for 2Q14, 3Q14, 4Q14, 1Q15, 2Q15, and 3Q15, LeapFrog reported weak results or lowered guidance, with reported sales often missing Wall Street's estimates by double-digit percentages. Defendants provided inflated guidance in consecutive quarters even though they had access to internal information that strongly indicated their projections were unsupportable.

180. The Company also would have necessarily analyzed the fair value of long-lived assets as part of its goodwill impairment analysis for the step two test. As part of the step two test for goodwill impairment, Defendants would have needed to determine the fair values of all assets and liabilities, excluding goodwill.[26] Consequently, because the Company reported $19.5 million goodwill impairment in 3Q15 (though even that should have been recorded in 2Q15, as discussed earlier), the Company already knew that the fair value of such long-lived assets as property and equipment were less than their carrying amount (book value). This was so because the Company would have necessarily determined, at a minimum, the fair value of long-lived assets relative to their carrying value in the Company's step two test of goodwill impairment.[27] As a result, Defendants would have known that the fair value of long-lived assets was less than carrying value at least by 3Q15 when the Company actually performed its step two of the goodwill impairment test because

---

[26] "The implied fair value of goodwill shall be determined in the same manner as the amount of goodwill recognized in a business combination . . . was determined. That is, an entity shall assign the fair value of a reporting unit to all of the assets and liabilities of that unit (including any unrecognized intangible assets) as if the reporting unit had been acquired in a business combination." ASC 350-20-35-14.

[27] The step two formula for computing the amount of goodwill impairment, if any, is as follows: Fair value of the reporting unit – Fair value of total assets (***including long-lived assets***, but excluding goodwill) + Fair value of total liabilities – Book value of goodwill = the amount of goodwill impairment (up to the book value of goodwill), if the resulting amount is less than zero, *i.e.*, a negative number. ASC 350-20-35-9 through 350-20-35-27.

determining the fair value of long-lived assets was an essential component of the step two calculation of goodwill impairment, in which the entire $19.5 million in goodwill was written off.

181. Further, Defendants already knew in 3Q15 that a substantial portion of the Company's property and equipment needed to be replaced; in particular, the Company's enterprise resource planning ("ERP") system, which was business management software used to collect, store, manage and interpret data from many business activities, including product planning, manufacturing and service delivery, inventory management, and other critical business functions. During Defendants' August 4, 2014 investors' conference call, CFO Arthur stated that "the low $20 million [capital expenditures] is [for] maintenance, updating the content library, and probably near $15 million to $18 million is probably more like a lot of strategic initiatives, ERP. I think I told you before, ERP is about a $14 million investment, and then site development."

182. Defendants deliberately ignored all of the above facts and circumstances that indicated that long-lived assets were more likely than not impaired at 3Q15 as well as the concept under GAAP that bias, slanting, and manipulation of the presentation of financial information "to increase the probability that financial information will be received favorably" be strictly avoided. SFAC No. 8, QC14. Rather, Defendants waited until June 11, 2015 to disclose the impairment and the abysmal financial condition of the Company. Defendants knew that the disclosure of this additional adverse information on June 11, 2015 would cause LeapFrog's stock price to further decline. If LeapFrog had complied with ASC 360, the Company would have taken the $36.5 million long-lived assets impairment charge in 3Q15, as shown in the chart in ¶170.

183. Defendants' May 18, 2015 statement that the testing of the recoverability of LeapFrog's long-lived assets "could lead to a non-cash accounting charge" was misleading for the same reasons set forth in ¶¶171-182 above. LeapFrog's long-lived assets were impaired no later than 3Q15 and an impairment charge should have been recorded at that time.

**<u>Defendants' False Statements Regarding LeapFrog's Internal Controls</u>**

184. Defendants Barbour and Arthur signed Sarbanes-Oxley Act of 2002 ("SOX") certifications accompanying LeapFrog's 2Q15 Form 10-Q (for the period ending September 30,

2014), filed on November 10, 2014 and 3Q15 Form 10-Q (for the period ending December 31, 2014), filed on February 9, 2015. Each certification stated in pertinent part:

> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;***
>
> 4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:
>
> a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared[.]

