UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LEAPFROG ENTERPRISE, INC. SECURITIES LITIGATION, _____/ This Document Relates to: All Actions. | Case No.  15-cv-00347-EMC  **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** Docket No. 72 |

## I.    INTRODUCTION

Plaintiffs have filed a class action against LeapFrog Enterprises Inc., and two of its officers, John Barbour ("Barbour") and Raymond L. Arthur ("Arthur"), for violations of federal securities laws. Defendants' motion to dismiss Plaintiffs' First Amended Consolidated Class Action Complaint ("FAC") focuses on the allegedly false and misleading statements about LeapFrog's inventory, the roll out of LeapTV, LeapFrog's financial guidance, and accounting. For the reasons stated below, the Court **GRANTS** Defendants' motion to dismiss.

## II.    REQUESTS FOR JUDICIAL NOTICE

A.    Defendants' Request

Defendants ask the Court to take judicial notice over nine categories of documents or to consider them under the doctrine of incorporation by reference: (1) LeapFrog's press releases filed with the SEC as attachments to Forms 8-K (Exs. 1, 4, 8, 14, 16); (2) LeapFrog's earnings and conference call transcripts (Exs. 2, 5, 7, 9, 11, 12, 15); (3) LeapFrog's Forms 10-Q filed with the SEC (Exs.  13, 17); (4) LeapFrog's Forms 10-K filed with the SEC (Exs. 3, 19); (5) LeapFrog's Forms DEF 14A filed with the SEC (Exs. 20, 21); (6) LeapFrog's press releases published through PRNewswire (Exs. 6, 18); (7) SunTrust Robinson Humphrey's Report about LeapFrog's 1Q15

United States District Court
For the Northern District of California

1    results (Ex. 10); (8) a Microsoft Excel Spreadsheet with the data about LeapFrog's daily stock

2    price for the period of January 1, 2014 to July 17, 2015 (Ex. 22); and (9) copies of Defendants'

3    Form 4 (Exs. 23, 24).  *See* Docket No. 73, ("Foster Decl."), Docket No. 74 ("D's RJN").

4         Plaintiffs object to the Court's consideration of three of the items.  Docket No. 76

5    ("Response to D's RJN").  Plaintiffs object to (1) Exhibit 21 – copies of LeapFrog's Form DEF

6    14A filed with the SEC on July 2, 2015 ("Proxy Statement") and (2) Exhibits 23 and 24 – copies

7    of Defendants' Forms 4, which show that Defendants exercised LeapFrog stock options.[1]

8    Defendants respond that Exhibits 21, 23, and 24 are public filings with the SEC and thus subject to

9    judicial notice.  Docket No. 81 at 4 ("D's Reply to P's RJN").  Because these exhibits are not

10   necessary to this decision, the Court declines to take judicial notice.

11        Plaintiffs also ask the Court to strike all factual assertions and arguments derived from

12   Exhibits 3, 15, and 19, (LeapFrog's 10-K filed March 14, 2014; a transcript of an earnings call

13   held February 5, 2015; and LeapFrog's 10-K filed June 15, 2015) asserting that Defendants

14   improperly rely on these exhibits for the truth of these factual assertions:

15
16   • Exhibit 3: "LeapFrog's business depends on being able to predict highly
       changeable trends and consumer preferences, which is no easy task, especially in
17     the toy market."  Docket No. 53 at 2; ("MTD") (citing Ex. 3 at 9); "LeapFrog's
       products help teach children things like phonics, reading, writing, math, sciences,
18     social studies, creativity, and life skills."  MTD at 2 (citing Ex. 3 at 1; ¶ 21);
       "LeapFrog's business is highly seasonal, and its overall success depends on sales
19     relating to a brief, but critical, holiday season."  MTD at 2-3 (citing Ex. 3 at 11).

20

21   _____

22   [1] Plaintiffs do not object to the Court considering Defendants' Exhibits 1, 2, 4-14, 16-18, 20, and
     22.  The Court **GRANTS**  Defendants' request for judicial notice of the Exhibits 1, 2, 4-14, 16-18,
23   20, and 22.  When ruling on a motion to dismiss, a court may take judicial notice of SEC filings.
     *Dreiling v. Am. Express Co.*, 458 F.3d 942, 946 n.2 (9th Cir. 2006).  In this case, LeapFrog's
24   securities filings are judicially noticeable because they are matters of public record.  Courts can
     consider securities offerings and corporate disclosure documents that are publicly available.  *See*
25   *Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1064 n.7 (9th Cir. 2008).
     Similarly, it is proper to take judicial notice of LeapFrog's net sales figures reported in 2013 Form
26   10-K and 3Q14 Form 10-Q.  *See In re Am. Apparel Shareholder Derivative Litig.*, No. CV 10-
     06576 MMM (RCx), 2012 U.S. Dist. LEXIS 146970, *60 (C.D. Cal. July 31, 2012) (taking
27   judicial notice of a company's forms 10-K, 10-Q, 8-K, and its annual reports).  The Court does not
     take judicial notice of the filings for the facts therein.  However, the Court takes judicial notice of
28   these filings for the fact that these statements were made, as well as for the wording and timing of
     the statements.

- Exhibit 15: "Worldwide sales of children's tablets 'shrunk for the first time since 2010,' causing 'significant sales declines' industrywide." MTD at 6 (citing Ex. 15 at 3).

- Exhibit 19: "Its products include, among others, the LeapPad learning tablets and, since the fall of 2014, the LeapTV educational video game system." MTD at 2 (citing Exh. 19 at 1; ¶ 21); "Over 70% of LeapFrog's sales come in the second half of the calendar year, with 40% in the period between October and December." MTD at 3 (citing Ex. 19 at 7).

Defendants respond that the contents of Exhibits 3, 5, and 19 must be considered for the truth of the facts asserted therein because these exhibits are incorporated by reference into the FAC. Docket No. 81 at 1 ("D's RJN Reply").

Under the incorporation by reference doctrine, if a document is referenced in a complaint, a court may "properly consider the [document] in its entirety." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1058 n.10 (9th Cir. 2014) ("Once a document is deemed incorporated by reference, the entire document is assumed to be true for purposes of a motion to dismiss, and both parties – and the Court – are free to refer to any of its contents."). Specifically, courts may take into account "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading." *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005). A court "may treat such a document as part of the complaint, and thus may assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003). Here, Plaintiffs expressly referred to these exhibits in the FAC, and relied on them as sources of the allegedly fraudulent statements. *See, e.g.*, FAC ¶¶ 55, 24, 176. Therefore, the Court **DECLINES** to strike all factual assertions and arguments derived from Exhibits 3, 15, and 19.

B.   Plaintiffs' Request

Plaintiffs filed a conditional request to take judicial notice of a November 5, 2014 analyst article entitled "LeapFrog Continues To Offer Rare And Compelling Value Going Into The Holidays," published by *Seeking Alpha*. Docket No. 78, Exhibit 1 ("Article"). "If the Court takes judicial notice of the extrinsic evidence (Defendants' Exhibits 21, 23, and 24) on which Defendants base their factual assertions concerning Barbour's and Arthur's stock ownership and

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    does not strike the assertions, Plaintiff respectfully requests that it also take judicial notice of

2    Exhibit 1." Docket No. 77 at 1 ("P's RJN"). Since the Court is not taking notice of Exhibits 21,

3    23, and 24, Plaintiff's request is denied. In any event, judicial notice is not proper. Plaintiffs must

4    allege sufficient facts, not wait to see what Defendants challenge and then seek to add facts at the

5    briefing stage. Because Plaintiffs attach the Article in an improper attempt to introduce new facts

6    at briefing, and because the Court is not taking judicial notice of Defendants' Exhibits 21, 23, and

7    24, the Court **DENIES** judicial notice of Plaintiffs' Exhibit 1.

