ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS (213113)
WILLOW E. RADCLIFFE (200087)
MATTHEW S. MELAMED (260272)
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax
shawnw@rgrdlaw.com
willowr@rgrdlaw.com
mmelamed@rgrdlaw.com

MOTLEY RICE LLC
JAMES M. HUGHES (*pro hac vice*)
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)
jhughes@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com

Co-Lead Counsel for Plaintiffs

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re LEAPFROG ENTERPRISES, INC. SECURITIES LITIGATION | Master File No. 3:15-cv-00347-EMC |
| | CLASS ACTION |
| This Document Relates To: ALL ACTIONS. | LEAD PLAINTIFF KBC ASSET MANAGEMENT NV'S SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATION OF THE SECURITIES LAWS |

## TABLE OF CONTENTS

Page

I. SUMMARY OF THE ACTION .......... 1

II. JURISDICTION AND VENUE .......... 7

III. PARTIES .......... 8

IV. BACKGROUND AND INFORMATION KNOWN TO DEFENDANTS .......... 9

A. LeapFrog's Poor Performance Heading Into F2Q15 .......... 9

B. Introduction to Relevant GAAP Concepts .......... 17

V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS .......... 19

A. LeapFrog's F2Q15 False Financial Results and Statements About Goodwill .......... 19

B. Reasons Why Defendants' F2Q15 Statements About Goodwill and LeapFrog's Financial Results Were False .......... 22

1. GAAP Provisions Concerning Goodwill and Goodwill Impairment .......... 23

2. Step Zero Required Defendants to Proceed to Step One of the Goodwill Impairment Test .......... 24

3. Steps One and Two of the Goodwill Impairment Test Show Fair Value Below Carrying Amount .......... 39

C. Defendants Announce Abysmal Holiday Quarter Results and Belatedly Take Impairment Charge to Goodwill, but Fail to Timely Write Down Long-Lived Assets Reporting False Financial Results .......... 51

D. Reasons Why Defendants' Long-Lived Assets Statements and LeapFrog's F3Q15 Financial Results Were False .......... 56

1. GAAP Provisions Concerning Long-Lived Assets .......... 57

2. Step Zero Required Defendants to Consider F3Q15 Operating and Cash Flow Losses, and Market Projections .......... 59

3. Steps One and Two of the Long-Lived Asset Test Required a Long-Lived Asset Charge for F3Q15 .......... 62

VI. END OF THE CLASS PERIOD .......... 75

VII. ADDITIONAL ALLEGATIONS OF SCIENTER .......... 76

VIII. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS .......... 81

IX. CLASS ACTION ALLEGATIONS .......... 85

X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET DOCTRINE ....... 87

XI. NO SAFE HARBOR ....... 87

XII. JURY DEMAND ....... 90

This is a securities class action on behalf of all persons who purchased or otherwise acquired the common stock of LeapFrog Enterprises, Inc. ("LeapFrog" or the "Company") between May 5, 2014 and June 11, 2015, inclusive (the "Class Period").[1] This action asserts claims under §§10(b) and 20(a) of the Securities Exchange Act of 1934 ("1934 Act") and Rule 10b-5 promulgated thereunder against LeapFrog, its Chief Executive Officer ("CEO") John Barbour ("Barbour") and its Chief Financial Officer ("CFO") Raymond L. Arthur ("Arthur") (collectively, "Defendants").

KBC alleges the following based upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon investigation of counsel, including, among other things: (i) review and analysis of public filings made by LeapFrog with the U.S. Securities and Exchange Commission ("SEC"); (ii) review and analysis of press releases and other publications disseminated by the Defendants; (iii) review of news articles and conference call transcripts; and (iv) review and analysis of other publicly available information concerning LeapFrog. The investigation of the facts pertaining to this case is ongoing. Lead Plaintiff believes that additional evidence will support the allegations herein after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This complaint stems from Defendants' knowing or deliberately reckless issuance of unaudited false financial results for F2Q15[2] and F3Q15, and narrative by Defendants related to those financial results disseminated to investors in press releases, in filings made with the SEC and during

[1] Lead plaintiff KBC Asset Management NV ("KBC" or "Lead Plaintiff") maintains the Class Period of May 5, 2014 to June 11, 2015, inclusive in order to preserve its right to appeal any of the false and misleading statements alleged in Lead Plaintiff KBC Asset Management NV's First Amended Consolidated Class Action Complaint for Violation of the Federal Securities Laws filed on December 4, 2015 in this action (Dkt. No. 70) that are not contained herein. The Court on August 2, 2016, entered an Order Granting Defendants' Motion to Dismiss this complaint (Dkt. No. 88). The false and misleading statements in the Second Amended Complaint pertain to misrepresentations regarding the Company's accounting for goodwill and long-lived assets. Plaintiffs have provided in this Second Amended Complaint additional facts, authority and analysis regarding these statements to address the Court's prior concerns.

[2] LeapFrog's fiscal quarters are designated herein as FQYY, such that F2Q15 indicates the Company's second fiscal quarter of 2015. LeapFrog's fiscal year commences on April 1. As such, F2Q15 ended on September 30, 2014, and F3Q15 ended on December 31, 2015. Prior to 1Q15 (*e.g.*, the quarter ended June 30, 2014), LeapFrog's quarters aligned more closely to the calendar year, with 1Q ending March 31, 2Q ending June 30, 3Q ending September 30 and 4Q ending December 31. Defendants announced on May 16, 2014 a change in the reporting period of the Company, with a new fiscal year-end of March 31, rather than the calendar year.

earnings calls. LeapFrog's financial results and Defendants' representations were materially false because Defendants knowingly or recklessly failed to properly account for impairments to the Company's goodwill and long-lived assets based on facts known or reasonably available to them relating to LeapFrog's F2Q15 and F3Q15, respectively.

2. LeapFrog's assets were impaired as of F2Q15 and F3Q15 but Defendants concealed this information from investors. As a result, the investments that LeapFrog's management had made for the Company could no longer generate cash sufficient to support those assets. Defendants' accounting fraud concealed from investors the poor performance of the Company's investments, as well as the poor performance of management itself, all the while overstating the Company's financial results. As a result, investors purchased stock at artificially inflated prices.

3. On November 3, 2014, Defendants publicly reported LeapFrog's results for F2Q15, the quarter ended September 30, 2014. In reporting their financial results, Defendants falsely represented that "***the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment***." As a result, Defendants did not test for goodwill impairment. As set forth below, LeapFrog's goodwill was ***in fact 100% impaired*** in F2Q15, *See* ¶¶125-141 (impairment calculations).

4. Defendants' representation was materially false. According to Generally Accepted Accounting Principles ("GAAP"), which Defendants represented they had complied with, there were numerous indicators or triggering factors, each sufficient on its own and for even more than sufficient holistically, that indicated to Defendants that it was more likely than not that LeapFrog's goodwill was impaired as of the quarter ended September 30, 2014. These indicators included a decline in overall financial performance (¶¶79-81), a sustained decrease in share price of 19% (and corresponding decline in market capitalization) over the last 57 days of F2Q15 (¶¶85-104), and increased competition and changed industry conditions (¶¶82-84). LeapFrog met three of the specific triggering factors identified by the requisite GAAP provision. As set forth below, the Company objectively and overwhelmingly met these factors.

5. For example, in assessing whether it was more likely than not LeapFrog's book value exceeded its fair value (*e.g.*, impairment), GAAP provides specific guidance as to examples of triggering events that if present, could give rise to the likelihood of a goodwill impairment. One of those triggering events is declining overall financial performance. As to that triggering event, LeapFrog had: (i) reported weak financial results or substantially lowered guidance for five consecutive quarters, including that net sales for F2Q15 were $113.6 million, down 43% year over year company wide and 47% for the Company's U.S. segment; (ii) suffered major declines in revenues starting in 2013; (iii) taken more than $320 million in cumulative operating losses since the Company's 2002 initial public offering ("IPO"); and (iv) recorded net year-over-year declines in total and U.S. net sales for four consecutive quarters.

6. Regarding the sustained decrease in share price (and corresponding decline in market capitalization), LeapFrog's average share price had dropped from $7.39 per share on August 4, 2014, to $6.01 per share on August 5, 2014 – a 19% decline – and it traded at an average closing price of $6.24 per share between August 5, 2014 and September 30, 2014 – the last 57 days of F2Q15 or 62% of the quarter. By comparison, LeapFrog's average stock price had closed at an average price of $7.33 per share between January 1, 2014 and March 31, 2014, and $7.17 per share between April 1, 2014 and August 4, 2014. This sustained 57-day decline contrasted with the negligible decline of prices of peer stocks during the same time period, and was longer than the sustained stock price decline cited by numerous other publicly-traded companies in determining that the decline required testing for goodwill impairment.

7. The stock price decline corresponded to LeapFrog's market capitalization plunge by $96 million – almost 20% – between August 4, 2014 and September 30, 2014, completing a decline of more than $221 million – more than 34% – over the prior year. When Defendants belatedly tested for goodwill impairment as of the quarter ended December 31, 2014, it was the significant stock price decline and corresponding decline in market capitalization they cited as the reasons. Those reasons, however, were manifestly present for F2Q15.

8. Defendants also knew of increased competition and changed industry conditions as they discussed these topics repeatedly prior to and related to F2Q15. According to Defendants, the

market for LeapFrog's tablets was "weaker than expected" and had been impacted by "increased competition"; the market was involved in "significant clearance activity"; and retailer shelves were "filled with competitor clients' product . . . at far deeper discount prices." In particular, there was "increased competition in the children's tablet market," kids tablets being the most substantial component of LeapFrog's sales. All of these circumstances were discussed by Defendants prior to the issuance of LeapFrog's F2Q15 results.

9. These factors informed Defendants that it was more likely than not that the fair value of LeapFrog's U.S. reporting unit was less than its carrying amount, which required Defendants to test for goodwill impairment. Defendants did not test. As set forth below in ¶¶172-210, testing would have required Defendants to write down 100% of LeapFrog's $19.5 million in goodwill for the quarter ended September 30, 2014. As a result, LeapFrog's financial results reported by Defendants for F2Q15 were false, including the understatement of net losses of $2.0 million, losses from operations of $3.1 million and net losses per share of $0.03.

10. As set forth below, there was no basis for any reasonable expectation of cash flows to support the Company's goodwill on its books. Defendants knew that retailers still had significant inventory of LeapPad tablets from the 2013 holiday season that had to be cleared in order for new tablet sales. In turn, the discounts offered to clear that inventory were negatively impacting revenues. In fact, Defendants later admitted that they had reduced projections for tablet sales for the following quarter, F3Q15.

11. Similarly, Defendants were aware that LeapTV, which was planned for shipment by the end of F2Q15, had not started shipping until several weeks into F3Q14 (mid-October 2014). Due to the late shipment date, Defendants knew that there was a limit to what retailers would "actually get through their distribution centers into their stores in time to hit the holiday shopping season," which was far and away LeapFrog's most important season for generating sales. In fact, as set forth below in ¶¶125-141, LeapFrog was required to write-off 100% of its goodwill for F2Q15.

12. Based on these facts, already known to Defendants as of September 30, 2014, they reduced guidance, forecasting losses per share of $0.25-$0.13 for LeapFrog's holiday quarter, F3Q15. Put simply, Defendants were expecting lesser, not greater, cash flows. Fair value of

LeapFrog in total, let alone the U.S. reporting unit (which performed worse than the Company as a whole and approximately 70% of net sales for F2Q15), was below its carrying amount requiring the Company to write down its goodwill. The late shipment date also precluded sales in F2Q14 for back to school shoppers.[3]

13. LeapFrog did eventually write down goodwill as of the quarter ended December 31, 2014. For that same quarter, however, Defendants falsely represented that "the Company concluded that its long-lived assets were not impaired as of December 31, 2014." In fact, they were impaired by nearly $36.5 million, or 96% of the long-lived assets on LeapFrog's books.

14. Defendants knew as of December 31, 2014, but had not yet informed the market that their F3Q15 financial results – the results from their most important holiday quarter – had been disastrous. Revenues were off $75 million and earnings per share were off $0.41 from guidance given six weeks later on November 3, 2014. Drivers of the missed results included: (i) "lower than planned LeapPad shipments in the quarter"; (ii) "significantly missing [LeapTV] [] sales expectations"; (iii) "less demand for cartridges, accessories and digital content"; (iv) "significant drop in the retail prices of children's tablets"; and (v) "tighter inventory management." *See* ¶¶144-151. These results also necessitated, according to Defendants, withdrawal of FY15 guidance and an overall assessment of the Company's product strategy and operations (¶¶147, 149). In other words, a reassessment of LeapFrog's entire business.

15. Under GAAP, Defendants were required to inform investors that, in fact, the Company's long-lived assets were impaired. The analysis Defendants later embraced when they took a $36.5 million impairment to LeapFrog's long-lived assets for F4Q15 – the significant decline in LeapFrog's stock price – ***required*** the Company to write down the long-lived assets for F3Q15.

16. The average stock price from January 23, 2015 – the day after they preliminarily announced LeapFrog's unaudited F3Q15 results – through the end of F4Q15 was $2.44 per share (March 31, 2015). Defendants, however, already knew as of December 31, 2014 that LeapFrog's

---

[3] *See* Rachel Abrams, O*nce Unique, LeapFrog Has Rivals in the Educational Toy Market*, New York Times ("New York Times Article"), March 12, 2015, http://www.nytimes.com/2015/03/13/business/once-unique-leapfrog-faces-competition-in-the-educational-toy-market.html?_r=0 (last visited Sept. 20, 2016, 2:11 p.m.).

stock price would collapse when they announced the "very disappointing" F3Q15's results. Defendants had prior recent history of weak results and corresponding stock declines that informed them of the estimated stock price decline as a result of LeapFrog's F3Q15 results. In fact, LeapFrog's stock price decline mirrored the anticipated drop, plummeting from a close of $4.72 per share on December 31, 2014 to $2.55 per share on January 23, 2015, a 46% decline. Defendants' rationale that a write-down was required at FQ15 based on an average stock price of $2.44 per share as of March 31, 2015 evidences that LeapFrog should have recorded impairment of its long-lived assets for F3Q15 as a result of its abysmal performance and stock price decline to $2.55 on the announcement to investors of the poor results. The stock price decline was a foregone conclusion based on the actual results known to Defendants as of December 31, 2014.

17. Regardless, Defendants erred by using the stock price and corresponding market price as the sole triggers for the long-lived asset write-down specified in the Company's FY15 Form 10-K. The stock prices were a lagging indicator that the carrying amount of LeapFrog's long-lived assets may not be recoverable. The current indicator requiring a long-lived asset charge was LeapFrog's actual results for F3Q15, and corresponding negative cash flows and operating losses which Defendants knew as of December 31, 2014.

18. LeapFrog's weak performance for the F3Q15 holiday quarter required an impairment for the Company's long-lived assets for that quarter. Defendants knew of the impairment and that the stock price had actually declined 46% from December 31, 2014 to January 23, 2015. Despite knowledge of these facts, Defendants falsely told investors on May 18, 2015 that the recoverability of long-lived assets "could lead to a non-cash accounting charge." That charge should have been taken for F3Q15.

19. Defendants concealed from investors the impact of the Company's poor performance and lowered expectations when issuing financial results for F2Q15 and F3Q15, $19.5 million for F2Q15 and $36.5 million for F3Q15. LeapFrog's goodwill should have been tested and written down as of F2Q15, but Defendants failed to do so until F3Q15. Likewise, LeapFrog's long-lived assets should have been written down as of F3Q15, but weren't until F4Q15. Further, the failure to

comply with GAAP and present the Company's financial results in a fair manner rendered Defendants' statements to that effect false.

20. Defendants' overstatement of LeapFrog's financial results and failure to inform investors that the Company's assets were impaired signaled to investors that LeapFrog's business strategy was working and they could expect it to continue to do so. As a result, Defendants artificially inflated LeapFrog's stock price throughout the Class Period. On January 23, 2015, Defendants would reveal that 100% of LeapFrog's goodwill was impaired, a partial disclosure that signaled to the market the Company's value had been overstated. On this news, LeapFrog's stock dropped from a close of $3.90 per share on January 22, 2015 to $2.55 per share on January 23, 2015, a drop of nearly 35%.

21. Not until June 11, 2015, would Defendants disclose that long-lived assets were also impaired to the tune of $36.5 million or 96%, indicating to investors that LeapFrog's worth and future expectations as a result were less than Defendants had previously led investors to believe. On this news, LeapFrog's stock dropped from a close of $2.07 per share on June 11, 2015 to close at $1.47 per share on June 15, 2015, a drop of nearly 29%. LeapFrog was eventually acquired for $72 million just over one-half years after the Class Period ended.

## II. JURISDICTION AND VENUE

22. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the 1934 Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

23. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act (15 U.S.C. §78aa).

24. LeapFrog's headquarters are located at 6401 Hollis Street, Suite 100, Emeryville, California 94608, a location within this District.

25. Venue is proper in this District pursuant to 28 U.S.C. §1391(b) because LeapFrog maintains its headquarters in this District and many of the acts and practices complained of herein occurred in substantial part in this District.

26. In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## III. PARTIES

27. Lead Plaintiff KBC's funds acquired LeapFrog's securities as described in the certification previously filed with the Court, and suffered damages thereby. KBC was appointed by the Court as Lead Plaintiff of this action on May 5, 2015.

28. Defendant LeapFrog is a Delaware corporation with its global headquarters in Emeryville, California.[4]

29. Defendant Barbour was, at all relevant times, CEO and a director of LeapFrog. Barbour has extensive experience as an executive of publicly-held companies, including serving as President of Toys "R" Us and holding senior-level positions at Hasbro, Inc. Defendant Barbour participated in LeapFrog's conference calls on November 3, 2014 and February 5, 2015, and signed LeapFrog's Forms 10-Q for F2Q15 and F3Q15 filed with the SEC on November 10, 2014 and February 9, 2015.

30. Defendant Arthur was, at all relevant times, CFO of LeapFrog. Arthur has extensive experience as an executive of a publicly held company, including as CFO of Toys "R" Us while Barbour was President of that company. Arthur also has a degree in accounting, is a Certified Public Accountant and previously worked for KPMG Peat Marwick. Defendant Arthur participated in LeapFrog's conference calls on November 3, 2014 and February 5, 2015, and signed LeapFrog's Forms 10-Q for F2Q15 and F3Q15 filed with the SEC on November 10, 2014 and February 9, 2015.

31. Defendants Barbour and Arthur are referred to as the "Officer Defendants." The Officer Defendants, because of their positions with the Company, possessed the power and authority to control the contents of LeapFrog's quarterly reports, press releases and presentations to securities analysts and institutional investors (*e.g.*, the market), and exercised such power and control. The Officer Defendants were provided with copies of the Company's reports and press releases alleged

---

[4] On April 4, 2016, after the events alleged herein, LeapFrog was acquired by the Hong Kong-based company, VTech Holdings Limited, for approximately $72 million, or $1.00 per share.

herein to be misleading prior to or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions with the Company, their access to material non-public information available to them but not to the public and their affirmative statements regarding the Company's financial results and financial condition, the Officer Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that LeapFrog's financial results and statements were materially false and misleading. The Officer Defendants are liable for the materially false and misleading statements pled herein.

## IV. BACKGROUND AND INFORMATION KNOWN TO DEFENDANTS

### A. LeapFrog's Poor Performance Heading Into F2Q15

32. LeapFrog is a developer of educational entertainment for children. The Company's product portfolio consists of multimedia learning platforms, related content and learning toys. The Company has developed a number of learning platforms, including the LeapPad learning tablets, the Leapster handheld learning game systems, the LeapReader reading and writing systems, the LeapBand and the LeapTV. Despite the introduction of new products, according to analysts, sales of LeapPad learning tablets accounted for more than half of LeapFrog's business during the relevant time period.[5]

33. The Company's sales are dependent on a small group of large retailers. For fiscal 2015, the Company reported that the "[s]ales invoiced to Wal-Mart Stores, Inc. ("Wal-Mart"), Toys "R" Us, Inc. ("Toys "R" Us"), Target Corporation ("Target") and Amazon.com, Inc. ("Amazon"), in the aggregate, accounted for approximately 70%, 60%, 73% and 73% of the [U.S.] segment's gross sales for the year ended March 31, 2015, the three months ended March 31, 2014 and the years ended December 31, 2013 and 2012, respectively."

34. LeapFrog found substantial success in 2011 with its first LeapPad product: a child-focused tablet, which sold for approximately $100 at the time, when other tables sold for

---

[5] In contrast, LeapBand was an offering in the Company's "toys" category. On the Company's February 5, 2015 earnings call, Defendants acknowledged that the entire toys category, of which LeapBand was one offering, comprised about 20% of the business.

substantially more. Needham and Company analysts estimated that the Company sold 1.2 million tablets the first year, and that figure more than doubled in 2012 with the release on the second generation of the product, LeapPad 2. They further estimate that sales of LeapPads began to level-off in calendar 2013.[6]

35. By the end of fiscal year 2013, LeapFrog and its executives were facing aggressive competition in the tablet market from other manufacturers, which forced LeapFrog to cut the price of its LeapPad offerings and disappointing 2013 and F4Q13 results. In a press release issued February 12, 2014, Defendants reported fiscal year 2013 results, including: consolidated net sales of $553.6 million, down 5%; U.S. segment net sales down 9% year-over-year; and net income per diluted share of $1.19, down 4% year-over-year.

36. In the February 12, 2014 press release, Defendants addressed the specific challenges arising from "tough retail conditions," "price discounting," and "increased competition":

- "The holiday retail environment was very challenging."
- "Tough retail conditions, deep retailer price discounting, open-to-buy issues and increased competition impacted our business."
- "Retailers' retail price discounting on the LeapPad2 tablet to drive traffic to their stores negatively affected the value proposition of our tablet line including our LeapPad2 Power tablet and our traditionally strong exclusive value bundle program. . . . [O]ur handheld gaming business declined significantly as more consumers played games on tablets."

37. Defendants also discussed their expectations that LeapPad inventory build, due to poor sales and difficult retail conditions, would reduce expectations for net sales throughout calendar 2014:

- "The year-on-year sales decline resulted in year-end inventory at retail being higher than last year. . . . We expect that this inventory plus current difficult retail conditions will negatively impact our net sales in the first and second quarters of 2014 and also for the full year."

38. During a February 12, 2014 earnings call regarding LeapFrog's fiscal 2013 results, Defendants stated that fourth quarter "US segment sales were $124 million, down 30% compared to

[6] *See* fn.3 *supra*.

a year ago," and that fiscal year "US segment net sales were $387 million, down 9% compared to a year ago."

