UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| IN RE LEAPFROG ENTERPRISE, INC. SECURITIES LITIGATION, <br><br> This Document Relates to: <br><br> All Actions. | Case No. 15-cv-00347-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO DISMISS** <br><br> Docket No. 100 |

Plaintiffs have filed a securities class action against Defendant Leapfrog Enterprises, Inc. ("LF") and two of its executive officers, John Barbour (CEO) and Raymond L. Arthur. Since appointment of lead plaintiff and lead counsel, and their filing of a consolidated class action complaint, Defendants have repeatedly challenged the sufficiency of Plaintiffs' pleadings. This Court previously dismissed the original consolidated class action complaint as well as the first amended complaint. *See* Docket No. 63 (minutes); Docket No. 88 (order). The current operative complaint is the second amended consolidated class action complaint ("SAC"). In that pleading, Plaintiffs allege that Defendants violated federal securities law, including § 10(b) and related Rule 10b-5, because they falsely represented that accounting write-offs did not need to be taken when, in fact, they did as required by generally accepted accounting principles ("GAAP"). Currently pending before the Court is Defendants' motion to dismiss the SAC pursuant to Federal Rule of Civil Procedure 12(b)(6).

Having considered the parties briefs, as well as their accompanying submissions where appropriate,[1] the Court hereby **GRANTS** in part and **DENIES** in part Defendants' motion.

---

[1] Defendants have asked the Court to take judicial notice of various documents and KBC has objected to most of the requests. The Court addresses only those objections that are pertinent to

# I.    FACTUAL & PROCEDURAL BACKGROUND

In their complaint, Plaintiffs allege as follows.

LF "is a developer of educational entertainment for children." SAC ¶ 32. It "has developed a number of learning platforms, including the LeapPad learning tablets." SAC ¶ 32. Mr. Barbour was, during the relevant period, LF's CEO, and Mr. Arthur was LF's CFO. *See* SAC ¶¶ 29-30.

For the relevant period, LF's fiscal years started in April and ended in March. Thus, for fiscal year 2015:

- F1Q15 lasted from April 1, 2014, to June 30, 2014;
- F2Q15 lasted from July 1, 2014, to September 30, 2014;
- F3Q15 lasted from October 1, 2014, to December 1, 2014; and
- F4Q15 lasted from January 1, 2015, to March 31, 2015.

*See* SAC at 1 n.2. Prior to F1Q15, LF's "quarters aligned more closely to the calendar year, with 1Q ending March 31, 2Q ending June 30, 3Q ending September 30 and 4Q ending December 31." SAC at 1 n.2.

At the end of the 2013 fiscal year, LF had disappointing results, due at least in part to the poor sales of the LeapPad tablet. *See* SAC ¶ 35 (noting that LF was "facing aggressive competition in the tablet market from other manufacturers, which forced LeapFrog to cut the price of its LeapPad offerings and disappointing 2013 and F4Q13 results"). LF issued what analysts considered weak guidance for fiscal year 2014, based in part on a carryover inventory problem with the LeapPad product.[2] *See* SAC ¶¶ 37, 40 (stating that, in a press release, Defendants "discussed their expectations that LeapPad inventory build, due to poor sales and difficult retail conditions, would reduce expectations for net sales throughout 2014"; also stating that, "[a]s a result of LeapFrog's poor 2013 performance, the Company faced a substantial retail inventory

---

resolution of the motion.

[2] Carryover inventory is a problem because "'[t]he longer [a] product sits in back rooms and on shelf, the less willing retailers will be to bring in new product, both for space and risk reasons, and the more they are likely to want in sales allowances.'" SAC ¶ 116 (quoting analysts at BMO Capital Markets).

2

hangover of LeapPad tablets from 2013 that management knew would impact both margins and sales heading into 2014"). "To generate sales in 2014, . . . Defendants sought to move up the release of what they described as a 'major' new product, LeapTV, to a calendar 2014 release." SAC ¶ 40.