**<u>LeapFrog Lacked Internal Controls</u>**

185. Defendants' statements in ¶184 above were materially false and misleading for, *inter alia*, the following reasons:

> (a) LeapFrog's lack of internal controls and procedures caused it to falsely report its financial results included in publicly issued financial statements for 2Q15 and 3Q15, press releases and conference calls, which improperly inflated the Company's earnings by failing to timely account for the impairment of the Company's goodwill and long-lived assets;
>
> (b) Management of any public company is responsible for establishing and maintaining adequate internal controls over financial reporting as defined in 15 U.S.C. §78m-o under the 1934 Act. AU 319.06, Internal Control in a Financial Statement Audit, defines internal control as "a process – effected by an entity's board of directors, management, and other personnel – designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (a) reliability of financial reporting, (b) effectiveness and efficiency of operations, and (c) compliance with applicable laws and regulations";
>
> (c) Section 13(b)(2) of the 1934 Act states, in pertinent part, that every reporting company must: "(A) make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; [and] (B) devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that . . . transactions are recorded as necessary . . . to permit preparation of financial statements in conformity with [GAAP]." 15 U.S.C. §78m(b)(2). These provisions require an issuer to employ and supervise reliable personnel to maintain reasonable assurances that transactions are

executed as authorized, to properly record transactions on an issuer's books and, at reasonable intervals, to compare accounting records with physical assets;

(d) Here, Defendants claimed that they had evaluated "the effectiveness of [LeapFrog's] disclosure controls and procedures" and that they "have undertaken a number of procedures and instituted controls to help ensure the proper collection, evaluation and disclosure of the information in our financial statements." Included in LeapFrog's reports for 2Q15 and 3Q15 were LeapFrog's assets, net income and EPS for each quarter that were overstated as explained in ¶¶126-147, 171-182. Had LeapFrog had the internal controls over the monitoring and reporting of the Company's financial condition that Defendants represented, those results would not have been overstated. Defendants, under GAAP, which they represented was adhered to, would have had to account for triggering factors that would have required LeapFrog to timely re-value goodwill in 2Q15 and record an impairment of long-lived assets no later than 3Q15 – as discussed in ¶¶126-147, 171-182;

(e) While Defendants claimed they had taken steps in 4Q15 to remediate the period-end close process to capture customer-related discounts and promotional allowances for financial statement impact, they failed to capture these discounts/allowances when issuing guidance as described in ¶¶55-56. The failure to do so was a lack of internal controls pertaining to the Company's goodwill and long-lived asset analysis in its 2Q15 and 3Q15 quarterly financial reports because that analysis included accounting for "planned revenue or earnings" and "projected results." Further, the issuance of guidance without taking into account these discounts/allowances served to inflate the Company's stock price and, in turn, the overstatement of LeapFrog's financial results for 2Q15 and 3Q15. For example, had Defendants issued guidance that took these discounts/allowances into account, LeapFrog's stock price would have decreased, an important factor in the analysis of the Company's goodwill and long-lived assets; and

(f) LeapFrog's financial statements contained untrue statements and omitted material facts as alleged herein. Defendants' attestation to the sufficiency of disclosure controls and procedures misled investors to believe that the Company's financials fairly represented the financial condition of the Company when, in fact, they did not.