8                                    **III.    BACKGROUND**

9    A.    The Parties and Claims

10          Defendant LeapFrog creates electronic learning toys and content. FAC ¶ 5. The putative

11   class consists of all persons or entities who purchased shares of LeapFrog common stock during

12   the Class Period. *Id.* ¶ 1. The Class Period is between May 5, 2014 and June 11, 2015. *Id.*

13   During the Class Period, Barbour was LeapFrog's director and CEO; *id.* ¶ 38; Arthur was

14   LeapFrog's CFO. *Id.* ¶ 39. Plaintiffs allege that from May 2014 to June 2015 Defendants made

15   false statements about: (1) LeapFrog's carryover inventory and development delays with Leap

16   TV; and (2) LeapFrog's financial guidance and accounting.

17   B.    Roll Out of LeapTV

18          Plaintiffs allege that Defendants claimed that LeapTV would help LeapFrog to deliver

19   growth. *Id.* ¶ 9. In January 2014, the management decided to move up the release of LeapTV to a

20   calendar 2014 release. *Id.* ¶ 6. Because the product had not been slated for such an early release,

21   the decision placed a tight timeline for development and production of the new product. *Id.*

22   Plaintiffs allege that Defendants misled investors by representing on June 11, 2014 that LeapTV

23   would be shipping at the end of September, *id.* ¶ 81, and would be "hitting stores in October." *Id.*

24   ¶ 72. However, LeapTV did not ship until mid-October meaning that LeapTV was not on store

25   shelves until November as the result of the typical lag time between shipment and arrival of the

26   product in stores of weeks. *Id.* ¶ 77. Plaintiffs contend that because Defendants knew about

27   development delays of LeapTV, they lacked any basis for telling investors that it would ship at the

28   end of September. *Id.* ¶ 100. Finally, Plaintiffs allege that Defendants misled investors during

                                             4

the November 3, 2014 conference call that "LeapTV [was] off to a very strong start." *Id*. ¶ 105. This was supposedly misleading because the late launch caused Target to relegate LeapTV to end-cap space and important retailers to drop LeapTV from sales. *Id*. ¶ 112(c).

C.   <u>Inventory</u>

Plaintiffs allege that LeapFrog "faced a substantial retail inventory hangover of LeapPads from 2013 that management knew would impact both margins and sales heading into 2014." *Id*. ¶¶ 6, 77. Plaintiffs allege that defendants made false and misleading statements on May 5, 2014 that "[i]nventories at retail have come down from where they were at year end by a fair amount . . . . []The important fact is that isn't across the board . . . . We don't have higher inventories across the board. We have some pockets of inventory." *Id*. ¶ 45. Plaintiffs allege that the above statements were false and misleading because in fact "there remained a massive volume of carryover inventory at retailers that required discounts to sell." *Id*. Plaintiffs further allege that Defendants "deliberate[ly] conceal[ed] the nature and impact of the carryover inventory" when referring to inventory hangover as a "one-off situation" and stating that the bulk of the inventory will be gone by Thanksgiving. *Id*. ¶¶ 88, 97.

D.   <u>Guidance</u>

1.   <u>May 5, 2014</u>

On May 5, 2014 (the first day of the proposed class period), LeapFrog issued a press release announcing LeapFrog's financial guidance for the rest of 2014. *Id*. ¶ 41. The company reported expected sales for the 2014 year of $554-$580 million, or $0.18-$0.25 per diluted share. *Id*. ¶ 42. Defendants are quoted in the press release as stating that "[their] line-up of major new product introductions will begin shipping in late summer and fall." *Id*. ¶ 41.

The same day Defendants held a 1Q14 earnings conference call to review LeapFrog's results for the first quarter ended March 31, 2014. *Id*. ¶ 41; Ex.5 at 3. Arthur projected net sales for the second quarter of $48-$52 million. *Id*. ¶ 43; Ex.5 at 7. Arthur announced that LeapFrog expected "net sales and earnings growth in the second half of the year, largely due to new product introductions." *Id*. Arthur noted that "[w]ithin the second half of this year, [LeapFrog's] results will be much more back-end-loaded with some new products shipping for the first time in

5

United States District Court
For the Northern District of California

September." *Id.*  In response to questions about inventory allowances for the next quarter, Arthur asserted that possible clearance costs are not going to be "incredibly significant."  *Id.* ¶ 46; Ex.5 at 10.  Following these announcements, the price of the company's stock increased from $6.83 to $7.29 per share, or approximately 6%.  *Id.* ¶ 47.

Plaintiffs contend that there was no reasonable basis for these projections.  They cite the August 4, 2014 press release stating that for the full fiscal year ending March 31, 2015 the company expected net sales to be $480-$505 million as opposed to $554-$580 million and net income (loss) per basic and diluted share to be in the range of a loss per share of $0.04-$0.10 as opposed to a loss of $0.18-$0.25.  *Id.* ¶ 197; Ex.8 at 3.  Plaintiffs emphasize that Defendants explained the reduction in guidance to be due "elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of new product shipments." *Id.*  Moreover, Plaintiffs assert that on May 5, 2014 the shipment date of "as-yet undeveloped and untested" LeapTV was in question.  *Id.* ¶ 68.

2.   August 4, 2014

On August 4, 2014, LeapFrog issued a press release announcing its financial results for the quarter ended June 30, 2014 and lowering its earning guidance for the 2015 fiscal year ending March 31, 2015.  *Id.* ¶ 80; Ex. 8.  The company noted that the new guidance will be offset by "a very back-end loaded year with Leap TV shipping at the end of September," and "the introduction of new products that we expect to perform very well in the market place in fiscal 2015 and beyond." *Id.* ¶ 81.  The press release stated that LeapFrog would experience a "strong holiday season" and a "solid net sales growth in both the December and March quarters, led largely by sales of new releases including LeapTV, LeapBand, LeapPad3, LeapPad Ultra XDi and related content." *Id.* ¶ 82; Ex. 8 at 1, 3.

On August 4, 2014, Defendants held a 1Q15 conference call to review LeapFrog's results for the first fiscal quarter, ended June 30, 2014.  *Id.* ¶ 83; Ex. 9.  Barbour stated that LeapFrog expected "double-digit sales growth in the December and March quarters." *Id.* ¶ 83; Ex. 9 at 3.  Barbour also stated: "We expect this growth to be driven by shipments of our exciting new product introductions for the year . . . ." *Id.* ¶ 84; Ex. 9 at 3.  Arthur added that LeapFrog expected

"solid growth in [its] third and fourth fiscal quarters" and that it was "well positioned for a strong holiday season with a new lineup of tablets, fantastic new products in LeapTV and LeapBand set to enter the market . . . ." *Id*. ¶ 85; Ex. 9 at 8.  Arthur stated that the company expected net sales in the second quarter to be in the range of $125-$130 million.  *Id*. ¶ 86; Ex. 9 at 7.  When asked how to reconcile an old guidance with the new guidance,[2] Arthur said: "Definitely the third quarter of our fiscal year is a big quarter for us, bigger than it has been for a long time.  I think that's primarily the result of LeapTV starting to ship at the end of September, so most of the channel fill is going to occur in Q3." *Id*. ¶ 90; Ex. 9.

Plaintiffs contend that the projections offered during this period were false and misleading, given that three months later Defendants reported a loss of $0.13 to $0.25 per share and net sales of $450-$470 million (as opposed to expected EPS of $0.04 to $0.10 and net sales of $480-$505 million).  *Id*. ¶ 95.  In a November 3, 2014 press release, Defendants explained that "slippage of first shipments of LeapTV" was the primary reason for reduced guidance.  *Id*. ¶ 95; Ex. 12 at 1.

### 3.    November 3, 2014

On November 3, 2014, LeapFrog issued a press release announcing financial results for the quarter ended September 30, 2014.  *Id*. ¶ 103; Ex. 12.  Defendants are quoted in the press release as stating that LeapFrog was "well-positioned for the all-important holiday season" and that the company expected "financial results in . . . fiscal third quarter ending December 31, 2014 to improve year-over-year given the launch of LeapTV, two new LeapPad tablets . . . ." *Id*. ¶ 103; Ex. 12 at 2.  Defendants stated that "for the full fiscal year ending March 31, 2015, [LeapFrog] expected net sales to be in the range of $450 million to $470 million compared to $528 million for the twelfth-month period ended March 31, 2014." *Id*. ¶ 104; Ex. 12 at 3.  Plaintiffs contend this was misleading, as Defendants "knew" that reaching even this lowered sales guidance "would be impossible due to their awareness of adverse facts and circumstances . . . ." FAC ¶ 110.  For the third fiscal quarter ending December 31, 2014, LeapFrog expected "net sales to be in the range of

---

[2] Per the FAC, sales guidance decreased by $75 million (from a range of $554-$580 million to a range of $480-$505 million), and EPS declined from a range of $0.18-$0.25 to a range of $(0.04-$0.10.  FAC ¶¶ 11, 58.