39. Defendants also elaborated during the February 12, 2014 earnings call on the challenges the Company faced due to competitive and market changes:

- "2013 was ***a challenging year*** to be in the kid business, especially in the US. . . . With over two-thirds of our sales coming from the US market, we felt more of the impact than our competitors who do a larger share of their business in international markets."

- "[T]he fourth quarter turned out to be ***disappointing*** at retail, with lower foot traffic, ***steep price discounting*** of our and competitors products, significant out-of-stock on shelves when recently shipped 2013 products were in retailers back rooms or storage containers available to replenish those shelves, and ***more competitors in the tablet market*** versus the same quarter of the prior year."

- "[E]xtremely ***aggressive retail price promotions*** driven by the ***soft market***. In US, slow overall retail stores heading into Thanksgiving led retailers to take some deep pricing discounts on a number of high profile children's products to try and stimulate demand, including our top selling tablet, the LeapPad2, with a price cut from $79 to $39. That is a 60% price reduction from its holiday 2012 price of $99. . . . [I]t wiped out the value proposition of our new for the holidays LeapPad2 Power . . . ."

- "[A] ***more competitive tablet market***. Many retailers expanded their tablet sections for 2013. A lot of the new tablets were targeted at adults or families with older children than our target market, but there were also some new entrants aimed at younger children. ***New competitive kids tablets*** gained significant traction in the market, but they still took up shelf space, and ***negatively impacted*** a portion of our sales."

- "I would say one of the issues that occurred during the year is retailers in general brought down their inventory of content that they kept online, so that had some impact on the business."

- "Our [marketplace] share [in tablets] did drop year-on-year, there is no question about that . . . ."

40. As a result of LeapFrog's poor 2013 performance, the Company faced a substantial retail inventory hangover of LeapPad tablets from 2013 that management knew would impact both margins and sales heading into 2014. To generate sales in 2014, in January 2014 Defendants sought to move up the release of what they described as a "major" new product, LeapTV, to a calendar 2014 release. The product had not been scheduled for such an early release and the decision resulted in an extremely tight timeline for development and production of the new product. Nevertheless, even

with the anticipated introduction of new products in 2014, LeapFrog issued what analysts considered "very weak" fiscal 2014 guidance.[7]

41. On May 5, 2014, Defendants issued a press release and held an earnings call to discuss LeapFrog's first quarter results, including:

- "U.S. segment, net sales [of] $39.1 million, down 33% compared to $58.1 million last year."
- "Loss from operations [of] $18.6 million, compared to $4.6 million last year."
- "Net loss (GAAP) [of] $11.5 million, compared to $3.0 million last year."

42. In the press release and during the earnings call on May 5, 2014, Defendants also commented that LeapFrog's results continued to be affected by a "tough" retail market and LeapPad carryover inventory:

- "[O]ur quarter one shipments were negatively impacted by carryover inventory issues and lower tablet point of sales in holiday 2013 than holiday 2012."
- "[O]verall ***retail and the children's market***, especially, continues to ***be tough*** in the US and developed markets around the world."
- "[S]oftware sales are down in the first quarter because we came into this year with more inventory of software on shelf."
- "The worldwide decline in sales was also driven by high retail inventory levels entering the quarter that resulted in reduced replenishment orders from our retailers. Sales were also impacted by our efforts to help reduce inventory levels set at retail."
- "The overall children's retail environment was weaker than expected, being impacted by ***significant industrywide discounting, increased competition***, and harsh weather conditions in January and February. In addition, retailers entered the first quarter with higher levels of retail inventory carried over from the holidays compared to last year."
- "[I]f you look at the inventory that we've been dealing with this year, you know the bulk of it is really two products, which is the Power LeapPad and the LeapPad Bundles. If you remember, the reason that we had carryover of those products was the ***significant discounting*** that happened on the LeapPad2, which some ways took away from the value of those products."
- "***[H]igher carry forward inventories*** across the overall tablet business and significant clearance activity and ***greater competition*** . . . ."

---

[7] In a report issued February 12, 2014, analysts at Ascendiant Capital Markets, LLC remarked on LeapFrog's "[l]arge Q4 miss and very weak 2014 guidance."

43. Defendants also acknowledged on the May 5, 2014 earnings call that they expected the negative effects of the retail market and carryover inventory to continue into the next quarter:

- "[O]ur second-quarter results will also be impacted by the timing of new product launches as we expect to ship more of our new products in the third and fourth quarters of [calendar] 2014 compared to the second and third quarters of 2013. Specifically, we expect net sales in the second quarter to be in the range of $52 million to $48 million, down 37% to 42% as compared to a year ago."
- "[I]f current retail trends continue we see ourselves coming in at the lower side of our guidance range."

44. A month later, on June 11, 2014, Defendants told investors that LeapTV would not ship until September 2014, with it "hitting stores in October." Defendants acknowledged that this would restrict LeapTV sales during the quarter ending December 31, 2014. As Defendant Arthur explained at a June 11, 2014 conference, "even if you assume [LeapTV is a] runaway success and we have inventory that we could supply retailers, there becomes a fiscal limit to what they're going to actually get through their distribution centers into their stores in time to hit the holiday shopping season." Among other reasons, the "fiscal limit" Arthur referenced arose from the fact that LeapFrog's major retailers like Wal-Mart typically put holiday items on their shelves in August and that to do so, the retailers would have to receive items at their distribution centers by the end of July. Defendants' anticipated September 2014 shipment date would result in LeapTV hitting shelves at least two months later than most competing holiday items.

45. On August 4, 2014, LeapFrog issued a press release concerning the Company's F1Q15 financial results. In addition, Defendants dramatically reduced FY14 net sales guidance from $554-$580 million to $480-$505 million for the period ending March 31, 2015 (now referred to as FY15 guidance) and reduced net income per share guidance for the same period from $0.18-$0.25 to $(0.04) to $0.10, an 86% reduction from the midpoint. The net sales guidance for the fiscal year was 4-9% below what the Company had reported the prior year for the same period.

46. The August 4, 2014 press release further reported on LeapFrog's F1Q15 results as follows:

- First fiscal quarter net sales were $47.0 million, down 43% compared to $83.0 million last year, and were not materially impacted by changes in

currency exchange rates. In the U.S. segment, net sales were $30.7 million, down 47% compared to $58.4 million last year.

- Loss from operations for the first fiscal quarter was $25.7 million, compared to a loss from operations of $4.1 million last year.
- Net loss for the first fiscal quarter was $16.4 million, compared to a net loss of $3.3 million last year. Net loss per basic and diluted share was $0.23, compared to a net loss per basic and diluted share of $0.05 last year.

47. Defendants also acknowledged in the August 4, 2014 press release that they expected the negative effects arising from elevated retail levels, the late launch of LeapTV, the deferral of a previously-planned consumer electronics tablet and a challenging market environment:

- "We expect our financial results to decline year-over-year in the September quarter due to remaining elevated retail inventory levels, continued challenging POS trends and the comparative timing of new product launches. In addition, our sales projections have declined with the deferral of our consumer electronics tablet . . . ."
- "We are lowering our outlook for the year given our June quarter performance, POS trends, and a very back-end loaded year with LeapTV shipping at the end of September."
- "We expect full fiscal year net sales to decline moderately year-over-year due to the issues we've already discussed . . . elevated beginning retail inventory levels, a challenging market environment and POS trends as well as the timing of new product shipments. Partially offsetting these challenges will be the introduction of new products that we expect to perform very well in the market place in fiscal 2015 and beyond."
- "For the fiscal year, we expect our net income per share to decline year-over-year due to the net sales decline and our longterm investments in the business to drive future growth."

48. In an earnings call also held on August 4, 2014, Defendants elaborated on the difficulties facing the Company. Defendants elaborated on LeapFrog's poor F2Q15 results:

- "[N]et sales declined 43% in the quarter, which was slightly more than expected. The retail environment in our key markets were tougher than we forecasted, and as you also heard from some of our toy competitors, they also had a tough time."
- "Net sales in our US segment were $31 million, down 47% compared to $58 million last year."
- "Worldwide net sales of multimedia learning platforms and content, which includes tablets, gaming systems, reading systems, content, and accessories, decreased 55% year over year."
- "Gross margin was 18.8%, down 18.4 percentage points year over year. The decline in gross margin was driven by higher trade discounts associated with

the continued retail support in clearing high inventory levels and unfavorable shift in product mix, higher royalty payments due to higher mix of license content, and a greater impact of fixed logistics costs due to the lower sales volume."

- "I would say [the decline in gross profit] is a little worse in the North American market . . . ."
- "Net loss was $16 million, a decline of $13 million over the $3 million loss reported for the prior year."
- "Cash used in operations increased by $23 million to $21 million, compared to cash provided by operations of $2 million a year ago, primarily due to an increase in the net loss resulting from the timing of our sales, increased discounts and promotional support, and investments in our infrastructure."

49. During the August 4, 2014 conference call, Defendants further discussed on the negative effects of LeapPad carryover inventory:

- "Net sales for the first quarter were negatively impacted by high inventory levels at retail entering the fiscal year that were carried over from the 2013 holiday season, which drove retailers to discount products, cut replenishment orders, and require higher trade discounts."
- "This year, with higher competitive [*sic*] and LeapFrog carryforward retail inventories and the planned shipment of our key new products in the September and December quarters, we announced at our last earnings call that our net sales would decline year over year in the June quarter . . . ."
- "We also had to provide additional support to our retail partners to discount our carryover tablets to help reduce inventory levels. This support and lower retail prices, in short, had a negative impact on our net sales and gross margins."
- "While much of [the excess retail carryover of multimedia platforms and bundles from holiday 2013] inventory has been discounted, it is still at prices that are significantly higher than the average consumer prices for children's products sold during spring and summer, and it's been selling in retail environments around the world that are filled with competitor clients' product which are a lot of times at far deeper discount prices."
- "[C]learance activity [of carryover inventory] also contributed to a drop in retail POS dollars."
- "We track POS through MPD every week in the tablet space. It's something we're actively looking. We look at children's tablet sales in the toy section of the store and we look at tablet sales in the CE section of the store as well, so we have an immense – put an immense amount of time into tracking tablet sales."
- "So, we have made some good progress on bringing down the amount of carryover inventory, but we are probably just past halfway through [the carryover inventory] at this point in time."

50. Defendants also provided additional color during the August 4, 2014 analyst call on the negative impact of the late introduction of LeapTV:

- "As John indicated, this was a tough quarter. We continued to work down carryforward holiday 2013 inventories at retail through increased discount promotional support that had a significant impact on both our sales and margin. In addition, as planned, our new products will be launched later this year than in the previous year. ***This later introduction of new products is the driver of more than about one-third of our decrease in sales quarter on quarter***."

51. As a result of these negative events and circumstances, Defendants told investors on the August 4, 2014 earnings call that Defendants had reduced their expectations:

- "Our business so far this year has been significantly hindered by retail inventory carry-forward from Holiday 2013, tough conditions in most of our key markets and the planned later launch of our major new product introductions for the year. . . . [T]hese difficulties have caused our financial performance to decline substantially during our seasonally slow quarters."

- "Net sales for the first fiscal quarter were negatively impacted by high inventory levels at retail entering the fiscal year that were carried over from the 2013 holiday season, which drove retailers to discount products, cut replenishment orders and required higher trade allowances, partially offset by the calendar shift of Easter."

- "As we look ahead, we expect continued headwinds in the September quarter from the remaining carryforward inventory and the timing of new product shipments compared to the prior year."

- "In addition, our sales projections have declined with the deferral until next year of our consumer electronics tablet as we focus more of our current-year efforts on LeapTV."

- "Specifically, we expect net sales in the second quarter to be in the range of $125 million to $130 million, down 38% to 35% as compared to a year ago. The decline is largely due to the timing of new product launches with our major new launch, LeapTV, which we will begin shipping at the end of September."

- "As a result, we expect September quarter net income per diluted share to be in the range of a loss of $0.03 per share to income of $0.01, compared to net earnings per diluted share of $0.37 a year ago."

- "[D]eferring our CE tablet to next year, [the reduction in guidance], challenging POS trends, and the carryover inventory are the real drivers, as well as the discounts we have given . . . ."

52. As set forth in ¶¶35-51 above, Defendants knew prior to the end of the Company's second quarter (September 30, 2014), and before they issued unaudited financial results for fiscal 2Q and 3Q, that LeapFrog faced serious problems as a company and that even Defendants' own future

expectations for the Company were tempered by these problems, including: (i) the late shipment of LeapTV and limitations in the ability to sell the product given the late shipment; (ii) indefinite deferral of its consumer electronics tablet; (iii) carryover inventory; and (iv) the cannibalizing LeapPad sales and profits.

**B. Introduction to Relevant GAAP Concepts**

53. The fraud alleged herein arises from Defendants violation of GAAP.[8]

54. One of the basic doctrines underlying accounting is the concept of neutrality, as expressed in the Statement of Financial Concepts No. 8, September 2010, Conceptual Framework of Financial Reporting ("SFAC 8"). "The Conceptual Framework . . . is intended to serve the public interest by providing structure and direction to financial accounting and reporting to facilitate the provision of unbiased financial and related information. That information helps capital and other markets to function efficiently in allocating scarce resources in the economy and society." *Id.* "To be useful, financial information . . . must faithfully represent the phenomena that it purports to represent" and should be "complete, neutral, and free from error" to the "extent possible." *Id.* at 17. "A neutral depiction is without bias in the selection or presentation of financial information. A neutral depiction is not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users." *Id.* at 18.

55. The specific accounting violations here concern when to test for goodwill impairment and when to write down goodwill and long-lived assets. These accounting activities require the application of neutral accounting. The specific GAAP provisions that govern are detailed in §§V.B., D. below.

[8] GAAP are the principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosure. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).

56. Whether and when goodwill and long-lived assets were impaired depends, in substantial part, on estimates of future discounted cash flows (for goodwill) and future undiscounted cash flows (for long-lived assets). A standard calculation of future discounted cash flows involves projecting changes to the current free cash flows into the future, discounted by an appropriate interest rate (because time has value) and there are risks associated with achieving the cash flows:

(a) Current free cash flows are calculated by subtracting operating expenses from cash flows from operating activities. This is an objectively calculable factor.

(b) The components of the interest rate by which projections should be discounted must represent realistic macroeconomic assumptions and observable inputs that market participants would use (*e.g.*, the current interest rate on a 20-year Treasury bond). This is an objective factor.

(c) The projected changes to current free cash flows is a subjective, speculative factor involving considerations including: performance year-to-date, trends in free cash flows over time, the competitive landscape, management track records, acquisitions, new products and other considerations bearing on a company's future performance. Because this factor is a significant uncertainty, the application of conservative accounting applies.

57. The F2Q15 and F3Q15 financial statements alleged to be false herein were not audited by LeapFrog's independent auditor Ernst & Young, LLP ("EY"). Audits, including an evaluation of the fair value measurements instrumental in determining whether goodwill and long-lived assets are impaired, are conducted in the context of annual financial statements. During annual audits, "the auditor performs procedures to evaluate whether the assumptions [that management used] provide a reasonable basis for measuring fair values in the context of an audit of the financial statements taken as a whole."[9] PCAOB, AS 2502: Auditing Fair Value Measurements and Disclosures, .32. Regardless, "[t]he financial statements are management's responsibility." PCAOB, AS 1001: Responsibilities and Functions of Independent Auditor, .03.

---

[9] The expression "as a whole" applies to the set of financial statements and the individual financial statements for the "periods presented," which do not include F2Q15 or F3Q15 financial statements, because no opinions are expressed for those quarters in LeapFrog's Form 10-K for the fiscal year ended March 31, 2015, filed June 15, 2015. PCAOB AS 3101: Reports on Audited Financial Statements, 05.

## V. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS

### A. LeapFrog's F2Q15 False Financial Results and Statements About Goodwill

58. On November 3, 2014, Defendants issued a press release discussing F2Q15 results, falsely reporting results for the quarter, including consolidated net sales of $113.6 million, down 43%, U.S. segment net sales down 47%, and international net sales down 33%. In the press release, Defendants also lowered FY15 expectations for net sales by approximately $30 million from its previous range, $480-$505 million, to $450-$470 million, and dramatically lowered EPS to $(0.13) to $(0.25), compared with the previous range of $(0.04) - $0.10 given only three months earlier. Thus, rather than forecasting a potential profit, Defendants informed investors that LeapFrog would report a loss.

59. In the November 3, 2014 press release, Defendants explained that the weak F2Q14 results resulted from late LeapTV shipment and continued carryover tablet inventory:

- "[O]ur fiscal second quarter ***net sales were hampered with the slippage of first shipments of LeapTV into the fiscal third quarter***, which is the primary reason our fiscal second quarter net sales results were below our guidance range."

- "Net sales for the quarter were negatively impacted by ***higher-than-desired inventory levels of tablets*** at retail entering the year which reduced retailer replenishment orders, the planned later timing of new product launches compared to the prior year, many of our retail partners around the world running far ***tighter inventories*** this year, ***retail sales softness in some of our key product categories*** and the first shipments of LeapTV slipping into the fiscal third quarter."

- "We expected a decline in our financial performance year-over-year given higher levels of retail carry-over inventory from Holiday 2013 and the comparative timing of new product launches," said Ray Arthur, Chief Financial Officer. However, the decline in net sales was more than anticipated primarily due to the slippage of first shipments of LeapTV into the fiscal third quarter."

60. Later on November 3, 2014, Defendants hosted an earnings call, in which they provided additional color on LeapFrog's poor F2Q15 results:

- "The worldwide decline was driven by the planned later timing of our new product introductions this year versus last year, reductions by retailers in inventory levels, and the continued clearance of carryover product from last holiday season. In addition, the planned late second fiscal quarter launch of LeapTV was delayed to our third fiscal quarter. Net sales for our US

segment were $78 million, down 47% compared to our year-ago sales of $147 million, due to the aforementioned conditions."

- "Four major factors affected our financial performance in the second fiscal quarter of 2015. First, as we previously said, we entered the current fiscal year with ***elevated carryover*** retail inventory from holiday 2013 that continues to be cleared. Second, the majority of our new product launches occurred earlier in the prior year than they did in the current year. Third, many of our retail partners around the world have been maintaining much ***tighter control over their inventories***. And fourth, we experienced ***retail sales softness*** in some of our key product categories."

- "While we predicted our fiscal first-half business was going to be significantly down as a result of the retail inventory challenges, the planned shift of new product launches later in the year, and a tough year-on-year comp, our sales came in worse than expected, which is disappointing."

- ***"New LeapPad shipments to customers continue to be hampered by the remaining carryforward inventory of our 2013 holiday tablets***. While much of this inventory has been discounted, it is still at prices that are significantly higher than the average consumer prices for other children's products sold during this time of year. And it's been selling in retail environments that still contain competitive clearance product, which are a lot times at far deeper discount prices. As a result, it has taken longer than we expected to work through this inventory."

- "***[O]ur growth will be hampered over the holiday season by retail inventory issues and some market softness***. . . ."

61. Defendants further told investors that the continued existence of tablet inventory, the late LeapTV launch, and negative industry conditions would continue to weigh on F3Q15's results:

- "Carryover inventory and later new product launches has shifted the build of holiday inventory at retail more towards our fiscal Q3 this year than Q2 last year."

- "[R]egarding the pricing of tablets within the market, there is still a lot of clearance activity out there, so the pricing is pretty volatile."

- "[W]e also owned in our inventory some LeapPad 2 Powers and some other product that you will see sold promotionally in the calendar fourth quarter. We don't get into the actual levels of content in toys, but I would say, if anything, I think people are just being – are really keeping their inventories tightly managed this year."

62. And Defendants acknowledged that the continuation of these issues, which had existed as of September 30, 2014, were the same reasons that LeapFrog was reducing its FY15 guidance in spite of Defendants' purported expectations for its new products:

- "***[W]e still face the headwind of the remaining clearance inventory at retail and weak market conditions in some of our key categories***. We had hoped the retail carryover inventory would be sold through by Thanksgiving, but we

now believe that there will be sales of this inventory over the holiday season."

- "Given concerns related to the remaining clearance inventory, weakness in the retail environment in some of our key product categories, and retailers bringing down their inventory levels, we are reducing our full fiscal-year 2015 guidance."

63. False and Misleading Statement: In the November 3, 2014 press release, Defendants reported false financial results, including net losses per share, losses from operation, assets and net losses. Each of these statements was false as a result of Defendants' failure to timely record an impairment to LeapFrog's goodwill, as GAAP required. LeapFrog's F2Q15 Form 10-Q, filed November 10, 2015, also reported the same false financial results.

- "***Net loss per basic and diluted share was $0.03, compared to net income per diluted share of $0.37 a year ago.***"
- "***Loss from operations for the second fiscal quarter was $3.1 million, compared to income from operations of $42.9 million last year.***"
- "***Net loss for the second fiscal quarter was $2.0 million, compared to net income of $26.4 million last year. Net loss per basic and diluted share was $0.03, compared to net income per diluted share of $0.37 last year.***"
- ***Total current assets of $354.6 million***.

64. False and Misleading Statement: On the November 3, 2014 earnings call, Defendants continued to make false statements concerning LeapFrog's financial results:

- "***Operating expenses for the quarter were $40 million, up 10% compared to $36 million a year ago***."
- "***Net loss on a GAAP basis was $2 million, a decrease of $28 million versus net income last year of $26 million. GAAP net loss per diluted share was $0.03, a contraction of $0.40 compared to the $0.37 net income per diluted share a year ago***."

65. False and Misleading Statement: In LeapFrog's F2Q15 Form 10-Q, filed November 10, 2015, Defendants falsely claimed that, "As of September 30, 2014, based on [the Company's] assessment of various qualitative factors and projection of future operating results, ***the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment***."

66. False and Misleading Statement: The F2Q15 Form 10-Q also falsely stated the financial information they reported was a fair statement of LeapFrog's financial results "***in***

***accordance with United States generally accepted accounting principles*** . . ." and results were prepared in accordance with GAAP. Barbour and Arthur executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that falsely stated:

> Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> Based on my knowledge, ***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***.

### B. Reasons Why Defendants' F2Q15 Statements About Goodwill and LeapFrog's Financial Results Were False

67. Each of Defendants' statements in ¶¶63-66 above were materially false and misleading because Defendants knew or recklessly disregarded, and failed to disclose, the facts described below.

68. Contrary to Defendants' representation to investors, the Company was ***required*** to test for goodwill impairment for the quarter ending September 30, 2014 because sufficient indicators of impairment of the Company's goodwill existed. Numerous events and changed circumstances, called "triggering events," indicated that it was objectively and overwhelmingly more likely than not LeapFrog's goodwill was impaired at F2Q15 (*see* §V.B.2. below). Each of the triggering events was sufficient on its own to require the Company to test for goodwill impairment under GAAP because each individually had a ***significant adverse impact*** on the fair value of the Company's U.S. reporting unit. When considered holistically, as GAAP directs, the requirement to test for goodwill impairment was only more evident. No mitigating events or circumstances sufficient to excuse the failure of Defendants to test for goodwill or inform investors that goodwill was impaired were present at the time Defendants issued LeapFrog's F2Q15 results on November 3, 2014 and November 10, 2014.