Problems, however, persisted in 2014, with LF's "results continu[ing] to be affected by a 'tough' retail market and LeapPad carryover inventory." SAC ¶ 42. In June 2014, Defendants informed "investors that LeapTV would not ship until September 2014, with [the product] 'hitting stores in October.' Defendants acknowledged that this would restrict LeapTV sales during the quarter ending December 31, 2014 [*i.e.*, F3Q15]." SAC ¶ 44. This is because the "anticipated September 2014 shipment date would result in LeapTV hitting shelves at least two months later than most competing holiday items." SAC ¶ 44 (noting that "major retailers like Wal-Mart typically put holiday items on their shelves in August and that to do so, the retailers would have to receive items at their distribution centers by the end of July").

F1Q15 (*i.e.*, April through June 2014) continued the downward trend, and, in August 2014, LF reduced its fiscal year 2015 guidance. *See* SAC ¶¶ 45-46, 51. Thus, according to Plaintiffs, prior to the end of F2Q15 (*i.e.*, September 30, 2014), Defendants knew that LF

> faced serious problems as a company and . . . even Defendants' own future expectations for the Company were tempered by these problems, including: (i) the late shipment of LeapTV and limitations in the ability to sell the product given the late shipment; (ii) indefinite deferral of its consumer electronics tablet; (iii) carryover inventory; and (iv) the cannibalizing LeapPad sales and profits.

SAC ¶ 52.

The gist of the SAC is that, subsequently, Defendants made false statements about LF's F2Q15 financial results and its F3Q15 financial results – more specifically, those results were based on accounting that violated GAAP provisions relating to goodwill and long-lived assets.

A.   2Q: No Write-Off for Goodwill Impairment

According to Plaintiffs, Defendants falsely stated that no goodwill impairment testing was necessary after the end of F2Q15, when in fact such testing was not only necessary and but also such testing would have led to a 100% writedown for goodwill impairment for 2Q.

"Goodwill represents the excess of the purchase price over the fair value of the net assets acquired in a business combination." SAC ¶ 71. Under GAAP, goodwill "'[i]mpairment is the condition that exists when the carrying amount [or book value] of goodwill exceeds its implied fair value.'" SAC ¶ 73.

Under GAAP, there is a two-step test for goodwill impairment. *See* SAC ¶ 74. However, before a company must engage in that two-step test, it first makes an assessment as to whether such testing is needed in the first place. That "qualitative assessment" is referred to as "step zero." SAC ¶ 74. "Step zero . . . requires impairment testing for any quarter when certain triggering events are present 'that would more likely than not reduce the fair value of a reporting unit below its carrying amount.'" SAC ¶ 75. Examples of triggering events include (but are not limited to) a negative or declining overall financial performance, a sustained decrease in share price, an increased competitive environment, and a change in the market for an entity's products or services. *See* SAC ¶ 75.

According to Plaintiffs, for 2Q (the quarter ending September 30, 2014), there were various triggering circumstances that "indicated . . . it was objectively and overwhelmingly more likely than not [that] LeapFrog's goodwill was impaired," SAC ¶ 68, such that Defendants should have tested for goodwill impairment. Plaintiffs point to, *e.g.*:

- a decline in overall financial performance, *see, e.g.*, SAC ¶ 80 (alleging that, "[f]or five consecutive quarters, from F2Q14 through F2Q15, [LF] reported weak financial results or substantially lowered guidance");
- increased competition and a change in the market for LF's products, *see, e.g.*, SAC ¶ 83 (referring to "a tough retail environment and competition," including but not limited to the carryover inventory problem); and
- a sustained decrease in share price (and corresponding decline in market capitalization). *See, e.g.*, SAC ¶ 92 (alleging that LF's "stock price decline lasted 57 days of the [F2Q15] quarter – 62% of F2Q15").

Plaintiffs assert that, even though it was obvious that goodwill impairment testing was necessary (step zero), Defendants falsely claimed, in November 2014 (*i.e.*, shortly after 2Q

4

ended), that such testing was not necessary. Most notably, in its 10-Q for 2Q (filed in November 2014), LF stated:

> As of September 30, 2014 [*i.e.*, the end of 2Q], based on its assessment of various qualitative factors and projection of future operating results, the Company does not believe that sufficient indicators of impairment of its goodwill currently exist that would require performing step one of the two-step test for goodwill impairment.

Defs.' RJN, Ex. 16, at 9 (LF's 10-Q for 2Q).

Plaintiffs further assert that, if Defendants had conducted goodwill impairment testing for 2Q (as they should have), then they would have determined that goodwill was in fact impaired under the GAAP two-step test for impairment. Thus, according to Plaintiffs, Defendants falsely overstated LF's financial results for 2Q by not making the necessary deduction for goodwill impairment.