## THE END OF THE CLASS PERIOD

186. On June 11, 2015, LeapFrog issued a press release reporting the Company's 4Q15 and full year fiscal 2015 financial results for the period ending March 31, 2015. In the release, Defendants reported ***net sales for fiscal year*** 2015 to be $339.1 million, ***down 36% year-over-year***. Net loss per basic and diluted share for the year was $3.12, which included a net non-cash charge of $0.22 per share for goodwill impairment, $0.52 per share for impairment of long-lived assets and $1.30 per share for additional deferred tax asset valuation allowance. In the prior year, net income per diluted share was $1.07. Net loss for the year was a staggering $218.8 million. The press release also reported ***that sales and net income "fell below expectations primarily due to high carry-forward retail inventories from the holidays, lower demand for our tablets and associated content***

***and the later than planned shipment and promotion of LeapTV."*** Defendants also disclosed that ***operating expenses*** for the full year 2015 were $235.1 million, ***up 28% compared to the prior year*** because of the non-cash permanent impairment of goodwill and ***$36.5 million of long-lived assets***.

187. Also in the June 11, 2015 press release, Defendants reported fourth fiscal quarter ***net sales were*** $33.9 million, ***down 40% compared to last year*** and operating expenses were $78.8 million, up 98% compared to $39.8 million last year. Defendants attributed the increase in operating expenses primarily to a non-cash $36.5 million permanent impairment of long-lived assets following a Financial Accounting Standards Board ("FASB") ASC 360 review. Defendants also reported net loss for the fourth quarter was $76.2 million, or $1.08 per basic and diluted share.

188. Defendant Arthur also disclosed, for the first time, the breadth of LeapFrog's financial troubles:

> While we continue to make good progress on our ***new product initiatives***, most of these ***will not be impactful until the fiscal 2017 holiday season***. We continue to work through the impact of retail space losses, inventory overhang and significant competitive pressures . . . . This will be a year of rebuilding. We will continue to prudently manage expenses and cash as we stabilize the business and position LeapFrog for long-term growth. We expect fiscal year 2016 sales to contract considerably relative to the prior year, and operating losses for fiscal year 2016 to be similar to or greater than fiscal year 2015 losses, excluding goodwill and long-lived asset impairments.

189. Also on June 11, 2015, LeapFrog hosted its 4Q15 and FY 2015 conference call. During the call, Defendant Barbour explained the reasons for the dismal financial results:

> For the fourth quarter and full year, our net sales and net income declined year-over-year and fell well below expectations, ***due mainly to carry-forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later-than-planned shipment and promotion of LeapTV***. The downturn in consumer sales of tablets over [the] holiday season and into 2015 across our major markets was greater than expected. Since tablets along with their associated content represent a large share of our overall sales, this decline had a significant impact on our performance. In addition, retail sales of LeapTV to date significantly missed our expectations. Following the later-than-planned shipment of the platform in the holiday season, we progressed into spring, which is seasonally sluggish and when consumer demand for video game consoles is traditionally very low. . . . Given our disappointing financial performance in the fiscal 2015, we've undertaken a major strategic review of our go-forward business model, product and operating plans.

190. Defendant Arthur added that gross profit for the quarter was $4 million, a ***decrease of 83% compared to the prior year, due to reduced sales, increased discounts and allowances to help clear inventory carried over from the holiday season and changes in product mix***. According to

Arthur, "gross margin rate was 10.3% compared to 37.1% a year ago, due to the reasons [] just mentioned and overall lower sales levels resulting in less effective leverage of fixed costs." ***Gross profit for the year was $94 million, a decline of 54% compared to the prior year***, again, "due to unfavorable changes in our product sales mix and higher discounts and allowances as a percentage of sales."

191. Operating expenses for the year were up 28% at $235 million as a result of "the non-cash permanent impairment of $20 million of goodwill . . . and the non-cash impairment of long-lived assets of $36 million." Inventory balance was $72 million, up $20 million or 38% from last year, "largely due to the decrease in sales." Arthur stated that LeapFrog "believe[d] inventories at retail are down by about 10% from last year due to SKU rationalization, loss of shelf space and lower POS." Defendant Arthur also reiterated the reasons for the disappointing fourth quarter performance: "***The shortfalls in the quarter and full year were [primarily] due to . . . [h]igh carry forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later than planned shipment and promotion of LeapTV.***"

192. During the same call on June 11, 2015, Defendant Barbour disclosed, for the first time, that the reduced demand in the tablet space was likely a permanent development: "So as I said earlier, the decline in the fourth quarter in the overall tablet space and kid tablet space took many people, including us, by surprise, the scale of that decline. . . . [W]e still believe in a long-term tablet marketplace as being a profitable business for us, but in saying that, ***we don't have expectations that it's going to be back where it was in its peak***."