$220 million to $240 million, up 18% to 28%, compared to $187 million for the quarter ended December 31, 2013." *Id.*

On November 3, 2014, defendants held a conference call to review results for the second fiscal quarter ended September 30, 2014. *Id.* ¶ 105; Ex. 11. Barbour emphasized that "[t]he second half of fiscal 2015 will be much brighter and [LeapFrog] expected double-digit sales growth in the December and March quarters." *Id.* ¶ 105; Ex. 11 at 3. Barbour stated that this growth will be driven "by shipments of [LeapFrog's] exciting new product introductions for the year." *Id.* Finally, Barbour reported that LeapFrog "started shipping [LeapTV] units to retailers a few weeks ago and . . . LeapTV [was] off to a very strong start." *Id.* ¶ 105; Ex. 11 at 4. Arthur reiterated: "[w]e expect sales to increase for the balance of our fiscal year versus the same period of last year as we are well positioned for the holidays with our best product lineup ever and strong support from significant retail, trade, and advertising campaigns, as well as off-shelf promotions." Looking forward to the full-year outlook, Arthur stated: "[w]hile our reported results through the second fiscal quarter of 2015 reflect sales and earnings reductions versus the same periods in the prior year, we expect to see improved results for the remaining two quarters of the year versus the same periods a year ago." *Id.* ¶ 106; Ex. 11 at 6. When asked if LeapFrog would make up for the second quarter shortfall of LeapTV sales in the fiscal third quarter, Barbour responded: "We would hope that we would make up most of it, yes . . . ." *Id.* ¶ 107; Ex. 11 at 9. Barbour added: "if you take the carryforward tablet from last year out of the equation, our inventory is actually quite tight in the marketplace at the moment. So I think it may be more than normalized at the moment, and that is why we are looking at growth . . . for the third quarter and into the fourth quarter." *Id.* ¶ 108; Ex. 11 at 11.

Plaintiffs assert that Defendants' forecasts during this period were materially false and misleading because Defendants knew that to achieve this guidance, the company "had to have holiday 2014 sales that surpassed those of its successful launch of LeapPad in 2011, and knew that this would be impossible due to their awareness of adverse facts and circumstances at the time." *Id.* ¶ 110. Plaintiffs contend given that "LeapTV had shipped to retailers late, in mid-October" Defendants "knew that LeapTV could not drive the 3Q15 and FY 2015 guidance they issued." *Id.*

8

¶ 111.  Plaintiffs also allege that Defendants "deliberate[ly] conceal[ed] the nature and impact of the carryover inventory," in telling investors that the carryover was "a 'one-off situation'" and "build-up would be gone by Thanksgiving."  FAC ¶ 97.  Specifically, Plaintiffs allege that a "shocking amount" of carryover inventory remained, which would require "further discounts" and "cannibalizing of new tablet sales."  *Id.*

4.    February and May 2015

On February 5, 2015, Defendants held a conference call to review results for the third fiscal quarter ended December 31, 2014.  *Id.* ¶ 154; Ex. 15.  Barbour stated that financial results for the third quarter of fiscal 2015 "were very disappointing."  *Id.* ¶ 154; Ex. 15 at 2.  Barbour explained: "[b]ased on these factors, and our own experiences with consumers playing with LeapTV, we believe this platform will deliver, but understand that financial performance did not live up to expectations for this past holiday season."  Ex. 15 at 4.

Arthur announced that LeapFrog "will not be providing guidance for fiscal fourth quarter or full year beyond indicating that we believe sales for our fiscal fourth quarter will be below that of the prior year period."  Ex. 15 at 6.  Arthur stated:

> We are very disappointed that our performance in the third fiscal quarter of 2015 was significantly below our expectations. . . . In our projections for the third quarter we planned for a decline in retail sales of LeapPad tablets.  However, we are surprised by the magnitude of the actual decline across the tablet business and our key competitors during the holiday season, which was significantly in excess of our expectations.

FAC ¶ 155.  Plaintiffs contend that Defendants materially misled investors regarding their surprise about across the tablet business sales declines because, in part, Defendants already knew that leading up to Black Friday 2014 LeapTV sales were off-trend and that the carryover inventory would not allow LeapFrog to achieve its guidance forecasts.  *Id.* ¶ 163.

E.    Accounting

1.    November 3, 2014

On November 3, 2014, defendants held a conference call to review results for the second fiscal quarter ended September 30, 2014.  *Id.* ¶ 122; Ex. 11.  The company reported a net income

9

loss of $2,026 and EPS of negative $0.03.  *Id.* ¶ 122.  Plaintiffs assert that if LeapFrog had properly recorded goodwill impairment charges of $19.5 million in 2Q15, then the company should have reported a net income loss of $17,442 and EPS of negative $0.25.  *Id.* ¶ 125.

On November 10, 2014, LeapFrog filed its 2Q15 form 10-Q with the SEC, which reported that "[a]s of September 30, 2014, based on [company's] assessment of various qualitative factors and projection of future operating results, the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment."  *Id.* ¶ 123; Ex. 13 at 9.

### 2.    February 5, 2015

On February 9, 2015, LeapFrog filed its 3Q15 form 10-Q with the SEC.  *Id.* ¶ 167.  The company reported a net income loss of $124,212 and EPS of $1.77 with negative $0.22, accounting for goodwill.  *Id.*  Plaintiffs assert that if LeapFrog had properly recorded goodwill impairment charges of $36.5 million in 3Q15, then the company should have reported a net income loss of $145,233 and EPS of $2.07.  *Id.* ¶ 170.  The company concluded that its long-lived assets were not impaired as of December 31, 2014.  *Id.* ¶ 168; Ex.17 at 9.

### 3.    GAAP Violation

Plaintiffs claim that LeapFrog fraudulently inflated its financial results for the second and third quarters of 2015.  See FAC ¶¶ 17, 24.  Plaintiffs first allege "that a $19.5 million goodwill impairment that LeapFrog took after its disappointing holiday season for the quarter ended December 31 should have been taken in the second quarter ended September 30, 2014."  MTD at 15-16.  Second, Plaintiffs allege that "the 36.5 million long-lived asset impairment that LeapFrog recorded in the quarter, ended March 31 should have been taken in the quarter ended December 31."  MTD at 16.

Plaintiffs allege that "Defendants falsely reported 2Q15 financial results in the November 3, 2014 press release and during the conference call on the same day as well as in the Company's Form 10-Q filed with the SEC on November 10, 2014, as a result of failing to timely write-off $19.5 million of impaired goodwill."  FAC ¶ 17.  Plaintiffs allege Defendants violated GAAP principles.  GAAP are the principles recognized in the accounting field as the conventions, rules,

and procedures necessary to define accepted accounting practice at a particular time.  Docket No. 52, CAC ¶ 91 n.6.  "Financial statements filed with the Commission which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate, despite footnote or other disclosures, unless the Commission has otherwise provided." 17 C.F.R. § 210.10-01(a).  Here, according to Plaintiffs, under GAAP, there were triggering events known to Defendants which should have led to earlier reporting of impairment to goodwill and long-lived assets: (1) the sustained decrease in share price of approximately 19% when the Company reported 1Q15 financial results on August 4, 2014; (2) the increased competition that Defendants admittedly faced; and (iii) the declines in actual and planned net sales and earnings, including knowledge that 2Q15 sales and EPS were going to be 7.8% and 9.5% below consensus estimates and that LeapFrog knew that it would have to dramatically reduce guidance with an anticipated loss for the fiscal year.  FAC ¶ 17.

## IV.  DISCUSSION

A.   Legal Standard Governing Motions to Dismiss Under Rule 12(b)(6)

Defendants move to dismiss Plaintiffs' claims under Federal Rule of Civil Procedure 12(b)(6), arguing Plaintiffs failed to state a claim that was "plausible on its face."  Mot. at 2.  In evaluating a motion to dismiss for failure to state a claim, the Court should "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party."  *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014).  However, Plaintiffs must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007).  The Court is "not bound to accept as true a legal conclusion couched as a factual allegation."  *Twombly*, 550 U.S. at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

1.   Rule 9(b) of the Federal Rules of Civil Procedure

Rule 9(b) of the Federal Rules of Civil Procedure provides that the "circumstances constituting fraud or mistake shall be stated with particularity."  Fed. R. Civ. Proc. 9(b).  It is not

enough for a plaintiff merely to identify an allegedly fraudulent statement made by defendants. *In re GlenFed, Inc. Securities Litigation*, 42 F.3d 1541, 1548 (9th Cir. 1994) (*en banc*). Plaintiffs must allege "why the disputed statement was untrue or misleading *when made*." *Id*. at 1549 (emphasis added).