69. Moreover, not only did triggering events require Defendants to test for goodwill impairment, but LeapFrog's goodwill was ***already impaired*** as of the quarter ended September 30, 2014. As of September 30, 2014, LeapFrog's book value of goodwill for its U.S. reporting unit

exceeded its implied fair value because the book value of LeapFrog's net assets or equity materially exceeded the fair value of those net assets or equity. In other words, LeapFrog's goodwill was underwater.

70. The reasons requiring Defendants to test for goodwill impairment as of the quarter ended September 30, 2014, and the write-down that would have resulted had they acted as required, are detailed in the following paragraphs.

### 1. GAAP Provisions Concerning Goodwill and Goodwill Impairment

71. Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination. Accounting Standards Codification ("ASC") 805-10-05-4 "requires that a business combination be accounted for by applying the acquisition method." ASC 805-20-30-1 describes the acquisition method, which requires the acquiring company to record the assets acquired and liabilities assumed at their respective fair market values as of the date of the acquisition. ASC 805-10-20 describes fair value as "[t]he price that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date." ASC 350-20-35-16 states that "[t]he excess of the fair value of a reporting unit over the amounts assigned to its assets and liabilities is the implied fair value of goodwill."

72. A reporting unit is an operating segment of a company or one level below an operating segment (also known as a component). ASC 350-20-20 Glossary. LeapFrog had two operating segments: (i) U.S., and (ii) International. For purposes of its goodwill impairment testing, LeapFrog considers its operating segments to be its reporting units. All of LeapFrog's $19.5 million goodwill was associated with the U.S. reporting unit, and was related to its 1997 acquisition of substantially all the assets and business of its predecessor, LeapFrog RBT, and the 1988 acquisition of substantially all of the assets of Explore Technologies.

73. Pursuant to ASC 350-20-35-2, "[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value." Following an acquisition, companies are required to account for any goodwill recorded as part of the acquisition in

accordance with ASC 350-20. ASC 350-20-35-28 requires goodwill to be tested annually and, as is at issue here, for any quarter when certain circumstances are present.

74. ASC 350-20-35-3A requires that a company test goodwill for any quarter when an assessment of "qualitative factors" determines that "more likely than not (that is a likelihood of more than 50 percent) that the fair value of a reporting unit is less than its carrying amount, including goodwill." This qualitative assessment is sometimes referred to as "step zero," since the goodwill impairment test itself involves GAAP procedures referred to as "step one," followed by "step two," if required, as discussed in detail below.[10]

**2. Step Zero Required Defendants to Proceed to Step One of the Goodwill Impairment Test**

75. Step zero of the goodwill impairment analysis requires impairment testing for any quarter when certain triggering events are present "that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC 350-20-35-30.[11] Pursuant to ASC 350-20-35-3C, examples of such triggering events include, but are not limited to, the following:

a. Macroeconomic conditions such as deterioration in general economic conditions, limitations on accessing capital, fluctuations in foreign exchange rates, or other developments in equity and credit markets

b. Industry and market considerations such as a deterioration in the environment in which an entity operates, an increased competitive environment, a decline in market-dependent multiples or metrics (consider in both absolute terms and relative to peers), a change in the market for an entity's products or services, or a regulatory or political development

c. Cost factors such as increases in raw materials, labor, or other costs that have a negative effect on earnings and cash flows

d. Overall financial performance such as negative or declining cash flows or a decline in actual or planned revenue or earnings compared with actual and projected results of relevant prior periods

---

[10] Instead of performing step zero, "[a]n entity has an unconditional option to bypass the qualitative assessment . . . and proceed directly to performing the first step of the goodwill impairment test. An entity may resume performing the qualitative assessment in any subsequent period." ASC 350-20-35-3B.

[11] "Goodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying amount." ASC-350-20-35-30.

e. Other relevant entity-specific events such as changes in management, key personnel, strategy, or customers; contemplation of bankruptcy; or litigation

f. Events affecting a reporting unit such as a change in the composition or carrying amount of its net assets, a more-likely-than-not expectation of selling or disposing all, or a portion, of a reporting unit, the testing for recoverability of a significant asset group within a reporting unit, or recognition of a goodwill impairment loss in the financial statements of a subsidiary that is a component of a reporting unit

g. If applicable, a sustained decrease in share price (consider in both absolute terms and relative to peers).

76. ASC 350-20-35-3E required Defendants to test for goodwill impairment if ***any*** triggering events, including but not limited to any of the examples given above, alone or in combination, made it more likely than not the fair value of reporting unit is less than the book value or carrying amount. ASC 350-20-35-3E also provides that the triggering events must be considered holistically. In other words, even if no individual triggering event is sufficient, on its own, to make it more likely than not the fair value of the reporting unit is less than the book value, if the "totality" of the events and circumstances described above, as applied to LeapFrog, made it more likely than not that the fair value of a reporting unit at F2Q15 was less than its carrying amount, then Defendants were required to perform the first step of the two-step goodwill impairment test.

77. Moreover, factors that were based on observable inputs are entitled to greater weight than those based on inputs (such as forecasts) in the step zero analysis because observable inputs reflect the assumptions market participants would use. ASC 820-10-05-1C requires that, "[w]hen a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk." *Cf.* SFAC 8 at 18 (accounting must strictly avoid bias, slanting and manipulation undertaken "to increase the probability that financial information will be received favorably").

78. For the quarter ended September 30, 2014, LeapFrog, by Defendants' own admissions and/or objective facts, met at least three of the specific triggering circumstances set forth

in ASC 350-20-35-3C, as well as other factors that they were required to consider under ASC 350-20-35-3F. These circumstances and factors indicated that LeapFrog's goodwill was more likely than not impaired, requiring testing of goodwill.

79. ***Decline in overall financial performance***. LeapFrog's continuous poor overall and U.S. reporting segment financial performance indicated that that LeapFrog's goodwill was more likely than not impaired. ASC 350-20-35-3C(d). Because LeapFrog's decline in overall financial performance was an observable input available to market participants, it was entitled to substantial weight in the step zero analysis. ASC 820-10-05-1C.

80. For five consecutive quarters, from F2Q14 through F2Q15, LeapFrog reported weak financial results or substantially lowered guidance, demonstrating Defendants' repeated failure to meet their own projections:

(a) On August 1, 2013, Defendants issued FY13 guidance of $570-$590 million in net sales. It maintained the same guidance on November 4, 2013. However, when Defendants announced LeapFrog's FY13 results on February 12, 2014, they reported net sales of $553.6 million, missing the midpoint of the prior guidance range by more than $16 million (3%).

(b) On February 12, 2014, Defendants issued FY14 guidance of $554-$580 million in net sales and net income per diluted share of $0.18-$0.25, which was not indicative of meaningful growth, but rather projected flat net sales. Analysts at Ascendiant Capital Markets, LLC called the guidance a "weak outlook." On May 5, 2014, Defendants announced that they were maintaining the guidance they issued on February 12, 2014 but warned that "if current retail trends continue we see ourselves coming in at the lower side of our guidance range." In other words, flat net sales year-over-year.

(c) On August 4, 2014, Defendants announced that they were "lowering our outlook for the year given our June quarter performance, [point of sale] trends, and a very back-end loaded year with LeapTV shipping at the end of September. . . . We expect full fiscal year net sales to decline moderately year-over-year." Defendants provided ***FY15 guidance of $480 million to $505 million in net sales, compared to $528 million in the same time period the year before*** and ***a***

***$74.5 million reduction***, or 13%, to the midpoint of fiscal year guidance provided on May 5, 2014.[12] Similarly, Defendants reduced the guidance for net income per diluted share to $(0.04)-$0.10, ***a reduction of nearly $0.19*** per share from the midpoint of the previously issued guidance. In context, they had previously guided that LeapFrog, at the low-end, would have net sales per diluted share of $0.18.

(d) On November 3, 2014, a week before the Company's 10-Q was filed with the SEC, Defendants would reduce guidance yet again, to $450-$470 million in net sales for FY15, representing ***a further $32.5 (or 7%) reduction*** to the midpoint of previously issued guidance; and losses per share of $0.25-$0.13, ***a further reduction of $0.16*** to the midpoint of the previously issued guidance.

(e) Subsequently, Defendants revealed their knowledge that they knew how poor LeapFrog's overall financial performance was as of September 30, 2014. LeapFrog filed a Schedule 14D-9 Solicitation/Recommendation Statement with the SEC on March 3, 2016, in which Defendants acknowledged that LeapFrog:

- ***had suffered major declines in revenues starting in 2013***.
- ***knew of substantial continuing declines in the children's tablet business***.
- ***had taken more than $320 million in cumulative operating losses since the Company's IPO in 2002***.
- ***had recorded operating losses in 9 of the last 13 years***.

Though these statements in the Schedule 14D-9 occurred after the close of F2Q15, they described the state of affairs, known to Defendants, which predated that quarter.

81. Moreover, Defendants had experienced substantial declines in actual net sales Company-wide, and even worse declines in the U.S. reporting segment:

[12] LeapFrog changed its fiscal year to commence on April 1, 2014. The shift meant that what was previously FY14 now became FY15, with the quarter ending March 31, 2014 replaced with the quarter ending March 31, 2015. The other three quarters, including the all-important holiday season, remained the same. Thus, while not a perfect comparison, guidance for (old) FY14 and (new) FY15 were still comparing largely similar time periods. The massive guidance reduction on August 4, 2014 only made clear that Defendants expected even worse results than before.

| *Quarter Ended* | *Total Net Sales (2013)* | *Total Net Sales (2014)* | *Δ%* | *US Net Sales (2013)* | *US Net Sales (2014)* | *Δ%* |
|---|---|---|---|---|---|---|
| 12/31/13 | $244.7m | $186.7m | ***-16%*** | $177.8m | $123.7m | ***-30%*** |
| 3/31/14 | $82.9m | $56.9m | ***-31%*** | $58.1m | $39.1m | ***-33%*** |
| 6/30/14 | $83.0m | $47.0m | ***-43%*** | $58.4m | $30.7m | ***-47%*** |
| 9/30/14 | $201.0m | $113.6m | ***-43%*** | $146.8m | $77.6m | ***-47%*** |

As Defendants had stated in their Form 10-K for FY13, filed on March 14, 2014 (and as they would repeat in their Form 10-K for FY15, filed on June 15, 2015), "***[a] decline of net sales, in the quarter ending September 30*** or December 31 ***in particular, will have a disproportionate negative impact on our results for the year and can lead to ongoing weakness in sales to retailers well into the following year***." As the chart above shows, Defendants knew that net sales had declined consistently, including in the quarter ended September 30, 2014. As such, they knew the results would have a disproportionate negative impact on LeapFrog's results.

82. ***Increased Competition, Change in Industry Conditions and the Market for LeapFrog's Products.*** Defendants repeatedly represented that LeapFrog faced increased competition and changed industry conditions. Pursuant to ASC 350-20-35-3C(b), the existence of increased competition, changed industry and/or market conditions added to the requirement that the Company test for goodwill impairment. Because increased competition, the change in industry conditions, and the market for LeapFrog's products were observable inputs available to market participants, they were entitled to substantial weight in the step zero analysis. ASC 820-10-05-1C.

83. Defendants repeatedly blamed a tough retail environment and competition on LeapFrog's poor performance and lowered expectations, including that:

- On February 12, 2014, Defendants acknowledged that "difficult retail conditions" would combine with the LeapPad hangover to "negatively impact our net sales . . . for the full year" of calendar 2014.

- During the Company's May 5, 2014 earnings conference call, Defendants informed investors that the ***market for its products was "weaker than expected"*** and had been impacted by "***increased competition***," and highlighted "***higher carry forward inventories across the overall tablet business*** and ***significant clearance activity*** and ***greater competition***." Indeed, on May 5, 2014 Defendants told investors that their tablet sales had fallen 31% year-over-year.

- During the Company's June 11, 2014 conference call, Defendants stated that retailers "will probably be cautious" with inventory due to changed conditions.

- During the Company's August 4, 2014 earnings conference call, they informed investors that their products were selling at retailers whose ***shelves "are filled with competitor clients' product*** which are a lot of times ***at far deeper discount prices***."

- On August 4, 2014, Defendants acknowledged that: "[o]ur business so far this year has been significantly hindered by retail inventory carry-forward from Holiday 2013, tough conditions in most of our key markets and the planned later launch of our major new product introductions for the year."

- Defendants also explained that POS trends were trending lower noting on August 4, 2014 that "[w]e are lowering our outlook for the year given our June quarter performance, POS trends, and a very back-end loaded year with LeapTV shipping at the end of September."

- On August 4, 2014, Defendants further elaborated on the challenging market and declining POS trends: "[w]e expect full fiscal year net sales to decline moderately year-over-year due to the issues we've already discussed . . . elevated beginning retail inventory levels, ***a challenging market environment and POS trends*** as well as the timing of new product shipments." They also acknowledged that these negative circumstances would be a challenge despite the issuance of any new products explaining that the introduction of new products, would only "[p]artially offset[] these challenges."

- On September 18, 2014, Defendants acknowledged that "it's been ***a tough overall retail environment with soft consumer sales in most of our key markets***. There is ***increased competition*** in the kids tablet market."

- When informing investors of the circumstances present during F2Q15, Defendants indicated on November 3, 2014 that "[f]our major factors affected our financial performance in the second fiscal quarter of 2015. . . . [W]e entered the current fiscal year with elevated carryover retail inventory from holiday 2013 that continues to be cleared. . . . [T]he majority of our new product launches occurred earlier in the prior year than they did in the current year. . . . [M]any of our retail partners around the world have been maintaining much tighter control over their inventories. . . . [W]e experienced retail sales softness in some of our key product categories."

84. Each of these statements, as well as the additional statements in ¶¶32-51, 59-62, "provide[d] additional evidence about the conditions that existed at the date of the balance sheet." ASC 855-10-1.[13]

85. ***<u>A sustained decrease in share price (and corresponding decline in market capitalization)</u>***. ASC 350-20-35-3C(g) also indicates that "a sustained decrease in share price

---

[13] Analysts also commented on the increased competition. *See, e.g.*, "increased competition in the children's table market" (Imperial Capital on 2/19/14); "[k]ids tablet competition likely to get tougher" (Ascendiant Capital Markets, LLC on 3/18/14, 5/6/14, 7/29/14 and 8/5/14); and "increased competition/lack of pricing power" (Piper Jaffray on 5/5/14).

(consider[ed] in both absolute terms and relative to peers)," can be a triggering event that requires testing for goodwill impairment. In fact, when Defendants belatedly reported that LeapFrog's goodwill was impaired in its F3Q15 Form 10-Q, they themselves ascribed the "decrease in trading values of the Company's stock and corresponding . . . market capitalization" as indicators of goodwill impairment. LeapFrog, however, had already suffered a sustained stock price decline and corresponding decline in market capitalization as of the end of the September 30, 2014 quarter. Because LeapFrog's stock price decline and its corresponding decline in market capitalization were observable inputs available to market participants, they were entitled to substantial weight in the step zero analysis. ASC 820-10-05-1C.

86. The Company did not breakout publicly the book value associated with the U.S. viewing reporting unit. The Company as a whole, however, is a conservative proxy for the U.S. reporting unit when assessing the sustained decrease in share price and whether it was more likely than not an indicator that the U.S. reporting unit's goodwill was impaired for several reasons.

87. First, approximately two-thirds of the fair value of the Company was attributable to the U.S. reporting unit. Net sales of the U.S. reporting unit represented approximately 67%, 70% and 73% of the Company's total net sales for the six months ended September 30, 2014, fiscal year 2013 and fiscal year 2012.[14]

88. Second, because the International reporting unit was significantly more profitable than the U.S. reporting unit, using the Company as a whole as a proxy for the U.S. reporting unit effectively overstates the fair value of the U.S. reporting unit relative to its book value. For the six months ended September 30, 2014, the loss from operations of the U.S. reporting unit was $34.16 million, while the International reporting unit reported income of $5.72 million. For fiscal year 2013, the loss from operations of the U.S. reporting unit was $1.3 million, while the International reporting unit reported income of $36.2 million. And for fiscal year 2012, income from operations for the U.S. reporting unit was $28.1 million, while the International reporting unit reported income

[14] *See* Form 10-Q for period ended September 30, 2014, filed November 10, 2014, at 13; and 2014 Form 10-K, filed March 14, 2014, at 25, 27.

of $36 million.[15] ***Consequently, assessing goodwill impairment on a Company-wide basis is conservative, and actually incorporates a fair value bias in the direction of non-impairment (i.e., in favor of LeapFrog).***

89. Third, the book value of equity (relative to the fair value of equity) of the Company as a whole is a reasonable proxy for the book value of equity for the U.S. reporting unit because there are no indications that the book values of assets and liabilities that pertain to the International reporting unit represented more than one-third of the amounts shown on the consolidated balance sheet of the Company as of September 30, 2014. In fact, the evidence indicates that the opposite is true. For example, of the total $36.8 million property and equipment on LeapFrog's books at September 30, 2014, about $36.5 million, 99%, belonged to the U.S. reporting unit.[16] Consequently, the difference between the fair value of equity and the carrying value of equity for the U.S. reporting unit should be approximately the same as the difference for the Company as a whole. In fact, as explained above, ***the use of the Company as a proxy for the U.S. reporting incorporates a bias in favor of Defendants because it overstates the fair value of equity of the U.S. reporting unit relative to its carrying value***.

90. Throughout July 2014, LeapFrog had been trading at an average price of $7.50 per share. Between April 1, 2014 – the start of F1Q15 – and August 4, 2014, LeapFrog stock closed at an average price of $7.17 per share. From January 1, 2014 through March 31, 2014, the stock closed at an average price of $7.33 per share.

91. However, following Defendants' August 4, 2014 announcement of LeapFrog's F1Q15 results, LeapFrog stock price plummeted nearly 19% from a close of $7.39 per share on August 4, 2014 to a close of $6.01 per share on August 5, 2014. ***Between August 5, 2014 and September 30, 2014, the last 57 days of F2Q15, LeapFrog's average stock price at market close was $6.24 per share, 13% below the average price between April 1, 2014 and August 4, 2014, and 15% below the average price between January 1, 2014 and March 31, 2014***.

---

[15] *Id.*

[16] Form 10-K for the period ending March 31, 2015, filed June 15, 2015, at 24.

92. In total, ***LeapFrog's stock price decline lasted 57 days of the September 30, 2014 quarter – 62% of F2Q15***, when GAAP required that Defendants assess whether the Company's goodwill was more likely than not impaired. The Office of the Chief Accountant for the SEC has explained the significance of recent stock price declines in the goodwill analysis:

> [I]t would not be reasonable for a registrant to simply ignore recent declines in their stock price, as the declines are likely indicative of factors the registrant should consider in their determination of fair value, such as a more than temporary repricing of the risk inherent in any company's equity that results in a higher required rate of return or a decline in the market's estimated future cash flows of the company.[17]

93. GAAP does not specify how long a period of time the stock price must decline before that period is characterized as a "sustained." However, publicly traded companies have regularly interpreted "sustained" to be a period fewer than the 57-day "sustained" decline LeapFrog experienced. For example:

- Sientra, Inc. cited "a significant decline in its common stock price" as one indicator of goodwill impairment for its quarter ended September 30, 2015. The "sustained" decline comprised 7 days, from September 24, 2015 to September 30, 2015. (Notably, Sientra still proceeded to step one of the goodwill impairment test even though the $10.15 stock price on September 30, 2015 exceeded the $9.63 book value of equity by 5.4%.)[18]

- Supervalu Inc. cited a "significant and sustained decline in the Company's market capitalization [*e.g.*, stock price multiplied by shares outstanding] and updated discounted cash flows" as indicators of goodwill impairment for is quarter ended December 3, 2011. The "sustained" decline comprised 10 days, from November 23, 2011 to December 2, 2011. (Notably, Supervalu still proceeded to steps one and two of the goodwill impairment test even though the $7.29 stock price on December 2, 2011 exceeded the $7.07 book value of equity.) [19]

- Ciber Inc. cited "a sustained decrease in the stock price and lower than expected earnings" as indicators of goodwill impairment for the quarter ended March 31, 2016. The "sustained" decline comprised 43 days, from

---

[17] Robert G. Fox III, Professional Accounting Fellow, Office of the Chief Accountant, U.S. Securities and Exchange Commission, Speech by SEC Staff: Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments, Washington, D.C. (Dec. 8, 2008), available at https://www.sec.gov/news/speech/2008/spch120808rgf.htm.

[18] Sientra, Inc. Form 10-Q for the period ended September 30, 2015, filed November 16, 2015, at 1, 8, 9, 19 and 36.

[19] Supervalu Inc. Form 10-Q for the period ended December 3, 2011, filed January 12, 2012, at 5, 9, 17, 18, 21 and 81.

February 18, 2016 through March 31, 2016. (Ciber proceeded to perform steps one and two of the goodwill impairment test.)[20]

- Marchex Inc. cited "a sustained decline in the Company's common stock share price and market capitalization as well as lower projected revenue growth rates and profitability levels compared to historical results" as indicators of goodwill impairment for the quarter ended June 30, 2016. The "sustained" decline comprised 45 days, from May 17, 2016 through June 30, 2016. (Marchex proceeded to perform steps one and two of the goodwill impairment test.)[21]

- China Techfaith Wireless Communication Technology LTD cited a "significant decline in its stock price for a sustained period" of time as the sole indicator of goodwill impairment for the quarter ended September 30, 2011. The "sustained" decline comprised 46 days, from August 16, 2011 through September 30, 2011. The company proceeded to perform steps one and two of the goodwill impairment test.).[22]

94. Moreover, LeapFrog's sustained stock price decline between August 5, 2014 and September 30, 2014 contrasted starkly with its peers, a consideration Defendants were required to include in their assessment. *See* ASC 350-20-35-3(g) (decline considered both absolutely and relative to peers). During this period, the stock prices of the 12 direct peer companies cited in LeapFrog's April 21, 2014 Proxy Statement only declined by an average of about 4% and a median of less than 1%.[23]

95. Related to LeapFrog's stock price decline, ***LeapFrog's market cap plunged $93.2 million during the sustained decline***, from $517.7 million on August 4, 2014 ($7.39 price per share x 70.052 million shares outstanding) to $424.5 million on September 30, 2014 ($6.06 price per share x 70.052 million shares outstanding), a decline of 18%.[24]

---

[20] Ciber Inc. Form 10-Q for the period ended March 31, 2016, filed May 10, 2016, at 5, 10, 20, 24, 28 and 37.