Plaintiffs admit that, in the next quarter, Q3, Defendants ultimately did make a goodwill impairment adjustment – a write-off of approximately $19.5 million (100% of its value). But, according to Plaintiffs, this was one quarter too late.

B.  <u>3Q: No Write-Off for Long-Lived Asset Impairment</u>

According to Plaintiffs, Defendants also falsely represented that LF's long-lived assets were not impaired as of F3Q15. *See* SAC ¶ 158 (alleging that LF's "long-lived assets consisted of property and equipment, capitalized content costs, and other intangible assets that the Company expected to retain for at least a year to generate cash flows").

Similar to above, under GAAP, there is a two-step test for impairment to a long-lived asset, but, before a company engages in that test, it must first determine (step zero) that such testing is necessary. *See* SAC ¶ 158. At step zero, a long-lived asset is to be tested for impairment "'whenever events or changes in circumstances indicate that [the] carrying amount [*i.e.*, book value] may not be recoverable.'" SAC ¶ 158. Events or changes in circumstances indicating long-lived asset impairment include: a significant decrease in the market price of a long-lived asset; a significant adverse change in the extent or manner in which a long-lived asset is being used or in its physical condition; a significant adverse change in legal factors or in the business

5

climate that could affect the value of a long-lived asset; and a current-period operating or cash flow loss combined with a history of operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with the use of a long-lived asset. *See* SAC ¶ 159.

In the instant case, there is no dispute that, for 3Q (ending on December 31, 2014), Defendants did conclude that testing for long-lived asset impairment was necessary and did conduct such testing. *See* RJN, Ex. 19, at 9 (LF's 10-Q for 3Q) (stating that "the Company determined that testing for recoverability of its long-lived assets . . . was required"). In the 10-Q for 3Q, Defendants indicated that testing was necessary based on "the Company's performance during the 2014 holiday season being significantly lower than anticipated," "the underperformance of products and product lines newly introduced to the market," and "the continuing decrease in trading values of the Company's stock and corresponding decline in the Company's market capitalization." *Id.*

At step one, however, Defendants went on to find that there was no long-lived asset impairment. At step, "one must determine whether the carrying amount of a long-lived asset (or asset group) exceeds the sum of the undiscounted cash flows expected to result from the use and the eventual disposition of the asset." SAC ¶ 160. According to Defendants, "its long-lived assets were not impaired as of December 31, 2014 [*i.e.*, the end of 3Q]" because "their carrying value did not exceed the cumulative undiscounted future cash flows." *Id.* (adding that "[t]he principal assumptions used in the Company's undiscounted cash flow analyses consisted of projections of future net cash flows").

According to Plaintiffs, Defendants falsely represented that its long-lived assets were not impaired as of 3Q. Plaintiffs admit (similar to above) that Defendants ultimately did make an adjustment for long-lived asset impairment in the following quarter, *i.e.*, 4Q – more specifically a write-down of $36.5 million which constituted 96% of the value of the long-lived assets. But Plaintiffs maintain (similar to above) that this adjustment was one quarter too late. Plaintiffs note that, when Defendants did find impairment at 4Q, they indicated that this was "primarily due to the significant decline of the trading value of the Company's Class A common stock and the corresponding market capitalization." Defs.' RJN, Ex. 22, at 58-59 (LF's 10-K for fiscal year

6

1  2015) (note 9). But, according to Plaintiffs, there already was a significant decline in LF's stock
2  value as of 3Q – or at least, there was a significant decline by January 23, 2015, when LF's stock
3  was worth only $2.55, compared to $4.72 at the end of December 31, 2014.[3] *See* SAC ¶ 175; *see*
4  *also* SAC ¶ 16 (alleging that the average stock price from January 23, 2015, through the end of
5  4Q, *i.e.*, March 31, 2015, was $2.44). Thus, according to Plaintiffs, the long-lived asset
6  impairment write-off of $36.5 million (96% of its value), which was taken in 4Q, should have
7  been taken in 3Q. *See* SAC ¶ 170 (alleging that "the 'weak financial results' that necessitated the
8  impairment charge of $36.5 million or 96% of the Company's long-lived assets [in 4Q] **had**
9  **already occurred** as of December 31, 2014 [*i.e.*, 3Q]") (emphasis in original).