193. On this news, the Company's stock price declined dramatically, from a close of $2.07 on June 11, 2015 to a close of $1.54 per share on June 12, 2015, on unusually high volume. The share price continued to decline, closing at $1.47 on June 15, 2015 and $1.39 on June 16, 2015. This represented a nearly 33% decrease over the course of a few days.

## ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS

194. Defendants' wrongful conduct and fraudulent scheme, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiffs. Throughout the Class Period, the market prices of LeapFrog's common shares were artificially inflated as a direct result of

Defendants' materially false and misleading statements and omissions. Defendants' false and misleading statements set forth in ¶¶41-46, 71-72, 80-91, 103-108, 122-124, 150, 154-157, 167-169, 184 operated as a fraud or deceit on Plaintiffs during the Class Period by, *inter alia*, misrepresenting the Company's financial prospects and assuring investors that LeapTV would launch in time to drive LeapFrog's financial results. Instead, Defendants falsely reported LeapFrog's business prospects and financial guidance and caused the Company to falsely report its net income, total assets and stockholder's equity for 2Q15 and 3Q15 by failing to timely write-off $19.5 million impaired goodwill associated with its U.S. reporting unit in 2Q15 and by failing to timely write-off $36.5 million impaired long-lived assets in 3Q15. Defendants also failed to disclose that carryforward inventory would negatively impact LeapFrog's financial results and future growth, further serving to artificially inflate the prices of the Company's stock price throughout the Class Period.

195. Defendants' false and misleading statements had their intended effect and proximately caused LeapFrog's securities to trade at artificially inflated levels, with its stock reaching a high of $7.85 per share on July 8, 2014. The artificial inflation was eliminated when the true financial condition, expectations for future growth and other information concealed by Defendants' scheme were revealed to the market as reflected in the following chart:[28]

[28] The peer group index referenced in the chart is the group that is defined in LeapFrog's 2014 proxy as direct peers. Pricing for the companies was downloaded from Bloomberg. The chart reflects the stock price until June 15, 2015.




196. Beginning on August 4, 2014, Defendants began to partially disclose LeapFrog's true financial condition, including that LeapFrog would not meet previously-issued guidance, concealed from investors by Defendants' scheme to defraud. While the disclosure was incomplete, it partially revealed the adverse business and financial conditions concealed by Defendants' fraudulent scheme. As a result, LeapFrog's stock price was partially corrected, reducing the extent which it had been inflated by Defendants' fraudulent scheme, and false and misleading statements alleged in herein.

197. On August 4, 2014, LeapFrog announced, *inter alia*: (i) the Company was reducing financial guidance, stating that it expected net sales to be $480-$505 million for FY 2015 (period ending March 31, 2015) as opposed to $554-$580 million for the period ending December 31, 2014, and net income per share to be in the range of a loss per share of $0.04 to an income per share of $0.10 as opposed to $0.18 to $0.25; (ii) Defendants claimed this reduction in guidance reflected "elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of" LeapTV's shipment, and "the deferral of [LeapFrog's] consumer electronics tablet until next year to allow [LeapFrog] to focus on the launch of . . . LeapTV"; and (iii) LeapTV would begin shipping at the end of September, as opposed to "late summer and fall." These partial disclosures were causally connected to LeapFrog's May 5, 2014 and June 11, 2014 false and inflated

financial guidance, to Defendants' false and misleading statements regarding the shipment of LeapTV and to Defendants' false and misleading statements regarding the impact carryover inventory was and would continue to have on LeapFrog's financial performance, including new tablet sales. As a direct result of Defendants' partial disclosures, the following day, LeapFrog's stock fell more than 18% from $7.39 on August 4, 2014 to $6.01 on August 5, 2014, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts including, *inter alia*, the impact of excess carryover inventory at retailers and the delay of LeapTV, as well as issuing financial guidance that lacked a reasonable basis.