2.      The Private Securities Litigation Reform Act

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. § 78u-4, further provides that "a securities fraud complaint shall identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed." *Silicon Graphics*, 183 F.3d at 996; 15 U.S.C. § 78u-4(b)(1). In alleging scienter, plaintiffs must "state with particularity . . . facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2). If the complaint does not adequately allege scienter, it must be dismissed. 15 U.S.C. § 78u4(b)(3)(A).

As noted in *Silicon Graphics*, in enacting the PSLRA, "Congress intended to elevate the pleading requirement[s]" that previously applied to securities fraud complaints. *Silicon Graphics*, 183 F.3d at 974, *see also Tellabs*, 351 U.S. at 319 (describing the new procedures and new pleading standards set forth in PSLRA). Under the PSLRA, it is no longer sufficient to plead "facts showing mere recklessness or a motive to commit fraud and opportunity to do so." *Silicon Graphics*, 183 F.3d at 974. Rather, "a private securities plaintiff proceeding under the PSLRA must plead in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Id*.

Finally, the PSLRA creates a "safe harbor" for "forward-looking" statements that are immaterial, are limited by "meaningful cautionary statements," or are made without actual knowledge of their falsity. 15 U.S.C. §§ 77z-2(c), 78u-5(c). "Forward-looking" statements include statements of future economic performance and management plans and objectives. 15 U.S.C. §§ 77z-2(i), 78u-5(i). This "safe harbor" has much the same effect as the "bespeaks caution" doctrine, which provides that forward-looking representations that contain adequate cautionary language or risk disclosure protect a defendant from securities liability. *See, e.g.*, *Plevy v. Haggerty*, 38 F.Supp.2d 816, 830 (C.D. Cal. 1998).

United States District Court
For the Northern District of California

1    B.    Sufficiency of Count I: Violation of Section 10(b) of the 1934 Act and Rule 10(b)-5

2         1.    Legal Standards Governing Section 10(b) and Rule 10b-5

3         Rule 10b-5 makes it unlawful for any person to use "manipulative or deceptive device[s]"

4    in connection with the purchase or sale of securities.  15 U.S.C. § 78j(b).  One may not "(a) . . .

5    employ any device, scheme, or artifice to defraud; (b) . . . make any untrue statement of a material

6    fact or omit to state a material fact necessary in order to make the statements made, in the light of

7    the circumstances under which they were made, not misleading; or (c) . . . engage in any act,

8    practice, or course of business which operates or would operate as a fraud or deceit upon any

9    person, in connection with the purchase or sale of any security."  17 C.F.R. § 240.10b-5.

10        To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must sufficiently allege

11             (1) a material misrepresentation or omission by the defendant;
               (2) scienter;
12             (3) a connection between the misrepresentation or omission and the
               purchase or sale of a security;
13             (4) reliance upon the misrepresentation or omission;
               (5) economic loss; and
14             (6) loss causation.

15   *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016) (line breaks added).  The Ninth

16   Circuit applies the heightened pleading standards of Rule 9(b) "to all elements of a securities fraud

17   action, including loss causation."  *Oregon Pub. Employees Ret. Fund v. Apollo Grp. Inc.*, 774 F.3d

18   598, 605 (9th Cir. 2014).

19        A misstatement or omission may be is material when there is "a substantial likelihood that

20   the disclosure of the omitted fact would have been viewed by the reasonable investor as having

21   significantly altered the 'total mix' of information made available."  *Basic Inc. v. Levinson*, 485

22   U.S. 224, 231-32 (1976).  To plead materiality, the complaint's allegations must "suffice to raise a

23   reasonable expectation that discovery will reveal evidence satisfying the materiality requirement,

24   and to allow the court to draw the reasonable inference that the defendant is liable." *Matrixx*

25   *Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 47 (2011).

26        "As for section 20(a), it essentially provides for derivative liability; that is, it 'makes

27   certain 'controlling' individuals also liable for violations of section 10(b) and its underlying

28   regulations.'"  *Westley v. Oclaro, Inc.*, 897 F. Supp. 2d 902, 912 (N.D. Cal. 2012) (citing *Zucco*

13

*Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 990 (9th Cir. 2009)).

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976). The Ninth Circuit has clarified that recklessness "satisfies scienter under § 10(b)" only to the extent that it "reflects some degree of intentional or conscious misconduct." *Silicon Graphics*, 183 F.3d at 977.

To adequately plead scienter, the complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To be "strong," an inference of scienter "must be more than merely plausible or reasonable – it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id*. at 314. The inference must be that "the defendant[ ] made false or misleading statements either intentionally or with deliberate recklessness." *Zucco*, 552 F.3d at 991. Deliberate recklessness means the conduct "reflects some degree of intentional or conscious misconduct." *S. Ferry LP, No.2 v. Killinger*, 542 F.3d 776, 782 (9th Cir. 2008). "[A]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort." *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 390 (9th Cir. 2010). "Facts showing mere recklessness or a motive to commit fraud and opportunity to do so provide some reasonable inference of intent," but are not independently sufficient. *Silicon Graphics*, 183 F.3d at 974. "It may also be reasonable to conclude that high-ranking corporate officers have knowledge of the critical core operation of their companies." *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014) (citing *S. Ferry LP*, 542 F.3d at 785-86).

Courts "must review all the allegations holistically" when determining whether scienter has been sufficiently pled. *Matrixx Initiatives, Inc. v. Siracusano,* 563 U.S. 27, 48 (2011). "The relevant inquiry is 'whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.'" *Reese*, 747 F.3d at 569 (quoting *Tellabs*, 551 U.S. at 323; *N.M. State Inv. Council v. Ernst & Young LLP*, 641 F.3d 1089, 1095 (9th Cir. 2011)). In the instant case, Defendants challenge Plaintiffs' securities fraud claims on the ground that Plaintiffs has failed to adequately

14

1    plead both falsity and scienter.

2       2.    Whether Plaintiffs' Complaint Sufficiently Pleads Defendants' Alleged

3             Misrepresentations and/or Omissions

4       As noted above, to state a claim for securities fraud, a complaint must specify "each

5    statement alleged to have been misleading, [and] the reason or reasons why the statement is

6    misleading."  15 U.S.C. § 78u-4(b)(1).

7       Defendants argue that there is "an 'insufficient basis for fraud allegations because [the

8    FAC] fails to state with particularity all facts on which [the] belief is formed.'"  MTD at 8

9    (quoting *Silicon Graphics*, 183 F.3d at 985).  Defendants assert that the FAC's lack of

10   corroboration and particularity is fatal to the allegations of falsity and scienter.  *Id*.  "To plead

11   falsity, a complaint must allege contemporaneous statements or conditions that are 'necessarily

12   inconsistent' with the challenged statement."  *Id*. (citing *In re Read-Rite Corp.*, 335 F.3d 843, 848

13   (9th Cir. 2003), *abrogated on other grounds as recognized in South Ferry, L.P.*, 542 F.3d at 782-

14   84).

15      Many of the statements Plaintiffs challenge are predictions or statements of belief.

16   Forward-looking statements are exempted under the PSLRA's safe harbor provision.  *See* 15

17   U.S.C.A. § 78u-5(c).  Under the PSLRA, forward-looking statements are exempt if they are

18   identified as such and accompanied by "meaningful cautionary" language, *see id*. at § 78u-

19   5(c)(1)(A); if the plaintiff is unable to show the statement "was made with actual knowledge . . .

20   that the statement was false or misleading," *id*. at § 78u-5(c)(1)(B); if the statement was made

21   orally and accompanied by a warning that the statement was forward-looking at "that the actual

22   results might differ materially from those projected," *id*. at § 78u-5(c)(2).  As to statements of

23   belief, all Defendants need show is "(1) that the statement is genuinely believed, (2) that there is a

24   reasonable basis for that belief, and (3) that the speaker is not aware of any undisclosed facts

25   tending to seriously undermine the accuracy of the statement."  *In re VeriFone Sec. Litig.*, 11 F.3d

26   865, 870-71 (9th Cir. 1993) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 501 (9th Cir.

27   1992)).  However, if one of those inquiries proves inaccurate, then liability may attach.  *See id*.

28   (citing Rule 10b-5).  "The fact that the prediction proves to be wrong in hindsight does not render

the statement untrue when made." *Id.* (citing *Marx v. Computer Sciences Corp.*, 507 F.2d 485, 489-90 (9th Cir. 1974)).