[21] Marchex Inc. Form 10-Q for the period ended June 30, 2016, filed August 9, 2016, at 3, 10, 15, 27, 31 and 42.

[22] China Techfaith Wireless Communication Technology LTD Form 20-F for the fiscal year ended December 31, 2011, at 3-5 and F-36.

[23] According to LeapFrog's Proxy Statement dated April 21, 2014, LeapFrog's peer companies were Arctic Cat, Demand Media, JAKKS Pacific, K12, Rosetta Stone, Rovi, Shutterfly, Skullcandy, Take-Two Interactive Software, TiVo, United Online and Universal Electronics.

[24] Market capitalization or "market cap" is the total dollar market value of a company's outstanding shares and is calculated by multiplying the company's shares outstanding by the current market price of one share. At September 30, 2014, LeapFrog's had 70,052,000 common shares, resulting in a market cap of $419.6 million (70,052,000 x $5.99 closing price per share).

96. LeapFrog's dramatic and sustained ***market cap decline of more than $221 million – more than 34% – since the quarter ended September 30, 2013*** was a key indicator that its goodwill was impaired:

| *Quarter Ended* | *Market Cap.* | *Δ to Prior Quarter* | *Δ to Prior Quarter (%)* |
|---|---|---|---|
| 9/30/2013 | $645.8m | -$25.3m | -4% |
| 12/31/2013 | $543.2m | -$102.6m | -16% |
| 3/31/2014 | $520.6m | -$22.6m | -4% |
| 6/30/2014 | $510.6m | -$10.0m | -2% |
| 9/30/2014 | $424.5m | -$86.1m | -17% |
| ***Total Market Cap Decline Between 9/30/13 and 9/30/14*** | | | ***Δ (%)*** |
| | | ***-$221.3m*** | ***-34%*** |

97. LeapFrog's sustained stock price and market capitalization declines were indicators the fair value of the U.S. reporting unit was more likely than not below its carrying amount. Based on the Company's F2Q15 Form 10-Q, as of September 30, 2014, LeapFrog's book value per share was $5.78 (*e.g.*, $404,921,000 stockholders' equity divided by 70,052,00 shares). LeapFrog's stock closed at $5.99 per share on the same day. Consequently, as of September 30, 2014, Leapfrog's $5.99 market value of equity per share was only $0.21 or 3.6% greater than its $5.78 book value of equity per share, a razor thin margin substantially narrower than prior quarters and a clear indication that goodwill was more likely than not impaired. The chart below reflects that for F2Q15 the $0.21 differential was dramatically narrower than prior quarters:

| *Date* | *Closing Price/ Share* | *Book Value/ Share* | Δ | *Closing Price as a % of Book Value* |
|---|---|---|---|---|
| 12/31/2013 | $7.94 | $6.15[25] | $1.79 | 129% |
| 3/31/2014 | $7.50 | $6.00[26] | $1.50 | 125% |
| 6/30/2014 | $7.35 | $5.79[27] | $1.56 | 127% |
| ***9/30/2014*** | ***$5.99*** | ***$5.78*** | ***$0.21*** | ***104%*** |

98. In fact, when Defendants belatedly reported that LeapFrog's goodwill was impaired in its F3Q15 Form 10-Q, they themselves ascribed the "decrease in trading values of the Company's stock and corresponding . . . market capitalization" as indicators of goodwill impairment. Yet, ***the $0.21 differential in F2Q15 between LeapFrog's fair value and book value of equity was the narrowest it had ever been at the close of any quarter since the Company's IPO in July 2002***. It was also ***even narrower than the $0.43 (or 9%) difference between equity and book values that existed when the Company finally reported the impairment at F3Q15***.[28]

99. Furthermore, Defendants also knew that even the $0.21 differential, based on LeapFrog's $5.99 stock price per share on September 30, 2014, remained substantially ***inflated***. As of that date, Defendants knew – but the market had not yet learned – that the Company's F2Q15 financial results were well below the prior year and below expectations that had already been substantially lowered during the middle of the second quarter (*e.g.* 86% decline in net income guidance for FY15 on August 4, 2014), including:

---

[25] Market value based on stock price as of December 31, 2013; book value based reported shareholder equity of $427,322,000 and 69,493,592 total shares of outstanding common stock (per LeapFrog's Form 10-K for the period ended December 31, 2013).

[26] Market value based on stock price as of March 31, 2014; book value based reported shareholder equity of $418,454,000 and 69,695,423 total shares of outstanding common stock (per individual defendants' Form 10-Q for the quarter ended March 31, 2014).

[27] Market value based on stock price as of June 30, 2014; book value based reported shareholder equity of $405,309,000 and 70,017,260 total shares of outstanding common stock (per individual defendants' Form 10-Q for the quarter ended June 30, 2014).

[28] According to LeapFrog's Form 10-Q as of December 31, 2014, LeapFrog's book value of equity at December 31, 2014 = $281.767 million reported stockholders' equity + $19.549 million book value of goodwill not included in reported stockholders' equity = $301.316 million. $301.316 million book value of equity ÷ 70.169 million Class A and B shares = $4.29 book value per share of equity. $4.72 closing market stock price per share – $4.29 book value per share of equity at December 31, 2014 = $0.43.

- ***dramatically reduced year-over-year net sales both Company-wide and in the U.S. segment*** (LeapFrog would report F2Q15 net sales down 43% and U.S. segment net sales down 47% year-over-year);

- ***dramatically worse losses per basic and diluted share when compared to prior year*** (LeapFrog would report F2Q15 net losses of $0.03, a swing of $0.40 year-over-year from the net income per basic and diluted share of $0.37);

- ***LeapTV shipments would not commence until after F2Q15 having previously acknowledged known limitations on sales of LeapTV as a result of the late shipment of the product***;[29]

- the Company continued to be "***negatively impacted by the significant retail inventory carry-over*** of tablets from Holiday 2013";

- retailers maintaining "***tighter inventories*** this year";

- "***retail sales softness*** in some of our key product categories"; and

- "***In our projections for the third quarter we planned for a decline in retail sales of LeapPad tablets***."

100. Moreover, even at September 30, 2014, when the stock price was $5.99 per share, Defendants certainly knew that the price would drop after the F2Q15 results were reported to the market. Defendants could even reasonably project the magnitude of the expected decline to be about 27% from the $5.99 closing price on September 30, 2014 ***based entirely on information they knew of as of September 30, 2014 and shortly thereafter***, given how the market previously responded to LeapFrog's poor F1Q15 results, based on the calculation described below.

101. When LeapFrog reported F1Q15 net sales of $47 million, $4 million or 7.8% short of the $51 million consensus estimate, the stock price fell 18.2% from $7.35 per share on June 30, 2014 (the day the quarter closed) to $6.01 per share on August 5, 2014 (the day after the market learned of the quarter's results). Given that Defendants knew that LeapFrog would report for F2Q15 $114 million net sales, $15 million or 11.6% short of the $129 million consensus estimate, Defendants could reasonably project a 27% stock price decline from $5.99 per share at September 30, 2014 to $4.37 per share after the market absorbed the weak F2Q15 results announced on November 3, 2014.

---

[29] On February 5, 2015, Defendants acknowledged that LeapTV did not begin shipping until mid-October 2014.

In fact, LeapFrog's stock price did trade as low as $4.45 per share on November 6, 2014, about 26% below the $5.99 per share F2Q15 closing price.[30]

102. Prior to the announcement of the Company's F2Q15 results and the filing of the Form 10-Q with the SEC on November 10, 2014, things only got worse, further informing Defendants that LeapFrog's goodwill was, in fact, impaired. LeapFrog's equity value was in fact underwater starting on October 24, 2014, when the Company's share price closed at $5.72 per share. The share price continued to decline up to the time of the announcement of LeapFrog's F2Q15 results. Before Defendants announcement of the F2Q15 results on November 3, 2014, the share price declined 5% further, closing at $5.43 per share on November 3, 2014. It continued to decline the next day, falling nearly 8% more the following day to $5.01 per share and almost 9% further to $4.57 per share on November 6, 2014. But a week later, on November 10, 2014, Defendants would file LeapFrog's Form 10-Q claiming they had followed GAAP and that there were no sufficient indicators of goodwill impairment.

103. Defendants were required to consider these stock price declines and other subsequent events even though they occurred after September 30, 2014. ASC 855-10-25-1 ***required LeapFrog to "recognize*** in the financial statements ***the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet***, including the estimates inherent in the process of preparing financial statements." The stock price decline arose from and related directly to the F2Q15 results concerning the period ending September 30, 2014. The November 4, 2014 stock price decline represented the market catching up to what Defendants already knew about LeapFrog's poor results.

104. The Company's sustained stock price decline and market cap relative to book value, poor overall financial performance and continuous failure to meet guidance, as well as the increased competitive environment, were triggering events that, whether viewed individually or holistically (as

[30] The formula to project the stock price drop based on the announcement of F2Q15 results is as follows: Projected stock price decline percentage = (18.231% stock price decline in response to F1Q15 results ÷ 7.843% net sales shortfall from F1Q15 consensus estimate) x 11.628% net sales shortfall from F2Q15 consensus estimate. Solving the equation results in a projected decline of 27%, from the $5.99 closing price on September 30, 2014 to $4.37 per share, well below LeapFrog's $5.78 book value of equity.

GAAP requires), required an impairment test to be performed in F2Q15 because it was more likely than not goodwill was impaired as of September 30, 2104 (F2Q15). ASC 350-20-35-3C(b), (d) and (g), and ASC 350-20-35-3F.

105. ***No Sufficient Mitigating Factors.*** Defendants falsely told investors on November 12, 2014 that they had assessed "various qualitative factors and projection of future operating results" and that "the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment." In fact, the qualitative factors required by GAAP, the triggering events discussed above, objectively and overwhelmingly indicated that LeapFrog's goodwill was more than likely impaired as of September 30, 2014. Nor did any projection of future operating results based on the circumstances known to Defendants at the time excuse LeapFrog's failure to test for goodwill impairment. Regardless, any "projection of future operating results," was entitled to minimal weight in the step zero analysis because it was an unobservable input based on analyses and methodologies unavailable to market participants. ASC 820-10-05-1C.

106. Nor did expected LeapBand sales constitute a sufficient mitigating factor. Defendants stated that, as of the quarter ended September 30, 2014, "worldwide net sales of learning toys increased by 6%, due to the introduction of LeapBand." However, in the next sentence, Defendants acknowledged: "This was offset somewhat by lower sales of our preschool toys, due to retail sales softness across the preschool category." Thus, any positive effects due to LeapBand had already been substantially offset.

107. Further, Defendants credited LeapBand's "worldwide net sales," including that "in Australia . . . it has been selling exceptionally well," with minimal comment about U.S. sales. Because LeapFrog's goodwill was entirely accounted for in the U.S. reporting unit, worldwide LeapBand sales would not affect any aspect of the goodwill impairment analysis. Regardless, Defendants admitted on November 3, 2014 that they were unsure how LeapBand would perform in F3Q15: "we will see how [LeapBand's sales] cut through the holiday season." Such tepid, muted expectations cannot substantiate LeapBand as the basis for heightened holiday expectations.

108. There is no basis to conclude that there was even a possibility that LeapBand's performance could offset the weight of the indicators of goodwill impairment addressed above. This is especially true in light of the reduced guidance Defendants issued when announcing F2Q15's results and GAAP's admonition that "***the existence of positive and mitigating events and circumstances is not intended to represent a rebuttable presumption that an entity should not perform the first step of the goodwill impairment test***." ASC 350-20-35-3G.

109. ***Step Zero Conclusion: Testing Required.*** Given the facts detailed in §V.B.2. above, including the significance and magnitude of the negative triggering events Defendants were required to assess, Defendants either did not believe, had no reasonable basis for their belief, or were aware of undisclosed facts that seriously undermined the accuracy of their representations to investors that, based on GAAP, sufficient indicators of goodwill did not exist at the quarter ended September 30, 2014 that would require testing for goodwill impairment. Defendants misled investors into believing that LeapFrog's investments and business were performing to levels to support the goodwill on the Company's books, when in fact the true value of those assets and, in turn, the Company, was concealed from investors as a result of the failure to inform investors that sufficient indicators of impairment not only existed, but as explained below, the Company was required to write-off 100% or $19.5 million of its goodwill because of the actual impairment.

**3. Steps One and Two of the Goodwill Impairment Test Show Fair Value Below Carrying Amount**

110. If LeapFrog had tested for goodwill impairment as of the quarter ended September 30, 2014, as the step zero analysis required, they would have been required to proceed to step one of the goodwill impairment test. ASC 350-20-35-4 provides that "[t]he first step of the goodwill impairment test, used to identify potential impairment, compares the fair value of a reporting unit with its carrying amount, including goodwill."[31] ASC 350-20-35-11, in turn, describes step two of the goodwill impairment analysis: "If the carrying amount of reporting unit goodwill exceeds the

[31] ASC 350-20-35-5 provides: "The guidance in paragraphs 350-20-35-22 through 35-24 shall be considered in determining the fair value of a reporting unit."

implied fair value of that goodwill, an impairment loss shall be recognized in an amount equal to that excess. The loss recognized cannot exceed the carrying amount of goodwill."[32]

111. There was no reasonable basis for Defendants to expect future cash flows to support the $19.5 million on the Company's books as of the quarter ended September 30, 2014. The facts known to Defendants that indicated the carrying amount exceeded the implied fair value of goodwill included many of the same facts that triggered the requirement to test in the first place.

112. ***LeapPad Inventory***. On November 3, 2014, Defendants announced that "***[n]ew LeapPad shipments to customers continue to be hampered by the remaining carryforward inventory of our 2013 holiday tablets***," much of which "has been discounted." Defendants kept close track of U.S. inventory levels and were aware of the LeapPad carryforward inventory as of September 30, 2014. In fact, when asked about inventory levels in the Company's May 5, 2014 earnings conference call, Arthur responded by hedging that Defendants did not have great information outside the U.S. on retail inventories, indicating by his response that they did have great information into U.S. retail inventories.[33]

113. The LeapPad carryover inventory negatively influenced future cash flows for several reasons. First, as Defendants had repeatedly acknowledged, sales of new LeapPads would be delayed until the carryforward inventory was reduced. For example, on August 4, 2014, Defendants stated: "Again, net sales for the first quarter were negatively impacted by high inventory levels [of LeapPads] at retail entering the fiscal year that were carried over from the 2013 holiday season, which drove retailers to discount products, cut replenishment orders, and require higher trade discounts."

114. Second, as Defendants had also repeatedly acknowledged, the discounts drove down LeapFrog's net sales and earnings, as each LeapPad sold was resulting in less revenue than originally expected. As Barbour stated during the Company's August 4, 2014 investor conference

[32] ASC 350-20-35-10 provides: "The guidance in paragraphs 350-20-35-14 through 35-17 shall be used to estimate the implied fair value of goodwill."

[33] Defendant Arthur answered in response to an analyst who asked: "[C]an you maybe talk about just inventory levels at retail at the end of the quarter?"

call, the support and discounts required to sell carryover tablets "had a negative impact on our net sales and gross margins." *See also* ¶¶37, 47-49, 51-52.

115. Defendants knew the status of LeapPad inventory as of September 30, 2014, as they received or otherwise had access to weekly POS reports that showed the inventory levels being held by U.S. retailers.

116. On November 3, 2014 when discussing F2Q15 results, Defendants stated: "***New LeapPad shipments to customers continue to be hampered by the remaining carryforward inventory of our 2013 holiday tablets***" and that "***our growth will be hampered over the holiday season by retail inventory issues***." Thus, Defendants were anticipating that the inventory would continue to negatively affect sales and earnings for the quarter ending December 31, 2014. As analysts at BMO Capital Markets said on November 5, 2014, in response to the Company's acknowledgment that substantial LeapPad carryover inventory remained:

> Previously management commented that it might not clear excess inventory until Thanksgiving, but now expects this issue to run into the holiday season. The longer this product sits in back rooms and on shelf, the less willing retailers will be to bring in new product, both for space and risk reasons, and the more they are likely to want in sales allowances.

117. ***Reduced LeapPad Sales Guidance***. In the Company's February 5, 2015 earnings conference call, Defendants admitted that they had planned for ***reduced*** LeapPad sales in the quarter ending December 31, 2014 before that quarter commenced (*i.e.*, as of September 30, 2014). "***In our projections for the third quarter we planned for a decline in retail sales of LeapPad tablets***." This fact, known to defendants before September 30, 2014, also indicated lower expected cash flows.

118. ***Deferred Consumer Electronics Tablet.*** Defendants told investors on May 5, 2014 that, "[t]his year, we plan to extend the market leadership in children's tablets with a number of innovative new LeapPads including our first tablet that's specifically designed to be merchandised in the consumer electronics section of stores." But one quarter later, on August 4, 2014, Defendants announced that they'd deferred the introduction of the consumer electronics tablet: "[O]ur sales projections have declined with the deferral until next year of our consumer electronics tablet as we focus more of our current-year efforts on LeapTV." In an article posted one day later, the Motley

Fool stated that ***LeapFrog was "holding back on the more conventional consumer electronics tablet that it was going to roll out in time for the holidays this year.***"

119. ***"Limit[ed]" Expectations for LeapTV.*** LeapTV did not meet its September 30, 2014 shipment date. Even if it had, as Defendants had warned on June 10, 2014, "there becomes a fiscal limit to what [retailers are] going to actually get through their distribution centers into their stores in time to hit the holiday shopping season." On November 3, 2014, Defendants would acknowledge that shipments of LeapTV did not commence until F3Q15, and on February 5, 2015, Defendants would acknowledge that "we began shipping the product in mid-October." The late shipment of LeapTV, which was delayed by several weeks, was undoubtedly a difference-maker to LeapFrog's ability to drive sales of the new product. Defendants acknowledged that the late shipment date would, in fact, hurt the holiday season as a result of fiscal limits and led, in substantial part, to F3Q15's poor results. They also blamed the decline in F2Q15's worldwide sales in part on the fact that "the planned late second fiscal quarter launch of LeapTV was delayed to our third fiscal quarter." And in 2013 Defendants noted that a quarter with merely six fewer shopping days when compared to the same quarter in the prior year had also contributed to disappointing sales as Defendants indicated during the February 12, 2014 earnings call.[34] Defendants knew they'd missed their shipment date as of September 30, 2014. LeapFrog's retailers such as Wal-Mart typically put holiday items on their shelves in August. To do so, Wal-Mart needed to receive items at its distribution center by the end of July. LeapTV's late shipment date was another factor indicating that cash flows would be lower than necessary to provide future expected cash flows at a level necessary to support goodwill.

120. ***Reduced Guidance***. On November 3, 2014, Defendants reduced their guidance for FY15 to $450-$470 million in net sales, compared to the range of $480-$505 million in net sales provided on August 4, 2014, and net losses per basic and diluted share to $0.13-$0.25, compared to net income per basic and diluted share of $(0.04)-$0.10. The reasons given for the November 3,

---

[34] Defendant Barbour explained "6 fewer shopping days between Thanksgiving and Christmas resulted in a compression of holiday shopping in the peak shopping weeks. These factors made store execution much more challenging for our retail partners."

2014 reduction included facts ***known to Defendants as of September 30, 2014***. In Defendants' November 3, 2014 press release announcing the guidance reduction, Arthur explained that the reduced guidance resulted from the expectation that LeapFrog would "continue to be impacted by residual Holiday 2013 carry-forward retail inventory of LeapPads," that "many of our retail partners around the world are running far tighter inventories this year, and we are experiencing retail sales softness in some of our key product categories." Similarly, on the November 3, 2014 earnings call, Arthur cited "concerns related to the remaining clearance inventory, weakness in the retail environment in some of our key product categories, and retailers bringing down their inventory levels" as the reasons for reduced guidance.

121. As explained above, each of these facts was already known to Defendants as of September 30, 2014. Defendants were aware of the amount of LeapPad carryover inventory to a high degree of specificity due to internal point of sale data, including weekly POS reports that showed the inventory levels being held by U.S. retailers. Moreover, they were aware that excess carryover inventory would "negatively impact[]" net sales, as they had explained most recently on the Company's August 4, 2014 earnings call. Similarly, retailer softness and tighter inventories were a subject of every conference call in calendar year 2014.

122. Analysts' reactions to the reduced guidance indicates that they expected lower cash flows due to LeapFrog's F2Q15 results (known to Defendants as of September 30, 2014) and the reduced guidance, the causes of which were also substantially known to Defendants as of September 30, 2014. Consensus guidance dropped from net sales of $491 and EPS of $0.00 in FY15 to $457 million and $(0.20), respectively. Those reductions reflected the expectations of substantially reduced cash flows. As analysts at Piper Jaffray explained: "Our thesis continues to break down, resulting in limited confidence in any base point in shares. . . . While we may be downgrading at the bottom of the trading range, there is little to ground a more opportunistic view. Fundamentals continue to erode."

123. There was no longer any reasonable basis for Defendants to believe that fair value exceeded the carrying amount such that goodwill was sufficiently supported by expected cash flows.

To the contrary, the carrying amount of LeapFrog was ***below*** its implied fair value, which required the Company to write down the entirety of its goodwill.[35]

124. In fact, had Defendants performed a market-based valuation as of September 30, 2014 using the Company's own "market based approach" to value its U.S. reporting unit,[36] LeapFrog would have failed step one of the goodwill impairment test and upon proceeding to step two of the goodwill impairment test, would have been required to write down the entirety of the Company's $19.5 million in goodwill. A market-based methodology is appropriate and should have been used at F2Q15. The methodology closely follows the requirements of GAAP: "When a price for an identical asset or liability is not observable, a reporting entity measures fair value using another valuation technique that maximizes the use of relevant observable inputs and minimizes the use of unobservable inputs. Because fair value is a market-based measurement, it is measured using the assumptions that market participants would use when pricing the asset or liability, including assumptions about risk." ASC 820-10-05-1C.

125. ***Step One Calculation***. The market-based approach begins with LeapFrog's stock price of $5.99 per share on September 30, 2014.[37] Next, one calculates LeapFrog's total enterprise value ("TEV"). The TEV equals the sum of market capitalization, interest bearing debt and preferred stock, minus excess cash.[38] These are all readily observable inputs. LeapFrog's TEV as of September 30, 2014 is $404.85 million.[39]

---

[35] For the reasons described in ¶¶86-89, the fair value of the entire Company is used as a conservative proxy for the fair value of the U.S. reporting unit.

[36] As the Defendants explained in their Form 10-Q for the period ended December 31, 2014, filed February 9, 2015, page 6: "Under the market based approach, the Company utilized its own information to determine earnings multiples and sales multiples that are used to value its U.S. reporting unit."