## II. DISCUSSION

A. Legal Standard

As the Court has before it a 12(b)(6) motion to dismiss, the *Twombly/Iqbal* standard is applicable. That is, the Court must evaluate the SAC for plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'") (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

> A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a "probability requirement," but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are "merely consistent with" a defendant's liability, it "stops short of the line between possibility and plausibility of 'entitlement to relief.'"

*Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556-57).

However, because Plaintiffs' claims are predicated on securities fraud, more than just the *Twombly/Iqbal* standard must be met. More demanding requirements must be satisfied, as codified in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act

---

[3] Although January 23, 2015, technically falls within 4Q, Plaintiffs point out that LF's 10-Q for 3Q was not filed with the SEC until after that date (*i.e.*, on February 9, 2015), and, under GAAP, Defendants were required to take into account "'subsequent events that provide[d] additional evidence about conditions that existed [at the end of 3Q, *i.e.*, December 31, 2014].'" SAC ¶ 178.

7

("PSLRA").

Under Rule 9(b), "[i]n alleging fraud . . . , a party must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b); *see also Cafasso v. Gen. Dynamics C4 Sys.*, 637 F.3d 1047, 1055 (9th Cir. 2011) (stating that "[t]o satisfy Rule 9(b), a pleading must identify 'the who, what, when, where, and how of the misconduct charged,' as well as 'what is false or misleading about [the purportedly fraudulent] statement, and why it is false'").

The PSLRA has a similar requirement. *See Janas v. McCracken (in Re Silicon Graphics Sec. Litig.)*, 183 F.3d 970, 996 (9th Cir. 1999) (noting that, under the PSLRA, "a securities fraud complaint shall identify: (1) each statement alleged to have been misleading; (2) the reason or reasons why the statement is misleading; and (3) all facts on which that belief is formed"; citing 15 U.S.C. § 78u-4(b)(1)).

Moreover, the PSLRA has an additional requirement – *i.e.*, that a securities fraud plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). For a § 10/Rule 10b-5 claim, "a private securities plaintiff proceeding under the PSLRA must plead, in great detail, facts that constitute strong circumstantial evidence of deliberately reckless or conscious misconduct." *Silicon Graphics*, 183 F.3d at 974. "Deliberate recklessness means that the reckless conduct 'reflects some degree of intentional or conscious misconduct.'" *Reese v. Malone*, 747 F.3d 557, 569 (9th Cir. 2014). For example, "'[a]n actor is [deliberately] reckless if he had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although he could have done so without extraordinary effort.'" *Id.*

> To qualify as a "strong inference," the Supreme Court has held, "an inference of scienter must be more than merely plausible or reasonable." *Tellabs*, 551 U.S. at 314. When determining whether there are sufficient allegations of scienter, courts "must consider the complaint in its entirety . . . [and inquire] whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 322-23. Moreover, courts must take into account plausible opposing inferences. *Id.* at 323. A complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

8

1   *In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 882-83 (9th Cir. 2012).

2   B.     2Q: No Write-Off for Goodwill Impairment

3   Defendants argue that Plaintiffs' claims based on the failure to take the goodwill impairment in 2Q must be dismissed because (1) Plaintiffs have failed to adequately allege scienter and (2) Plaintiffs have failed to adequately allege falsity. As discussed below, the Court agrees that allegations on scienter are lacking.

Plaintiffs contend that they have sufficiently pled scienter largely based on two reasons: (1) because the impairment to goodwill was obvious in 2Q, *see In re Cardinal Health, Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 719-20 (S.D. Ohio 2006) (noting that an "inference of knowledge or recklessness may be drawn from allegations of accounting violations that are so 'simple, basic, and pervasive in nature, and so great in magnitude, that they should have been obvious to a defendant'"); and (2) because, effectively "overnight" (*i.e.*, from 2Q to 3Q), Defendants wrote off 100% of goodwill, which amounted to a sizeable $19.5 million. *See Dudley v. Haub*, No. 2-11-cv-05196 (WJM), 2013 U.S. Dist. LEXIS 61386, at *30-31 (D.N.J. Apr. 30, 2013) (noting that "the magnitude of the impairment suggests that it should have been recorded earlier[;] [g]oodwill does not go from being unimpaired to fully impaired overnight"). Neither argument is convincing, particularly in light of Plaintiffs' obligation to state with particularity facts giving rise to a strong inference of scienter.