198. Following this partial disclosure, analysts lowered their expectations for LeapFrog. For example, an August 4, 2014 SunTrust Robinson Humphrey analyst report noted that LeapFrog had "elected to step up promotional investments in recent weeks to clear carry-over inventory" resulting in lower quarterly revenue for 1Q15 (ending June 30, 2014) and a "massive" decline in gross margin. In lowering estimates, SunTrust noted that LeapFrog had "cut FY15 guidance dramatically" as a result of "slower than expected post-2013 inventory reduction" and "delayed launch of a new tablet until 2015."

199. On November 3, 2014, LeapFrog issued a second partial disclosure in which it announced, *inter alia*: (i) the Company was reducing financial guidance, stating that it expected net sales for FY 2015 to be $450-$470 million as opposed to $480-$505 million, and net loss per share to be in the range of $0.13 to $0.25 as opposed to a net loss per share of $0.04 to net income per share of $0.10; (ii) Defendants claimed this reduction in guidance reflected the "continue[d] . . . impact[] [of] Holiday 2013 carry-forward retail inventory of LeapPads" and the fact that "many of [LeapFrog's] retail partners around the world are running far tighter inventories this year, and [LeapFrog] [is] experiencing retail sales softness in some of [their] key product categories"; and (iii) LeapTV's ship time had "slip[ped] . . . into the fiscal third quarter," which "hampered" the Company's second quarter net sales and was the "primary reason [LeapFrog's] fiscal second quarter

net sales results were below [LeapFrog's] guidance range." These partial disclosures were causally connected to LeapFrog's false and inflated financial guidance for FY 2015, to Defendants' false and misleading statements regarding the expected shipping date for LeapTV and to Defendants' false and misleading statements regarding the impact excess inventory would have on LeapFrog's financial performance, including new tablet sales. As a direct result of Defendants' partial disclosures, by November 6, 2014, LeapFrog's stock fell nearly 16% from $5.43 on November 3, 2014, to $4.57 on November 6, 2014, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because *inter alia*, Defendants continued to conceal adverse material facts regarding the true expected impact of excess carryover inventory at retailers, the delay of LeapTV, LeapTV's poor sales, the lack of internal controls, the impairment of goodwill, as well as issuing financial guidance that lacked a reasonable basis. Indeed, Defendants falsely stated that they expected "financial results in [the Company's] fiscal third quarter ending December 31, 2014 to improve year-over-year given the launch of LeapTV."

200. Following this partial disclosure, analysts again lowered their expectations for LeapFrog. For example, on November 3, 2014, KeyBanc Capital Markets issued an analyst report in which it noted that LeapFrog "attributed essentially all of fiscal 2Q15's revenue miss (roughly $14 million) to delayed shipments of the LeapTV." Further, "results again came in well below expectations as the 2013 holiday season inventory hangover continues to meaningfully weigh on near-term results."