The statements which Plaintiffs challenge as false may be grouped into four categories: statements about carryover inventory, about LeapTV, about financial guidance, and about financial results for the second and third quarters of fiscal 2015 (focusing on goodwill).

          a.    <u>LeapFrog's Statements About Carryover Inventory</u>

With regard to the first category, statements about carryover inventory, Plaintiffs contend that the following statements were false:

- February 12, 2014 statement: "We are going [to] face some challenges early in the year with the [excess retail] inventory." FAC ¶ 7

- May 5, 2014 statement: "[I]f you look at the inventory . . . it was quite a unique situation . . . ." FAC ¶ 44.

- May 5, 2014 statements: "Inventories at retail have come down from where they were at year end by a fair amount.[] The important fact is that this isn't across the board . . . . We don't have higher inventories across the board. We have some pockets of inventory . . . ." FAC ¶ 45.

- May 5, 2014 statement: "There will probably be some cost associated with the clearance [of pockets of inventory], but I don't think it's going to be incredibly significant." FAC ¶ 46.

- June 11, 2014 statement: "From inventory retail, it's still being worked down . . . . That will probably take [until] second and third quarter to clear up because they're traditionally not high volume quarters at all." FAC ¶ 71.

- August 4, 2014 statement: "I think we have given all the discounting and promotional offers we've needed to give during this quarter and taken the pain so that those units will now clear out more quickly." FAC ¶ 87.

- August 4, 2014 statement: "My sense is that the bulk of it will be cleared as we move into probably late fall, into the early part of the season . . . . So again, our sense is that the bulk of it will be gone as you get close – as we get close to Thanksgiving . . . . We're dealing with a one-off situation here, which, as I say, we have explained many times on the calls in the past where we are trying to deal with it as quickly as possible." FAC ¶ 88.

- August 4, 2014 statement: "we should be done with the discounting." FAC ¶ 89.

- November 3, 2014 statement: "The carryover inventory was primarily in tablets and we substantially sold through the excess inventory in tablets that's at the marketplace . . . ."  FAC ¶ 108.

- January 22, 2015 statement: "Despite these sales declines, the children's tablet business remains a sizeable business around the world . . . ."  FAC ¶ 150.

- February 5, 2015 statement: "[O]ne of the big advantages we have this year is that there's less inventory at retail, and that retail is significantly cleaner . . . ."  FAC ¶ 157.

Overall, Plaintiffs argue that Defendants knew the carryover inventory would harm their financial results, and that they attempted to conceal this future harm.  *See, e.g.*, FAC ¶ 45. However, Rule 10b-5 prohibits "*only* misleading and untrue statements, not statements that are incomplete."  *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002).   Indeed, the PSLRA's safe harbor provision for forward-looking statements says that "[n]othing in this section shall impose upon any person a duty to update a forward-looking statement."  15 U.S.C.A. § 78u-5(d).  Thus, Defendants will not face liability unless they "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists." *Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1061 (9th Cir. 2014).

First, many of these statements are too vague to induce reliance by a reasonable investor.[3] Multiple courts in this District have refused to find material falsity where a statement was so "vague" as to be "nonactionable."  *See, e.g., In re Splash Tech. Holdings, Inc. Sec. Litig.*, 160 F. Supp. 2d 1059, 1076-77 (N.D. Cal. 2001).[4]  "Vague, amorphous statements are not actionable because reasonable investors do not consider 'soft' statements or loose predictions important in making investment decisions."  *Wenger v. Lumisys, Inc.*, 2 F. Supp. 2d 1231, 1245 (N.D. Cal. 1998).  Here, the Defendants made statements about "some cost" or a "fair amount."  Because no

---

[3] *See* FAC ¶¶ 7 ("face some challenges"), 44 (describing the "situation" as "unique"), 45 (inventories "have come down . . . by a fair amount", though there are "some pockets" remaining), 46 ("There will probably be some cost"), 88 ("My sense is that the bulk of it will be cleared"), 150 ("the children's tablet business remains a sizeable business").

[4] *See also In re Northpoint Commc'ns Grp., Inc. Sec. Litig.*, 184 F. Supp. 2d 991, 1005 (N.D. Cal. 2001) ("vague and amorphous statements do not give rise to liability for securities fraud, since reasonable investors do not consider such puffery"); *In re Calpine Corp. Sec. Litig.*, 288 F. Supp. 2d 1054, 1088 (N.D. Cal. 2003).

reasonable investor would rely on a statement about "some" unquantified cost, these statements are too vague to be actionable.

To the extent a statement might be interpreted as implying concrete facts about inventory (*see, e.g.,* FAC ¶¶ 71, 87-89), the problem for Plaintiffs is that Defendants had issued public acknowledgments of the hang-over inventory problem:

- "We expect that this inventory plus current difficult retail conditions will negatively impact our net sales in the first and second quarters of 2014 and also for the full year." Ex. 1 at 9 (February 12, 2014 statement in a press release of LeapFrog's 2013 financial results).

- "[W]e're continuing to deal with significant headwinds that will probably remain through late summer and the fall until we begin to ship our major new introductions this fall." Ex. 5 at 3 (May 5, 2014 statement in an earnings call following announcement of Leapfrog's first quarter 2014 earnings).

- "[Inventory] may not get sold in the second quarter. It may get sold in the third quarter. But clearly from our perspective, we believe it's good and marketable inventory that's going to get sold through before the end of the year." Ex. 5 at 11 (same).

- Barbour represented LeapFrog was "just over halfway for clearing the product that was there . . . and the bulk of it will be gone . . . as [LeapFrog] get[s] close to Thanksgiving." FAC ¶ 88 (quoting a statement from an August 4, 2014 earnings call following announcement of LeapFrog's first quarter 2015 financial results).

- LeapFrog expected "continued headwinds in the September quarter from the remaining carryforward inventory and the timing of new product shipments compared to the prior year," purportedly because of "a challenging market environment and POS trends." FAC ¶ 80, 84 (August 4, 2014 statements in the earnings call and in a press release).

- "[W]e still face the headwind of the remaining clearance inventory at retail and weak market conditions in some of our key categories. We had hoped the retail carryover inventory would be sold through by Thanksgiving, but we now believe that there will be sales of this inventory over the holiday season." Ex. 11 at 6 (statement from a November 3, 2014 earnings call discussing LeapFrog's second quarter 2015 financial results).

These disclosures put the alleged misleading statements about carryover inventory in context. They substantially mitigate the potentially misleading nature of the challenged statements.

Furthermore, many of the statements about expected inventory reduction were forward

18

looking – these are subject to the PSLRA Safe Harbor. *In re Cutera Securities Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010). Under the PSLRA, a person may not be held liable for making an untrue statement of material fact if the statement is (1) a statement that is, and is identified as, a "forward-looking statement" and (2) is accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement." 15 U.S.C. § 78u-5(c)(1)(A). Under this "safe harbor" provision, a "forward-looking statement" is defined as "any statement regarding (1) financial projection, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions 'underlying or related to' any of these issues." *Bartlet v. Affymax, Inc.*, 13-CV-01025-WHO, 2014 WL 231551, at *13 (N.D. Cal. Jan. 21, 2014) (quoting *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 936 (9th Cir. 2003)). Here, multiple statements expressly refer to what "will" happen in the future. [5] Because they discuss future plans and expectations, these statements are forward-looking.

To fall within the safe harbor, a statement must not only be forward-looking, but also accompanied by meaningful cautionary language. 15 U.S.C. § 78u-5(c)(1)(A)(i). Cautionary language is meaningful where it "identif[ies] important factors that could cause actual results to differ materially from those in the forward-looking statement[s]." *Intuitive Surgical*, 759 F.3d at 1058; *Cutera*, 610 F.3d at 1110-11. Defendants point to a number of specific cautionary statements by Leapfrog, including "if inventory levels are too high . . . our operating results will be adversely affected," *see* Ex.3 at 12; the "failure to manage production introductions and transitions, could adversely affect our operating results," *id.* at 9; "it can be difficult to correctly predict changing consumer preferences and accurately forecast optimal product and sales targets for these products," *id.* These warnings identify the very risks that came to fruition here: Plaintiffs contend that LeapFrog's financial performance was harmed by an excess of inventory. *See* FAC ¶ 6.

---

[5] *See* ¶¶ 7 ("We are going to . . ."), 46 ("There will probably be . . ."); 71 ("That will probably take . . ."), 87 ("those units will now clear out . . ."), 88 ("the bulk of it will be cleared"), 157 (referring at the very beginning of the year to an expected "advantage[] we have this year").