[37] The $5.99 stock price per share represents the market price of the entire Company, including the U.S. and International reporting units. This amount will be adjusted later to reflect the value of only the U.S. reporting unit.

[38] *See* http://www.investopedia.com/terms/t/tev.asp.

[39] The calculation is relatively simple in LeapFrog's case because there is no interest bearing debt or preferred stock to consider. Excess cash at September 30, 2014 is determined by subtracting $96,584,000 current liabilities from $111,344,000 total cash on hand. The result, $14,760,000, is the excess cash. The concept behind deducting excess cash is that a buyer would not need that cash to

126. Next one must develop a multiple to adjust for expected future earnings. As analysts at Piper Jaffray observed in a March 5, 2015 analyst report, "Shares [of LeapFrog] maintain a very high correlation to changes in annual sales – over the last 14 years, the correlation has neared 0.75. This degree of correlated stock price movement to sales rates suggests that sales estimates are a key point of focus for investors." The multiple here is based on analysts' consensus estimate of FY15 net sales of $491 million as of September 30, 2014.[40] The net sales multiple is calculated by dividing the $404.85 million TEV by the consensus $491 million FY15 net sales to arrive at a multiple of 0.82. One could also calculate a multiple based on consensus net sales estimates for FY16. A TEV/FY16 net sales would be calculated by dividing the $404.85 million TEV by consensus FY16 net sales expectations of $533 million to arrive a multiple of 0.76.[41]

127. The multiple must then be applied to the revised FY15 or FY16 consensus net sales estimates based on F2Q15's financial results, which Defendants knew as of September 30, 2014 or immediately thereafter. When Defendants reduced their FY15 net sales guidance on November 3, 2014, they would explicitly cite facts known or knowable to them as of September 30, 2014. Defendant Arthur explained the reasons for reducing guidance as follows:

> However, we also expect our business to continue to be impacted by residual Holiday 2013 carry-forward retail inventory of LeapPads. Additionally, many of our retail partners around the world are running far tighter inventories this year, and we

---

operate the business and the excess cash effectively lowers the acquisition price. Thus, TEV equals market capitalization – $5.99 stock price per share x 70,052,000 shares outstanding – minus $14,760,000 excess cash. The result is $404.85 million. The $14.76 million excess cash, however, is added back to the final total company valuation.

[40] Multiples based on net sales figures are not only a common means of determining value, but Defendants themselves belatedly employed sales multiples for their own F4Q15 step one and step two fair value determinations. A consensus estimate is a figure based on the combined estimates of the financial analysts covering a public company. The consensus net sales estimate is used in valuation because it is an observable market input based on the estimates of financial analysts, and that input is the best available input that market participants would use for a market-based valuation applying a revenue or net sales multiple. In other words, the consensus estimate of financial analysts is a close proxy for the estimate of FY15 net sales that market participants would use based on information known or knowable to them as of September 30, 2014.

[41] Those multiples mean that market participants were effectively valuing LeapFrog at 0.82 times FY15 consensus estimated net sales and 0.76 times FY16 consensus estimated net sales.

> are experiencing retail sales softness in some of our key product categories. As a result, we are lowering our outlook for the fiscal year.[42]

Each of these facts – the residual carry-forward LeapPad inventory, retailers running tighter inventories, and retail sales softness – was known to Defendants as of September 30, 2014. ¶¶35-52. As a result, Defendants knew they needed to cut FY15 and FY16 net sales estimates based on the known F2Q15 results and other information pertinent to those estimates.

128. It is necessary to incorporate the actual results into the TEV because market participants valuing the U.S. reporting unit would have received the Company's actual F2Q15 results and the Company's lowered guidance as part of their due diligence. Put simply, no reasonable market participant would blindly value the U.S. reporting unit as of September 30, 2014 without knowing the information pertaining to that quarter, and Defendants would have made that information available to a market participant seeking to value the U.S. reporting unit.

129. Thus, it is necessary to re-calculate LeapFrog's TEV as of September 30, 2014 based on the actual September 30, 2014 results. To do so, the 0.82 multiple is multiplied by the revised $457 million FY15 net sales consensus estimate, and the 0.76 multiple is multiplied by the revised $490 million FY16 net sales consensus estimate, established after the market learned of the F2Q15 results. This results in a revised TEV for the entire Company applying FY15 and FY16 consensus net sales estimates of $373.74 million and $372.4 million, respectively. The average revised TEV is $373.57 million, which equates to $5.33 per share.[43] To determine the fair value of the entire Company, $14.76 million – $0.21 per share excess cash – is added back to the $5.33 revised price per share to a fair value price of $5.54 per share for LeapFrog.

130. The fair value of LeapFrog's U.S. reporting unit is, in turn, based on a conservative estimate that the U.S. reporting unit represents 70% of the $5.54 total Company fair value on a per share basis, or $3.88 per share. The 70% estimate is used because net sales of the U.S. reporting unit

---

[42] On the November 3, 2014 earnings call, Arthur would provide substantially identical reasons for the guidance reduction: "Given concerns related to the remaining clearance inventory, weakness in the retail environment in some of our key product categories, and retailers bringing down their inventory levels, we are reducing our full fiscal-year 2015 guidance."

[43] Based on 70,052,000 million shares outstanding as of September 30, 2014.

represented approximately 67%, 70%, and 73% of the Company's total net sales for the six months ended September 30, 2014, FY13, and FY12.[44] The estimate is conservative because the International reporting unit was significantly more profitable than the U.S. reporting unit, meaning that it almost certainly comprised more than 30% of the Company's fair value while comprising approximately 30% of the Company's net sales.[45]

131. To calculate the carrying or book value of equity of the U.S. reporting unit alone, $36.5 million of property and equipment, $0.52 per share outstanding, is first deducted from the $5.78 total Company book value of equity to arrive at $5.26 per share.[46] Then, the $5.26 per share book value figure is multiplied by 70% to result in a $3.68 book value estimate. Finally, the previously deducted $0.52 per share for property and equipment is added back, resulting in a book value of equity per share of $4.20 for the U.S. reporting unit alone. Again, the above calculations are conservative because they also assume that 70% of the total Company book value is also attributable to the U.S. reporting unit despite its underperformance relative to the International reporting unit.

132. ***Consequently, the $3.88 fair value of equity of the U.S. reporting unit on a per share basis is $0.32 below the $4.20 book value of the U.S. reporting unit***. Multiplying $0.32, the amount by which book value exceeds fair value, by 70,052,000 million shares outstanding results in ***book value exceeding fair value by $22.4 million***. That is more than the $19.5 million goodwill that LeapFrog carried on its books at September 30, 2014 for its U.S. unit. Had Defendants performed

---

[44] *See* Form 10-Q for period ended September 30, 2014, filed November 10, 2014, at 13; and 2014 Form 10-K filed March 14, 2014, at 25, 27.

[45] *See id.* (For the six months ended September 30, 2014, the loss from operations of the U.S. reporting unit was $34.16 million, while the International reporting unit reported income of $5.72 million. For FY13, the loss from operations of the U.S. reporting unit was $1.3 million, while the International reporting unit reported income of $36.2 million. And for FY12, income from operations for the U.S. reporting unit was $28.1 million, while the International reporting unit reported income of $36 million.)

[46] One hundred percent of the property and equipment assets belong to the U.S. reporting unit.

step one of the goodwill impairment test in accordance with GAAP, the U.S. reporting unit would have failed and been required to proceed to step two.[47]

133. ***Moreover, even if Defendants had used their own guidance, instead of market consensus, as inputs for the multiple, they would have reached the conclusion that the fair value of equity of the U.S. reporting unit was below book value by $20.3 million***. Using the $492.5 million and $460 million midpoints of Defendants' own inflated August 4, 2014 guidance of $480 – $505 million FY15 net sales and November 3, 2014 revised guidance of $450 – $470 FY15 million net sales, respectfully, Defendants would have arrived at a sales multiple of 0.82 and a revised per share equity value of $5.59 for the entire Company. Given that the value of the U.S. reporting unit was approximately 70% of the entire Company per above, the fair value of equity for the U.S. reporting unit using Defendants' own inflated assumptions was $3.91 per share (70% of $5.59), which was $0.29 below the estimated $4.20 book value of the U.S. reporting unit. Multiplying 70,052,000 million shares outstanding by the $0.29 amount results in ***book value exceeding fair value by $20.3 million, an amount still significantly more than the $19.5 million goodwill that LeapFrog carried on its books at September 30, 2014***.[48]

134. All of the above calculations are based on LeapFrog's $5.99 stock price as of September 30, 2014 and various adjustments to that price to determine the fair value of equity of the U.S. reporting unit. Some companies have argued that because the stock price purportedly reflects a minority interest value that a "control premium" must be added to the stock price to determine fair value. Research, however, has indicated that adding such control premiums is often arbitrary,

---

[47] In fact, although 70% of the total Company is a reasonable estimate for determining the fair value and adjusted book value of the U.S. reporting unit, that percentage could rise to as much as 86.3% – an absurdly unreasonable estimate that no reasonable market participant would consider – using the FY15 and FY16 consensus net sales estimates and 100% of the $19.5 million goodwill on the Company's books at September 30, 2014 would still be impaired.

[48] Defendants could also have used other metrics, such as the commonly-used earnings before interest, taxes, depreciation and amortization ("EBITDA"). If the changes in FY15 and FY16 consensus EBITDA estimates were used, instead of net sales, the average fair value of the U.S. reporting unit would have been only $2.77 per share, or $1.43 below the $4.20 book value of equity, ***representing an impairment of $100.2 million***, many times more than the $19.5 million goodwill on LeapFrog's books as of September 30, 2014.

unsupported, and amounts to double-counting. For example, Eric Nath has stated the market prices do not reflect minority interests:

> "I have concluded that demonstrable control premiums are rare in public companies, and that, for the most part, statistics on control premiums provide little or no useful information when attempting to estimate the fair market value of a controlling interest in a private company."[49]

135. Dr. Bradford Cornell, another expert on control premiums has also stated that there is little support for adding control premiums in most instances:

> [I]n the great majority of situations there is no such value associated with a change of control because current board and management are effectively maximizing the value of the company. In these situations, according to Nath and Cornell, the control premium is zero.
>
> * * *
>
> [A]dding a premium to a guideline public company valuation amounts to double counting the beneficial impact of removing bad management.[50]

136. The SEC's Chief Accountant has also cautioned against the application of arbitrary and unsupported control premiums:

> If a registrant concludes that their current market capitalization does not reflect fair value then they should understand that the staff may ask them to support the propriety of their control premium or other reasons for such a conclusion. For example, I believe that this support should be based on factors such as an evaluation of control premium identifiable in comparable transactions or the cash flows associated with obtaining control of a reporting unit. A percentage selected because it allows the registrant to avoid an impairment or one based on an arbitrary percentage determined by a "rule-of-thumb" would not appear to be well reasoned. Nor do I believe it is appropriate to support a control premium based on the quantitative percentage that the control premium is in excess of market capitalization.[51]

137. In fact, there are no indications that Defendants had applied or considered a control premium in their own belated goodwill impairment test valuation using a market-based

---

[49] *See* James R. Hitchner, *Financial Valuation: Applications and Models* 378 (3rd ed. 2011) (quoting Eric Nath, "Control Premiums and Minority Interest Discounts in Private Companies," *Business Valuation Review* (June 1990)).

[50] Bradford Cornell, *Guideline Public Company Valuation and Control Premiums: An Economic Analysis* 5, 16 (Jan. 29, 2013) (California Institute of Technology).

[51] Robert G. Fox III, Professional Accounting Fellow, Office of the Chief Accountant, U.S. Securities and Exchange Commission, Speech by SEC Staff: Remarks before the 2008 AICPA National Conference on Current SEC and PCAOB Developments (Dec. 8, 2008).

methodology: "Under the market based approach, the Company utilized its own information to determine earnings multiples and sales multiples that are used to value its U.S. reporting unit."[52]

138. ***Step Two Calculation***. In step two of the goodwill impairment test, the book values of the assets other than goodwill and the liabilities of the U.S. reporting unit are adjusted to fair value to determine the implied fair value of goodwill, if any. "The implied fair value of goodwill shall be determined in the same manner as the amount of goodwill recognized in a business combination . . . was determined. That is, an entity shall assign the fair value of a reporting unit to all of the assets and liabilities of that unit (including an unrecognized intangible assets) as if the reporting unit had been acquired in a business combination . . . ." ASC 350-20-35-14.

139. Consequently, the step two could only potentially result in a different amount of goodwill impairment than determined by step one if the fair values of the assets and liabilities of the U.S. reporting unit were significantly different than their book values. LeapFrog listed inventory assets at $108.2 million and property and equipment assets at $36.8 million on the Company's books as of September 30, 2014. There are no indications by the Company that the fair values of those assets was significantly less than their book values at F2Q15. Defendants took no write-downs in either of those assets in F2Q15.

140. Given that there are no indications that the fair values of the Company's assets and liabilities at September 30, 2014 were significantly less than their book values under step two, the amount of goodwill impairment calculated above under step one is the same. ***That is, the U.S. reporting unit was impaired by $22.4 million using the changes in the FY15 and FY16 consensus net sales estimates and by $20.3 million using the changes in the Company's own inflated FY15 net sales estimates. Using either set of net sales estimates, LeapFrog's goodwill of $19.5 million was 100% impaired at September 30, 2014.***

141. If LeapFrog had taken the $19.5 million charge to goodwill for the quarter ended September 30, 2014, as it was required to do, it would have had a material effect LeapFrog's F2Q15 net sales and losses per share.

---

[52] Form 10-Q for the period ended December 31, 2014, filed February 9, 2015 at 10.

| ***F2Q15 Basic/Diluted Losses Per Share*** | |
|---|---|
| Reported Net Income | -$2.0 million |
| Reported Basic and Diluted Losses Per Share | -$0.03 |
| ***Goodwill Write-Off Defendants Were Required to Take to Timely Reflect Impairment*** | ***-$19.5 million*** |
| ***Net Income (Reflecting Goodwill Write-Off)*** | ***-$21.5 million*** |
| ***Basic and Diluted Losses Per Share (Reflecting Goodwill Write-Off)***[53] | ***-$0.25*** |

142. Defendants' failure to test for goodwill impairment and, in turn, timely write down the impaired goodwill associated with LeapFrog's U.S. reporting unit in compliance with GAAP or ASC 350 is a common fraudulent scheme. In a recent academic study, Kevin K. Li and Richard G. Sloan concluded that the implementation of what was previously referred to as SFAS 142 (currently ASC 350) has resulted in "relatively inflated goodwill balances and untimely impairments." They also concluded that, precisely as Defendants did here, "***managers exploit the discretion afforded by SFAS 142 [using non-neutral, biased projections and assumptions that do not comport with GAAP] to delay goodwill impairments, causing earnings and stock prices to be temporarily inflated***."[54]

**C. Defendants Announce Abysmal Holiday Quarter Results and Belatedly Take Impairment Charge to Goodwill, but Fail to Timely Write Down Long-Lived Assets Reporting False Financial Results**

143. On January 22, 2015, Defendants issued a press release announcing the Company's F3Q15 or holiday quarter results. Defendants reported that: (i) net sales for F3Q15 of $145 million, at least $75 million (or 34%) short of prior guidance issued November 3, 2014; (ii) ***losses per share***

---

[53] Adjusted for taxes.

[54] Kevin K. Li and Richard G. Sloan, *Has Goodwill Accounting Gone Bad?*, Social Science Research Network (March 30, 2015), *available at* http://ssrn.com/abstract=1466271 (last visited Sept. 20, 2016, 5:41 p.m.). Professor Sloan is the Emile R. Nimela Chair in Accounting and International Business at the Hass School of Business, University of California, Berkeley, and serves as an editor, associate editor, or on the editorial board of *Review of Accounting Studies*, *Accounting Review*, *Accounting and Finance*, *Journal of Accounting and Economics*, and *Journal of Finance Economics*.

***were $0.25*** compared to guidance of earnings per share of $0.16-$0.28;[55] (iii) the Company would not achieve its FY15 guidance; (iv) LeapFrog was taking a $19.5 million goodwill impairment charge; and (v) it had suffered net losses of $124 million, including non-cash charges of $19.5 million for goodwill impairment, which wrote down 100% of the Company's goodwill.

144. Defendants' January 22, 2015 press release purported to give an explanation of the primary reasons for the Company's results, including:

- "In our major territories, ***holiday sales of children's tablets across the toy and electronics segments declined more than expected***. This fall in consumer demand resulted in lower than planned LeapPad shipments in the quarter."
- "Due to development issues, ***we shipped and promoted our new LeapTV*** educational video ***game system later than planned***. ***This delay*** along with communication challenges and inconsistent execution at retail ***resulted in us significantly missing our sales expectations*** on this innovative new platform."
- "The lower consumer sales of LeapPad and LeapTV hardware resulted in ***less demand for cartridges, accessories and digital content***."
- "Our ***LeapReader*** learn-to-read system ***sales were also lower*** than expected over the quarter, partly due to the ***significant drop in the retail prices of children's tablets***."
- "In addition to the primary drivers above, ***retail in-stocks of our new tablets were hampered by tighter inventory management and open-to-buy challenges*** across a number of our retailer partners . . . ."

145. On this news, LeapFrog's stock plummeted 35% from a close of $3.90 per share on January 22, 2015, to a close of $2.55 per share on January 23, 2015 on unusually high trading volume, a market cap loss of $94.6 million in a single day.

146. On February 5, 2015, Defendants issued a press release further discussing LeapFrog's "very disappoint[ing]" F3Q15 results, adding that to those factors listed in ¶144 above as follows:

- "***In light of the sales decline and losses, we are reviewing our product strategies, operations*** and cost structure."

---

55 Defendants disclosed, on January 22, 2015, that net loss per basic and diluted share was $1.77 and included $0.23 per share of goodwill impairment and $1.29 per share of an additional deferred tax asset valuation allowance. The figure $0.25 is derived from subtracting the additional charges of $0.23 and $1.29 from $1.77. Later, LeapFrog's Form 10-K filed on June 15, 2015 reported that its FY15 results included a goodwill impairment charge, reporting that it accounted for a loss of $0.22 of the Company's basic and diluted net loss per share for the year.

- "***We expect our net sales to decline in the fourth quarter*** compared to the same period of the prior year ***given our recent sales trends***," said Ray Arthur, Chief Financial Officer.

147. In the February 5, 2015 press release discussing F3Q15 results Defendants also indicated that they had withdrawn guidance for F4Q15 and FY16 as a result of the Company's F3Q15 sales decline and losses which necessitated a review of LeapFrog's product strategies, operations and cost structure.

148. During a conference called held later the same day, February 5, 2015, Defendants further elaborated on the consequences of the abysmal holiday results on the Company:

- "As we preannounced a couple of weeks ago, our ***financial results*** for the third quarter of fiscal 2015 ***were very disappointing***. Before I discuss our performance in more detail, I would like to provide you with some insight on ***how we're immediately responding to these results***. We're taking a deep look into our calendar 2014 performance, to squeeze as much learning as possible out of the year. In addition, ***we're reviewing our product strategies, operations and cost structure***. In order to improve our financial performance and return the business to a growth path."

149. Defendants also expanded during the February 5, 2015 conference call on the factors contributing to the disappointing results:

- "Our analysis of retail of ***POS [Point of Sale] data from the Thanksgiving to Christmas*** period, shows that the ***industry-wide children's tablet sales took a significant downturn in the US***."

- "***There were a wide range of factors that could have contributed to the drop in holiday sales of children's tablets*** including LeapPad. We are analyzing and researching the situation, and ***will incorporate the insight into our plans for this year***."

- "The other ***disappointment in the quarter*** was the ***sales of*** our new educational video game system, ***LeapTV***, which was our largest overall product investment in time and money over the last 12 months."

- "Due to technical development challenges, we began shipping the product in mid-October, which meant that our TV advertising around the world was back end loaded. We are researching whether prospective consumers may have already decided their large holiday purchases prior to our major advertising push. We are also evaluating whether our marketing measures could have been more clear, and based on our findings we will adjust this year's messages accordingly. Pricing could also have been a factor, with the glut of discount electronics on the market in the holiday season."

- "I would like now ***[to] look ahead to fiscal 2016 . . . our strategic review may lead to changes in our Company direction and product investment***."

- "We are very disappointed that our ***performance in the third fiscal quarter of 2015 was significantly below our expectations***. John [Barbour] covered the primary reasons for the sales miss, but before I discuss the numbers in more detail, I would like to elaborate on a few of his comments. In our projections for the third quarter we planned for a decline in retail sales of ***LeapPad tablets***. However, we are surprised by the ***magnitude of the actual decline across the tablet business*** and our key competitors during the holiday season, which was ***significantly in excess of our expectations***."

- "Beyond the primary reasons for the declines that John explained versus our expectations, to a lesser extent ***our reading business also underperformed***, we believe ***due in part to the glut of discounted tablets in the marketplace***, and ***the toy business was also down*** to a lesser extent."

- "***We will not be providing guidance for fiscal fourth quarter or full year*** beyond indicating that we believe sales for our fiscal fourth quarter will be below that of the prior year period. ***In closing considering our third quarter sales decline and losses, we are reviewing our product strategies, operations and cost structure*** . . . ."

- "I think the Amazon Fire for example was down something like 70%. So I think that the ***broader tablet marketplace is challenging***, too."

150. Defendants also indicated in response to an analyst question during the February 5, 2015 conference call that they did not know what the problem was with respect to LeapTV, as follows:

Sean McGowan - Needham & Company – Analyst

Okay. Alright. Then a couple of other things. What do you feel like needs to be done at this point for LeapTV? Is the problem of discovery, because I mean you make comments about people who like it and tested, those are people who are already in the midst of experiencing it. What do you think needs to be done in order to improve that discovery?

John Barbour - LeapFrog Enterprises, Inc. – CEO

We're exploring that right now, we're looking at data we're doing testing, and we'll take that as we go forward, but I think you have pinpointed a key challenge for us.

151. During the February 5, 2015 earnings call, Defendants also indicated that any anticipated new platforms or expansion internationally were not anticipated by the holiday season for FY16 which includes holiday 2015:

Jim Chartier - Monness, Crespi, Hardt & Co. – Analyst

I have two questions. On previous calls you had talked about some new platform initiatives that were in development. Do you plan to launch any of those in 2015 for holiday? And the second question, you had also talked about looking at

> some new international territories to expand into. What's the update there? Thank you.
>
> Ray Arthur - LeapFrog Enterprises, Inc. – CFO
>
> ***The two new platforms I do not believe we will have in the coming year***. As to the ***international territories***, we continue to explore opportunities in Europe and in Asia. ***I don't feel comfortable at this point committing to opening one of those in the coming fiscal year***, but there's a possibility.