As an initial matter, even if it were obvious that LF had suffered a decline in overall financial performance, that there was increased competition and a change in the market for LF's products, and that there had been a sustained decrease in LF's share price – *i.e.*, that certain "triggering events" *existed* – that does not mean that it was obvious that those triggering events "'would *more likely than not* reduce the fair value of a reporting unit below its carrying amount.'" SAC ¶ 75 (emphasis added). This is especially true given that, by the end of 2Q (September 30, 2014), the holiday season was still upcoming. It is undisputed that the holiday season is a highly significant period for LF, a time where a major portion of its annual sales are made. Plaintiffs admit as much in their complaint. *See, e.g.*, SAC ¶ 81 (chart reflecting largest sales for the quarter ending on December 31). Given that circumstance, even with the triggering events alleged by

9

Plaintiffs, it may not have been obvious that goodwill impairment testing was warranted as the end of F2Q15 – prior to the big holiday season. *See City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, No. 12-cv-06039-WHO, 2013 U.S. Dist. LEXIS 172841, at *26, 32 (N.D. Cal. Dec. 9, 2013) (taking into account that "a goodwill evaluation is based on several factors present at the time the assessment is made 'which are not matters of objective fact'"; adding that "'[a] plaintiff arguing for a quicker write down of goodwill would have to explain how, in a given quarter, the company's optimism about that market was not just wrong . . . but so wholly unfounded that it was fraudulent'"); *City of Omaha v. CBS Corp.*, No. 08 Civ. 10816 (PKC), 2010 U.S. Dist. LEXIS 25497, at *30 (S.D.N.Y. Mar. 16, 2010) (noting that "SFAS 142 – upon which plaintiffs base their fraud theory – requires testing only once it is 'more likely than not' that that a reporting unit's fair value had fallen below its carrying amount, based on, among other things, adverse changes in market conditions[;] [t]his formulation necessarily involves judgment and discretion on the part of a company in deciding whether to undertake an intra-year impairment test"), *affirmed on appeal in* 679 F.3d 64 (2d Cir. 2012); *In re Radian Sec. Litig.*, 612 F. Supp. 2d 594, 615 (E.D. Pa. 2009) (noting that, "[e]ven if an impairment of [the company's] investment did occur at some point earlier than [the company] ultimately stated, the plaintiffs do not allege facts to show that [the company's] decision not to report whatever impairment may have existed until July 2007 involved not merely simple, or even inexcusable negligence, but an extreme departure from the range of reasonable business treatments permitted under GAAP"); *see also SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011) ("recogniz[ing] that GAAP 'tolerate[s] a range of "reasonable" [accounting] treatments, leaving the choice among alternatives to management'").

In fact, in LF's 10-Q for 2Q, Defendants expressly pointed to the upcoming holiday season in addressing why it was not testing for goodwill impairment at that point in time. *See* Defs.' RJN, Ex. 16, at 9 (LF's 10-Q, filed in November 2014, covering F2Q15) (stating there were insufficient indicators to do goodwill impairment testing; noting that "[i]ndicators of impairment considered by the Company include . . . overall financial operating results *which depend in large part on the strength of the Company's performance during the holiday season*") (emphasis added).

10

1    Moreover, in the 10-Q, Defendants went on to warn that, "[t]o the extent the Company's results
2    during the holiday season are weaker than anticipated, the Company may be required to perform
3    step one of the two-step test for goodwill impairment." *Id.* The fact that Defendants disclosed this
4    information to the public and expressly warned of the consequences of a poor holiday season
5    further weighs against an inference of scienter. *See Iron Workers Local No. 25 Pension Fund v.*
6    *Oshkosh Corp.*, No. 08-C-797, 2010 U.S. Dist. LEXIS 30693, at *63 (E.D. Wis. Mar. 30, 2010)
7    (explaining that, if the defendants intended to defraud, they would likely have used stronger
8    language – not just express cautious optimism; defendants would not "have repeatedly warned
9    about the possibility of an impairment charge" – defendants "teed up the issue and flagged the
10   question of an impairment so that investors could make their own judgments"); *see also In re*
11   *NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1065 (9th Cir. 2014) (finding no strong inference of
12   scienter based on, *inter alia*, company's warning to investors of possible product flaws and
13   "set[ting] aside a reserve to account for costs related to those flaws"). As it turns out, the fact that
14   the holiday season was not the boon anticipated by Defendants provides an explanation was to
15   why there was the "overnight" decision to do goodwill impairment testing for 3Q and to find a
16   sizeable impairment.