201. On January 22, 2015, LeapFrog issued a third partial disclosure, preannouncing its 3Q15 financial results, and announcing, *inter alia*: (i) its net sales for 3Q15 fell at least $75 million (or 34%) short of guidance and that net sales for 3Q15 would be approximately $145 million, net loss would be approximately $124 million, and net loss per basic and diluted share would be approximately $1.77 per share; (ii) that the Company would not achieve its FY 2015 or 4Q15 financial guidance and was withdrawing its 4Q15 and FY 2015 financial guidance; (iii) that the Company was taking a $20 million goodwill impairment charge; and (iv) the primary reasons for

LeapFrog's 3Q15 shortfall were that "holiday sales of children's tablets . . . declined more than expected" that resulted in "lower than planned LeapPad shipments in the quarter," "[d]ue to development issues, [LeapFrog] shipped and promoted [its] new LeapTV educational video game system later than planned" that "resulted in [LeapFrog] significantly missing [their] sales expectations" of LeapTV and associated accessories, and "retail in-stocks of [LeapFrog's] new tablets were hampered by tighter inventory management." These partial disclosures were causally connected to LeapFrog's false and inflated financial guidance for 3Q15 and FY 2015, to Defendants' false and misleading statements regarding LeapTV and to Defendants' false and misleading statements regarding the impact excess inventory would have on LeapFrog's financial performance, including new tablet sales. As a direct result of Defendants' partial disclosures, the next day, on January 23, 2015, LeapFrog's stock fell ***34.62%*** from $3.90 on January 22, 2015 to $2.55 on January 23, 2015, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts including, *inter alia*, the impact of excess carryover inventory at retailers, the impact of the delays of LeapTV, LeapTV's effect on the Company's financial results going forward, the Company's lack of internal controls and the impairment of LeapFrog's long-lived assets.

202. Analyst reports following the January 22, 2015 partial disclosures reflected the market's shock. For example, on January 23, 2015, Piper Jaffray issued a report describing the severity of the miss as "staggering." Likewise, analysts at BMO Capital Markets wrote in a report issued January 26, 2015 that "***[w]e had been of the belief that current guidance, as well as investor expectations had already incorporated a worst-case scenario. Clearly that was wrong***." BMO also noted that "[t]he company's inability to accurately guide the Street is a strong indication that it may not have the best systems in place to gauge demand or track its supply."

203. On May 18, 2015, LeapFrog issued a fourth partial disclosure, announcing in a press release that they would be delaying its fiscal fourth quarter and full year 2015 earnings conference call scheduled for May 18, 2015 because it was, "in the process of testing the recoverability of its

long-lived assets under the requirements of FASB ASC 360." The Company also announced that "[t]he result of this analysis could lead to a non-cash accounting charge." This partial disclosure was causally connected to Defendants' fraud, including LeapFrog's falsely reported financial results for 3Q15 (ending December 31, 2014). As a direct result of Defendants' partial disclosure, LeapFrog's stock price declined from close of $2.19 on Friday, May 15, 2015, to a close of $2.08 on May 18, 2015, a drop of more than 5%, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts, including, *inter alia*, the impact of carryover inventory at retailers, the impact of the delays of LeapTV, poor LeapTV sales and effect of the Company's financial results going forward, the Company's lack of internal controls and the impact or magnitude of the impairment of LeapFrog's long-lived assets. Following the May 18, 2015 partial disclosure, Piper Jaffray issued an analyst report noting that, "[a] delay in the FQ1 report further adds to concern and may signal forthcoming asset revaluation and the possibility of significant write-downs. . . . To-date, the stock price decline has largely been tied to poor fundamental execution. But with this delay, the argument around true asset value is surfacing and speculation about a material write-down of assets is a valuation risk."

204. Finally, on June 11, 2015, LeapFrog again surprised investors for the fifth time when they disclosed in a press release and during an earnings conference call, that LeapFrog's 4Q15 and full year results were far worse than analysts expected. The Company revealed that: (i) net sales for FY 2015 were $339.1 million, down 36% year-over-year, net sales for the 4Q15 were $33.9 million, down 40% compared to the same quarter last year, and net loss per basic and diluted share for FY 2015 was $3.12 compared to the prior year's income per share of $1.07, and net loss per share for 4Q15 was $1.08 per share compared to a loss of $0.18 per share in the same period the prior year, while operating expenses for the quarter were up 98%, at $78.8 million compared to last year's $39.8 million; (ii) LeapFrog was taking a $36 million non-cash payment accounting charge which reflected impairment of the Company's long-lived assets; (iii) that FY 2016 results were actually expected to be ***worse*** than FY 2015 and that financial improvements from new products would not be felt until