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

1    In any event, the FAC does not allege any specific evidence demonstrating that the

2  Defendants did not believe their assessment of the inventory problem at the time the statements

3  were made.  As quoted in the FAC, there are no specific figures given about the current level of

4  inventory at the time of each particular statement that would demonstrate falsity (and hence

5  knowledge thereof) at the time.  The FAC cites no specific evidence or cites any reports that

6  would have alerted Defendants in advance that inventory problems were going to exceed what

7  they had disclosed.  Although Plaintiffs allege that LeapFrog "maintained weekly POS reports

8  regarding LeapPad sales that showed the previous week's sales, as well as year-to-date sales and

9  the inventory levels being held by retailers," FAC ¶ 117, they fail to "cite to any specific report, to

10  mention any dates or contents of reports, or to allege their sources of information about any

11  reports."  *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079, 1088 (9th Cir. 2002).  Nor does the FAC

12  allege there was something said during demand planning, consensus, and weekly E-Commerce

13  team meetings which would have demonstrated the challenged statements were false and

14  knowingly so.  FAC ¶¶ 54, 101, 117.  Because Plaintiffs have failed to raise any inference that

15  defendants "intentionally or with deliberate recklessness" "made false or misleading statements,"

16  much less a strong inference, they have failed to plead scienter.  *Zucco*, 552 F.3d at 991.

17    Plaintiffs' theory is basically an assertion of fraud by hindsight – judging the statements on

18  how things actually turned out subsequently.  Such proof is not adequate to state a claim.  *Silicon

19  Graphics*, 183 F.3d at 988 (9th Cir. 1999) ("Congress enacted the PSLRA to put an end to the

20  practice of pleading "fraud by hindsight.'""); *In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir.

21  1993) ("The fact that the prediction proves to be wrong in hindsight does not render the statement

22  untrue when made.").  Similarly, although Plaintiffs allege that "Defendants were only halfway

23  through the shocking amount of carryover inventory for months after May 5, 2014 . . . .", FAC ¶

24  54, as of May 2014, Defendants may well have been anticipating that the inventory was going to

25  move more quickly over the next two or three months.  Plaintiffs allege no facts establishing that

26  Defendants did not honestly believe such, other than establishing by hindsight where in fact the

27  inventory did not in fact move so quickly.

28    Plaintiffs fail adequately to allege actionable fraud as to the carryover statements.

**United States District Court**
For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

    b.  LeapFrog's Statements and Predictions About LeapTV

   The second category of statements which Plaintiffs challenge have to do with LeapTV, specifically the day of its launch and financial consequences of its delay.  *See, e.g.*, FAC ¶¶ 72, 154.  The FAC alleges that Defendants believed that LeapTV would ship to stores at "the end of September."  FAC ¶ 81.  Though Defendants repeatedly referred to an October launch date, Plaintiffs argue that when Defendants represented LeapTv would "hit[] stores in October," this necessarily required a September ship date "as the result of the typical lag time between shipment and arrival of the product in stores . . . ."  FAC ¶ 77.

   Ultimately, LeapTV shipped in mid-October.  FAC ¶ 77.  Plaintiffs allege that "[b]y September 2014, it was obvious internally that the original launch date [of October 2014, with a ship date of September 2014] of LeapTV was not going to be achieved."  FAC ¶ 112.  However, Plaintiffs do not plead any specific allegation that at the time of the announced September expected date of shipping Defendants had reports or other information that made it clear that LeapFrog would not meet the September ship date.  "Missing are allegations linking specific reports and their contents to the executives."  *Intuitive Surgical*, 759 F.3d at 1063.  Moreover, the sparse allegations Plaintiffs do provide contradict Plaintiffs' theory.  For example, Plaintiffs allege that "for much of 2014 no one at the Company knew when it would launch."  FAC ¶ 67.  If "no one at the Company," which logically includes Defendants, knew when LeapTV would ship, then how could Defendants know LeapTV would miss its ship date?

   Plaintiffs describe "[m]eetings in which discussions regarding LeapTV development being behind schedule were attended by those involved in its development, including engineers and product managers."  *Id*. ¶ 66.  But Plaintiffs do not plead the specific dates of the meetings with engineers, what precisely was said, or even that Barbour or Arthur attended or received reported about the meetings.  *Cf. id.* (stating the Chief Marketing Officer "was conveying [] Barbour's position . . . during the meetings," but not saying Barbour was informed about the meetings).  Lacking are "contemporaneous statements or conditions that demonstrate the intentional or the deliberately reckless false or misleading nature of the statements when made."  *Ronconi v. Larkin*, 253 F.3d 423, 432 (9th Cir. 2001).  Plaintiffs' allegations are too vague to establish that the

1    statements above were false, or that Defendants were aware of any alleged falsity.

2         Finally, LeapTV shipped late only by 2-4 weeks, hardly an indication of clear advance

3    knowledge that shipping would be delayed.  Plaintiffs are required to plead allegations giving rise

4    to an "inference of scienter cogent and *at least as* compelling as any opposing inference one could

5    draw from the facts alleged." *Tellabs*, 551 U.S. at 324.  An equally logical inference suggested by

6    Plaintiffs' facts is that LeapFrog encountered unexpected difficulties in developing the LeapTV,

7    something not uncommon when developing new products, and that these difficulties caused an

8    unexpected and slight delay in shipping.  Plaintiffs have failed to state a claim with respect to

9    statements about LeapTV.

10              c.    LeapFrog's Statements Regarding Financial Guidance

11        The third category of statements that Plaintiffs challenge is LeapFrog's financial guidance.

12   Plaintiffs argue that, because of the inventory and LeapTv issues addressed above, Defendants'

13   guidance lacked a reasonable basis.  *See, e.g.*, FAC ¶ 50.  Defendants contend that, because

14   Plaintiffs cannot establish the statements regarding inventory and LeapTV were false, they also

15   cannot show that the statements regarding financial guidance were false at the time they were

16   made.  MTD at 14.

17        As a general proposition, missed guidance alone generally does not render Defendants'

18   financial projects false or misleading.  *See In re Rigel Pharms., Inc. Secs. Litig., Inter-Local*

19   *Pension Fund GCC/IBT v. Deleage*, 697 F.3d 869, 882 n.12 (9th Cir. 2012) ("The mere fact that

20   stated expectations fail to pass does not make a statement concerning expectations or plans

21   false."); *see also In re VeriFone Sec. Litig.*, 11 F.3d 865, 871 (9th Cir. 1993) (the fact that a

22   prediction proves to be wrong in hindsight does not render the statement untrue when made); *In re*

23   *GlenFed, Inc. Sec. Litig.*, 42 F.3d 1541, 1549 (9th Cir. 1994) (plaintiffs must show that a

24   difference between earlier and later statements is "not merely the difference between two

25   permissible judgments, but rather the result of a falsehood").

26        More specifically, Plaintiffs' argument fails for two reasons.  First, LeapFrog disclosed the

27   fact that it faced challenging sales trends.  There were changes in the industry such as tightened

28   inventory controls and a fall-off in sales for all margins, which Defendants predicted would harm

22

**United States District Court**
For the Northern District of California

sales.  *See* FAC ¶ 104 (noting that retailers were "running far tighter inventories" and "lowering []

outlook" as a result).  Defendants thus warned investors about the effect this industry-wide decline

would have on LeapFrog's results.  Second, sales of other new LeapFrog products (such as new

LeapPad tablets, *id*. ¶¶ 103, 154) were weaker than expected.  Plaintiffs also acknowledge that

Defendants faced a "declining demand for the LeapPad tablets" irrespective of the carryover

inventory.  *See* FAC ¶¶ 12, 163; *see also* ¶ 118 ("These declines informed Defendants that the

Company's LeapPad business was deteriorating.").  As new tablets failed to sell well, this decline

cannot necessarily be attributed to Defendants' carryover inventory problem.  *See id*. ¶ 154 ("two

exciting new tablets, the LeapPad3 and LeapPad Ultra XDi" also failed to perform as expected).

The Complaint does not allege the decline in demand for tablets was foreseeable and incorporated

into the guidance.

Given what appears to be an unexpected decline in demand for a key LeapFrog product,

along with the lack of viable allegations of knowing false representation about the state of

inventory, Plaintiffs have not established the financial guidance was false and knowingly so.

### d.    LeapFrog's Statements About Impairment Charges

The fourth category of challenged statements, regarding financial results for the second

and third quarters of 2015, focus on whether LeapFrog should have recorded impaired goodwill or

long-lived assets earlier than it actually did.  *See* FAC ¶¶ 171, 24.[6]  Defendants correctly note that

Plaintiffs must show "that the accounting was a result of a 'falsehood' rather than the 'difference

between two permissible judgments.'"  Reply at 6.  Plaintiffs have not done so.