152. False and Misleading Statement: Despite the impairment charge to goodwill, LeapFrog's stock price remained artificially inflated due to Defendants' failure to timely account for the Company's impaired long-lived assets when reporting its F3Q15 financial results. In the Company's January 22, 2015 and February 5, 2015 press releases, as well as on the Company's February 5, 2015 earnings call and in the Company's 3Q15 Form 10-Q filed on February 9, 2015, ***Defendants falsely reported F3Q15 financial results, including net losses of $124.2 million and losses per share of $1.77***.[56] Additionally, in the Company's February 5, 2015 press release as well as the Company's F3Q15 Form 10-Q, defendants falsely reported ***losses from operations for F3Q15 of $36.5 million***, compared to income from operations of $0.7 million the prior year. In the Company's F3Q15 Form 10-Q, Defendants also falsely reported ***assets of $351.8 million and operating losses of $36.5 million.*** Each of the these statements were false as a result of Defendants' failure in violation of GAAP to timely record an impairment of LeapFrog's long-lived assets.

153. False and Misleading Statement: In LeapFrog's F3Q15 Form 10-Q, filed February 9, 2015, Defendants further falsely represented that "***the Company concluded that its long-lived assets were not impaired as of December 31, 2014***":

> The Company evaluates long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset group may not be recoverable. For the quarter ended December 31, 2014, based on various qualitative factors, the Company determined that testing for recoverability of its long-lived assets, including other intangible assets, was required. These qualitative factors included, among others, the Company's performance during the 2014 holiday season being significantly lower than anticipated, which included the underperformance of products and product lines newly introduced to the market, and the continuing decrease in trading values of the Company's stock and corresponding decline in the Company's market capitalization. As a result, ***the Company performed an impairment review of its long-lived assets, including other intangible assets, by comparing the cumulative undiscounted future cash flows with their carrying***

[56] These results included charges for goodwill.

> ***value as of December 31, 2014. Upon completion of the assessment, the Company concluded that its long-lived assets were not impaired as of December 31, 2014 as their carrying value did not exceed the cumulative undiscounted future cash flows.***

154. <u>False and Misleading Statement</u>: In LeapFrog's F3Q15 Form 10-Q, Defendants also falsely stated that the financial information they reported was "***in accordance with United States generally accepted accounting principles . . . applicable to interim financial information***" and a fair statement of LeapFrog's financial results. Barbour and Arthur executed SOX certifications in the F3Q15 Form 10-Q that falsely stated in pertinent part:

> 2. Based on my knowledge, ***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***;
>
> 3. Based on my knowledge***, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report***.

155. <u>False and Misleading Statement</u>: On May 18, 2015, Defendants continued to conceal that LeapFrog's long-lived assets were impaired for the quarter ending December 31, 2015 by falsely telling investors that recoverability of long-lived assets "***could lead to a non-cash accounting charge***," when a charge was not only certain, but in fact should have been taken at the end of F3Q15, fully five months earlier.

156. On this news, LeapFrog's stock price declined, from a close of $2.19 per share on Friday, May 15, 2015, to a close of $2.08 per share on May 18, 2015 – a drop of more than 5%. Investors, however, continued to be misled because, *inter alia*, Defendants knew or recklessly disregarded the fact that Defendants had been required under GAAP to take a charge for LeapFrog's long-lived assets when it reported F3Q15 results.

### D. Reasons Why Defendants' Long-Lived Assets Statements and LeapFrog's F3Q15 Financial Results Were False

157. Each of Defendants' statements in ¶¶152-155 above were materially false and misleading because Defendants knew or recklessly disregarded, and failed to disclose the following facts:

### 1. GAAP Provisions Concerning Long-Lived Assets

158. LeapFrog's long-lived assets consisted of property and equipment, capitalized content costs, and other intangible assets that the Company expected to retain for at least a year to generate cash flows. GAAP required the Company to test its long-lived assets for impairment as follows: "A long-lived asset (asset group) shall be tested for recoverability whenever events or changes in circumstances indicate that [the] carrying amount may not be recoverable." ASC 360-10-35-21. The determination whether to test for long-lived asset impairment is referred to as step zero in the impairment analysis.

159. In determining whether there existed a current indicator of long-lived asset impairment, GAAP required LeapFrog to assess whether the following examples of "events or changes in circumstances" existed, indicating impairment:

> a. A significant decrease in the market price of a long-lived asset (asset group).
>
> b. A significant adverse change in the extent or manner in which a long-lived asset (asset group) is being used or in its physical condition.
>
> c. A significant adverse change in legal factors or in the business climate that could affect the value of a long-lived asset (asset group), including an adverse action or assessment by a regulator.
>
> d. An accumulation of costs significantly in excess of the amount originally expected for the acquisition or construction of a long-lived asset (asset group).
>
> e. A current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset (asset group).
>
> f. A current expectation that, more likely than not, a long-lived asset (asset group) will be sold or otherwise disposed of significantly before the end of its previously estimated useful life. The term more likely than not refers to a level of likelihood that is more than 50 percent.

ASC 360-10-35-21(e). Here, Defendants claimed that they did test for long-lived asset impairment but falsely told investors "long-lived assets were not impaired" for F3Q15.

160. Once a determination that the circumstances were met at step zero requiring testing, GAAP required Defendants to apply a two-part test to determine whether long-lived assets were, in fact, impaired. In step one, one must determine whether the carrying amount of a long-lived asset (or asset group) exceeds the sum of the undiscounted cash flows expected to result from the use and

eventual disposition of the asset. ASC 360-10-35-17. If so, one proceeds to step two to determine the amount by which the carrying amount exceeds the expected discounted cash flows. ASC 360-10-35-17, 18. An "impairment loss shall be recognized only if the carrying amount of a long-lived asset (asset group) is not recoverable and exceeds its fair value," which occurs when "it exceeds the sum of the discounted cash flows expected to result from the use and eventual disposition of the asset (asset group)." ASC 360-10-35-17.

161. As part of step one, Defendants were required to consider all available evidence, including the information conveyed to investors regarding F3Q15 in ¶¶143-155 above:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) shall incorporate the entity's own assumptions about its use of the asset (asset group) and ***shall consider all available evidence***. The ***assumptions*** used in developing those estimates ***shall be reasonable*** in relation to the assumptions used in developing other information used by the entity for comparable periods, such as internal budgets and projections, accruals related to incentive compensation plans, or ***information communicated to others***.

ASC 360-10-35-30.

162. Further, as to the estimate of future cash flows GAAP provides:

> Estimates of future cash flows used to test the recoverability of a long-lived asset (asset group) that is in use, including a long-lived asset (asset group) for which development is substantially complete, shall be based on the existing service potential of the asset (asset group) at the date it is tested. The service potential of a long-lived asset (asset group) encompasses its remaining useful life, cash-flow-generating capacity, and for tangible assets, physical output capacity. Those estimates shall include cash flows associated with future expenditures necessary to maintain the existing service potential of a long-lived asset (asset group), including those that replace the service potential of component parts of a long-lived asset (for example, the roof of a building) and component assets other than the primary asset of an asset group. Those estimates shall exclude cash flows associated with future capital expenditures that would increase the service potential of a long-lived asset (asset group).

ASC-360-10-35-33.

163. GAAP further requires that bias, slanting, and manipulation of the presentation of financial information "to increase the probability that financial information will be received favorably" be strictly avoided. SFAC 8 at 18.

**2. Step Zero Required Defendants to Consider F3Q15 Operating and Cash Flow Losses, and Market Projections**

164. Defendants indicated to investors in LeapFrog's F3Q15 Form 10-Q, filed on February 9, 2015, that step zero of the long-lived asset impairment analysis had been met as follows:

> The Company evaluates long-lived assets for impairment whenever events or changes in circumstances indicate that the carrying value of an asset group may not be recoverable. For the quarter ended December 31, 2014, based on ***various qualitative factors***, the Company determined that testing for recoverability of its long-lived assets, including other intangible assets, was required. These ***qualitative factors included***, among others, ***the Company's performance during the 2014 holiday season being significantly lower than anticipated***, which included the underperformance of products and product lines newly introduced to the market, and ***the continuing decrease in trading values of the Company's stock and corresponding decline in the Company's market capitalization***.

165. Defendants thus knew that "the Company's [abysmal] performance during the 2014 holiday season" – and the "continuing decrease in trading values of the Company's stock and corresponding decline in the Company's market capitalization" were qualitative factors that "indicate[d] that [the] carrying amount [of a long-lived asset or asset group] may not be recoverable." ASC 360-10-35-21.

166. Defendants also ***already knew*** as of December 31, 2014 the "very disappointing" results of LeapFrog's critical holiday quarter, including that: (i) ***revenues were off by $75 million*** – $145 million compared to guidance of $220 million; (ii) ***earnings per share were off $0.41*** – $(0.25) vs. guidance of $0.16-$0.28 per share for F3Q15; (iii) ***inventory levels had increased 43% year-over-year***, from $54.29 million to $77.796 million; (iv) ***sales had decreased 23% year-over-year***, from $186.71 million to $144.60 million; and (v) inventory carryover combined with lower sales represented a significant headwind for net sales and EPS in F4Q15 and FY16.

167. When determining whether "events or changes in circumstances indicate that [the] carrying amount [of a long-lived asset or asset group] may not be recoverable" (ASC 360-10-35-21) for F3Q15, Defendants were required to consider more than those qualitative factors they specifically set forth in the Company's F3Q15 Form 10-Q (¶153, above). For example, in accordance with ASC 360-10-35-21e, Defendants were required to determine whether there was a current indicator of impairment based on other factors enumerated in GAAP, including: "***A current-***

***period operating or cash flow loss combined with a history of operating or cash flow losses or a projection . . . that demonstrates continuing losses associated with the use of a long-lived asset (asset group)***."

168. The connection between Defendants' reliance on stock price as an indicator of impairment and the actual indicator identified in ASC 360-10-35-21e is the basic financial concept that a company's stock price is driven by the market's perception of the levels of that company's future cash flows. The market factors-in all publicly known information into its expectation for future cash flows, and the market adjusts the stock price accordingly. "Share prices are determined by long-term [projected] cash flows."[57] "Studies consistently confirm that current stock prices are based on long-term forecasts of cash flows."[58]

169. This connection was acknowledged by Defendants when they were discussing the untimely charge for LeapFrog's long-lived assets during a June 11, 2015 earnings call. Defendants indicated that "[t]he long-lived asset impairment charge is due to the weak financial results, coupled with a significant decline in the trading value of our stock." Defendants explained further in their Form 10-K for the fiscal year ended March 31, 2015, which they filed on June 15, 2015, that they determined the long-lived assets were impaired as of March 31, 2015 based on the significant decline of LeapFrog's stock price and the corresponding decline in market capitalization during F4Q15:

> During the quarter ended March 31, 2015, we determined that testing for recoverability of our long-lived assets was again required based on our continued financial underperformance, and the continued decline of the trading values of our Class A common stock and the corresponding market capitalization. As a result, we performed step one of the impairment test and concluded that our long-lived assets in our U.S. reporting unit were impaired as of March 31, 2015 as their carrying value exceeded the cumulative undiscounted future cash flows that included an estimated residual market valuation. ***This result was primarily due to the significant decline of the trading value of our Class A common stock and the corresponding market capitalization during the fourth quarter of fiscal 2015***.[59]

---

[57] Tim Koller, Marc Goedhart, and David Wessels, *Valuation: Measuring and Managing the Value of Companies, Fourth Edition* (Hoboken, New Jersey: John Wiley & Sons, Inc., 2005), at 78.

[58] Alfred Rappaport, *Creating Shareholder Value: A Guide for Managers and Investors, Revised and Updated* (New York: The Free Press, 1998), at 70.

[59] FY14 Form 10-K at 36.

170. As discussed herein, the "weak financial results" that necessitated the impairment charge of $36.5 million or 96% of the Company's long-lived assets ***had already occurred*** as of December 31, 2014.

171. Rather than specifically referring to the current indicator of impaired long-lived assets – "***[a] current-period operating or cash flow loss combined with a history of operating or cash flow losses***" – in the Company's F3Q15 Form 10-Q, or in the Company's FY15 Form 10-K when Defendants belatedly took a $36.5 million long-lived asset charge for F4Q15, Defendants referred to the "decrease [or significant decline] in trading values of the Company's stock price" in LeapFrog's SEC filings. In other words, Defendants cited the ***lagging*** indicator, stock price, which reflected the impact of the declining cash flows. By doing so, Defendants were in effect relying on to the market's perception of the Company's continuing declining future cash flows, but it is the fact (not the perception) of the continuing declining future cash flows that is a ***current*** indicator of impairment. ASC 360-10-35-21e. However, by relying on the lagging indicator to determine impairment rather than the current indicator (what Defendants knew as of December 31, 2014), Defendants, as described in ¶¶178-185 below, violated GAAP by failing to account for LeapFrog's significant operating and cash flow losses for F3Q15. As a result, Defendants misrepresented LeapFrog's F3Q15 financial results conveyed to investors as set forth in ¶¶152-154. For example, had Defendants complied with GAAP, the Company would have had to tell investors that the Company's losses and losses per share were dramatically worse than what was represented as follows:

| (In Thousands of $ Except EPS) | **F3Q15** |
|---|---|
| Net Income (Loss) as Falsely Reported | ($124,212) |
| Basic and Diluted EPS as Falsely Reported | ($1.77) |
| Add Back Goodwill Write-Off Defendants Should Have Taken in F2Q15 to Timely Reflect Impairment in F2Q15 | $19,549 |
| Long-lived Assets Write-Off Defendants Should Have Taken to Reflect Impairment | ($36,461) |
| **Net Income (Loss) Reflecting Goodwill and Long-lived Assets Write-Offs**[60] | **($145,233)** |
| **Actual Basic and Diluted EPS Reflecting Long-Lived Assets Write-Offs**[61] | **($2.07)** |

### 3. Steps One and Two of the Long-Lived Asset Test Required a Long-Lived Asset Charge for F3Q15

172. **Step one**: Step one of the long-lived assets determination required Defendants to determine whether the carrying amount of the assets exceeded the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset. ASC 360-10-35-17. "This assessment shall be based on the carrying amount of the asset (asset group) at the date it is tested for recoverability, whether in use . . . or under development." *Id.* For step one, the carrying amount of LeapFrog's long-lived assets did not change significantly from F3Q15 to F4Q15, when Defendants belatedly recorded a $36.5 million long-lived asset charge. The carrying amount of LeapFrog's property and equipment was $38.19 million as of December 31, 2014 (F3Q15)[62] and $38.14 million as of March 31, 2015 (F4Q15).[63] Because the book value of property and equipment was nearly equivalent at F3Q15 as it was at F4Q15, the slight change in the carrying amount of LeapFrog's long-lived assets from F3Q15 to F4Q15 would not be a significant factor in the recoverability analysis.

---

60 Adjusted for taxes.

61 Adjusted for taxes.

62 LeapFrog's Form F3Q15 10-Q, filed with the SEC on February 9, 2015 at 3.

63 Property and equipment was $1.676 million before the $36.461 million long-lived assets charge. Adding back $36.461 million, property and equipment was $38.14 million before the long-lived assets charge as of March 31, 2015. LeapFrog's 2015 Form 10-K at 56.

173. Consequently, since the carrying amount of long-lived assets did not change significantly from F3Q15 to F4Q15, a step one failure would have resulted at F3Q15, if the "cumulative undiscounted future cash flows that included an estimated residual valuation" also did not change significantly from F3Q15 to F4Q15. The facts demonstrate that this was the case. The cumulative undiscounted cash flows did not change significantly from F3Q15 to F4Q15 based on Defendants' own explanation for why carrying value exceeded the cumulative undiscounted cash flows – "the significant decline of the trading value of our Class a common stock and the corresponding market capitalization during the fourth quarter of fiscal 2015."

174. Based on Defendants' own stated analysis at F4Q15, the referenced decline in the stock price necessarily meant that the cumulative undiscounted cash flows also declined. Furthermore, based on Defendants' own stated analysis, the specific level that the undiscounted cash flows needed to fall to for LeapFrog's long-lived assets to be impaired occurred when LeapFrog's stock price declined to that level "during the fourth quarter of fiscal 2015." According to Defendants' analysis, the specific stock price decline "during the fourth quarter of fiscal 2015" was a proxy for the level of the decline in the cumulative undiscounted cash flows that resulted in impairment.

175. During F4Q15, LeapFrog's stock price declined from a closing price of $4.72 on December 31, 2014 to $2.55 on January 23, 2015, in response to the Company's announcement of the poor F3Q15 results. As set forth below in detail, during the remainder of F4Q15, LeapFrog's average closing stock price was $2.44 (¶184). Based on Defendants' stated assessment in LeapFrog's FY15 Form 10-K (¶171), the reasonable inference to be drawn is that the $2.44 stock price designates the approximate stock price at which the level of the cumulative undiscounted cash flows were below carrying value, triggering the long-lived assets impairment.

176. In assessing whether cumulative undiscounted cash flows that Defendants were required to use at F3Q15 were similar to those at F4Q15, the proper comparison is LeapFrog's $4.72 stock price at December 31, 2014 adjusted downward to reflect LeapFrog's weak results and corresponding "current-period [*i.e.*, F3Q15] operating or cash flow loss" and the Company's "forecast that demonstrate[d] continuing losses," as referred to in ASC 360-10-35-21e. As explained

below, Defendants should have used an approximate estimable price of $2.45 per share (¶¶183-184).[64]

177. Applying Defendants' stated long-lived analysis at F4Q15, and, as a result, using LeapFrog's estimable stock price of $2.45 per share as a proxy for the cumulative undiscounted cash flows at F3Q15, the estimable, the levels of the cumulative undiscounted cash flows at F3Q15 were necessarily similar to those that Defendants ultimately used at F4Q15 when the average closing price for the period from January 23, 2015 to March 31, 2015 was $2.44, resulting in long-lived assets impairment at F3Q15.

178. Defendants were required to "recognize in the financial statements the effects of all subsequent events that provide additional evidence about conditions that existed at the date of the balance sheet, including the estimates inherent in the process of preparing financial statements." ASC 855-10-25-1. As a result, Defendants were required to consider not only LeapFrog's "very disappointing" F3Q15 results but subsequent events arising from those results.

179. GAAP sets forth factors for the use of estimates in testing for long-lived asset impairment (*see* ¶¶160-163). Defendants represented that they complied with GAAP and tested for long-lived asset impairment at F3Q15. The undiscounted cash flows associated with the use of the long-lived assets that Defendants belatedly used for F4Q15 should have been applied at F3Q15, but Defendants did not do so. This is because the same adverse factors that went into the Company's undiscounted cash flows in F4Q15 had already existed at F3Q15, the weak results for the holiday quarter and the significant decline in stock price.[65]

180. Defendants knew that LeapFrog's stock price of $4.72 per share at the close of December 31, 2014 (F3Q15) did not yet incorporate F3Q15's abysmal results. But the results were

---

[64] It would not be reasonable to use the comparison between the $4.72 closing price at December 31, 2014 and the $2.44 average stock price from January 23, 2015 to March 31, 2015. The $2.44 stock price was a lagging indicator of the facts, circumstances, conditions and events that Defendants knew (but not the market) as of December 31, 2014.

[65] As previously indicated, analysts at Piper Jaffray noted in an analyst report on March 5, 2015 that "[s]hares maintain a very high correlation to changes in annual sales – over the last 14 years, the correlation has neared 0.75. This degree of correlated stock price movement to sales rates suggests that sales estimates are a key point of focus for investors."

already known to Defendants as of that date. As a result, the $4.72 stock price at the close of December 31, 2014 did ***not*** incorporate the "current-period operating or cash flow loss" or the Company's "forecast that demonstrates continuing losses associated with the use of [] long-lived asset[s]" referred to in ASC 360-10-35-21e.

181. Defendants knew the Company would record operating and cash flow losses in the current period (*i.e.*, F3Q15) but deliberately or recklessly failed to adjust their own future cash flows downward to incorporate the F3Q15 results known to them, but not the market, as of December 31, 2014. ASC 360-10-35-30 also required Defendants to "consider all available evidence" and "information communicated to others." The market did not incorporate the F3Q15 "current-period operating or cash flow loss" and the Company's "forecast that demonstrate[d] continuing losses associated with the use of [] long-lived asset[s]" (referred to in ASC 360-10-35-21e) that existed as of December 31, 2014, until January 23, 2015 when Defendants disclosed the results. In particular, on January 23, 2015, Defendants, for the first time, released the actual weak F3Q15 results and provided an accompanying narrative of the Company's financial condition and prospects. The information communicated to others included lower net sales $75 million less than guidance for the critical holiday quarter, "significantly missing" LeapTV sales expectations; "less demand for cartridges accessories and digital content"; a "significant drop in the retail prices of children's tablets"; a decline in tablet sales; and "tighter inventory management." (¶¶14, 143-144.)

182. It is on January 23, 2015, when Defendants disclosed the actual results, that the market priced-in the actual results from F3Q15 and the negative impact of those results. As a result, LeapFrog's stock price plunged to a close of $2.55 per share. ***The $2.55 stock price per share was a lagging indicator of expected future cash flows based on facts known or knowable to Defendants as of December 31, 2014***.

183. Defendants had recent history to use as a guide to calculate an estimated stock price that would have reflected the Company's "very disappointing" results as of December 31, 2014. Defendants knew that, when LeapFrog announced that it had missed consensus net sales expectations by 11.6% in F2Q15 – *e.g.*, only one quarter earlier – the stock price had declined by 16.4%. Defendants knew that F3Q15 results missed net sales guidance by 34%, and thus knew to

expect a stock price decline of approximately 48%, to $2.45 per share. In fact, the actual decline of the stock in relation to F3Q15 was 46%, closely mirroring the 48% decline estimate, from a close of $4.72 per share on December 31, 2014 to a close of $2.55 per share on January 23, 2015.[66]

184. Defendants belatedly took the $36.5 million long-lived assets impairment charge based on LeapFrog's significant stock price decline, citing the stock price decline. In other words, the fact that LeapFrog stock traded at an average closing price of $2.44 per share from January 23, 2015, when the market first learned of the adverse information pertaining to F3Q15, through March 31, 2015, the close of F4Q15.[67] The Company's $2.44 average stock price from January 23, 2015 to March 31, 2015 was only $0.11 cents lower than the stock price close on January 23, 2015.[68] But when the market priced-in the conditions known to the Company about its results for the quarter ended December 31, 2014, it caused LeapFrog's stock price to decline 46% from its trading date on December 31, 2014, and 35% from the January 22, 2014 (¶¶16, 20, 145, 183). In addition, the January 23, 2015 average stock price decline to $2.44 per share on the news of LeapFrog's actual results for F3Q15 was only ***one cent*** less than the stock price Defendants had the tools to reasonably estimate – $2.45 per share – based on Defendants' historical experience relating to how the market would react to the F3Q15 results once they were announced, as discussed above in ¶183. Thus, the stock price level that Defendants credited as the primary driver of the $36.5 million long-lived assets impairment charge in F4Q15 had already been reached as of the quarter ended December 31, 2014 based on adverse information known to or ignored by Defendants.