17   Finally, strongly weighing against scienter is the fact that "[Mr.] Barbour and [Mr.] Arthur
18   each purchased [LF] stock within days after the challenged November [2014] disclosures
19   [regarding goodwill], adding to their significant holdings." Mot. at 5 (citing Foster Decl. ¶ 26 &
20   Exs. 28-29).[4] Plaintiffs have objected to judicial notice of the individual defendants' stock
21   purchases, *see* Docket No. 106 (Obj. at 3) (arguing that the documents are not relevant), but, in a
22   different case, the Court rejected a similar objection.[5] *See Westley v. Oclaro, Inc.*, 897 F. Supp. 2d

---

[4] *See, e.g.*, Defs.' RJN, Ex. 28, at 11 (Mr. Barbour's Form 4 regarding November 5, 2014, transaction) (indicating that Mr. Barbour acquired 20,000 shares of common stock on that date); RJN, Ex. 28, at 12 (Mr. Barbour's Form 4 regarding November 7, 2014, transaction) (indicating that Mr. Barbour acquired 3,125 shares of common stock on that date); Defs.' RJN, Ex. 29, at 7 (Mr. Arthur's Form 4 regarding November 10, 2014, transaction) (indicating that Mr. Arthur acquired 21,000 shares of common stock on that date).

[5] Plaintiffs argue that, if the Court does take judicial notice of the acquisition of stock, it should also take judicial notice of an article that criticizes LF management for not buying or holding stock. *See* Pls.' RJN at 2 (quoting article as stating: "'If they believed in the long run success of

1  902, 929 (N.D. Cal. 2012) (noting "obligat[ion] to take a 'holistic approach' in evaluating
2  scienter" and stating that, as "the Court may take judicial notice of the individual defendants'
3  Oclaro stock sales (as reflected in the SEC Forms 4 which are public records), the presence or
4  absence of insider trading is a fact that could be considered by the Court as a part of its holistic
5  approach"); *cf. In re Rigel Pharms., Inc. Secs. Litig.*, 697 F.3d 869, 884-85 (9th Cir. 2012) (noting
6  that "the individuals' conduct concerning their stock is inconsistent with Plaintiff's theory that
7  financial motive establishes scienter here[;] [t]he complaint alleges that individual defendants
8  knew that the value of their stock options would increase if Rigel reported positive results from
9  the clinical trial" but, "because none of the defendants sold stock during the period between the
10 allegedly fraudulent statements and the subsequent public disclosure of the detailed data, which is
11 the period during which they would have benefitted from any allegedly fraudulent statements, the
12 value of the stock and stock options does not support an inference of scienter"). Plaintiffs do not
13 dispute that these stock purchases were in fact made.
14      Taking into account the above, the Court concludes that, as to Defendants' failure to take a
15 write-off for goodwill impairment in 2Q, Plaintiffs have failed to plead facts supporting a strong
16 inference of scienter.
17 C.     3Q: No Write-Off for Long-Lived Asset Impairment
18      Similar to above, Defendants argue that Plaintiffs have not sufficiently alleged either
19 scienter or falsity with respect to their claims that Defendants improperly failed to take a write-off
20 in 3Q for long-lived asset impairment. Here, the Court reaches a different conclusion than that
21 reached as to goodwill impairment.
22      As to scienter, the Court acknowledges that Plaintiffs' contentions are similar to above –
23 *i.e.*, scienter may reasonably be inferred on the part of Defendants because (1) it was obvious that
24 the impairment for long-lived assets needed to be taken and (2) 96% of LF's long-lived assets, for

---

the company as much as I do, they would probably be buying up shares of LF'"). Plaintiffs' point here seems to be that Mr. Barbour and Mr. Arthur acquired stock in response to this criticism and not because they truly believed in the value of the stock. But the missing link in Plaintiffs' analysis is that, even if the article was in the public realm (and thus judicially noticeable), that does not mean that Mr. Barbour or Mr. Arthur read or knew about the article, which then (allegedly) prompted them to purchase LF stock.