2017 (*i.e.*, LeapTV would not deliver growth in 2016); (iv) that the decline in demand for tablets was likely a permanent thing because "we don't have expectations that it's going to be back where it was in its peak"; and (v) that retailers ***still*** had excess inventory. In reaction to these disclosures, LeapFrog's stock price fell nearly 29%, from $2.07 per share on June 11, 2015 to close at $1.47 per share on June 15, 2015, on heavy volume.

205. Analyst reports following the June 11, 2015 disclosure reflected the market's shock. On June 14, 2015, BMO Capital Markets issued an analyst report in which it noted that "***neither we nor the market was prepared for the company's FY2016 guidance that financials would actually be worse than in FY2015, a year when sales declined 36% (on top of an 11% decline in FY 2014)*** and earnings plummeted to a loss of ($1.08) per share. . . . [LeapFrog's] outlook continues to deteriorate." BMO also noted that "[r]etail sales of LeapTV to date have significantly missed management expectations, with management believing the weakness was caused by a later-than-planned release of the system last fall, resulting in lack of holiday momentum and spring season follow-through" and that the market did not "have confidence that the inventory really is 'good quality' or will stay 'good quality.'" BMO said it was "disconcerting that the company was caught off guard [regarding the decline in the tablet market] (for the second year in a row)." BMO commented that many investors regarded LeapPad as "somewhat irrelevant" and continued to "see the tablet market weakening."

206. In a June 14, 2015 article on *Seeking Alpha*, entitled "Even A Kiss From A Prince Can't Save LeapFrog," the author wrote:

> In my last LeapFrog . . . article I made a comment that I've never seen a company blow guidance this badly when it reported fiscal Q3 results. Unfortunately the disappointment continued really badly into Q4 results and now the company seems like a lost cause. . . . ***The results were absolutely nowhere close to estimates*** of $48.3 million in sales and an adjusted net loss of $(0.21) per share. . . . I believe competition from tablets and other devices are turning the Leapfrog line into a dinosaur. LF management has already proven that they stink at guidance and even they don't expect any hope before the fiscal 2017 holiday season. . . . ***[W]ith management's extreme confidence in a highly profitable last-holiday season, then absolutely blowing it, it's hard to imagine that they [have] their finger on the pulse*** on what will change the business around. . . .

207. The stock decline removed the artificial inflation from LeapFrog's stock price, causing economic loss to investors who had purchased the stock during the Class Period.

**CLASS ACTION ALLEGATIONS**

208. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired shares of LeapFrog common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their family members, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

209. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. LeapFrog has over 66 million shares of stock outstanding, owned by hundreds if not thousands of persons.

210. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the 1934 Act;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the finances, business, operations and management of LeapFrog;

(c) Whether statements made by Defendants omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d) Whether the price of LeapFrog stock was artificially inflated; and

(e) To what extent the members of the Class have sustained damages and the proper measure of damages.

211. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

212. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

213. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

214. A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results. Class members have not indicated an interest in prosecuting separate actions as none have been filed. The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable. No difficulties are likely to be encountered in the management of this action as a class action.

215. In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class members have suffered disparate damages, the fraudulent scheme alleged and the misrepresentations and omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action.