With regard to the impairment of long-lived assets, Plaintiffs argue that Defendants should

have taken a $36.5 million impairment charge one fiscal quarter before they did so.  *See* FAC ¶

172.  Specifically, they allege that "Defendants falsely claimed" that LeapFrog's Form 10-Q for

third quarter fiscal 2015 "was a fair statement of LeapFrog's financial results and that the results

were prepared in accordance with GAAP."  FAC ¶ 168.  Plaintiffs also contend Defendants lied

---

[6] Plaintiffs contend that "Defendants fail to address the particularized allegations concerning their
failure to test for goodwill impairment at 2Q15 or record $19.5 million in impaired goodwill."
Opp. at 6.  However, Defendants addressed both these topics in their Motion.  *See* MTD at 15.

United States District Court
For the Northern District of California

1    when they said that "the Company concluded that its long-lived assets were not impaired as of

2    December 31, 2014." *Id.* Plaintiffs do not appear to argue that Defendants failed to test for

3    impairment, but rather challenge Defendants' conclusion that long-lived assets were not impaired.

4    *See id.*[7]

5          Plaintiffs have failed sufficiently to allege LeapFrog lied when it stated its long-lived

6    assets were not impaired.  They contend LeapFrog was required "to evaluate its long-lived assets

7    for impairment whenever events or changes in circumstances indicate[d] that the carrying value of

8    an asset group *may not be* recoverable."  FAC ¶ 173 (emphasis added) (citing but not quoting ASC

9    360-10-35-17).  However, the relevant accounting standard states that "[a]n impairment loss shall

10   be recognized *only if* the carrying amount of a long-lived asset (asset group) *is not* recoverable and

11   exceeds its fair value."  ASC 360-10-35-17 (emphasis added).  This occurs when "[t]he carrying

12   amount of [the] long-lived asset . . . exceeds the sum of the undiscounted cash flows *expected to*

13   *result* from the use and eventual disposition of the asset . . . ."  *Id.* (emphasis added).  This

14   determination, in turn, should be calculated from "the existing service potential of the asset,"

15   which "encompasses its remaining useful life, cash-flow-generating capacity, and for tangible

16   assets, physical output capacity."  ASC 360-10-35-33.

17         According to Plaintiffs, Defendants had to take an impairment charge because of "the

18   'significant decline' of the trading value of LeapFrog's stock," which "follow[ed] announcement

19   of 3Q15 results."  Opp. at 9.  That is, Defendants' 3Q15 Form 10-K issued disappointing results,

20   which then led to a stock decline, which then supposedly led to the need to take the $36.5 million

21   impairment charge.  *See* Opp. at 9-10; FAC ¶ 176.  However, stock price is not included in the list

22   of factors companies are directed to consider when evaluating their long-lived assets.  *See* ASC

23   360-10-35-33.  Plaintiffs' FAC is silent on the factors that companies are directed to consider.  *See*

24   FAC ¶¶ 167-83 (failing to discuss the assets' useful life, cash-flow-generating capacity, or

25   physical output capacity).  Moreover, by Plaintiffs' argument, the market's reaction to the results

26

27   ───────────────────

28   [7] Plaintiffs state that "[f]or 3Q15, Defendants acknowledged the existence of triggers requiring testing . . . as of December 31, 2014 . . . ."  ¶ 174.  They do not allege Defendants failed to perform any required test.

required the impairment charge; it would therefore be impossible for Defendants to calculate the impairment before releasing results to the public and getting that reaction.  Thus, Plaintiffs' argument actually supports Defendants' statement that no impairment charge was necessary as of December 31, 2014, as according to Plaintiffs, the event that necessitated that impairment charge did not occur until several weeks later.

Plaintiffs also seem to argue that Defendants should have taken an impairment charge between January 23 and February 9, 2015.  FAC ¶ 171.  But the statement Plaintiffs challenge says that "long-lived assets were not impaired *as of December 31, 2014*."  FAC ¶ 168.  Because of this limitation, the statement was not rendered false by events occurring between January 23 and February 9, 2015.

With regard to goodwill, Plaintiffs have not provided enough facts to suggest Defendants "fail[ed] to timely write-off $19.5 million impaired goodwill."  FAC ¶ 126.  Plaintiffs contend that Defendants were required "to test for goodwill impairment if any of the triggering events made it more likely than not" that the value of LeapFrog's goodwill was less than its book value. *Id*. ¶ 131 (citing ASC 350-20-35-30).  Those triggering events are outlined in ASC 350-20-35-30(C):

> a. Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets;
>
> b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development;
>
> c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows;
>
> d. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods;

1    e. Other relevant entity-specific events such as changes in
     management, key personnel, strategy, or customers; contemplation
2    of bankruptcy; or litigation;

3    f. Events affecting a reporting unit such as a change in the
     composition or carrying amount of its net assets, a more-likely-than-
4    not expectation of selling or disposing all, or a portion, of a
     reporting unit, the testing for recoverability of a significant asset
5    group within a reporting unit, or recognition of a goodwill
     impairment loss in the financial statements of a subsidiary that is a
6    component of a reporting unit; and

7
     g. If applicable, a sustained decrease in share price (consider in both
8    absolute terms and relative to peers).

9    FAC ¶ 30 (emphases removed).  Plaintiffs contend that triggers b, d, and g were present.  *Id.*

10       Specifically, Plaintiffs argue that Defendants lied when they said "they did 'not believe'

11   there were 'sufficient indicators of [goodwill] impairment' to even test for goodwill impairment"

12   "as of September 30, 2014."  FAC ¶ 128, 123.  In *City of Dearborn Heights Act 345 Police & Fire*

13   *Ret. Systems v. Align Technology, Inc.*, 65 F. Supp. 3d 840 (N.D. Cal. 2014), the plaintiffs argued

14   that the defendants "did not conduct interim goodwill impairment analysis, nor did it take any

15   interim goodwill impairments," when it should have.  *Id.* at 845.  The court noted that, while the

16   Ninth Circuit has yet to weigh in on this issue, the Second Circuit has twice held that because

17   goodwill depends on estimates and "'management's determination of the "fair value" of the assets,

18   . . . statements regarding goodwill . . . are subjective ones rather than "objective factual matters."'"

19   *Id.* at 850 (quoting *Fait v. Regions Fin. Corp.,* 655 F.3d 105, 111 (2d Cir.2011)).  Agreeing with

20   the Second Circuit, the court held that "statements regarding goodwill are inherently subjective

21   and involve management's opinion."  *Id.*  Because these were expressions of opinion, the court

22   required plaintiffs to show the opinions were "both objectively and subjectively false or

23   misleading."  *Id.* at 851 (quoting *Rubke v. Capitol Bancorp Ltd*, 551 F.3d 1156, 1162 (9th Cir.

24   2009)).  Further supporting the conclusion that they are expressions of opinion rather than

25   statements of fact, the statements here expressly contains the qualifier, "the Company does not

26   believe."  FAC ¶¶ 123, 128.  These are thus statements of opinion.  *See Apollo Grp.*, 774 F.3d at

27   607 (holding allegedly misleading statements were opinions where they "were subjective and

28   preceded by qualifiers, such as 'We believe.'").

26

United States District Court
For the Northern District of California

1    Opinions, like predictions, are actionable only if the statement is not genuinely believed,

2    there is no reasonable basis for that belief, or the speaker is aware of undisclosed facts that

3    "seriously undermine the accuracy of the statement."  *In re Wells Fargo Sec. Litig.*, 12 F.3d 922,

4    930 (9th Cir. 1993), *superseded by statute on other grounds*, 15 U.S.C. § 78u-4(b)(1).  In other

5    words, because these statements regarding goodwill "are alleged to be misleading opinions, not

6    statements of fact," Plaintiffs can state a claim "only if the complaint alleges with particularity that

7    the statements were both objectively and subjectively false or misleading."  *Rubke*, 551 F.3d at

8    1162.[8]  Plaintiffs must allege with particularity both that Defendants did not believe this statement,

9    and that the statement is objectively false.  *See id*.