---

[66] To extrapolate the expected stock price in response to F3Q15 results, the following simple equation provides a reasonable estimation: Expected stock drop in response to F3Q15 = (16.4% stock drop in response to F2Q15 results x 34% F3Q15 missed net sales expectation) divided by 11.6% missed F2Q15 net sales expectations. The expected stock drop in response to learning F3Q15 results is 48%, solving the equation based on known information prior to reporting F3Q15 results. The actual stock drop turned out to be 46% *(i. e.*, ($4.72 stock price as of December 31, 2014 -$2.55 stock price as of January 23, 2015) divided by $4.72 = 46%).

[67] LeapFrog's F4Q15 average closing price per share from January 1, 2015 to March 31, 2015, was, in fact, much higher than $2.44. Plaintiffs refer to the $2.44 per share as a conservative measure of the stock price decline following the January 23, 2015 announcement of F3Q15 results as opposed to the decline prior to this announcement.

[68] On January 23, 2015, the closing price was $2.55 per share as compared to the average closing price of $2.44 per share from January 23, 2015 to March 31, 2015.

185. The stock price decline on January 23, 2015 was also consistent with what Defendants already knew, including, *inter alia*: (i) ***revenues were off for F3Q15 by $75 million***; (ii) ***earnings per share were off $0.41***; (iii) ***inventory levels had increased 43% year-over-year***; (iv) ***sales had decreased 23% year-over-year***; (v) they could no longer meet FY15 guidance; (vi) they had experienced "a significant downturn in the U.S." in children's tablet sales based on POS data from Thanksgiving to Christmas; (vii) LeapTV's performance was "significantly" well below expectations – in part due to its development issues, late shipment (mid-October), and execution issues, but in part due to reasons Defendants were still assessing; and (viii) in response to the results, Defendants were undertaking a "review [] of our product strategies, operations and cost structure."

186. The stock price decline to $2.55 per share on January 23, 2015 represented a ***decline of 46%*** from December 31, 2014 to January 23, 2015, or a decline of $1.17 per share. Between January 23, 2015 and March 31, 2015, the close of FY15, the stock price fell only $0.37 more, to $2.18 per share. Between March 31, 2015 and June 11, 2015, when Defendants belatedly announced the charge the Company should have taken at the end of F3Q15, the stock price declined only $0.07 more, to $2.07 per share. Thus, the "significant decline of [LeapFrog's] trading value" that Defendants later cited as the cause for the write-down of long-lived assets occurred when the market priced-in the "very disappointing" F3Q15 results that Defendants knew as of December 31, 2014, not smaller subsequent stock price declines. According to their own reasoning the "significant decline of [LeapFrog's trading value]" was related to events and circumstances known as of December 31, 2014 requiring the long-lived asset impairment charge to be taken with respect to F3Q15.

187. The long-lived impairment analysis requires ***undiscounted*** cash flows for the first step of the recoverability analysis. ASC 360-10-35-17 ("The carrying amount of a long-lived asset (asset group) is not recoverable if it exceeds the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset (asset group)."). The difference between undiscounted future cash flows and discounted future cash flows is the discount rate, *e.g.*, discounted future cash flows are the undiscounted future cash flows discounted back to present value. The

discount rate in effect as of December 31, 2014 was slightly higher than it was as of March 31, 2015.[69] Thus, the undiscounted future cash flows as of F3Q15 would not be significantly different from the undiscounted future cash flows as of F4Q15.

188. In LeapFrog's F3Q15 Form 10-Q, filed February 9, 2015, Defendants also stated that "the Company's undiscounted cash flow analyses consisted of projections of future net cash flows, which are considered as Level 3 inputs within the fair value hierarchy." Level 3 inputs are unobservable inputs for an asset, as opposed to observable inputs such as quoted market prices, quoted market prices of similar assets, actual operating losses and other inputs that are directly or indirectly observable. ASC 820-10-35-40 through ASC 820-10-35-54A. GAAP did not permit LeapFrog to use inputs that other market participants would not have used because directly or indirectly observable inputs were available. LeapFrog was also required to use inputs and estimates that were "not slanted, weighted, emphasized, deemphasized, or otherwise manipulated to increase the probability that financial information will be received favorably or unfavorably by users." SFAC 8 at 18.

189. In particular, GAAP states that "[i]n developing unobservable inputs, a reporting entity may begin with its own data, ***but it shall adjust those data if reasonably available information indicates that other market participants would use different data*** . . . ." ASC 820-10-35-54A. The reasonably available information that Defendants did ***not*** incorporate into their F3Q15 analysis included the F3Q15 "current-period operating or cash flow loss" and the "forecast that demonstrates continuing losses associated with the use of [] long-lived asset[s]" that market participants would have used. ASC 360-10-35-21e.[70]

---

[69] For example, the 20-year U.S. Treasury Note as of December 31, 2014, a key component of the discount rate, was 2.47%, whereas the 20-year U.S. Treasury Note as of March 31, 2015 was 2.31%. *See* https://fred.stlouisfed.org/series/DGS20. The date parameters are set by typing and selecting the range of October 1, 2014 to March 31, 2015. Then, select the "download" button, and open Excel when prompted. The historical interest rate is shown for each corresponding date listed.

[70] Furthermore, LeapFrog's actual stock price of $2.55 per share was virtually the same on January 23, 2015 as it averaged during the period January 23, 2015 through March 31, 2015. As a result, the expected future cash flows that market participants would have used for F3Q15 would have been virtually identical to those as of the close of F4Q15 when Defendants belatedly took the long-lived asset impairment charge, if market participants had known what Defendants already knew as of December 31, 2014.

190. Defendants also had no reasonable expectation of increased cash flows as of December 31, 2014, particularly given their withdrawal of LeapFrog's guidance for F4Q15 and the lack of visibility necessary to provide guidance for FY16 (¶147). As described in ¶¶144-150, above, Defendants also knew as of December 31, 2014, *inter alia*, that: (i) tablet sales were low, with F3Q15 sales "significantly below expectations"; and (ii) they could not forecast for LeapTV because they were still assessing why the product performed poorly.

191. Nor did the new calendar year offer a reason for optimism. To the contrary, Defendants knew that net sales for quarters ending March 31, 2015 would be a mere fraction of their (disappointing) holiday season quarter due to seasonality.[71] Indeed, ***net sales from the prior three years had declined by 66% or more from the quarter ending December 31 to the quarter ending March 31, 2015***:

| *Quarter Ended* | *Net Sales* | *Quarter Ended* | *Net Sales* | *Decline (%)* |
|---|---|---|---|---|
| 12/31/11 | $210.0m | 3/31/12 | $72.0m | ***66%*** |
| 12/31/12 | $244.7m | 3/31/13 | $82.9m | ***66%*** |
| 12/31/13 | $186.7m | 3/31/14 | $56.9m | ***70%*** |

192. Defendants and investors also knew that dramatic decline in net sales for F3Q15 (ending December 31, 2014) was of particular importance to the Company's future sales. As Defendants indicated in LeapFrog's FY13 Form 10-K, filed with the SEC on March 14, 2014, that "[a] decline in net sales" for this quarter (and the December 31 quarter) "will have a disproportionate negative impact on our results for the year and can lead to ongoing weakness in sales to retailers well into the following year."[72]

193. Further, the Company repeatedly failed to meet its own guidance and Defendants already anticipated F4Q15 sales to do poorly, further reducing expectations for future cash flows (¶¶146, 149). Even as financial analysts continually lowered their own estimates in light of LeapFrog's track record of missing its forecasts, the Company still managed to report results below

---

[71] On the Company's May 5, 2014 investor conference call, Barbour stated that the first calendar quarter was "seasonably the smallest in the toy industry."

[72] LeapFrog's FY15 Form 10-K filed on June 11, 2015 contained nearly identical language.

analysts' expectations. *E.g.*, ¶¶80-81. In fact, for F2Q14, F3Q14, F4Q14, F1Q15, F2Q15, and F3Q15, LeapFrog reported weak results or lowered guidance, with reported sales often missing Wall Street's estimates by double-digit percentages.

194. Defendants even knew by F3Q15 that a substantial portion of the Company's property and equipment, a portion of the very long-lived assets later written-down, needed to be replaced. Specifically, Defendants knew that the Company's enterprise resource planning ("ERP") system, which was business management software used to collect, store, manage and interpret data from many business activities, including product planning, manufacturing and service delivery, inventory management, and other critical business functions, needed to be written down. During Defendants' August 4, 2014 investors' conference call, CFO Arthur stated that "the low $20 million [capital expenditures] is [for] maintenance, updating the content library, and probably near $15 million to $18 million is probably more like a lot of strategic initiatives, ERP. I think I told you before, ERP is about a $14 million investment, and then site development." In light of the facts listed above, Defendants had no reasonable basis to expect increased cash flows sufficient to make the sum of the undiscounted cash flows expected to result from LeapFrog's use and eventual disposition of the long-lived assets more than their carrying amount. As such, they were required to proceed to step two of the long-lived asset impairment analysis.

195. As demonstrated below, the step two analysis based on: (i) what Defendants knew about the Company's significant cash flow and operating losses as of December 31, 2014; and (ii) consideration of Defendants' own stated reason for determining that it was required to record an impairment charge to its long-lived assets for F4Q15 (ending March 31, 2015) – the "significant decline in trading values of the Company's stock price" – results in the conclusion that LeapFrog was ***required*** to take the charge as of the quarter ended December 31, 2014.

196. **<u>Step Two:</u>** For step two, the amount of the impairment loss was required to be "measured as the amount by which the carrying amount of a long-lived asset (asset group) exceeds its fair value." ASC 360-10-35-17. For this step, the calculation reverts to expected "discounted cash flows." ASC 360-10-35-18.

197. When Defendants "performed step two of the [long-lived assets] impairment test [they] determined the fair value of [their] U.S. reporting unit using a combination of an income approach and a market approach."[73] Under the income approach, Defendants determined value "by discounting projected future net cash flows to their present value at a rate that reflects both the current return requirements of the market and the risks inherent in the specific investment."[74] "Under the market approach, [Defendants] utilized [their] own information to determine earnings multiples and sales multiples and sales multiples that are used to value [the] U.S. reporting unit."[75] According to Defendants "[t]his analysis yielded a fair value below the carry value of the reporting unit."[76]

198. In using the combination approach, Defendants relied on the $2.44 average stock price for the period January 23, 2015 through March 31, 2015, which represented the value of the total Company, to determine the value of the U.S. reporting unit. The U.S. reporting unit represented 70% or less of the value of the entire Company. ¶130.[77] Consequently, a comparison of the $2.44 average stock price from January 23, 2015 to March 31, 2015 to the $2.45 adjusted stock price as of December 31, 2014, based entirely on the facts, circumstances, conditions and events known to Defendants by December 31, 2014 and immediately thereafter, demonstrated that the ***discounted*** cash flows used at F4Q15 were similar to those Defendants were required to use at December 31, 2014. Therefore, Defendants also failed step two of the long-lived assets as of F3Q15, as the carrying value did not significantly change from F3Q15 to F4Q15.

---

[73] Form 10-K for period ended March 31, 2015, filed June 15, 2015 at 36.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] There are no indications that the value of the U.S. reporting unit increased from 70% at F2Q15 to a higher percentage at F3Q15. In fact, the percentage value of the U.S. reporting unit likely declined from 70% from F2Q15 to F3Q15, given the respective sales levels and profitability of the U.S. reporting unit relative to the International unit.

199. Defendants then proceeded to value the property and equipment by estimating the value "that may reasonably be expected in an exchange for an asset between a willing buyer and seller."[78] Defendants explained the process as follows:

> We determined the value of the property and equipment assets using a depreciated replacement cost study which incorporated historical costs, published trends, market supported depreciation curves, and certain adjustments such as indirect costs, level of asset customization and general marketability. Based on significant economic obsolescence associated with these assets, we incorporated the valuation premise established at a "highest and best use" assessment, using a value-in-exchange concept. Fair value-in-exchange is defined as the estimated value that may reasonably be expected in an exchange for an asset between a willing buyer and seller in an orderly transaction between market participants as of the valuation date. Based on the results of this study, we concluded that the carrying value of our property and equipment assets, including primarily our recent investments in our internal business systems and the non-content related website systems costs, exceeded its fair value by $36.5 million, and recorded this permanent impairment charge to these assets appropriately.[79]

200. The facts, circumstances and conditions pertaining to the property and equipment did not significantly change from F3Q15 to F4Q15. Thus, the specific valuation of property and equipment at F4Q15 would not have changed significantly from F3Q15.

201. Defendants already knew in 3Q15 that the Company's enterprise resource planning ("ERP") system, a substantial portion of the Company's property and equipment, needed to be replaced. During Defendants' August 4, 2014 investors' conference call, CFO Arthur stated that "the low $20 million [capital expenditures] is [for] maintenance, updating the content library, and probably near $15 million to $18 million is probably more like a lot of strategic initiatives, ERP. I think I told you before, ERP is about a $14 million investment, and then site development."

202. Thus, the step two analysis that led Defendants to write down long lived assets on June 11, 2015 would have led to precisely the same write down as of the quarter ended December 31, 2014 if Defendants had complied with ASC 360.

203. As detailed above, the fair value of LeapFrog's long-lived assets at F3Q15 would have been substantially the same as the fair value that Defendants calculated as of F4Q15, because the facts and circumstances that existed at F3Q15 were substantially the same as those at F4Q15.

---

78 Form 10-K for period ended March 31, 2015, filed June 15, 2015 at 37.

79 *Id.*

This includes an expected stock price of $2.45 per share based on LeapFrog's recent history of market reaction, or the actual stock price of $2.55 per share based on F3Q15 results. Both of which are similar to the average closing stock price of $2.44 per share between January 23, 2015, and March 31, 2015. All of these stock prices were a direct result of LeapFrog's announcement of poor F3Q15 results. The significant decline in LeapFrog's stock price was the stated reason Defendants gave for taking the write down at FY15.

204. The discounted cash flows that Defendants actually used as of F4Q15 to determine the $36.5 million long-lived assets impairment would have also been similar to those Defendants would have used for F3Q15. ***If Defendants had complied with GAAP (as they represented they had, ¶154) and slashed their future cash flows to levels that market participants would have used as of F3Q15 based on the adverse information known to Defendants but not yet disclosed to investors, Defendants would have been required under GAAP to recognize the $36.5 million long-lived assets impairment charge in F3Q15***. GAAP does not permit a company to wait for the stock price to drop based on adverse information known in any given quarter before they reduce expected future cash flows used in the recoverability analysis.

205. Defendants described their step two calculation for long-lived assets as of F4Q15 as follows:

> Accordingly, we performed step two of the impairment test and determined the fair value of our U.S. reporting unit using a combination of an income approach and a market approach. Under the income approach, we used the DCF methodology which recognizes that current value is premised on the expected receipt of future economic benefits. Indications of value are developed by ***discounting projected future net cash flows to their present value at a rate that reflects both the current return requirements of the market and the risks inherent in the specific investment***. Under the market based approach, ***we utilized our own information to determine earnings multiples and sales multiples that are used to value our U.S. reporting unit.*** This analysis yielded a fair value below the carry value of the reporting unit.[80]

206. Given that LeapFrog's stock price was in the same $2.50 per share range as soon as the market priced-in the F3Q15 results (which Defendants already knew) as it was throughout F4Q15, and Defendants expressly admitted that when LeapFrog's stock price reached that depressed level that $36.5 million of long-lived assets were impaired, the inference is compelling that those

[80] FY15 Form 10-K for period ended March 31, 2015, filed with the SEC on June 15, 2015 at 36.

assets were already impaired by the same amount as of F3Q15. Defendants themselves describe the stock price decline as a "significant decline" in the Company's FY15 Form 10-K. As set forth in ¶¶182, 184-186 above, the "significant decline" occurred as a direct result of F3Q15 weak results announced on January 23, 2015 – a decline of 46% from a close of $3.90 per share on January 22, 2015 to a close of $2.55 per share on January 23, 2015, with a single-day market cap loss of $94.6 million.[81]

207. It was unreasonable and a violation of GAAP under the circumstances for Defendants to wait to see that the stock price actually dropped to the $2.50 per share range based on the adverse information they knew as of F3Q15 before they adjusted estimates of future cash flows. Defendants already knew the adverse events and circumstances that inevitably corresponded to the stock price decline. GAAP required Defendants to account for these events, not wait for the market to price them in once they were disclosed.

208. Defendants knew that the key driver of the long-lived assets impairment assessment was ***"current-period operating or cash flow loss"*** and the Defendants' ***"forecast that demonstrate[d] continuing losses associated with the use of [] long-lived asset[s]"*** as cited in ASC 360-10-35-21e. The ***"current-period"*** was F3Q15, not F4Q15. Furthermore, Defendants knew how to estimate what level LeapFrog's stock price would drop as of F3Q15 based on the adverse information known to Defendants as of December 31, 2014, as a result of their ample experience with projecting stock drops based on previously reported weak results or lowered guidance, with reported net sales often missing Wall Street's estimates by double-digit percentages, for F2Q14, F3Q14, F4Q14, F1Q15, and F2Q15. *See* ¶¶80-81.

209. Therefore, if Defendants had performed the second step of the long-lived assets impairment test as of F3Q15 in accordance with GAAP as required, ***LeapFrog would have reported a long-lived assets charge of approximately $36.5 million as of F3Q15, rather than knowingly and improperly deferring the charge to F4Q15***.

[81] In contrast, LeapFrog's market cap declined only $25.9 million between January 23, 2015 and March 31, 2015, and $33.6 million between January 23, 2015 and June 11, 2015.

210. Thus, contrary to Defendants' representation on February 9, 2015, LeapFrog's long-lived assets ***were*** impaired as of the quarter ending December 31, 2014. As such, their May 18, 2015 statement that they "could" have to record a charge for long-lived assets was also materially misleading. Further, by May 18, 2015, Defendants already knew of the "significant decline" in the trading value of LeapFrog's stock and corresponding loss in market capitalization.

211. Given the facts detailed in §V.D.3. above, including the existence, as of December 31, 2014, of the very factors Defendants cited in belatedly writing down LeapFrog's long-lived assets – specifically, "the continued underperformance of products and product lines newly introduced to the market, and the continued significant decline in trading values of our Class A common stock and the corresponding decline in our market capitalization" – Defendants either did not believe, had no reasonable basis for their belief, or were aware of undisclosed facts that seriously undermined the accuracy of LeapFrog's F3Q15 financial results, their representations that "the Company concluded that its long-lived assets were not impaired as of December 31, 2014," that LeapFrog reported financial information "in accordance with generally accepted accounting principles," or, later, that testing merely "could" lead to a "non-cash accounting charge."

## VI. END OF THE CLASS PERIOD

212. On June 11, 2015, after market close, Defendants belatedly disclosed that net sales for FY15 were $339.1 million, down 36% year-over-year, and that F4Q15 net sales were down 40% from the prior year. Gross profit for F4Q15 plummeted "83% compared to the prior year, due to reduced sales, increased discounts and allowances to help clear inventory carried over from the holiday season and changes in product mix." Notably, ***Defendants disclosed that operating expenses had increased 98% to $78.8 million, largely as a result of a $36.5 million impairment charge for long-lived assets***, which as discussed above in §V.D.3. was required to be taken at F3Q15.

213. Defendants were also forced to disclose that operating losses for FY16 would be similar to or greater than FY15 losses with sales to "contract considerably" in FY16. In other words, LeapFrog failed to drive growth in FY15, it would not drive growth in FY16, either. Following this

news, LeapFrog's stock plunged another 25.6%, from a close of $2.07 per share on June 11, 2015, to a close at $1.54 per share on June 12, 2015.

214. Also on June 11, 2015, LeapFrog hosted its F4Q15 and FY15 earnings call. During the call, Defendant Barbour explained the reasons for the dismal financial results:

> For the fourth quarter and full year, our net sales and net income declined year-over-year and fell well below expectations, ***due mainly to carry-forward retail inventories from the holidays, lower demand for our tablets and associated content, and the later-than-planned shipment and promotion of LeapTV***. The downturn in consumer sales of tablets over [the] holiday season and into 2015 across our major markets was greater than expected. Since tablets along with their associated content represent a large share of our overall sales, this decline had a significant impact on our performance. In addition, ***retail sales of LeapTV to date significantly missed our expectations. Following the later-than-planned shipment of the platform in the holiday season, we progressed into spring, which is seasonally sluggish*** and when consumer demand for video game consoles is traditionally very low. . . . Given our disappointing financial performance in the fiscal 2015, ***we've undertaken a major strategic review of our go-forward business model, product and operating plans***.

215. On this news, the Company's stock price declined dramatically, from a close of $2.07 per share on June 11, 2015 to a close of $1.54 per share on June 12, 2015, on unusually high volume. The share price continued to decline, closing at $1.47 per share on June 15, 2015 and $1.39 per share on June 16, 2015. This represented a nearly 33% decrease over the course of a few days.

## VII. ADDITIONAL ALLEGATIONS OF SCIENTER

216. Defendants were uniquely motivated to maintain LeapFrog's reputation and stock price in light of longstanding, consistent, and widespread criticism from investment analysts. Moreover, Defendants were desperate to maintain (indeed, increase) LeapFrog's stock price because stock price declines would (and did according to Defendants) require write-downs of goodwill and long-lived assets.

217. Starting well before Defendants' accounting fraud, investment analysts were critical of the Company and, in particular, Defendants' management of the Company. At least as far back as when LeapFrog reported its FY13 results, investment analysts criticized management's execution and started lowering their expectations for the future:

(a) On February 12, 2014, analysts at Piper Jaffray commented that "execution has been inconsistent and investor confidence is shaken." The report also stated that "LeapFrog's

FQ4 report fell short of expectations broadly across many measures" and that the analysts "are now assuming that 2014 is a rebuilding year."

(b) On February 12, 2014, analysts at Ascendiant Capital Markets, LLC headlined their report by stating: "Large Q4 miss and very weak 2014 guidance. Outlook hazy from tough holidays. We remain cautious as competition concerns remain high and toy industry outlook weak."

(c) On February 13, 2014, analysts at SunTrust Robinson Humphrey commented on LeapFrog's "bleak 4Q results": "By nearly any measure the quarter was a disappointment." The report also called the Company's 2014 outlook "[a]nemic."

(d) On February 14, 2014, analysts at BMO Capital Markets issued a report expressing surprise at LeapFrog's miss to BMO's already lowered guidance: "After lowering through a reduction in guidance post 3Q, we believed that expectations were sufficiently low to allow for 4Q upside. Instead, business deteriorated further in the holiday season owing to a weak toy-selling environment and what appears to be several company missteps."