12

a total of $36.5 million, were effectively written off "overnight" (in F4Q15 as opposed to F3Q15). These arguments have resonance in respect to long-lived asset impairment.

The Court recognizes that Defendants actually tested for long-lived asset impairment (*i.e.*, they concluded step zero was met) and that the long-lived asset impairment determination is somewhat of a subjective assessment. As Plaintiffs expressly admitted in their SAC:

- "[s]tep one of the long-lived assets determination required Defendants to determine whether the carrying amount of the assets exceeded the sum of the undiscounted cash flows expected to result from the use and eventual disposition of the asset," SAC ¶ 172; and

- "[t]he projected changes to current free cash flows is a *subjective, speculative* factor involving considerations including: performance year-to-date, trends in free cash flows over time, the competitive landscape, management track records, acquisitions, new products and other considerations bearing on a company's future performance." SAC ¶ 56(c) (emphasis added).

To be sure, inferring scienter can be challenging where an alleged GAAP violation is complicated and not obvious. *See, e.g.*, *MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 636 (E.D. Va. 2000) (noting that, "if the GAAP rules and [company] accounting policies Defendants are alleged to have violated are relatively simple, it is more likely that the Defendants were aware of the violations and consciously or intentionally implemented or supported them, or were reckless in this regard"); *see also SEC v. Todd*, 642 F.3d 1207, 1216 (9th Cir. 2011) ("recogniz[ing] that GAAP 'tolerate[s] a range of "reasonable" [accounting] treatments, leaving the choice among alternatives to management'"). Nevertheless, Plaintiffs' argument that the need to take the impairment was obvious in this case is supported by specific allegations in the complaint. Plaintiffs point out that, when Defendants did make the adjustment for impairment in 4Q (rather than 3Q), they justified it based on a significant stock decline (and not, *e.g.*, on changed cash flow projections). *See* Defs.' RJN, Ex. 22, at 58-59 (LF's 10-K for fiscal year 2015) (note 9) (indicating that there was impairment at 4Q "primarily due to the significant decline of the trading value of the Company's Class A common stock and the corresponding market capitalization").

13

1   The bulk of the stock decline, however, had already happened in 3Q or at least by January 23,
2   2015, when the price fell to $2.55 (a 46.3% fall from its price of $4.75 on December 31, 2014).
3   *See* SAC ¶ 175 (noting that LF's stock was worth $4.75 at the end of December 31, 2014, but that
4   it declined to $2.55 by January 23, 2015); SAC ¶ 16 (adding that the average stock price from
5   January 23, 2015, through the end of 4Q (March 31, 2015) was $2.44).  After January 23, 2015,
6   the stock fell further by the end of 4Q15, but the bulk of the price reduction during the quarter
7   occurred *before* January 23, 2015.  *See* SAC ¶ 16 (alleging that the average stock price from
8   January 23, 2015, through March 31, 2015, was $2.44 – *i.e.*, only $0.11 less).  Although January
9   23, 2015, technically falls in 4Q rather than 3Q, LF's 10-Q for 3Q was filed on February 9, 2015,
10  and therefore should have taken into account the January 23, 2015, price drop, as required by
11  GAAP.  *See* SAC ¶ 178 (alleging that, under GAAP, Defendants were required to take into
12  account "'subsequent events that provide[d] additional evidence about conditions that existed [at
13  the end of 3Q, *i.e.*, December 31, 2014]'").  In short, as Defendants justified the long-lived
14  impairment write-off in 4Q based on an obvious stock decline, but that stock decline was obvious
15  as of 3Q or shortly thereafter.  Accordingly, Plaintiffs' obviousness argument in support of
16  scienter has merit.
17       A strong inference of scienter arises because not only are there Plaintiffs' obviousness
18  allegations but also their allegations related to the timing and size of the impairment, which further
19  support scienter.  As Plaintiffs have alleged, Defendants knew that the LF stock price had dropped
20  to $2.55 by January 23, 2015, but did not claim any impairment to long-lived assets for 3Q; then,
21  just two months later, *i.e.*, March 31, 2015, for the end of 4Q, Defendants claimed an impairment
22  of $36.5 million, which represented 96% of LF's long-lived assets.  Defendants have failed to
23  explain why, in just two months, they changed their view on long-lived assets from no impairment
24  to a 96% impairment.  This is in contrast to the analysis of the failure to take a goodwill
25  impairment in F2Q15; in that case, there was a significant intervening event that could have
26  altered Defendants' expectations between F2Q15 and F3Q15 – the disappointing holiday sales.
27  No such intervening event explains the difference between F3Q15 and F4Q15.
28       Defendants point out that they did give a warning about the possibility of an impairment to