## APPLICABILITY OF THE PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET DOCTRINE

216. At all relevant times, the market for LeapFrog common stock was an efficient market for the following reasons, among others:

(a) LeapFrog common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, LeapFrog filed periodic reports with the SEC;

(c) LeapFrog regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on

the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) LeapFrog was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

217. As a result of the foregoing, the market for LeapFrog common stock promptly digested current information regarding LeapFrog from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of LeapFrog common stock during the Class Period suffered similar injury through their purchase of LeapFrog common stock at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

218. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. For example, the following statements identified as materially false and/or misleading in ¶¶41-46, 71-72, 80-91, 103-108, 122-124, 150, 154, 157, 167-169, 184 above are statements of past or present fact and are not forward-looking: "[I]f you look at the inventory . . . ***it was*** quite a unique situation, and ***we're working*** the way through the inventory right now" (¶44); "***I feel, at this stage***, pretty good about the response we've had from the trade in terms of these products. I think they are going to be in super demand this year" (¶44); "LeapTV ***is*** hitting stores in October" (¶72); "***we are making good progress*** on our growth initiatives" (¶72); "***our progress*** in reducing carryforward retail and inventory levels and initial success in launching our major new product categories" (¶84); "***we are very well positioned*** for a strong holiday season" (¶86); "that trend [retail POS] ***has*** improved somewhat" (¶87); "***we have given*** all the discounting and promotional offers ***we've needed*** to give during this quarter and taken the pain" (¶87); "***[w]e're dealing with*** a one-off situation here" (¶88); LeapTV "will get to stores ***when we had planned*** to get it to stores" (¶91); "we ***are well-positioned*** for the all-important holiday season" (¶103); "LeapTV is off to a very strong

start" (¶103); the "carryover inventory was primarily in tablets and ***we substantially sold*** through the excess inventory in tablets" (¶108); and "***there's less*** inventory at retail, and that retail ***is*** significantly cleaner" (¶157).

219. Even with regard to Defendants' forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For example, Defendants did not caution investors the extent to which LeapTV had not shipped as planned. Nor did Defendants sufficiently caution investors that LeapFrog's carryover inventory would negatively impact the Company's financial results. Moreover, as set forth in ¶¶51-70, 74-79, 94-102, 110-121, 126-147, 161-166, 171-183, 185, at the time the purportedly forward-looking statements were made, the speaker knew that the particular forward-looking statement was false.

## COUNT I

## For Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

220. Lead Plaintiff incorporates ¶¶1-219 by reference.

221. During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

222. These Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of LeapFrog common stock during the Class Period.

223. Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LeapFrog common stock. Lead Plaintiff and the Class would not have purchased LeapFrog common stock at the prices they paid, or at all, if they

had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

**COUNT II**

**For Violation of Section 20(a) of the 1934 Act Against All Defendants**

224. Lead Plaintiff incorporates ¶¶1-223 by reference.

225. The Officer Defendants acted as controlling persons of LeapFrog within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, their ownership of LeapFrog stock, the nature of LeapFrog's business and the small size of the Company, and their review and control of the press releases, conference call statements and financial statements, the Officer Defendants had the power and authority to cause LeapFrog to engage in the wrongful conduct complained of herein. LeapFrog controlled the Officer Defendants and all of its employees. It also had the power to control the financial information disseminated in LeapFrog's SEC filings. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiff and the members of the Class damages, including interest;

C. Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: December 4, 2015

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MATTHEW S. MELAMED
EKATERINI M. POLYCHRONOPOULOS

s/Willow E. Radcliffe
WILLOW E. RADCLIFFE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

MOTLEY RICE LLC
JAMES M. HUGHES
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

Co-Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on December 4, 2015, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on December 4, 2015.

s/Willow E. Radcliffe
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: willowr@rgrdlaw.com

# Mailing Information for a Case 3:15-cv-00347-EMC In Re: LeapFrog Enterprise, Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,dawn.hartman@ksfcounsel.com
- **Jordan Eth**
  jeth@mofo.com,gmartinez@mofo.com,jrahman@mofo.com
- **Mark R.S. Foster**
  mfoster@mofo.com,lroiz@mofo.com,kmaccardle@mofo.com,rbarajas@mofo.com
- **James Michael Hughes**
  jhughes@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Ekaterini Maria Polychronopoulos**
  katerinap@rgrdlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,ptiffith@rgrdlaw.com,katerinap@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)