10    In the case at bar, Plaintiffs do not allege that Defendants believed the following statement

11    was false:  "As of September 30, 2014, based on its assessment of various qualitative factors and

12    projection of future operating results, the Company does not believe that sufficient indicators of

13    impairment of its goodwill currently exist that would require performing step one of the two-step

14    test for goodwill impairment."  Ex. 11 at 9.  Plaintiffs contend that Defendants knew of the

15    conditions that rendered the statement false, but they do not actually allege that Defendants did not

16    believe this statement.  *See* FAC ¶ 128; *see generally*, FAC ¶¶ 122-147.  Plaintiffs thus fail to

17    allege the statement was subjectively false.  Furthermore, the statement does not appear to be

18    objectively false.  Plaintiffs contend that good will was impaired because LeapFrog had

19    experienced a sustained decrease in share price, *see* FAC ¶¶ 133-38; had poor overall financial

20    performance, *id*. ¶¶ 139-142; and was facing increased competition and changing industry

21    conditions, *id*. ¶¶ 143-45.  The triggering event on which Plaintiffs rely most heavily is "a

22    *sustained* decrease in share price."  FAC ¶ 130(g) (emphasis added).  They allege that, because

23    Defendants' share price decreased from the $7.00 range to "the $6 range" for the trading period

24    between August 4, 2014 and September 30, 2014, Defendants should have conducted an

25    impairment analysis.  FAC ¶¶ 133-134.  But the FAC does not establish that a depressed period of

26

27    [8] While this was a section 11 case, its principles have been applied in section 10 cases as well.  *See
City of Omaha, Neb. Civilian Employees' Ret. Sys. v. CBS Corp.*, 679 F.3d 64, 67 (2d Cir. 2012)
(applying *Rubke*); *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,

28    65 F. Supp. 3d 840, 851 (N.D. Cal. 2014) (same).

1  a little over a month is enough to be considered a "sustained" decrease, particularly since the stock

2  traded in the $6 range for most of April and May, 2014.  Ex. 22.  Thus, Plaintiffs have failed to

3  plead why this period required a goodwill impairment charge.[9]

4        Finally, as Defendants note, accounting standards also direct them to consider "positive

5  and mitigating events."  Mot. at 17 n.7; *see also* FAC ¶ 142 (same).  Plaintiffs argue

6  "Defendants . . . knew that there were no offsetting 'positive and mitigating circumstances' that

7  could conceivably obviate an impairment charge," referring to the alleged problems with LeapTV,

8  declining tablet sales, and carryover inventory.  FAC ¶ 142.  But these are not Defendants' only

9  products. For example, Defendants also introduced LeapBand, "the first wearable activity tracker

10  for children," "inspired by the Let's Move initiative by First Lady Michelle Obama."  Ex. 8 at 5;

11  *see also* FAC ¶ 82 (referring to LeapBand).  This product was purportedly "a hit in many of

12  [LeapFrog's] markets around the world," and was "selling very well in most of those

13  marketplaces."  Ex. 11 at 4, 15.  Thus, the fact that there were problems in the three areas of

14  competitive environment, negative financial performance, and decreased share price does not by

15  itself show that Defendants could not have considered positive events such as the promising sales

16  of LeapBand, and expected those events to offset the problems.  As above, Plaintiffs have failed to

17  raise an "inference of scienter cogent and *at least as* compelling as an[] opposing inference" of

18  innocent conduct.  *Tellabs*, 551 U.S. at 324.

19     3.   <u>PSLRA Safe Harbor</u>

20        As Defendants note, the Court has already observed that the majority of the alleged

21  misrepresentations are forward-looking, especially forecasting.  MTD at 23.  For example, these

22  statements discuss "how we think LeapTV is going to do, what impact it's going to have, how we

23  think the inventory is going, and how long it will take to dispose of that."  *Id.* (quoting Transcript

24  at 3:8-12).

[9] Plaintiffs also allege that "[a]t the time Defendants reported LeapFrog's 2Q15 financial results the Company was underwater," and that it was "underwater beginning on October 24, 2014." FAC ¶¶ 127, 138.  Plaintiffs use the stock prices from November 4 and October 24, 2014 for their calculations.  But the statement Plaintiffs challenge refers to good will "as of September 30, 2014."  FAC ¶ 123.  Even assuming LeapFrog was underwater after October 24, 2014, this does not render Defendants' prior statement as to September 30, 2014 false.

1        Twenty-two of these statements forecast quarterly and annual financial results, including

2   projected net sales and earnings growth.  *See* FAC ¶¶ 41-43, 72, 80, 82, 83-86, 90, 103-07, 156,

3   169.  Such statements are inherently forward-looking.  *Intuitive Surgical*, 759 F.3d at 1058

4   ("growth and revenue projections . . . are forward-looking on their face." ).  Five more statements

5   discuss future operations, such as the launch date for LeapTV and how that launch date will affect

6   LeapTV's performance.  *See id.* ¶¶ 44, 72, 81, 91, 154.  Finally, another four discuss LeapFrog's

7   plans and ability to work through carryover inventory.  *See id.* ¶¶ 46, 71, 88, 89; *see also* Docket

8   No. 72-1, Defs.' Appendix A (grouping statements).

9        All of these statements fall within the PSLRA's safe harbor.  They are expressly forward-

10  looking and were accompanied by meaningful cautionary language.  For example, Defendants

11  expressly warned that "if inventory levels are too high . . . our operating results will be adversely

12  affected," and that the "failure to manage production introductions and transitions, could adversely

13  affect our operating results."  Defs.' Ex. 3 at 12, 9.  This is precisely the problem Plaintiffs

14  complain of with regard to the carryover inventory.  Defendants warned there was no certainty that

15  "any new products or services will be widely accepted and purchased by consumers" and "if the

16  marketing for our products and services fails to resonate with consumers, particularly during the

17  critical holiday season . . .  our business and operating results could be materially affected."  *Id.* at

18  9.  This is precisely the problem that occurred with regard to LeapTV's disappointing holiday

19  sales.  Not only were Defendants' forward-looking statements accompanied by cautionary

20  language, but the problems of which Plaintiffs complain were specifically disclosed within that

21  cautionary language.  This satisfies the PSLRA's requirement that the cautionary language be

22  "meaningful."  *See* 15 U.S.C.A. § 78u-5(c)(1)(A).

23        4.    Whether, When Considered Holistically, Plaintiffs' Complaint Adequately Pleads

24              Scienter

25        Plaintiffs' failure to allege a misstatement or omission is enough to dismiss the FAC.  *See*

26  *Apollo Grp. Inc.*, 774 F.3d at 607.  Despite their recitation that scienter should be assessed

27  "holistically," Opp. at 20, Plaintiffs also failed to adequately plead scienter.  Even considered

28  holistically, the FAC fails to raise an inference of scienter that is as strong as the inference of

29

1    innocence.  *Tellabs*, 551 U.S. at 326.

2         As an example, Plaintiffs contend that Defendants were aware the LeapTV would have a

3    delayed release date in part because the impossibility of meeting the schedule was discussed at

4    engineering meetings.  FAC ¶ 66.  While Plaintiffs allege that management's views were

5    expressed to the engineers when the Chief Marketing Officer "convey[ed] Defendant Barbour's

6    position on LeapTV during" engineering meetings, *see id.*, Plaintiffs do not allege what

7    information, if any, went in the other direction, from engineers to management.  Nowhere do they

8    plead that anyone was tasked with reporting the engineers' concerns about meeting deadlines to

9    management.  The only meetings Defendants are alleged to have attended are "monthly consensus

10   meetings."  FAC ¶¶ 54, 101.  But Plaintiffs only allege that those meetings were "to determine

11   how many products needed to be produced, shipped, and delivered," not that they discussed

12   development problems with the LeapTV.  *Id.* ¶ 101.

13        Without allegations showing Defendants knew of the engineers' concerns, Plaintiffs are

14   unable to show that Defendants acted with scienter.

15        5.    Sufficiency of Count II: Violation of Section 20(a) of the 1934 Act

16        As noted above, Section 20(a) imposes control person liability only where there is an

17   underlying violation of the securities laws.  See 15 U.S.C. § 78t(a).  Because Defendants did not

18   violate Section 10(b), the Court dismisses the Section 20(a) claim as well.

                            V.    **CONCLUSION**

20        For the foregoing reasons, Defendants' motion to dismiss is **GRANTED** with leave to

21   amend within thirty (30) days from the date of this order.

22        Although the Court is skeptical that Plaintiffs can amend to assert valid claims, it will

23   afford Plaintiffs one last opportunity to amend.

24        This order disposes of Docket No. 72.

25        **IT IS SO ORDERED**.

26   Dated: August 2, 2016

27

28                                          _____
                                            EDWARD M. CHEN
                                            United States District Judge
                                            30

*United States District Court*
*For the Northern District of California*