218. When Defendants reported LeapFrog's F2Q15 financial results, analysts criticism and surprise at management's sustained inability to forecast or meet expectations led analysts to question the prudence of investing in LeapFrog.

(a) On November 3, 2014, analysts at Ascendiant Capital Markets, LLC remarked on "[a]nother weak quarter," noting that it was the fifth straight quarter in which LeapFrog "reported weak results or lowered guidance."

(b) On November 4, 2014, analysts at Piper Jaffray noted that their investment thesis "continues to break down":

> Our thesis continues to break down, resulting in limited confidence in any base point in shares. As such, we are downgrading to Neutral. While we may be downgrading at the bottom of the trading range, there is little to ground a more opportunistic view. ***Fundamentals continue to erode, sales slippage is now raising questions around business structure***, and little action around diversity of revenue has us concerned that competition will trump LeapFrog in winning the content battle.
>
> * * *
>
> We had been one of a few analysts holding out for the potential for new products to rejuvenate the operating model, but we see a best case scenario that new products simply cushion the downside to a declining core tablet business. This raises ***incremental questions around the operating structure***, and further capital

> investment into the tablet category, at the expense of other newer-generation business opportunities. Ultimately, our ratings revision is a point of recognition that time is needed to restore visibility and confidence in the business model.
>
> * * *
>
> ***Execution has been very spotty***, and even with new products flowing into the marketplace, it remains difficult to know if those products will be satisfactory enough to drive a business model that is profitable. Without some level of profitability or assets that would be valuable to a larger entity (CRM, content library, preschool toys, new hardware platforms, etc.), we expect LF to trade on depressed fundamentals with limited visibility.

(c) On November 5, 2014, analysts at BMO Capital Markets stated that "the market is justified in questioning the prudence of an investment in LF given its recent track record and missteps," noting its surprise that the challenges Defendants mentioned as responsible for weak F2Q15 results hadn't already been incorporated into guidance:

> We are disappointed in the company's performance as well as its recent inability to hit its own guidance, bringing into question the company's ability to forecast its own business.
>
> * * *
>
> Even without the LeapTV delay the company had originally anticipated a steep decline in revenues owing to high inventory levels at retail that were carried over from the 2013 holiday season. . . .
>
> Management claimed that its discounted products were retailing more slowly than anticipated as they were competing against a lot of other markdown and clearance products in the market at a general time of the year (late summer) when its learning products traditionally don't sell well at retail. This rationale, ***while it makes sense, may generate more questions for investors since management would have been keenly aware that its hardware sales are more seasonal than traditional toys and its guidance should have incorporated this understanding***.
>
> Management also commented that ***retailers were managing their inventories more tightly*** than anticipated going into the holiday season. This is another sensible rationale for lower than expected sales, but, again, ***an issue we thought would have already been contemplated in prior guidance***.

(d) On November 26, 2014, analysts at Ascendiant Capital Markets, LLC published a report concerning their meeting with LeapFrog executives: "We met with LeapFrog's management (Ray Arthur - CFO and Karen Sansot - IR) last week and came away with a continued near term cautious view on the company. The company discussed its product roadmap and strategy for 2014 and the future as well as reviewed its recent weak results and outlook."

(e) On December 4, 2014, analysts at Piper Jaffray "revisit[ed] our low-end of guidance estimates for [LeapFrog's] FQ3 (holiday quarter)" again, noting that "[t]he declines in the core business are deepening at a rate faster than expectations" and seeing "heightened risk that there's more of a sustained correction to revenues into 2015, limiting the company from returning to profitability and potentially tapping into the cash balance to attempt to reaccelerate the business."

219. Reactions to Defendants' preliminary announcement of LeapFrog's unaudited F3Q15 results continued the trend of increasingly negative expectations for the Company's future.

(a) On January 23, 2015, analysts at Piper Jaffray wrote: "We see fundamental weakness persisting and as such, would recommend waiting to own." They continued:

> We now estimate losses will persist through the next 12 months, which will result in a cash burn level near $100M. Note, March is the cash peak and our estimates place FYE cash near $135M (just under $2/sh). Any sort of recovery will be heavily discounted until the company can demonstrate fundamental consistency.
>
> * * *
>
> Volatility in the business makes calling a "bottom" increasingly difficult and we expect fundamentally focused investors to wait for improved visibility before adding to positions.

(b) On January 23, 2015, analysts at Ascendiant Capital Markets, LLC issued a report with section headers including "Major negative preannouncement," "Weakness across all its products," "Management strategy uncertain," "Q4 to decline and guidance removed," "Lowering estimates," "Weak momentum continues," and "Valuation still uncertain."

(c) On January 26, 2015, analysts at BMO Capital Markets issued a report noting that the market had "lost faith" in management:

> We had been of the belief that current guidance, as well as investor expectations had already incorporated a worst-case scenario. Clearly that was wrong. And with the massive decline in shares on Friday, it appears the ***market has lost faith not only in management's ability to execute its business plan, but also in its ability to effectively formulate and communicate a viable long-term strategy***.

220. Thereafter, analysts' criticism of the Company and management intensified.

(a) On February 5, 2015, analysts at Piper Jaffray "maintain[ed] our cautious view given significantly impaired visibility and strategies for recovery that are questionable." "***We are challenged to engineer an economic model that supports profit rate assumptions***," the report

continued, "particularly as the company continues to invest in new hardware platforms. We think the road to recovery will be steep." As a result, the analysts noted that "cash balances will be significantly discounted in valuation considerations until declines in profit rates abate."

(b) On February 6, 2015, analysts at Ascendiant Capital Markets, LLC also commented on LeapFrog's "uncertain" valuation and "hazy" outlook:

> Valuation still uncertain: LeapFrog's stock is down ~40% following its preannouncement in mid-January. The company is expected to have ~$2 in cash in Q4, but we believe that if sales and earnings continue to decline, this cash level is likely to decline in FY16. Without visibility into a new strong product, we believe LeapFrog's outlook remains very hazy.

(c) On March 5, 2015, analysts at Piper Jaffray provided an update, stating: "Checks suggest fundamentals remain incredibly weak, and consensus estimates are too high for 2015 and 2016." The report continued: "We do not recommend LF as a longterm holding, given risks surrounding meaningful estimate revisions offset by chatter related to restructuring and take-out speculation."

221. Another indication of scienter is Defendants' failure to exercise their option to repurchase up to $30 million worth of LeapFrog stock in calendar year 2014. During LeapFrog's February 2, 2014 earnings call, Defendants announced that "Our Board of Directors has approved a share repurchase program that authorizes us to repurchase up to $30 million of our common stock through December 31, 2014." The program reflected the "Board and the leadership team's continued confidence in LeapFrog's strategic direction, and ongoing commitment to maximizing shareholder value."

222. Later in the same February 2, 2014 call, Defendant Arthur responded to a question concerning how aggressive Defendants repurchases would be by stating that it would depend on cash flow projections and affirming his belief that the stock was then undervalued:

> [ANALYST]: In terms of the buyback, how should we think about given the stock with where it is trading, how should we think about how aggressive you are planning to be, what is the thought process in how you think about the buyback? Thanks.
>
> [ARTHUR]: We will consult with an internal team here during open windows and determine whether we believe that it is an appropriate time to go into the market based on trading volumes, trading prices. I wouldn't provide a guide to you as to a per share price, but clearly ***we believe the stock is under-valued where it is, so I***

> ***don't have timing at this point, or cash flow projections*** as to when we might complete that program.

223. The repurchase program expired on December 31, 2014. In Defendants' Form 10-Q for the quarter ended December 31, 2014, filed on February 9, 2015, Defendants revealed that they had purchased a grand total of ***six*** shares in the repurchase program at cost of $39:

> On February 10, 2014, the Company's board of directors approved a stock repurchase program authorizing the Company to repurchase up to an aggregate of $30 [million] of its Class A common stock through December 31, 2014. The Company intended, from time to time, as conditions warranted, to repurchase stock in the open market. The plan did not obligate the Company to repurchase any specific number of shares and was suspendable at any time at management's discretion. During the three months ended June 30, 2014, the Company repurchased approximately 6 shares of its common stock at an average price of $6.50, which were retired upon repurchase. The Company did not repurchase any of its common stock during the three months ended December 31, 2014. This stock repurchase program expired on December 31, 2014.

224. Defendants' failure to repurchase more than the most minimal amount of LeapFrog stock during 2014 supports the strong inference that Defendants knew LeapFrog's share price was overvalued and not, in fact, supported by any projections.

## VIII. ADDITIONAL ALLEGATIONS OF LOSS CAUSATION/ECONOMIC LOSS

225. Defendants' wrongful conduct and fraudulent conduct, as alleged herein, directly and proximately caused the economic loss suffered by investors, including Lead Plaintiff. The market prices of LeapFrog's common shares were artificially inflated as a direct result of Defendants' materially false and misleading statements and omissions. Defendants' false and misleading statements set forth in ¶¶63-66, 152-155 operated as a fraud or deceit on investors by, *inter alia*, misrepresenting the Company's financial prospects by failing to timely account for impairments to goodwill and long-lived assets.

226. Defendants' false and misleading statements had their intended effect and proximately caused LeapFrog's securities to trade at artificially inflated levels, with its stock reaching a high of $5.68 on November 20, 2014. The artificial inflation was eliminated when the

true financial condition and performance and other information concealed by Defendants were revealed to the market as reflected in the following chart:[82]




227. Beginning on January 22, 2015, with its pre-announcement of LeapFrog's unaudited F3Q15 financial results, Defendants disclosed that the Company was not performing as Defendants had previously led investors to believe. Among other things, Defendants disclosed, *inter alia*, that LeapFrog was taking a $19.5 million goodwill impairment charge and was reporting weak financial results. (*See* ¶¶143-144.) As such, Defendants disclosed that "events or changes in circumstances" required LeapFrog to test for goodwill impairment and that the fair value of its U.S. reporting unit was less than its carrying value by 100%. These partial disclosures were causally connected to LeapFrog's false financial results for F2Q15. Defendants' disclosures beginning on January 22, 2015 were a manifestation of the risks associated with their failure to properly account for LeapFrog's goodwill for F2Q15 and the impact thereof.

[82] The peer group index referenced in the chart is the group that is defined in LeapFrog's 2014 proxy as direct peers. Pricing for the companies was downloaded from Bloomberg. The chart reflects the stock price until June 15, 2015.

228. As a result of Defendants' partial disclosures, LeapFrog's stock fell ***34.62%*** from $3.90 per share on January 22, 2015, to $2.55 per share on January 23, 2015, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions related to the Company's goodwill.

229. Following this news, analysts noted LeapFrog's substantially reduced EPS, "fundamental weakness," and increased "cash burn level" and questioned management strategy.

230. On January 23, 2015, analysts at Piper Jaffray wrote:

> We see fundamental weakness persisting and as such, would recommend waiting to own . . . Given likely cash burn over FTM, we expect cash levels to be discounted in valuation.
>
> * * *
>
> We now estimate losses will persist through the next 12 months, which will result in a cash burn level near $100M. Note, March is the cash peak and our estimates place FYE cash near $133M (just under $2/sh). Any sort of recovery will be heavily discounted until the company can demonstrate fundamental consistency. . . .
>
> Volatility in the business makes calling a "bottom" increasingly difficult and we expect fundamentally focused investors to wait for improved visibility before adding to positions.

231. On January 23, 2015, analysts at Ascendiant Capital Markets, LLC wrote:

> **Major negative preannouncement**: After market close Thursday, LeapFrog preannounced much weaker than expected Q3 2015 (ending December) results. . . . Pro forma EPS is now expected to be $(0.25) (excluding $1.52 in goodwill and deferred tax charges), compared to our estimate of $0.22 and consensus of $0.19.
>
> * * *
>
> **Management strategy uncertain**: As a result of the poor results, management stated that it is "thoroughly reviewing our product strategies, operations and cost structure in order to improve our financial performance."
>
> * * *
>
> **Valuation still uncertain**: LeapFrog's stock is down ~25% in after market trading following its preannouncement. The company is expected to have ~$1.50 in cash in Q4, but we believe that if sales and earnings continue to decline, this cash level is likely to decline in FY16.

232. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal the adverse material facts and impact of LeapFrog's impaired long-lived assets.

233. On May 18, 2015, Defendants announced that they would be delaying LeapFrog's fiscal fourth quarter and full year 2015 earnings conference call scheduled for May 18, 2015 because they were "in the process of testing the recoverability of its long-lived assets under the requirements of FASB ASC 360." The Company also announced that "[t]he result of this analysis ***could*** lead to a non-cash accounting charge." This partial disclosure was causally connected to Defendants' fraud, including LeapFrog's falsely reported financial results for F3Q15 (ending December 31, 2014), that failed to account for the Company's already impaired long-lived assets. This particular disclosure was also a manifestation of the risks associated with Defendant's failure to properly account for LeapFrog's impaired assets for F3Q15 and the impact thereof.

234. As a direct result of Defendants' partial disclosure, LeapFrog's stock price declined from close of $2.19 per share on Friday, May 15, 2015, to a close of $2.08 per share on May 18, 2015, a drop of more than 5%, on heavy trading volume, causing damages to investors who had purchased their shares at prices that had been fraudulently and artificially inflated by Defendants' false statements and material omissions.

235. The Company's stock price remained artificially inflated, however, because Defendants continued to conceal adverse material facts regarding the certainty and magnitude of the impairment of LeapFrog's long-lived assets. Following the May 18, 2015 partial disclosure, Piper Jaffray issued an analyst report noting that, "[a] delay in the FQ1 report further adds to concern and may signal forthcoming asset revaluation and the possibility of significant write-downs. . . . ***[W]ith this delay, the argument around true asset value is surfacing and speculation about a material write-down of assets is a valuation risk***."

236. On June 11, 2015, LeapFrog issued a press release and held an earnings conference call in which, *inter alia*, the Company revealed that LeapFrog was taking a $36 million non-cash payment accounting charge which reflected impairment of the Company's long-lived assets. This disclosure was a direct result of the failure of Defendants to properly account for the Company's

impaired assets and the impact thereof. Defendants themselves attributed "[t]he increase in operating expenses . . . primarily to a non-cash $36.5 million permanent impairment of long-lived assets." Defendants also stated that the long-lived asset impairment charge was "due to," and thus revealed, "the weak financial results." This disclosure on June 11, 2015 was also a manifestation of the risks associated with Defendants' failure to properly account for F3Q15 and the impact thereof.

237. In reaction to these disclosures, LeapFrog's stock price fell nearly 29%, from $2.07 per share on June 11, 2015 to close at $1.47 per share on June 15, 2015, on heavy volume.

238. The stock decline removed the artificial inflation from LeapFrog's stock price, causing economic loss to investors who had purchased the stock.

## IX. CLASS ACTION ALLEGATIONS

239. Lead Plaintiff brings this action as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class consisting of all persons or entities who acquired shares of LeapFrog common stock during the Class Period and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their family members, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

240. The members of the Class are so numerous that joinder of all members is impracticable. The disposition of their claims in a class action will provide substantial benefits to the parties and the Court. During the Class Period, LeapFrog had approximately 70 million shares of stock outstanding, owned by hundreds if not thousands of persons.

241. There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

(a) Whether Defendants violated the 1934 Act;

(b) Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about LeapFrog;

(c) Whether statements made by Defendants omitted material facts necessary to make the statements, in light of the circumstances under which they were made, not misleading;

(d) Whether the price of LeapFrog stock was artificially inflated; and

(e) To what extent the members of the Class have sustained damages and the proper measure of damages.

242. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in managing this action as a class action.

243. Lead Plaintiff's claims are typical of those of the Class because Lead Plaintiff's funds and the Class sustained damages from Defendants' wrongful conduct.

244. Lead Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Lead Plaintiff has no interests which conflict with those of the Class.

245. A class action will achieve economies of time, effort and expense and provide uniformity of decision to the similarly situated members of the Class without sacrificing procedural fairness or bringing about other undesirable results. Class members have not indicated an interest in prosecuting separate actions as none have been filed. The number of Class members and the relatively small amounts at stake for individual Class members make separate suits impracticable. No difficulties are likely to be encountered in the management of this action as a class action.

246. In addition, a class action is superior to other methods of fairly and efficiently adjudicating this controversy because the questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Although individual Class members have suffered disparate damages, the fraudulent scheme alleged and the misrepresentations and omissions causing damages are common to all Class members. Further, there are no individual issues of reliance that could make this action unsuited for treatment as a class action.

## X. APPLICABILITY OF THE PRESUMPTION OF RELIANCE/FRAUD ON THE MARKET DOCTRINE

247. At all relevant times, the market for LeapFrog common stock was an efficient market for the following reasons, among others:

(a) LeapFrog common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b) As a regulated issuer, LeapFrog filed periodic reports with the SEC;

(c) LeapFrog regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) LeapFrog was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

248. As a result of the foregoing, the market for LeapFrog common stock promptly digested current information regarding LeapFrog from all publicly available sources and reflected such information in the prices of the stock. Under these circumstances, all purchasers of LeapFrog common stock at prices artificially inflated by Defendants' misrepresentations alleged herein suffered similar injury through their purchase of LeapFrog common stock at artificially inflated prices, and a presumption of reliance applies.

249. Further, to the extent that Defendants concealed or improperly failed to disclose material facts with regard to the Company and its impaired assets, Lead Plaintiff and Class is entitled to a presumption of reliance in accordance with *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972).

## XI. NO SAFE HARBOR

250. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint.

Specifically, the safe harbor excludes from protection all forward-looking statements that are included in financial statements purportedly prepared in compliance with GAAP, including those at issue here. 15 U.S.C. §78u 5(b)(2)(A). The statements identified as materially false and/or misleading in ¶¶63-66, 152-155 above are statements of past or present facts and are not forward-looking.

251. Even if Defendants' statements could be construed as forward-looking statements, there was no meaningful cautionary language identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. For example, Defendants did not caution investors that they would ignore circumstances requiring them to test for goodwill at the close of the quarter ending September 30, 2014 or fail to properly evaluate indicia requiring them to write down long-lived assets at the close of the quarter ending December 31, 2014. Moreover, as set forth in ¶¶109-211, at the time the purportedly forward-looking statements were made, the speaker knew that the particular forward-looking statement was false.

## COUNT I

### For Violation of Section 10(b) of the 1934 Act and Rule 10b-5 Against All Defendants

252. Lead Plaintiff incorporates ¶¶1-251 by reference.

253. Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

254. The Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of LeapFrog common stock.

255. Lead Plaintiff's funds and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for LeapFrog common stock. Lead Plaintiff's funds and the Class would not have purchased LeapFrog common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

## For Violation of Section 20(a) of the 1934 Act Against All Defendants

256. Lead Plaintiff incorporates ¶¶1-255 by reference.

257. The Officer Defendants acted as controlling persons of LeapFrog within the meaning of §20(a) of the 1934 Act. By reason of their positions with the Company, their ownership of LeapFrog stock, the nature of LeapFrog's business and the small size of the Company, and their review and control of the press releases, conference call statements and financial statements, the Officer Defendants had the power and authority to cause LeapFrog to engage in the wrongful conduct complained of herein. LeapFrog controlled the Officer Defendants and all of its employees. It also had the power to control the financial information disseminated in LeapFrog's SEC filings. By reason of such conduct, Defendants are liable pursuant to §20(a) of the 1934 Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for judgment as follows:

A. Declaring this action to be a proper class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

B. Awarding Lead Plaintiff and the members of the Class damages, including interest;

C. Awarding Lead Plaintiff reasonable costs and attorneys' fees; and

D. Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## XII. JURY DEMAND

Lead Plaintiff demands a trial by jury.

DATED: September 20, 2016

ROBBINS GELLER RUDMAN
& DOWD LLP
SHAWN A. WILLIAMS
WILLOW E. RADCLIFFE
MATTHEW S. MELAMED

s/ Willow E. Radcliffe
WILLOW E. RADCLIFFE

Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)

MOTLEY RICE LLC
JAMES M. HUGHES
WILLIAM S. NORTON
CHRISTOPHER F. MORIARTY
28 Bridgeside Blvd.
Mount Pleasant, SC 29464
Telephone: 843/216-9000
843/216-9450 (fax)

Co-Lead Counsel for Plaintiffs

CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2016, I authorized the electronic filing of the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the e-mail addresses denoted on the attached Electronic Mail Notice List, and I hereby certify that I caused to be mailed the foregoing document or paper via the United States Postal Service to the non-CM/ECF participants indicated on the attached Manual Notice List.

I certify under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on September 20, 2016.

s/ Willow E. Radcliffe
WILLOW E. RADCLIFFE

ROBBINS GELLER RUDMAN
& DOWD LLP
Post Montgomery Center
One Montgomery Street, Suite 1800
San Francisco, CA 94104
Telephone: 415/288-4545
415/288-4534 (fax)
E-mail: willowr@rgrdlaw.com

# Mailing Information for a Case 3:15-cv-00347-EMC In Re: LeapFrog Enterprise, Inc. Securities Litigation

## Electronic Mail Notice List

The following are those who are currently on the list to receive e-mail notices for this case.

- **Ramzi Abadou**
  ramzi.abadou@ksfcounsel.com,dawn.hartman@ksfcounsel.com
- **Jordan Eth**
  jeth@mofo.com,gmartinez@mofo.com,jrahman@mofo.com
- **Mark R.S. Foster**
  mfoster@mofo.com,lroiz@mofo.com,kmaccardle@mofo.com,rbarajas@mofo.com
- **James Michael Hughes**
  jhughes@motleyrice.com,erichards@motleyrice.com,kweil@motleyrice.com
- **Jeremy A Lieberman**
  jalieberman@pomlaw.com,disaacson@pomlaw.com,lpvega@pomlaw.com
- **Matthew Seth Melamed**
  mmelamed@rgrdlaw.com,e_file_SF@rgrdlaw.com,e_file_SD@rgrdlaw.com
- **Brian O. O'Mara**
  bo'mara@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Robert Vincent Prongay**
  rprongay@glancylaw.com,info@glancylaw.com,echang@glancylaw.com,bmurray@glancylaw.com
- **Willow E. Radcliffe**
  willowr@rgrdlaw.com,ptiffith@rgrdlaw.com,mmelamed@rgrdlaw.com,katerinap@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com
- **Shawn A. Williams**
  shawnw@rgrdlaw.com,e_file_sd@rgrdlaw.com,e_file_sf@rgrdlaw.com

## Manual Notice List

The following is the list of attorneys who are **not** on the list to receive e-mail notices for this case (who therefore require manual noticing). You may wish to use your mouse to select and copy this list into your word processing program in order to create notices or labels for these recipients.

- (No manual recipients)