14

long-lived assets in the 10-K for LF's 3Q. *See* Defs.' RJN, Ex. 19, at 28 (LF's 10-Q for 3Q) (stating that, "[i]f impairment testing shows that the carrying value of our long-lived assets exceeds their estimated fair values, we would be required to record a non-cash impairment charge, which would decrease the carrying value of our long-lived assets, as the case may be, and our results of operations would be adversely affected"). While this warning is given some consideration, the fact that it is general in nature, *i.e.*, lacking in specifics, particularly in comparison to the specificity of the warning regarding goodwill impairment, renders its impact on scienter of less consequence.

At the end of the day, Plaintiffs' allegations regarding scienter are more than merely plausible; the inference of scienter is at least as compelling as any opposing inference, especially in light of the lack of any explanation as to why, in just two months, Defendants recognized an impairment of the size claimed despite the absence of a significant intervening change in circumstances.

At the hearing, Defendants suggested for the first time that the long-lived impairment may not have been taken at 3Q because, *e.g.*, costs were going to be brought down (which would affect the cash flows of the company). *See* Defs. RJN, Ex. 18 (LF earnings call for Q3, held on February 5, 2015) (stating that "yesterday we announced internally a reduction of 95 full term positions across our business, which represents over 16% of our organization"). While, based on timing, reduction-in-workforce costs may well have been a consideration for 3Q, *see* SAC ¶ 178 (alleging that, under GAAP, Defendants were required to take into account "'subsequent events that provide[d] additional evidence about conditions that existed [at the end of 3Q, *i.e.*, December 31, 2014]'"), that same consideration, based on timing, should have affected 4Q as well. Thus, as the Court asked at the hearing, the question is what changed between 3Q and 4Q that caused Defendants to take the impairment at 4Q but not 3Q? As nothing has been identified for the Court, it concludes that there is a strong inference of scienter.

Defendants protest that, even if the Court is inclined to find sufficient allegations of scienter, Plaintiffs have still failed to allege falsity. According to Defendants, because an assessment of long-lived asset impairment depends on expected cash flows, *see* SAC ¶ 160

15

1  (alleging that, at step one, "one must determine whether the carrying amount of a long-lived asset
2  (or asset group) exceeds the sum of the undiscounted cash flows expected to result from the use
3  and the eventual disposition of the asset"), and Plaintiffs have not made any allegations about
4  what cash flow analysis Defendants actually did (*i.e.*, what was wrong with that analysis), the
5  falsity allegations arelacking. The Court is not persuaded. Plaintiffs have adequately pled falsity
6  based on the allegations that Defendants justified the long-lived asset impairment determination
7  based on a significant stock decline, but that stock decline had primarily taken place at 3Q (or
8  shortly thereafter, *i.e.*, by January 23, 2015). Plaintiffs have alleged enough to survive the motion
9  to dismiss.

### III. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part Defendants' motion to dismiss the SAC. The motion is granted to the extent Plaintiffs' claims are based on Defendants' failure to take a write-off for goodwill impairment in 2Q. The motion is denied to the extent Plaintiffs' claims are based on Defendants' failure to take a write-off for long-lived asset impairment in 3Q.

Defendants shall file their answer to the SAC, with claims limited by the Court's ruling herein, within four (4) weeks of the date of this order. The Court will hold a Case Management Conference on April 6, 2017 at 9:30 a.m. to set dates in connection with Plaintiffs' motion to certify the class. A Joint Case Management Conference statement shall be filed by March 30, 2017.

This order disposes of Docket No. 100.

**IT IS SO ORDERED**.

Dated: February 24, 2017

EDWARD M. CHEN
United States District Judge

16